# EXHIBIT 14

# Docket Report

## Case Description

| | |
|---|---|
| **Case ID:** | 170300712 |
| **Case Caption:** | B. ETAL VS ROOSEVELT INN LLC ETAL |
| **Filing Date:** | Friday , March 10th, 2017 |
| **Location:** | CH - City Hall |
| **Case Type:** | 2O - PERSONAL INJURY - OTHER |
| **Status:** | CLDBR - DEFERRED - BANKRUPTCY |

**Documents:** REDACTED Ex.pdf
Exhibits to Exclude Staub.pdf
Pltf Resp to Exclude Staub (Roosevelt).pdf
Motion CoverSheet Form
Confidential Document Form

**Docket Entry:** 95-21060495 ANSWER IN OPPOSITION OF MOTION IN LIMINE FILED. (FILED ON BEHALF OF WILLIAM A CALANDRA AND M. B.)

| 11-JUN-2021 06:19 PM | MTANS - ANSWER (MOTION/PETITION) FILED | NOCHO, KYLE B | 14-JUN-2021 08:30 AM |
|---|---|---|---|

**Documents:** Pltf Resp to Preclude Fenwick Statement.pdf
REDACTED Ex.pdf
Exhibits to Exclude Ferwick.pdf
Motion CoverSheet Form
Confidential Document Form

**Docket Entry:** 33-21060533 ANSWER IN OPPOSITION OF MOTION IN LIMINE FILED. (FILED ON BEHALF OF WILLIAM A CALANDRA AND M. B.)

| 11-JUN-2021 03:47 PM | MTANS - ANSWER (MOTION/PETITION) FILED | MARKS, EMILY B | 11-JUN-2021 04:15 PM |
|---|---|---|---|

**Documents:** 9. Pltfs Resp to Alpha MIL re Use of Rape.pdf
Motion CoverSheet Form

**Docket Entry:** 03-21060403 ANSWER IN OPPOSITION OF MOTION IN LIMINE FILED. (FILED ON BEHALF OF M. B.)

| 11-JUN-2021 04:18 PM | MTANS - ANSWER (MOTION/PETITION) FILED | MARKS, EMILY B | 11-JUN-2021 04:29 PM |
|---|---|---|---|

**Documents:** Pltfs Response to Motion to Change Venue or Venire.pdf
Motion CoverSheet Form

| | |
|---|---|
| **Docket Entry:** | 32-21060632 ANSWER IN OPPOSITION OF MISCELLANEOUS MOTION/PETITION FILED. (FILED ON BEHALF OF M. B.) |

| 11-JUN-2021 04:46 PM | MTANS - ANSWER (MOTION/PETITION) FILED | BYERS MS., JUSTINA L | 11-JUN-2021 05:01 PM |
|---|---|---|---|

**Documents:** Response to Alpha MIL as to Hanton criminal background.pdf
Exhibits to Response to Alpha MIL as to Hanton Criminal Background.pdf
Motion CoverSheet Form

| | |
|---|---|
| **Docket Entry:** | 84-21060284 ANSWER IN OPPOSITION OF MOTION IN LIMINE FILED. (FILED ON BEHALF OF YAGNA PATEL, UFVS MANAGEMENT COMPANY LLC, ROOSEVELT MOTOR INN INC AND ROOSEVELT INN LLC) |

| | | |
|---|---|---|
| M.B | : | PHILADELPHIA COUNTY |
| | : | COURT OF COMMON PLEAS |
| v. | : | |
| | : | CIVIL TRIAL DIVISION |
| ROOSEVELT INN LLC | : | MARCH TERM, 2017 |
| d/b/a ROOSEVELT INN and | : | NO.: 00712 |
| ROOSEVELT INN CAFÉ, et al. | : | |
| | : | JURY TRIAL DEMANDED |
| | : | |

## <u>ORDER</u>

**AND NOW**, this _____ day of June, 2021, upon consideration of the Motion in Limine to Preclude and Exclude Inadmissible Evidence filed by Defendants Roosevelt Inn LLC, Roosevelt Motor Inn, Inc., UFVS Management Company, LLC, and Yagna Patel (collectively "Roosevelt Defendants"), Plaintiff's Response in Opposition, and any response thereto, it is hereby:

**ORDERED** and **DECREED** that the Roosevelt Defendants' Motion in Limine is **DENIED.**

BY THE COURT:

_____

J.

Case ID: 170300712
Control No.: 21060495

**KLINE & SPECTER, P.C.**                         Attorneys for Plaintiff M.B.
BY:    THOMAS R. KLINE, ESQUIRE/28895
       NADEEM A. BEZAR, ESQUIRE/63577
       EMILY B. MARKS, ESQUIRE/204405
       KYLE B. NOCHO, ESQUIRE/319270
1525 Locust Street
Philadelphia, Pennsylvania 19102
(215) 772-1000

| | | |
|---|---|---|
| M.B | : | PHILADELPHIA COUNTY |
| | : | COURT OF COMMON PLEAS |
|     v. | : | |
| | : | CIVIL TRIAL DIVISION |
| ROOSEVELT INN LLC | : | MARCH TERM, 2017 |
| d/b/a ROOSEVELT INN and | : | NO.: 00712 |
| ROOSEVELT INN CAFÉ, et al. | : | |
| | : | JURY TRIAL DEMANDED |
| | : | |

## PLAINTIFF'S RESPONSE IN OPPOSITION TO THE MOTION IN LIMINE TO PRECLUDE AND EXCLUDE INADMISSIBLE EVIDENCE FILED BY DEFENDANTS ROOSEVELT INN LLC, ROOSEVELT MOTOR INN, INC., UFVS MANAGEMENT COMPANY, LLC, AND YAGNA PATEL

Plaintiff by and through her attorneys, Kline & Specter, hereby responds in opposition to the Motion in Limine to Preclude and Exclude Inadmissible Evidence filed by Defendants Roosevelt Inn LLC, Roosevelt Motor Inn, Inc., UFVS Management Company, LLC, and Yagna Patel (collectively "Roosevelt Defendants"), as follows:

1. Denied as stated. This paragraph refers to Plaintiff's Complaint and Plaintiff's Amended Complaints, which are written documents that speak for themselves. Any characterizations of these documents are denied. See Plaintiff's Fourth Amended Complaint, attached as Exhibit "A".

2. Denied as stated. Abdul Lopez and Daiquan Davis sex trafficked Plaintiff M.B. at the Roosevelt when she was a minor. Both of these sex traffickers were convicted of the crime sex trafficking of a minor under 18 U.S.C. §§ 1591 and 1594(a). The Roosevelt Defendants filed a

Case ID: 170300712
Control No.: 21060495

Joinder Complaint joining Abdul Lopez and Daiquan Davis as Additional Defendants. All other averments are denied.

3. Denied as stated. Plaintiff's counsel has obtained an interview summary with the witness Michael Staub who is also identified as a witness in Plaintiff's First Amended Pre-Trial Memorandum. See Staub Interview, attached as Exhibit "B".

4. – 9. Denied as stated. These paragraphs refer to the Interview of Michael Staub, which is a written document that speaks for itself. All characterizations of this document are denied.

10. – 25. Denied. The averments in these paragraphs are legal conclusions to which no response is required. The Roosevelt Defendants have filed this Motion in Limine attempting to exclude evidence and testimony from a witness to the criminal activity endemic to the area around the Roosevelt Inn. This witness is named Michael Staub, and he lived on the street behind the Roosevelt Inn from 2002 to 2017. He was interviewed by an investigator hired by Plaintiff's counsel and noted witnessing rampant criminal activity, including shootings, drug sales, police raids, and prostitution. This evidence and potential testimony of crime occurring at the Roosevelt Inn is relevant in showing that the Roosevelt Defendants knew or should have known about the dangers posed to the safety of those at the motel like M.B. Evidence that is relevant and admissible cannot be precluded merely because it is unfavorable to Defendants' position. See Commonwealth v. Dillon, 925 A.2d 131 (Pa. 2007).

Under Pennsylvania law, a plaintiff can establish liability of a business like the Roosevelt Inn for negligence in preventing the criminal acts of third parties under Section 344 of the Restatement (Second) of Torts, if the plaintiff shows the business failed to take reasonable

Case ID: 170300712
Control No.: 21060495

precautions to protect the plaintiff against "harmful third party conduct that might be reasonably anticipated." Rabutino v. Freedom State Realty Co., Inc., 932 A.2d 933, 939 (Pa. Super. 2002).

As operators of a motel, the Roosevelt Defendants owed M.B. a duty to take reasonable precautions against potential criminal acts of third parties, where through prior experience the motel could anticipate such conduct. Evidence of criminal activity witnessed at the Roosevelt Inn goes to the heart of the issue of notice and the motel's need to take reasonable precautions against the foreseeable harm suffered by Plaintiff M.B. See, e.g., Paliometros v. Loyola, 932 A.2d 128, 135 – 37 (Pa. Super. 2007) (reasoning that a plaintiff who was sexually assaulted at a motel could show the harm that she faced was reasonably foreseeable by introducing evidence of rampant underage drinking at the motel); Rabutino, 809 A.2d at 941 n.6 (reasoning that the harm experienced by a shooting victim at a motel was reasonably foreseeable based on the "alleged laissez faire reputation" of the motel "coupled with an extensive record of reported crimes in the locale during the previous twelve months—170 total calls including 43 disorderly crowds and fighting, twenty three burglaries, five robberies (including one strong arm), 11 vandalisms, and 2 false imprisonments…"); Young v. Prizm Asset Mgmt. Co., 2014 PA Super 195, 100 A.3d 594, 600–02 (2014) (reasoning that plaintiff met notice requirement in case involving assault where plaintiff introduced evidence of police calls made regarding fights, disorderly conduct, trespassing, drug activity, and shoplifting, along with a prior assault in the area); Bonilla v. Motel 6 Operating L.P., No. 2:09CV712, 2011 WL 4345786, at *5-*8 (W.D. Pa. Sept. 15, 2011) (reasoning that the frequency of calls to the police for crimes generally could be a factor considered by the jury whether the motel had constructive notice of the foreseeable harm experienced by a plaintiff stabbed at a motel).

Case ID: 170300712
Control No.: 21060495

Mr. Staub's testimony and evidence also rebuts the Roosevelt Defendants' denial of knowledge of crimes occurring at the motel. During their depositions, the motel's manager Yagna Patel and the employees of the motel denied any knowledge about criminal activities going on at the Roosevelt Inn.

It is premature to categorically exclude Mr. Staub's witness interview when it can be admissible in a number of different ways. Plaintiff's counsel is well-aware of the Pennsylvania Rules of Evidence and the specific rules pertaining to hearsay evidence. Mr. Staub's interview can be admissible in a number of different ways, including through expert testimony, refreshing a witness' recollection, or through impeachment. See, e.g., Pa. R.E. 703 ("If experts in the particular field would reasonably rely on those kinds of facts or data in forming an opinion on the subject, they need not be admissible for the opinion to be admitted.). The Roosevelt Defendants' own liability experts rely on witness interviews or note in their methodology that witness interviews are typically relied upon by security experts. This evidence's high probative value outweighs its prejudicial effect. The Court should thus deny the Roosevelt Defendants' Motion in Limine.

Case ID: 170300712
Control No.: 21060495

WHEREFORE, Plaintiff respectfully request this Honorable Court deny the Roosevelt Defendants' Motion *in Limine*.  An appropriate form of Order is attached.

Respectfully submitted,

**KLINE & SPECTER, P.C.**

**BY:**    ***/s/Emily B. Marks***

THOMAS R. KLINE, ESQUIRE
NADEEM A. BEZAR, ESQUIRE
EMILY B. MARKS, ESQUIRE
KYLE B. NOCHO, ESQUIRE
*Attorneys for Plaintiff*

5

Case ID: 170300712
Control No.: 21060495

**KLINE & SPECTER, P.C.**                        Attorneys for Plaintiff M.B.
BY:    THOMAS R. KLINE, ESQUIRE/28895
       NADEEM A. BEZAR, ESQUIRE/63577
       EMILY B. MARKS, ESQUIRE/204405
       KYLE B. NOCHO, ESQUIRE/319270
1525 Locust Street
Philadelphia, Pennsylvania 19102
(215) 772-1000

| | | |
|---|---|---|
| M.B | : | PHILADELPHIA COUNTY |
| | : | COURT OF COMMON PLEAS |
|     v. | : | |
| | : | CIVIL TRIAL DIVISION |
| ROOSEVELT INN LLC | : | MARCH TERM, 2017 |
| d/b/a ROOSEVELT INN and | : | NO.: 00712 |
| ROOSEVELT INN CAFÉ, et al. | : | |
| | : | JURY TRIAL DEMANDED |
| | : | |

**PLAINTIFF'S MEMORANDUM OF LAW IN OPPOSITION TO THE MOTION IN LIMINE TO PRECLUDE AND EXCLUDE INADMISSIBLE EVIDENCE FILED BY DEFENDANTS ROOSEVELT INN LLC, ROOSEVELT MOTOR INN, INC., UFVS MANAGEMENT COMPANY, LLC, AND YAGNA PATEL**

## I.    PRELIMINARY STATEMENT

The Roosevelt Defendants have filed this Motion in Limine attempting to exclude evidence and testimony from a witness to the criminal activity endemic to the area around the Roosevelt Inn. This witness is named Michael Staub, and he lived on the street behind the Roosevelt Inn from 2002 to 2017. He was interviewed by an investigator hired by Plaintiff's counsel and noted witnessing rampant criminal activity, including shootings, drug sales, police raids, and prostitution. This evidence of crime occurring at the Roosevelt Inn is relevant in showing that the Roosevelt Defendants knew or should have known about the dangers posed to the safety of those at the motel like M.B. and contradicts the Roosevelt Defendants' position that they were unaware of any criminal activity.

As operators of a motel, the Roosevelt Defendants owed M.B. a duty to take reasonable precautions against potential criminal acts of third parties, where through prior experience the

Case ID: 170300712
Control No.: 21060495

motel could anticipate such conduct. Testimony and evidence from Michael Staub about criminal activity in the area can be used to prove that the Roosevelt Inn had notice of the need to take reasonable precautions to prevent the foreseeable harm suffered by Plaintiff M.B. This evidence also rebuts the Roosevelt Defendants' denial of knowledge of crimes occurring at the motel.

Plaintiff's counsel is well-aware of the Pennsylvania Rules of Evidence and the specific rules pertaining to hearsay evidence. It is premature to categorically exclude the witness interview of Michael Staub when it can be admissible in a number of different ways, including through refreshing a witness' recollection, impeaching a witness, or expert testimony if reviewed and relied upon by an expert. The Roosevelt Defendants' own liability experts rely on witness interviews or note in their methodology that witness interviews are typically relied upon by security experts. The Court should thus deny the Roosevelt Defendants' Motion in Limine.

## II.    QUESTION PRESENTED

A.      Should the Court deny the Roosevelt Defendants' Motion to preclude evidence and testimony of Michael Staub who lived behind the Roosevelt Inn and witnesses various criminal activity occurring at the motel?

*Suggested Answer*: Yes. Evidence of crime occurring at the Roosevelt Inn is certainly relevant in showing that the Roosevelt Defendants knew or should have known about the dangers posed to the safety of those at the motel like M.B. As operators of a motel, the Roosevelt Defendants owed M.B. a duty to take reasonable precautions against potential criminal acts of third parties, where through prior experience the motel could anticipate such conduct. Evidence of criminal activity can be used to prove that the Roosevelt Inn was put on notice that it needed to take reasonable precautions to prevent the foreseeable harm suffered by Plaintiff. This evidence can also rebut the Roosevelt Defendants employees' denial of knowledge of crimes occurring at the motel. In addition, the witness interview of Mr. Staub may be admissible through expert testimony, as security experts reasonably rely on witness interviews when forming their opinions. Thus, it would be premature for the Court to categorically exclude this evidence.

Case ID: 170300712
Control No.: 21060495

### III.    BRIEF FACTUAL AND PROCEDURAL BACKGROUND

Plaintiff M.B. was the victim of sex trafficking that occurred at the Roosevelt Inn Motel when she was just 14 years-old from approximately January 2014 through June 6, 2014. Plaintiff filed a Complaint on March 10, 2017 against Defendants Roosevelt Inn LLC and Roosevelt Motor Inn, Inc., as owners of the motel; the motel's management company, UFVS Management Company, LLC; and the motel's manager, Yagna Patel (hereinafter collectively, "Roosevelt Defendants"). On September 5, 2017, Plaintiff filed an Amended Complaint adding the security company, Alpha-Centurion Security, Inc., as an additional defendant.  In this action, Plaintiff has asserted claims under theories of common law Negligence (Counts - I, II) and Negligent Infliction of Emotional Distress (Counts III, IV).  See Plaintiff's 4th Amended Complaint attached as Exhibit "A".

Through the instant Motion, the Roosevelt Defendants seek to preclude the introduction of relevant evidence and testimony from the witness Michael Staub who lived behind the Roosevelt Inn from 2002 to 2017.  Defendants not only seek to preclude Mr. Staub from testifying, but also, they seek to preclude the admission of a witness interview of Mr. Staub conducted by Plaintiff's investigator.  See Interview of Michael Staub, attached as Exhibit "B". In the interview, Mr. Staub noted witnessing rampant criminal activity at the motel, including shootings, drug sales, police raids, and prostitution.  It is premature to categorically exclude Mr. Staub's witness interview when it can be admissible in a number of different ways, including through refreshing a witness' recollection, impeaching a witness or expert testimony if reviewed and relied upon by an expert.  The Roosevelt Defendants' own liability experts rely on witness interviews or note in their methodology that witness interviews are typically relied upon by security experts.  The Court should thus deny the Roosevelt Defendants' Motion in Limine.

Case ID: 170300712
Control No.: 21060495

## IV.   LEGAL ARGUMENT

### A. Evidence and testimony from Michael Staub would show that he witnessed rampant criminal activity at the Roosevelt Inn, including commercial sex activity.

Under Pennsylvania law, to plead a claim for negligence, a plaintiff must show: (1) the existence of a duty or obligation recognized by law; (2) a failure on the part of the Defendant to conform to that duty, or breach thereof; (3) a causal connection between the Defendant's breach and the resulting injury; and (4) actual loss or damage suffered by the complainant." Paliometros v. Loyola, 932 A.2d 128, 134 (Pa. Super. 2007) (citation and internal quotations omitted).

Plaintiff's claims center on Defendants' negligence in failing to take appropriate steps to ensure the safety and protection of people at the Roosevelt Inn including M.B. from reasonably anticipated criminal conduct by third parties.  See Ex. A at ¶¶ 68 – 87.  Pennsylvania has adopted § 344 of the Restatement (Second) of Torts, which lays out the standard for businesses' liability for third party criminal acts committed against an invitee on the business premises.  See Moran v. Valley Forge Drive–In Theater, Inc., 431 Pa. 432, 246 A.2d 875, 878 (Pa.1968) (reasoning that § 344 applied when deciding whether a busines was liable for the tortious or negligent acts by third parties).

The Restatement (Second) of Torts § 344 states:

> A possessor of land who holds it open to the public for entry for his business purposes is subject to liability to members of the public while they are upon the land for such a purpose, for physical harm caused by the accidental, negligent, or intentionally harmful acts of third persons or animals, and by the failure of the possessor to exercise reasonable care to
> - (a) discover that such acts are being done or are likely to be done, or
> - (b) give a warning adequate to enable the visitors to avoid the harm, or otherwise to protect them against it.

Restatement (Second) of Torts § 344 (1965).

4

Case ID: 170300712
Control No.: 21060495

Comment f. to Section 344 provides that businesses may have a duty to police the premises adequately, if the businesses "know or have reason to know, from past experience that there is a likelihood of conduct on the part of the third person in general which is likely to endanger the safety of the visitor, even though he had no reason to expect it on the part of the particular individual." Id. The Comment further states: "If the place or character of his business, or his past experience is such that he should reasonably anticipate a careless or criminal conduct on the part of a third person, either generally or at some particular time, he may be under a duty to take precautions against it, and to provide a reasonably sufficient number of servants to afford a reasonable protection." Id.

In other words, a plaintiff can establish liability of a business like the Roosevelt Inn for the criminal acts of third parties under Section 344 of the Restatement (Second) of Torts, if the plaintiff shows the business failed to take reasonable precautions to protect the plaintiff against "harmful third party conduct that might be reasonably anticipated." Rabutino v. Freedom State Realty Co., Inc., 932 A.2d 933, 939 (Pa. Super. 2002).

Various Pennsylvania state court decisions have found that a plaintiff can show that a business was on notice of the need to take reasonable precautions against the foreseeable potential harm suffered by the plaintiff when the plaintiff introduced evidence of other crimes previously committed in the area. For instance, the Superior Court has reasoned that a plaintiff who was sexually assaulted at a motel could show the harm that she faced was reasonably foreseeable by introducing evidence of rampant underage drinking at the motel. See Paliometros, 932 A.2d at 135-37. In another case, the Superior Court reasoned that the harm experienced by a shooting victim at a motel was reasonably foreseeable based on the "alleged laissez faire reputation" of the motel "coupled with an extensive record of reported crimes in the

Case ID: 170300712
Control No.: 21060495

locale during the previous twelve months—170 total calls including 43 disorderly crowds and fighting, twenty three burglaries, five robberies (including one strong arm), 11 vandalisms, and 2 false imprisonments…".  <u>Rabutino</u>, 809 A.2d at 941 n.6.  The Superior Court in <u>Rabutino</u> reasoned that the extensive crimes "bore on the foreseeability that the illicit environment permitted at the [motel] would foster careless, reckless, and/or deliberate conduct causing harm to those present." <u>Id.</u>; <u>see also</u> <u>Murphy v. Penn Fruit Co.</u>, 274 Pa. Super. 427, 432–33, 418 A.2d 480, 483 (1980) (reasoning that in case involving plaintiff who was assaulted, the plaintiff demonstrated the business' notice of her potential harm through evidence of "instances of disturbances, car thefts, muggings, purse snatches, drug use" occurring in the area); <u>Young v. Prizm Asset Mgmt. Co.</u>, 2014 PA Super 195, 100 A.3d 594, 600–02 (2014) (reasoning that plaintiff met notice requirement in case involving assault where plaintiff introduced evidence of police calls made regarding fights, disorderly conduct, trespassing, drug activity, and shoplifting, along with a prior assault in the area).

Federal courts interpreting Pennsylvania law have also reasoned that plaintiffs can meet the notice requirement by showing evidence of past criminal activity in the area.  In a case involving a stabbing victim at a motel, the court reasoned that the frequency of calls to the police for crimes generally could be a factor considered by the jury whether the motel had constructive notice of the foreseeable harm experienced by the plaintiff.  <u>See</u> <u>Bonilla v. Motel 6 Operating L.P.</u>, No. 2:09CV712, 2011 WL 4345786, at *5-*8 (W.D. Pa. Sept. 15, 2011).  These courts have reasoned that past criminal activity near a business can be used to show that the crime suffered by the plaintiff was reasonably foreseeable.  <u>See</u> <u>Morgan v. Bucks Assocs.</u>, 428 F. Supp. 546, 550–51 (E.D. Pa.1977) (reasoning that non-violent car thefts occurring on premises put the defendant on constructive notice that violent criminal conduct on the part of third persons, such

Case ID: 170300712
Control No.: 21060495

as the assault of the plaintiff, might occur on the premises); <u>Baker v. Solo Nightclub, LLC</u>, No. CIV.A. 11-2380, 2013 WL 1927052, at *8 (E.D. Pa. May 9, 2013) (reasoning that Defendants were on notice of potential danger to plaintiff in case involving plaintiff who was a shooting victim, where the plaintiff showed past incidents of disorderly conduct and fights occurring in the area, along with a Commonwealth action to enjoin the business's liquor license and previous gun incidents).

Contrary to the Roosevelt Defendants' argument, evidence and testimony from Michael Staub is relevant to the issue of notice and contradicts the position taken by the Roosevelt Defendants that they were unaware of any criminal activity at the motel. This evidence would detail criminal activity witnessed at the motel and would show that the staff were on notice of open commercial sex activity occurring at the motel. Mr. Staub lived behind the Roosevelt Inn from 2002 through 2017. During that time, he witnessed rampant criminal activity at the motel, including shootings, drug sales, police raids, and prostitution. These crimes help to show that the motel was on notice of the need to take precautions against the reasonably foreseeable harm experienced by M.B. while at the motel. <u>See</u> <u>Murphy</u>, 418 A.2d at 483–84 ("[A]n examination of past criminal acts in the immediate vicinity of [the defendant's business] leads us to conclude the jury could infer that the occurrence of the instant crime was reasonably foreseeable."); <u>Young</u>, 100 A.3d at 601–02 ("… section 344 does not require for the establishment of liability that closely similar incidents of criminality have occurred at or very near the location at which the later crime occurred."); <u>Rabutino</u>, 809 A.2d at 942 (reasoning that the plaintiff shot at motel could prove notice requirement by showing that defendant motel "perpetuated an atmosphere where it was foreseeable that a harmful confrontation involving one or more of the unruly groups in the crowded hallways could have arisen.").

Case ID: 170300712
Control No.: 21060495

The Court should allow the admission of this evidence, because it's relevant to the issue of notice. This evidence is offered to show notice and is not inherently unreliable, as contended by the Roosevelt Defendants in their Motion. This relevant evidence can be used to prove Plaintiff's case, and its high probative value outweighs its prejudicial effect. Evidence that is relevant and admissible cannot be precluded merely because it is unfavorable to Defendant's position. See Commonwealth v. Dillon, 925 A.2d 131 (Pa. 2007).

Witness statements and interviews can reasonably be relied upon by experts in the field of security. See Pa. R.E. 703 ("If experts in the particular field would reasonably rely on those kinds of facts or data in forming an opinion on the subject, they need not be admissible for the opinion to be admitted."). Along with his expert report, the Roosevelt Defendants' security expert Norman Bates provided a copy of his forensic methodology relied upon when issuing his opinions. See Bates' Methodology, attached as Exhibit "C". This methodology was issued as "Best Practices" by the International Association of Professional Security Consultants. The methodology lists in the records typically reviewed by experts in premises liability cases: "Affidavits, Witness Statements, and **Interviews**". See Ex. C (emphasis added). Defendant's liability expert Kimberly Mehlman-Orozco relies upon witness interviews in her expert report when she discusses the profile of a sex trafficker whom she interviewed. See Mehlman-Orozco Expert Report, attached as Exhibit "D" at page 19.

Although the interview summary of Michael Staub may not be able to be read to the jury on its own, it can be admissible under various circumstances. The interview can be used by the witness to refresh his recollection. See Pa. R.E. 612 ("(a) Right to Refresh Memory. A witness may use a writing or other item to refresh memory for the purpose of testifying while testifying, or before testifying."). The interview can also be used to impeach the person who made the

Case ID: 170300712
Control No.: 21060495

statement in that person's testimony. Pa. R.E. 613 ("(a) Witness's Prior Inconsistent Statement to Impeach. A witness may be examined concerning a prior inconsistent statement made by the witness to impeach the witness's credibility."). It is premature to categorically preclude the interview of Michael Staub or preclude this witness from testifying at trial.

The evidence and testimony relating to Michael Staub witnessing criminal activity at the Roosevelt Inn is relevant to proving Plaintiff's claims against the Roosevelt Defendants and Defendant Alpha. This evidence's high probative value outweighs any prejudicial effect. Therefore, it's premature to preclude his testimony or witness interview.

## V. CONCLUSION

The Court should deny the Roosevelt Defendants' Motion. An appropriate form of order is respectfully attached hereto for the Court's consideration.

Respectfully submitted,

**KLINE & SPECTER, P.C.**

*/s/Emily B. Marks*

BY: _____
THOMAS R. KLINE, ESQUIRE
NADEEM A. BEZAR, ESQUIRE
EMILY B. MARKS, ESQUIRE
KYLE B. NOCHO, ESQUIRE
*Attorneys for Plaintiff*

9

Case ID: 170300712
Control No.: 21060495

## <u>VERIFICATION</u>

I, EMILY B. MARKS, ESQUIRE, hereby state that I am the attorney for Plaintiff M.B. in this matter and hereby verify that the statements made in the foregoing motion are true and correct to the best of my knowledge, information and belief.

The undersigned understands that the statements contained therein are made subject to the penalties of 18 Pa. C.S. § 4904 relating to unsworn falsification to authorities.

**KLINE & SPECTER, P.C.**

*/s/Emily B. Marks*

**BY:** _____
THOMAS R. KLINE, ESQUIRE
NADEEM A. BEZAR, ESQUIRE
EMILY B. MARKS, ESQUIRE
KYLE B. NOCHO, ESQUIRE
*Attorneys for Plaintiff*

## <u>CERTIFICATE OF SERVICE</u>

I, Emily B. Marks, Esquire attorney for Plaintiff, do hereby certify that service of a true and correct copy of the above *Plaintiff's Response in Opposition to the Motion in Limine to Preclude and Exclude Inadmissible Evidence filed by Defendants Roosevelt Inn LLC, Roosevelt Motor Inn, Inc., UFVS Management Company, LLC, and Yagna Patel*, was filed with the Court on June 11, 2021 and served by electronic filing upon counsel of record:

Charles S. Marion, Esquire
Kevin M. Eddy, Esquire
Justina L. Byers, Esquire
Blank Rome LLP
One Logan Square, 130 North 18th Street
Philadelphia, PA 19103
*Counsel for Defendants Roosevelt Inn LLC, Roosevelt Motor Inn, Inc.,*
*UFVS Management Company, LLC and Yagna Patel*

Thomas P. Wagner, Esq.
Robert W. Stanko, Esq.
Melanie J. Foreman, Esq.
Marshall Dennehey Warner Coleman & Goggin
2000 Market Street, Suite 2300
Philadelphia, PA 19103
*President of Defendant Alpha-Centurion Security, Inc.*

By first-class mail upon the following parties:

Daiquan Davis, Register No. 72304-066
USP Terre Haute
U.S. Penitentiary
P.O. Box 33
Terre Haute, IN 47808
*Pro Se Defendant*

Abdul Lopez, Register No. 69643-066
USP Tucson
U.S. Penitentiary
P.O. Box 24550
Tucson, AZ 85734
*Pro Se Defendant*

**KLINE & SPECTER, P.C.**

*/s/Emily B. Marks*

BY: _____
EMILY B. MARKS, ESQUIRE
*Attorney for Plaintiff*

Case ID: 170300712
Control No.: 21060495

# EXHIBIT A

Case ID: 170300712
Control No.: 21060495

**KLINE & SPECTER, P.C.**
BY:    THOMAS R. KLINE, ESQUIRE/28895
       NADEEM A. BEZAR, ESQUIRE/63577
       EMILY B. MARKS, ESQUIRE/204405
1525 Locust Street
Philadelphia, Pennsylvania 19102
(215) 772-1000

Attorneys for Plaintiff

*Filed and Attested by the
Office of Judicial Records
08 NOV 2019 10:20 am
S. RICE*

| | |
|---|---|
| M.B. : | PHILADELPHIA COUNTY |
| c/o Kline & Specter, P.C. : | COURT OF COMMON PLEAS |
| 1525 Locust Street : | |
| Philadelphia, PA 19102 : | CIVIL TRIAL DIVISION |
| Plaintiff, : | MARCH TERM, 2017 |
| : | NO.: 00712 |
| V. : | |
| : | |
| ROOSEVELT INN LLC : | JURY TRIAL DEMANDED |
| *d/b/a ROOSEVELT INN and* : | |
| *ROOSEVELT INN CAFE* : | |
| 7630 Roosevelt Boulevard : | |
| Philadelphia, PA 19152 : | |
| : | |
| and : | |
| : | |
| ROOSEVELT MOTOR INN, INC. : | |
| *d/b/a ROOSEVELT MOTOR INN* : | |
| 7630 Roosevelt Boulevard : | |
| Philadelphia, PA 19152 : | |
| : | |
| and : | |
| : | |
| UFVS MANAGEMENT COMPANY, LLC : | |
| 287 Bowman Avenue : | |
| Purchase, NY 10577 : | |
| : | |
| and : | |
| : | |
| YAGNA PATEL : | |
| 7630 Roosevelt Boulevard : | |
| Philadelphia, PA 19152 : | |
| : | |
| and : | |
| : | |
| ALPHA-CENTURION SECURITY, INC. : | |
| 3720 West Chester Pike : | |
| Newtown Square, PA 19073 : | |

Case ID: 170300712
Control No.: 21060495

Defendants                    :

_____

## **NOTICE TO DEFEND**

**NOTICE**

You have been sued in court. If you wish to defend against the claims set forth in the following pages, you must take action within twenty (20) days after this complaint and notice are served, by entering a written appearance personally or by attorney and filing in writing with the court your defenses or objections to the claims set forth against you. You are warned that if you fail to do so the case may proceed without you and a judgment may be entered against you by the court without further notice for any money claimed in the complaint or for any other claim or relief requested by the plaintiff. You may lose money or property or other rights important to you.

YOU SHOULD TAKE THIS PAPER TO YOUR LAWYER AT ONCE. IF YOU DO NOT HAVE A LAWYER (OR CANNOT AFFORD ONE), GO TO OR TELEPHONE THE OFFICE SET FORTH BELOW TO FIND OUT WHERE YOU CAN GET LEGAL HELP.

THIS OFFICE CAN PROVIDE YOU WITH INFORMATION ABOUT HIRING A LAWYER.

IF YOU CANNOT AFFORD TO HIRE A LAWYER, THIS OFFICE MAY BE ABLE TO PROVIDE YOU WITH INFORMATION ABOUT AGENCIES THAT MAY OFFER LEGAL SERVICES TO ELIGIBLE PERSONS AT A REDUCED FEE OR NO FEE.

**LAWYERS REFERENCE SERVICE**
**One Reading Center**
**Philadelphia, PA 19107**
**(215) 238-6333**
**TTY(215) 451-6197**

**AVISO**

Le han demandado en corte. Si usted quiere defenderse contra las demandas nombradas en las paginas siguientes, tiene viente (20) dias a partir de recibir esta demanda y notificacion para entablar personalmente o por un abogado una comparecencia escrita y tambien para entablar con la corte en forma escrita sus defensas y objeciones a las demandas contra usted. Sea advisado que si usted no se defiende, el caso puede continuar sin usted y la corte puede incorporar un juicio contra usted sin previo aviso para conseguir el dinero demandado en el pleito o para conseguir cualquier otra demanda o alivio solicitados por el demandante. Usted puede perder dinero o propiedad u otros derechos importantes para usted.

USTED DEBE LLEVAR ESTE DOCUMENTO A SU ABOGADO INMEDIATAMENTE. SI USTED NO TIENE ABOGADO (O NO TIENE DINERO SUFICIENTE PARA PAGAR A UN ABOGADO), VAYA EN PERSONA O LLAME POR TELEFONO LA OFICINA NOMBRADA ABAJO PARA AVERIGUAR DONDE SE PUEDE CONSEGUIR ASSISTENCIA LEGAL. ESTA OFICINA PUEDE PROPORCIONARLE LA INFORMACION SOBRE CONTRATAR A UN ABOGADO.

SI USTED NO TIENE DINERO SUFICIENTE PARA PAGAR A UN ABOGADO, ESTA OFICINA PUEDE PROPORCIONARLE INFORMACION SOBRE AGENCIAS QUE OFRECEN SERVICIOS LEGALES A PERSONAS QUE CUMPLEN LOS REQUISITOS PARA UN HONORARIO REDUCIDO O NINGUN HONORARIO.

**SERVICIO de REFERENCIA LEGAL**
**Uno Reading Centro**
**Filadelfia, PA 19107**
**Telefono: (215) 238-6333**
**TTY(215) 451-6197**

Case ID: 170300712
Control No.: 21060495

**KLINE & SPECTER, P.C.**
BY:   THOMAS R. KLINE, ESQUIRE/28895
       NADEEM A. BEZAR, ESQUIRE/63577
       EMILY B. MARKS, ESQUIRE/204405
1525 Locust Street
Philadelphia, Pennsylvania 19102
(215) 772-1000

Attorneys for Plaintiff

| | |
|---|---|
| M.B. | PHILADELPHIA COUNTY |
| c/o Kline & Specter, P.C. | COURT OF COMMON PLEAS |
| 1525 Locust Street | |
| Philadelphia, PA 19102 | CIVIL TRIAL DIVISION |
| | MARCH TERM, 2017 |
| Plaintiff, | NO.:00712 |
| v. | |
| | |
| ROOSEVELT INN LLC | JURY TRIAL DEMANDED |
| *d/b/a ROOSEVELT INN and* | |
| *ROOSEVELT INN CAFE* | |
| 7630 Roosevelt Boulevard | |
| Philadelphia, PA 19152 | |
| | |
| and | |
| | |
| ROOSEVELT MOTOR INN, INC. | |
| *d/b/a ROOSEVELT MOTOR INN* | |
| 7630 Roosevelt Boulevard | |
| Philadelphia, PA 19152 | |
| | |
| and | |
| | |
| UFVS MANAGEMENT COMPANY, LLC | |
| 287 Bowman Avenue | |
| Purchase, NY 10577 | |
| | |
| and | |
| | |
| YAGNA PATEL | |
| 7630 Roosevelt Boulevard | |
| Philadelphia, PA 19152 | |
| | |
| and | |
| | |
| ALPHA-CENTURION SECURITY, INC. | |
| 3720 West Chester Pike | |
| Newtown Square, PA 19073 | |

Case ID: 170300712
Control No.: 21060495

---

## PLAINTIFF'S FOURTH AMENDED COMPLAINT

### PRELIMINARY STATEMENT

1.     Human sex trafficking is a form of modern day slavery that exists throughout the United States and globally.  It is a form of evil in the abuse and exploitation of the most innocent and vulnerable.

2.     Since 2007 over 17,000 incidents of sex trafficking in the United States have been reported to the National Human Trafficking Resources Center.  Over 1,200 cases of sex trafficking has been reported in the first six months of 2016, with the vast majority of victims being women and a disproportionate number being minors.

3.     In 2014, the Commonwealth of Pennsylvania extensively revised its human trafficking law to compensate the victims and ensure that anyone or any entity that knowingly markets or provides its goods or services to sex traffickers is civilly liable.

### THE PARTIES

4.     Plaintiff, M.B., was born on September 3, 1999 and is one of the thousands of victims of human trafficking in the United States.  In 2014, Plaintiff was exploited as a minor by commercial sex traffickers who financially benefitted from her exploitation.  Plaintiff resides in Philadelphia County, Pennsylvania.  Plaintiff can be contacted through her counsel, Thomas R. Kline, Esquire, Nadeem A. Bezar, Esquire, and Emily B. Marks, Esquire of Kline & Specter, P.C., 1525 Locust Street, Philadelphia, Pennsylvania 19102.

5.     Plaintiff's name and address are not contained in this Complaint so as to protect the privacy and identity of Plaintiff M.B. who incurred injuries and damages starting when she was fourteen (14) years old. See also Public Access Policy of the Unified Judicial System of

Pennsylvania: Case Records of the Appellate and Trial Courts § 7.0.

6. Defendant Roosevelt Inn LLC d/b/a Roosevelt Inn and Roosevelt Inn Cafe [hereinafter referred to as "Roosevelt Inn LLC"] is a limited liability company organized and existing under the laws of Delaware. At all material times hereto, Defendant Roosevelt Inn LLC owned, operated or managed a motel located at 7630 Roosevelt Boulevard, Philadelphia, PA 19152 [hereinafter referred to as the "Roosevelt Inn"].

7. Defendant Roosevelt Motor Inn, Inc. d/b/a Roosevelt Motor Inn [hereinafter referred to as "Roosevelt Motor Inn, Inc."] is a corporation duly organized and existing under the laws of the Commonwealth of Pennsylvania. At all material times hereto, Defendant Roosevelt Motor Inn, Inc. owned, operated or managed the Roosevelt Inn.

8. Defendant UFVS Management Company, LLC, is a limited liability company duly organized and existing under the laws of the State of New York. At all material times hereto, Defendant UFVS Management Company LLC owned, operated and/or managed the Roosevelt Inn.

9. Defendant Yagna Patel is an adult person and resident of Pennsylvania who resides at 7630 Roosevelt Boulevard, Philadelphia, Pennsylvania, PA 19152. Based on information and belief, Mr. Patel owned, operated and/or managed the Roosevelt Inn.

10. Defendant Alpha-Centurion Security, Inc. is a corporation duly organized and existing under the laws of the Commonwealth of Pennsylvania. At all material times hereto, Defendant Alpha-Centurion Security, Inc. provided security services at the Roosevelt Inn.

11. Upon information and belief, at all times relevant hereto, Defendant Alpha-Centurion Security, Inc. provided paid for security and related services at the Roosevelt Inn located at 7630 Roosevelt Boulevard, Philadelphia, Pennsylvania 19152, incidental to a

contractual arrangement as between itself and the owners and operators of the premises: Defendants Roosevelt Inn LLC, Roosevelt Motor Inn, Inc., UFVS Management Company, LLC, and Yagna Patel.

13. Defendant Alpha-Centurion Security, Inc. occupied, controlled, patrolled, monitored and assumed responsibility for security of the premises located at the Roosevelt Inn, 7630 Roosevelt Boulevard, Philadelphia, PA 19152.

13. Venue is appropriate in this case because Defendant Yagna Patel resides in Philadelphia County and Defendants Roosevelt Inn LLC, Roosevelt Motor Inn, Inc. UFVS Management Company, LLC, and Alpha-Centurion Security, Inc. regularly conduct business in Philadelphia County. Venue is also proper in this case because Pennsylvania's human trafficking law, 18 Pa. C.S.A. § 3051, permits victims of human trafficking and the sex trade to bring suit in the county in which the victim resides. Plaintiff M.B. resides in Philadelphia County. Therefore, venue is proper in the Philadelphia County Court of Common Pleas.

14. At all times material hereto, Defendants Roosevelt Inn LLC, Roosevelt Motor Inn, Inc., UFVS Management Company, LLC and Yagna Patel acted individually and/or by and through their actual or apparent agents, servants and employees, including but not limited to front desk staff, back room staff, housekeepers, custodians, maintenance workers, food preparation workers, doorman, concierges and security guards and are therefore liable for the acts and/or omissions of their agents, servants and/or employees under theories of agency, master-servant, respondent superior and/or right of control.

15. At all times material hereto, Alpha-Centurion Security, Inc. acted individually and/or by and through its actual or apparent agents, servants and employees, including but not limited to security guards and is therefore liable for the acts and/or omissions of their agents,

Case ID: 170300712
Control No.: 21060495

servants and/or employees under theories of agency, master-servant, respondent superior and/or right of control.

16.    At all material times hereto, Defendants Roosevelt Inn LLC, Roosevelt Motor Inn, Inc., UFVS Management Company, LLC and Yagna Patel individually and/or by their actual or apparent agents, servants and employees were uniquely positioned to observe the manifestations, indications and evincement of human sex trafficking within the Roosevelt Inn where they worked.

17.    At all material times hereto, Alpha-Centurion Security, Inc., individually and/or by its actual or apparent agents, servants and employees, was uniquely positioned to observe the manifestations, indications and evincement of human sex trafficking within the Roosevelt Inn.

18.    At all material times hereto, Defendants Roosevelt Inn LLC, Roosevelt Motor Inn, Inc., UFVS Management Company, LLC and Yagna Patel individually and/or by their actual or apparent agents, servants and employees, failed to take any steps to prevent criminal activity, including sex trafficking, at the Roosevelt Inn and instead permitted heinous and unspeakable acts to occur.

19.    At all material times hereto, Defendant Alpha-Centurion Security, Inc., individually and/or by its actual or apparent agents, servants and employees, failed to take any steps to prevent criminal activity, including sex trafficking, at the Roosevelt Inn and instead permitted heinous and unspeakable acts to occur.

## OPERATIVE FACTS

20.    Hotels and motels are common venues for sex trafficking, due to ease of access for buyers and traffickers, ability to pay in cash and maintain financial anonymity, and the avoidance of building and maintenance fees.  Hotels and motels are a convenient place for

customers to purchase sex to avoid detection. Indeed, since 2007, 1,434 cases of human trafficking in hotels and motels have been reported to the National Human Trafficking Resource Center (NHTRC).

21.     Defendants Roosevelt Inn LLC, Roosevelt Motor Inn, Inc., UFVS Management Company, LLC and Yagna Patel, individually and/or by and through their actual or apparent agents, servants and employees knew or should have known that sex crimes were occurring at the Roosevelt Inn. From January 2012 through December 2017, the Philadelphia Police Department documented more than one thousand incidents of criminal activity at and/or near the Roosevelt Inn including aggravated assault, domestic abuse, theft, weapon violations, rape, prostitution, drug offenses, disorderly conduct and a video recorded shooting.

22.     While investigating and making arrests of perpetrators of prostitution at the Roosevelt Inn, the Philadelphia Police Department would regularly collect up to eight key cards from a single guest involved in prostitution.

23.     Philadelphia Police Department records note, on at least one occasion, that a female guest told a police officer that she would receive texts from a security guard at the Roosevelt Inn, warning of any police activity that would expose her to potential arrest.

24.     Commencing in 2014, Plaintiff was recruited, enticed, solicited, harbored and/or transported to engage in commercial sex acts by sex traffickers to engage in commercial sex acts at the Roosevelt Inn on a regular, consistent and/or repeated basis.

25.     Defendants Roosevelt Inn LLC, Roosevelt Motor Inn, Inc., UFVS Management Company, LLC and Yagna Patel, individually and/or by and through their actual or apparent agents, servants and employees, regularly rented or otherwise provided rooms and services at the Roosevelt Inn to traffickers engaged in commercial sex acts with Plaintiff when she was a minor.

26. Defendants Roosevelt Inn LLC, Roosevelt Motor Inn, Inc., UFVS Management Company, LLC and Yagna Patel, individually and/or by and through their actual or apparent agents, servants and employees had a duty to ensure the safety and well-being of individuals lawfully on the motel's premises, the motel's guests, the motel's employees, and the motel's property.

27. Defendants Roosevelt Inn LLC, Roosevelt Motor Inn, Inc., UFVS Management Company, LLC and Yagna Patel, individually and/or by and through their actual or apparent agents, servants and employees had a duty to ensure the safety and well-being of Plaintiff while she was at the Roosevelt Inn and protect her from criminal conduct.

28. Upon information and belief, Defendant Alpha-Centurion Security, Inc. contracted with the Roosevelt Inn beginning in approximately March 2007 to provide security services.

29. Defendant Alpha-Centurion Security, Inc., individually and/or by and through its actual or apparent agents, servants and employees, had a duty ensure the safety and well-being of individuals lawfully on the motel's premises, the motel's guests, the motel's employees, and the motel's property.

30. Defendant Alpha-Centurion Security, Inc., had a duty to ensure the safety and well-being of Plaintiff while she was at the Roosevelt Inn and protect her from criminal conduct.

31. Defendants Roosevelt Inn LLC, Roosevelt Motor Inn, Inc., UFVS Management Company, LLC and Yagna Patel, individually and/or by and through their actual or apparent agents, servants and employees assumed responsibility for protecting individuals lawfully present at the Roosevelt Inn, including Plaintiff from foreseeable harm, including commercial sex exploitation and human sex trafficking.

32.     Defendant Alpha-Centurion Security, Inc., assumed responsibility for protecting individuals lawfully present at the Roosevelt Inn, including Plaintiff from foreseeable harm, including commercial sex exploitation and human sex trafficking.

33.     Defendants Roosevelt Inn LLC, Roosevelt Motor Inn, Inc., UFVS Management Company, LLC and Yagna Patel, individually and/or by and through their actual or apparent agents, servants and employees had a duty to Plaintiff to provide a reasonably safe environment at the Roosevelt Inn and protect Plaintiff from dangerous people and conditions on the premises.

34.     Defendant Alpha-Centurion Security, Inc., had a duty to Plaintiff to provide a reasonably safe environment at the Roosevelt Inn and protect Plaintiff from dangerous people and conditions on the premises.

35.     Defendants Roosevelt Inn LLC, Roosevelt Motor Inn, Inc., UFVS Management Company, LLC and Yagna Patel, individually and/or by and through their actual or apparent agents, servants, and employees, failed to take any steps to protect Plaintiff from criminal acts including sex trafficking.

36.     Defendant Alpha-Centurion Security, Inc., individually and/or by and through its actual or apparent agents, servants and employees, failed to take any steps to protect Plaintiff from criminal acts including sex trafficking.

37.     Defendants Roosevelt Inn LLC, Roosevelt Motor Inn, Inc., UFVS Management Company, LLC, and Yagna Patel, individually and/or by and through their actual or apparent agents, servants and employees, knew or should have known that criminal activity and sex trafficking that occurred at the Roosevelt Inn put plaintiff at risk of being harmed.

38.     Defendant Alpha-Centurion Security, Inc., individually and/or by and through its actual or apparent agents, servants and employees, knew or should have known that criminal

Case ID: 170300712
Control No.: 21060495

activity and sex trafficking that occurred at the Roosevelt Inn put plaintiff at risk of being harmed.

39. Plaintiff's traffickers put up internet advertisements for the purpose of sex trafficking Plaintiff as a minor.

40. The advertisements included a fake name for Plaintiff and a phone number to call.

41. During the phone call, sex for cash was negotiated and the caller "John" would be informed that Plaintiff was at the Roosevelt Inn.

42. Plaintiff's traffickers would linger in the halls and on the premises of the Roosevelt Inn.

43. The motel room where Plaintiff engaged in commercial sex acts contained used condoms and condom wrappers and the room frequently smelled of marijuana.

44. Plaintiff engaged in numerous commercial sex acts and/or "dates" per day.

45. Plaintiff was accompanied by older men while on the premises of the Roosevelt Inn.

46. Plaintiff was visibly treated in an aggressive manner by traffickers engaged in commercial sex acts with Plaintiff while in public areas of the Roosevelt Inn.

47. Plaintiff exhibited fear and anxiety while on the premises and in public areas of the Roosevelt Inn.

48. Plaintiff's traffickers paid cash for the motel rooms where Plaintiff engaged in commercial sex acts.

49. Plaintiff's traffickers consistently displayed "Do Not Disturb" signs on the door to the motel where Plaintiff engaged in commercial sex acts and consistently refused housekeeping services.

50. Men and other minors frequently entered and left the rooms where Plaintiff engaged in commercial sex acts.

51. Men stood in the hallways outside of rooms where Plaintiff was engaged in commercial sex acts.

52. Plaintiff had extended stays at the Roosevelt Inn with few or no personal possessions and was left in the room for long periods of time.

53. Plaintiff dressed in a sexually explicit manner and would walk the hallways of the Roosevelt Inn.

54. Security guards and/or employees of Defendant Alpha-Centurion Security, Inc. observed Plaintiff who was a minor at the time at the Roosevelt Inn in sexually explicit clothing.

55. Plaintiff was paid cash for the commercial sex acts she engaged in while at the Roosevelt Inn.

56. Plaintiff distributed the cash she received for the commercial sex acts to her traffickers who used the cash to pay for the motel rooms rented at the Roosevelt Inn.

57. Despite the open and obvious signs of criminal activity and human trafficking, Defendants Roosevelt Inn LLC, Roosevelt Motor Inn, Inc., UFVS Management Company, LLC, and Yagna Patel, individually and/or by and through their actual or apparent agents, servants and employees, failed to take reasonable steps to prevent the sex trafficking of the Plaintiff and failed to ensure her safety and well-being.

58. Defendants Roosevelt Inn, LLC, Roosevelt Motor Inn, Inc. UFVS Management Company, LLC and Yagna Patel, individually and/or by and through their actual or apparent agents, servants and negligently failed to prevent Plaintiff from being sexually exploited.

59. Despite the open and obvious signs of human trafficking, Defendants Roosevelt

Case ID: 170300712
Control No.: 21060495

Inn, LLC., Roosevelt Motor Inn, Inc., UFVS Management Company, LLC, and Yagna Patel, individually and/or by and through their actual or apparent agents, servants and employees failed to protect Plaintiff from criminal conduct.

60. Despite the open and obvious signs of human trafficking, Defendant Alpha-Centurion Security, Inc failed to take reasonable steps to prevent the sex trafficking of the Plaintiff and failed to ensure her safety and well-being.

61. Defendant Alpha-Centurion Security, Inc. negligently failed to prevent Plaintiff from being sexually exploited.

62. Despite the open and obvious signs of human trafficking, Defendant Alpha-Centurion Security, Inc. failed to protect Plaintiff from criminal conduct.

63. The negligence of Defendants Roosevelt Inn LLC, Roosevelt Motor Inn, Inc., UFVS Management Company, LLC and Yagna Patel, individually and/or by and through their actual or apparent agents, servants and employees caused Plaintiff to suffer physical harm, a sexually transmitted disease, mental anguish, humiliation, exploitation, degradation, mental distress, loss of the enjoyments of life, and loss of life's pleasures both in the past and in the future.

64. By renting rooms to individuals sex trafficking Plaintiff, Defendants Roosevelt Inn LLC, Roosevelt Motor Inn, Inc., UFVS Management Company, LLC and Yagna Patel, individually and/or by and through their actual or apparent agents, servants and employees caused Plaintiff to suffer physical harm, a sexually transmitted disease, mental anguish, humiliation, exploitation, degradation, mental distress, loss of the enjoyments of life, and loss of life's pleasures both in the past and in the future.

65.     The negligence of Defendant Alpha-Centurion Security, Inc., individually and/or by and through its actual or apparent agents, servants and employees, caused Plaintiff to suffer physical harm, a sexually transmitted disease, mental anguish, humiliation, exploitation, degradation, mental distress, loss of the enjoyments of life, and loss of life's pleasures both in the past and in the future.

66.     Defendants Roosevelt Inn LLC, Roosevelt Motor Inn, Inc., UFVS Management Company, LLC and Yagna Patel, individually and/or by and through their actual or apparent agents, servants and employees acted outrageously and in reckless disregard for the health and welfare of the Plaintiff warranting the imposition of punitive damages.

67.     Defendant Alpha-Centurion Security, Inc., individually and/or by and through its actual or apparent agents, servants and employees, acted outrageously and in reckless disregard for the health and welfare of the Plaintiff warranting the imposition of punitive damages.

## COUNT I - NEGLIGENCE

## M.B. v. ROOSEVELT INN LLC, ROOSEVELT MOTOR INN, INC., UFVS MANAGEMENT COMPANY, LLC, YAGNA PATEL

68.     The averments of Paragraphs 1 through 67 are incorporated herein by reference.

69.     Defendants Roosevelt Inn LLC, Roosevelt Motor Inn, Inc., UFVS Management Company, LLC and Yagna Patel, individually and/or by and through their actual or apparent agents, servants and employees, were under a duty to provide reasonable, adequate, and sufficient security personnel and/or to otherwise take appropriate steps to ensure the safety and protection of persons, including Plaintiff, on the premises of the Roosevelt Inn.

70.     Defendants Roosevelt Inn LLC, Roosevelt Motor Inn, Inc., UFVS Management Company, LLC and Yagna Patel, individually and/or by and through their actual or apparent agents, servants and employees should have reasonably anticipated criminal conduct by third

Case ID: 170300712
Control No.: 21060495

parties, including other guests, invitees or persons on the premises of the Roosevelt Inn.

71. Defendants Roosevelt Inn LCC, Roosevelt Motor Inn, Inc. UFVS Management Company, LLC and Yagna Patel, individually and/or by and through their actual or apparent agents, servants and employees, had a duty to take precautions against reasonably anticipated criminal conduct by third parties and to operate the Roosevelt Inn in a manner that did not endanger children or other persons, including Plaintiff. Moreover, the Defendants had a duty of care to take reasonable steps to protect foreseeable victims of the dangers created by their acts and omissions, including the danger of human trafficking and sexual exploitation on the premises of the Roosevelt Inn.

72. Defendants Roosevelt Inn LLC, Roosevelt Motor Inn, Inc., UFVS Management Company, LLC and Yagna Patel, individually and/or by and through their actual or apparent agents, servants and employees, breached the foregoing duties because they knew or should have known that persons on the premises of the Roosevelt Inn, including Plaintiff, could be victimized by, or subjected to, criminal activities on the premises that would likely endanger their health, safety, and/or well-being.

73. Defendants Roosevelt Inn LLC, Roosevelt Motor Inn, Inc., UFVS Management Company, LLC and Yagna Patel, individually and/or by and through their actual or apparent agents, servants and employees, should have reasonably anticipated that it was reasonably foreseeable from their knowledge and/or past experiences that persons on the premises of the Roosevelt Inn, including Plaintiff, would suffer serious bodily harm as a result of being victimized by violent crimes perpetrated by third parties on the premises of the Roosevelt Inn.

74. Defendants Roosevelt Inn LLC, Roosevelt Motor Inn, Inc., UFVS Management Company, LLC and Yagna Patel, individually and/or by and through their actual or apparent

Case ID: 170300712
Control No.: 21060495

agents, servants and employees, failed or refused to take adequate precautions to protect persons on the premises of the Roosevelt Inn, including Plaintiff, from criminal and violent activities of others, despite a reasonable likelihood that person on the premises of the Roosevelt Inn, including Plaintiff, would be victimized by, or subjected to, such criminal and/or violent acts, which could cause such persons serious bodily injury. The negligence of Defendants Roosevelt Inn LLC, Roosevelt Motor Inn, Inc., UFVS Management Company, LLC and Yagna Patel, individually and/or by and through their actual or apparent agents, servants and employees consisted of the following:

a. Failing to execute and/or implement the established security plan and/or execute and/or implement any established security plan;

b. Failure to publish and/or post orders at the security posts providing protocols for employees to follow in circumstances involving commercial sexual activity and/or human sex trafficking;

c. Failing to adopt, establish, implement, and/or enforce required policies, procedures, rules, regulations and/or guidelines concerning protection of individuals lawfully on the premises;

d. Failing to adopt, establish, implement, and/or enforce required policies, procedures, rules, regulations and/or guidelines concerning removal from the premises of individuals posing security threats;

e. Failing to adequately control access to the premises;

f. Failing to prevent entry of unauthorized individuals onto the premises;

g. Failing to properly and adequately hire, train and provide ongoing training to employees including but not limited to ongoing training involving recognizing, preventing and responding to criminal activity, prostitution and sex trafficking;

h. Failing to select and/or retain only personnel competent to provide proper and adequate professional services;

i. Failing to assign experienced security personnel to provide competent guard services at the Roosevelt Inn;

j. Failing to adopt, establish, implement, execute and/or enforce required policies,

Case ID: 170300712
Control No.: 21060495

procedures, rules, regulations and/or guidelines concerning protection of business invitees on the premises of the Roosevelt Inn;

k. Failing to adopt, establish, implement, execute and/or enforce required policies, procedures, rules, regulations, and/or guidelines concerning proper security measures in a motel setting;

l. Failing to adopt, establish, implement, execute and/or enforce required policies, procedures, rules, regulations, and/or guidelines concerning proper monitoring, surveillance, and patrolling of the premises;

m. Failing to adopt, establish, implement, execute and/or enforce required policies, procedures, rules, regulations, and/or guidelines concerning prevention of violent and/or criminal acts on the premises;

n. Failing to detect and respond to commercial sex activity and human sex trafficking at the Roosevelt Inn;

o. Failing to conduct adequate surveillance of the premises of the Roosevelt Inn;

p. Failing to utilize surveillance equipment to monitor suspicious activity and promptly react thereto for the safety of Plaintiff;

q. Failing to respond and react to suspicious activity;

r. Failing to maintain surveillance equipment in proper working order;

s. Failing to test or properly test surveillance equipment to ensure it was in working order;

t. Failing to utilize appropriate and/or required surveillance equipment;

u. Failing to adequately monitor activity on video surveillance and promptly react thereto for the safety of Plaintiff;

v. Allowing individuals to come on to the premises for the express purpose of trafficking Plaintiff;

w. Failing to prevent Plaintiff from being trafficked on the premises;

x. Breaching its duties under the Restatement of the Law of Torts (Second), including but not limited to §§ 302, 318, 321, 323, 324A, and 344; and

y. Failing to exercise care, caution and diligence required under the circumstances.

75.    As a result of Defendants Roosevelt Inn LLC, Roosevelt Motor Inn, Inc., UFVS

Management Company, LLC and Yagna Patel's negligence, Plaintiff was caused to suffer

Case ID: 170300712
Control No.: 21060495

physical harm, a sexually transmitted disease, mental anguish, humiliation, exploitation, degradation, mental distress, loss of the enjoyments of life and loss of life's pleasures both in the past and in the future.

76.     As a result of Defendants Roosevelt Inn LLC, Roosevelt Motor Inn, Inc., UFVS Management Company, LLC, and Yagna Patel's negligence, Defendants breached its duty to Plaintiff to ensure her safety and well-being and protect her from criminal acts.

77.     Defendants Roosevelt Inn LLC, Roosevelt Motor Inn, Inc., UFVS Management Company, LLC and Yagna Patel acted outrageously and in reckless disregard for the health and welfare of the Plaintiff warranting the imposition of punitive damages.

**WHEREFORE,** Plaintiff M.B. demands judgment in her favor and against Defendants Roosevelt Inn LLC, Roosevelt Motor Inn, Inc., UFVS Management Company, LLC and Yagna Patel and demands compensatory and punitive damages in excess of Fifty Thousand ($50,000.00) Dollars exclusive of prejudgment interest, costs and damages for pre-judgment delay.

## COUNT II – NEGLIGENCE

## M.B. v. ALPHA-CENTURION SECURITY, INC.

78.     The averments of paragraphs 1 through 77 are incorporated herein by reference.

79.     Defendant Alpha-Centurion Security, Inc. had a duty to provide reasonable, adequate, and sufficient security personnel and/or to otherwise take appropriate steps to ensure the safety and protection of persons, including Plaintiff, on the premises of the Roosevelt Inn.

80.     Defendant Alpha-Centurion Security, Inc should have reasonably anticipated criminal conduct by third parties, including other guests, invitees or persons on the premises of the Roosevelt Inn.

81.     Defendant Alpha-Centurion Security, Inc. had a duty to take precautions against reasonably anticipated criminal conduct by third parties so as not to endanger the welfare and well-being of Plaintiff. Moreover, the Defendant Alpha-Centurion Security, Inc a duty of care to take reasonable steps to protect foreseeable victims of the dangers created by their acts and omissions, including the danger of human trafficking and sexual exploitation on the premises of the Roosevelt Inn.

82.     Defendant Alpha-Centurion Security, Inc. breached the foregoing duties because they knew or should have known that persons on the premises of the Roosevelt Inn, including Plaintiff, could be victimized by, or subjected to, criminal activities on the premises that would likely endanger their health, safety, and/or well-being.

83.     Defendant Alpha-Centurion Security, Inc. should have reasonably anticipated that it was reasonably foreseeable from their knowledge and/or past experiences that persons on the premises of the Roosevelt Inn, including Plaintiff, would suffer serious bodily harm as a result of being victimized by violent crimes perpetrated by third parties on the premises of the Roosevelt Inn.

84.     Defendant Alpha-Centurion Security, Inc. failed or refused to take adequate precautions to protect persons on the premises of the Roosevelt Inn, including Plaintiff, from criminal and violent activities of others, despite a reasonable likelihood that person on the premises of the Roosevelt Inn, including Plaintiff, would be victimized by, or subjected to, such criminal and/or violent acts, which could cause such persons serious bodily injury. The negligence Alpha-Centurion Security, Inc. consisted of the following:

   a.  Failing to execute and/or implement the established security plan and/or execute and/or implement any established security plan;

Case ID: 170300712
Control No.: 21060495

b. Failure to publish and/or post orders at the security posts providing protocols for security personnel to follow in circumstances involving criminal activity, commercial sexual activity and/or human sex trafficking;

c. Failing to adopt, establish, implement, and/or enforce required policies, procedures, rules, regulations and/or guidelines concerning protection of individuals lawfully on the premises;

d. Failing to adopt, establish, implement, and/or enforce required policies, procedures, rules, regulations and/or guidelines concerning removal from the premises of individuals posing security threats;

e. Failing to adequately control access to the premises;

f. Failing to prevent entry of unauthorized individuals onto the premises;

g. Failing to properly and adequately train and provide ongoing training to its security personnel including but not limited to ongoing training involving preventing and responding to commercial sexual activity and human sex trafficking;

h. Failing to select and/or retain only personnel competent to provide proper and adequate security services;

i. Failing to assign experienced security personnel to provide competent guard services at the Roosevelt Inn;

j. Failing to adopt, establish, implement, execute and/or enforce required policies, procedures, rules, regulations and/or guidelines concerning protection of business invitees on the premises of the Roosevelt Inn;

k. Failing to adopt, establish, implement, execute and/or enforce required policies, procedures, rules, regulations, and/or guidelines concerning proper security measures in a hotel setting;

l. Failing to adopt, establish, implement, execute and/or enforce required policies, procedures, rules, regulations, and/or guidelines concerning proper monitoring, surveillance, and patrolling of the premises;

m. Failing to adopt, establish, implement, execute and/or enforce required policies, procedures, rules, regulations, and/or guidelines concerning prevention of violent and/or criminal acts on the premises;

n. Failing to detect and respond to commercial sex activity and human sex trafficking at the Roosevelt Inn;

o. Failing to conduct adequate surveillance of the premises of the Roosevelt Inn;

p. Failing to utilize surveillance equipment to monitor suspicious activity and promptly react thereto for the safety of Plaintiff;

q. Failing to respond and react to suspicious activity detected on video surveillance;

r. Failing to maintain surveillance equipment in proper working order;

s. Failing to test or properly test surveillance equipment to ensure it was in working order;

t. Failing to utilize appropriate and/or required surveillance equipment;

u. Failing to adequately monitor activity on video surveillance and promptly react thereto for the safety of Plaintiff;

v. Allowing individuals to come on to the premises for the express purpose of conducting commercial sex acts with Plaintiff;

w. Failing to prevent Plaintiff from being trafficked on the premises; and

x. Breaching its duties under the Restatement of the Law of Torts (Second), including but not limited to §§ 302, 318, 321, 323, 324A, and 344.

85.     As a result of Defendant Alpha-Centurion Security, Inc.'s negligence, Plaintiff was caused to suffer physical harm, a sexually transmitted disease, mental anguish, humiliation, exploitation, degradations, mental distress, loss of enjoyment of life and loss of life's pleasures both in the past and in the future.

86.     As a result of Defendant Alpha-Centurion Security, Inc.'s negligence, Defendant Alpha-Centurion Security, Inc. breached its duty to ensure Plaintiff's safety and well-being and protect her from criminal acts..

87.     Defendant Alpha-Centurion Security, Inc. acted outrageously and in reckless disregard for the health and welfare of the Plaintiff warranting the imposition of punitive damages.

Case ID: 170300712
Control No.: 21060495

WHEREFORE, Plaintiff M.B. demands judgment in her favor and against Defendant Alpha-Centurion Security, Inc. and demands compensatory and punitive damages in excess of Fifty Thousand ($50,000.00) Dollars exclusive of prejudgment interest, costs and damages for pre-judgment delay.

## COUNT III – NEGLIGENT INFLICTION OF EMOTIONAL DISTRESS

### M.B. v. ROOSEVELT INN LLC, ROOSEVELT MOTOR INN, INC., UFVS MANAGEMENT COMPANY, LLC, YAGNA PATEL

88.     The averments of paragraphs 1 through 87 are incorporated herein by reference.

89.     Defendants Roosevelt Inn LLC, Roosevelt Motor Inn, Inc., UFVS Management Company, LLC and Yagna Patel, individually and/or by and through their actual or apparent agents, servants and employees, negligently committed the acts averred in this Complaint against the Plaintiff and thereby caused Plaintiff to suffer fear, depression, humiliation, mental anguish and severe physical and emotional distress, directly and proximately causing harm and damages to the Plaintiff.

90.     Defendants acted outrageously and in reckless disregard for the health and welfare of the Plaintiff warranting the imposition of punitive damages.

WHEREFORE, Plaintiff M.B. demands judgment in her favor and against Defendants Roosevelt Inn LLC, Roosevelt Motor Inn, Inc., UFVS Management Company, LLC and Yagna Patel and demands compensatory and punitive damages in excess of Fifty Thousand ($50,000.00) Dollars exclusive of prejudgment interest, costs and damages for pre-judgment delay.

## COUNT IV– NEGLIGENT INFLICTION OF EMOTIONAL DISTRESS

## M.B. v. ALPHA-CENTURION SECURITY, INC.

91.     The averments of paragraphs 1 through 90 are incorporated herein by reference.

92.     Defendant Alpha-Centurion Security, Inc., individually and/or by and through its actual or apparent agents, servants and employees, negligently committed the acts averred in this Complaint against the Plaintiff and thereby caused Plaintiff to suffer fear, depression, humiliation, mental anguish and severe physical and emotional distress, directly and proximately causing harm and damages to the Plaintiff.

93.     Defendant Alpha-Centurion Security, Inc. acted outrageously and in reckless disregard for the health and welfare of the Plaintiff warranting the imposition of punitive damages.

**WHEREFORE**, Plaintiff M.B. demands judgment in her favor and against Defendant Alpha-Centurion Security, Inc. and demands compensatory and punitive damages in excess of Fifty Thousand ($50,000.00) Dollars exclusive of prejudgment interest, costs and damages for pre-judgment delay.

**KLINE & SPECTER, P.C.**

BY: _____
THOMAS R. KLINE, ESQUIRE
NADEEM A. BEZAR, ESQUIRE
EMILY B. MARKS, ESQUIRE

Dated:_____

Case ID: 170300712
Control No.: 21060495

**CERTIFICATE OF SERVICE**

    I do hereby certify that service of a true and correct copy of the ***Plaintiff's Fourth Amended Complaint*** was filed with the Court on _____ and served by electronic filing upon the following counsel of record:

Grant S. Palmer, Esq.
James J. Quinlan, Esq.
Daniel E. Oberdick, Esq.
Blank Rome LLP
One Logan Square, 130 North 18th Street
Philadelphia, PA 19103
*Counsel for Roosevelt Inn LLC, Roosevelt Motor Inn, Inc.,*
*UFVS Management Company, LLC and Yagna Patel*

Thomas P. Wagner, Esq.
Robert W. Stanko, Esq.
Melanie J. Foreman, Esq.
Marshall Dennehey Warner Coleman & Goggin
2000 Market Street, Suite 2300
Philadelphia, PA 19103
*Counsel for Alpha-Centurion Security, Inc.*

Via Certified and Regular Mail to:

Daiquan Davis, Register No. 72304-066
USP Terre Haute
U.S. Penitentiary
P.O. Box 33
Terre Haute, IN 47808
*Pro Se Defendant*

Abdul Lopez, Register No. 69643-066
USP Tucson
U.S. Penitentiary
P.O. Box 24550
Tucson, AZ 85734
*Pro Se Defendant*

KLINE & SPECTER, P.C.

Dated:                    By: _____
                               NADEEM A. BEZAR, ESQUIRE
                               Attorney for Plaintiff

Case ID: 170300712
Control No.: 21060495

## VERIFICATION

I, M.B., hereby state that I am the Plaintiff in the within matter, and as such verify that the statements made in the foregoing Fourth Amended Complaint are true and correct to the best of my knowledge, information and belief.

The undersigned understands that the statements herein are made subject to the penalties of 18 Pa. C.S. 4904 relating to unsworn falsification to authorities.

_____
M.B.

# EXHIBIT B

Case ID: 170300712
Control No.: 21060495

# MEMORANDUM

## Privileged and Confidential – Attorney Work Product

For Discussion Purposes Only

Date : 13 April 2019

From : CGS LLC (GRC, PMG & RTC)

To : Nadeem Bezar, Esq. & Emily Marks, Esq. (Kline & Spector, P.C.)

RE : M.B. v. Roosevelt Inn

On Friday, 12 April 2019 between approximately 10:40a.m. and 11:55a.m., CGS LLC Associates PMG & RTC met in person with the former resident of 7629 Leonard Street, Philadelphia, PA 19152 named **Michael H. Staub**, who is currently 64-years of age and now residing in Bensalem, PA 19020 (Bucks County).

The following is a summary of the conversation between Michael Staub and Investigators:

Mr. Staub advised that he and his wife (Cynthia), lived at 7629 Leonard Street, Philadelphia, PA 19152, which is directly behind the Roosevelt Inn, from February 2002 until 18 December 2017. The rear of Mr. Staub's home on Leonard Street faced the rear parking area of the Roosevelt Inn.

Staub stated that one of the primary reasons that he and his wife moved from the neighborhood was due to the activities that they observed and/or heard taking place at the Roosevelt Inn. Staub described that these activities included:

➢ A shooting on a Sunday afternoon, although Staub couldn't recall the exact date, he remembered trying to watch television in his family room when he heard a series of pop, pop, pop coming from the rear of his property originating at the Roosevelt Inn. Staub's wife (Cynthia) saw those involved in the shooting, however; she was unable to make any positive identifications.

➢ Staub recalled another shooting at the Roosevelt Inn that was reported during a news broadcast. He/Staub didn't hear the gunshots personally since the incident occurred inside the Roosevelt Inn itself.

➢ Mr. Staub also noted that he witnessed 'open air drug sales' taking place at the Roosevelt Inn adding that he could see people pull up in their vehicles to the back entrance of the Roosevelt, get out of the vehicles and bang on the window of one of the hotel rooms. Money would be passed into the hotel room and drugs would be passed out to the customer(s) who would then drive off the Roosevelt Inn property.

MSTAUB000001

➢ Staub said that he complained about the drug paraphernalia and condoms being left all over the rear driveway left by occupants of the Roosevelt Inn and added that many, many times, neighbors were forced to use their own hoses to wash the paraphernalia and trash back under the fence onto the Roosevelt Inn parking lot.

➢ In early June, again Staub could remember the exact date, a man committed suicide in the parking lot of the Roosevelt Inn and had apparently been in the parking lot for several days. Also, in 2016, two nurses committed suicide inside the Roosevelt Inn. At that event, the Philadelphia Police and several news stations were all swarming the Roosevelt Inn property.

Staub said that he and his wife were interviewed by Jenny Jones from TV Channel 29 concerning that incident, however; the Staub's faces were disguised and not revealed on the video tape.

➢ Mr. Staub further noted that he witnessed a number of raids conducted at the Roosevelt Inn by Philadelphia Police and was aware that a number of arrests have been made both inside and outside of the Roosevelt on several occasions.

➢ Before the Roosevelt Inn started 'tinting' the windows of their guest rooms, Staub said he was able to look right into the hotel and see people engaging in sex. He even saw a man and woman having sex on a chair in the rear parking lot of the Roosevelt Inn. Staub also witnessed a young woman during one day, come out of the back door of the Roosevelt and she was completely naked. The unknown young female took a bag of trash to the dumpster and then just walked back into the Roosevelt Inn.

➢ Mr. Staub stated further that there were always a stream of young girls and women coming in and out of the back entrance of the Roosevelt Inn. These girls/women would come out of the Roosevelt, go to vehicles that arrived in the parking lot and engage in sex acts and/or get clothing and return to the Roosevelt Inn when they finished their business.

Staub said it was no secret to him, his wife and/or several of the neighbors on Leonard Street that there was open prostitution and drug violations going on at the Roosevelt Inn and the activities were one of the motivating factors in his decision to move from Leonard Street to Bensalem, PA.

Associates RTC & PMG asked some follow-up questions of Mr. Staub to which he provided the following answers:

Q. Are you and your wife willing to meet with Attorney's if requested at a later date?
A. Staub answered yes, however; he doesn't like going into Center City. If the Lawyers can make suitable arrangements, Mr. Staub would cooperate. His wife (Cynthia), prefers not to participate in anything to do with the Roosevelt Inn.

Q. Did you or your wife ever file any formal Police reports or make 911 calls?
A. Again, Mr. Staub answered yes and that he called Philadelphia Police a number of times during his time living at 7629 Leonard Street.

Case ID: 170300712
Control No.: 21060495

Several of his calls to the 911 system were related to fighting taking place in the rear of the Roosevelt Inn and on the parking lot. Staub said he never gave his name to the 911 operator and by the time the Police arrived, most of the time the fights had broken up or the Police would handle the situations.

Staub recalled one instance, when a male knocked on his door and said that the night before, the male and his girlfriend had a fight while at the Roosevelt Inn and his girlfriend threw the guys mobile phone on Staub roof. The unknown man had a friend with him carrying a ladder and Staub allowed them to retrieve the mobile telephone from his roof.

Staub said he called the Police when this guy showed up thinking it was just a scam to get into his home. It turned out not to be a scam.

Q. Did you even make a complaint to the City 411 Hotline or any other City Agency? (L&I, DA's Office, US Attorney, Council Person, Mayor's Office etc.)
A. Staub said he never filed a formal complaint with any Agency, City, State or Federal.

Q. Did you ever suffer property/vehicle damage caused by any of the individuals involved with the illegal activities at the Roosevelt Inn?
A. Staub answered no to this question.

Q. Were you and/or your wife ever involved in a confrontation with the guests/visitors to the Roosevelt Inn and/or the Inn's Management or Staff?
A. Staub said he personally never had any confrontations with guests/tenants or the Management at the Roosevelt Inn. Staub did say that the employees of the Roosevelt Inn were usually quite attentive to cleaning up the parking lot area regularly. Staub doesn't know the names of any of the Management or Staff at the Roosevelt Inn.

Q. When you sold your home at 7629 Leonard Street, did the sale value of your residence suffer because of the situation with the Roosevelt Inn?
A. Staub said he is unaware of any depreciation at the time he sold his home due to the Roosevelt Inn, in fact, Staub said his house sold in 4-days.

Q. Mr. Staub was asked if there are other Leonard Street neighbors who might be willing to talk to us about the Roosevelt Inn? Particularly, if those individuals have also moved away from the neighborhood.
A. Staub said he is no longer in contact with any of his former neighbors on Leonard Street but, he did mention the names of "Tom" (Ching) and "Winona" (Dohling) as potential people who might discuss the Roosevelt Inn.

Staub added that "Tom" is Asian and he's very hesitant to talk since "Tom" doesn't trust Investigators or Lawyers.

Mr. Staub was thanked for his time and said that he would remain available if there were more questions he might be able to assist with about the Roosevelt Inn.

Case ID: 170300712
Control No.: 21060495

# EXHIBIT C

Case ID: 170300712
Control No.: 21060495



Best Practices

# FORENSIC METHODOLOGY

Case ID: 170300712
Control No.: 21060495

# Table of Contents

Position Statement ......................................2

Evidence Review—The Process .................3

Risk Assessment..........................................3

Threat Assessment.......................................3

Vulnerability Assessment/Security Survey...4

Analysis and Opinions .................................6

Bibliography/References .............................6

Forensic Security Committee Members......7

Cases Citing Methodology ..........................8

Document Revision History ........................8

Case ID: 170300712
Control No.: 21060495

The International Association of Professional Security Consultants has issued this consensus-based and peer-reviewed Best Practice for the guidance of and voluntary use by businesses and individuals who deal or may deal with the issues addressed in the context of third-party premises security litigation.

## POSITION STATEMENT

The International Association of Professional Security Consultants does hereby recognize that its members will be called upon to perform as "Forensic Consultants" and serve as Expert Witnesses in a court of law or other legal proceeding. The purpose of these guidelines is to meet the need for a standardized methodology used in the evaluation of premises security cases.

It is recognized that the task of the Forensic Consultant is one of education. Forensic Consultants will provide their opinion(s) to the client, to opposing counsel during deposition, in response to written interrogatories, in reports, and to the judge and jury at trial or any other lawfully convened hearing. This is done with the goal of making others aware of the security issues and contributing to a just and proper conclusion on the litigation.

The responsibility of the Forensic Consultant lies within our system of justice and the ethics of the security profession. The opinions so offered are made as an objective expert witness/consultant, without any financial or other interest in the outcome of the litigation.

Forensic Consultants will, at all times, be forthright, honest and precise in evolving the ultimate conclusion(s) and opinion(s). The opinion(s) will be the result of a review of all available, applicable documentation and discovery material presented by all parties to the litigation. Site inspections and analytical procedures generally followed by the "Forensic Consultant" are described in these guidelines.

The following methodology is to be used in a typical premises security case, including crimes committed by employees. The Forensic Consultant is expected to exercise diligence in requesting and/or obtaining information that the Consultant reasonably believes is relevant to the facts and circumstances of the case. *It is reasonable to expect variations of the steps, with some steps deleted and others added as the facts and circumstances of the case being analyzed warrant.*

Case ID: 170300712
Control No.: 21060495

# EVIDENCE REVIEW— THE PROCESS

In the context of this Guideline, the Forensic Consultant will review and analyze various information, whether produced during the discovery process of the litigation or otherwise obtained through research, common knowledge, investigation, and/or the consultant/expert's experience which allows the Consultant to identify factors leading to an understanding of the crime risks present at the time of the criminal event.

Types of evidence generally available to the Forensic Consultant include, but are not limited, to the following:

1. Complaint/Petition

2. Police Report of the subject incident

3. Site and Immediate Vicinity Crime History, including police and security incident reports

4. Interrogatories and Responses

5. Requests for Production of Documents and Responses

6. Requests for Admissions and Responses

7. Affidavits, Witness Statements and Interviews

8. Depositions

9. Expert Witness Reports

10. Applicable Medical Records Relating to the Facts of the Incident

11. Photographs, Video and Audio Recordings, etc.

12. Other Related Evidence (e.g., prosecutors file, if available)

# RISK ASSESSMENT

A risk assessment is the general process of identifying relevant risks, given the facts of the case. It is a qualitative, quantitative, or hybrid assessment that seeks to determine the likelihood that criminals could successfully exploit a vulnerability or compromise a security countermeasure.

There are two main components to a risk assessment: a threat assessment and a vulnerability assessment. The threat assessment is an evaluation of the various sources for crime threats. The vulnerability assessment, includes an evaluation of the physical aspects of the facility and an analysis of the overall security program as it relates to the specific facts of the case.

The security survey, along with documented evidence, is the means by which security measures utilized and/or available at the facility at the time of the incident that is the subject of the litigation are identified and analyzed.

A risk assessment provides the foundation for effectively determining the adequacy of countermeasures employed.

# THREAT ASSESSMENT

A threat assessment is an evaluation of events that can adversely affect operations and/or specific assets. Historical information is a primary source for threat assessments, including past criminal and terrorist events. A threat assessment considers actual and inherent threats.

Case ID: 170300712
Control No.: 21060495

1. Actual Threats - The crime history at the subject property based on data reflecting actual crime data.[1]  Actual threats are a quantitative element of a threat assessment. When assessing actual threats, the following may be considered *as deemed relevant by the security expert*:

    a. Relevant crimes on the subject property for a three to five year period prior to the date of the incident.[2]

    b. Relevant crimes in the immediate vicinity of the subject property for a three to five year period prior to the date of the incident. [Note: There is no single definition of what constitutes an "immediate vicinity" or "neighborhood" around a given property. Often what is available for evaluation from a law enforcement agency depends upon that agency's software programming and/or staff capabilities (e.g., the agency can only provide data for a set size of an area, such as a quarter mile radius).]

    c. The expert may consider the relationship between offenders and victims (e.g. interpersonal, domestic, targeted, etc.).

2. Inherent Threats – The crime risk at the subject property as determined by the expert based on the property's characteristics, the expert's research and/or experience in similar environments, information gathered through the discovery process, and/or a site inspection (if conducted).

# VULNERABILITY ASSESSMENT/ SECURITY SURVEY

The vulnerability assessment is an analysis of security weaknesses and opportunities for criminal activity. A security survey is a method for collecting information used in the vulnerability assessment.

A security survey may include a physical survey of the scene of the incident and areas/functions that are applicable to the incident to achieve an understanding of information that has potential application to the matter in litigation.

The following areas of review are not meant to be all inclusive, nor all exclusive. The decision to review the material is at the judgment/discretion of the expert.

1. Incident Review

    a. Police incident and investigation report(s)

    b. Security incident report(s)

    c. Medical records (emergency room and/or autopsy as it relates to information about the occurrence of the incident)

    d. Other sources of information about how the incident occurred (e.g., witness statements, testimony, etc.)

---

1. Depending on the police jurisdiction that serves the subject property, different types of crime records may be available. The most common type of crime record used in a crime risk analysis is Calls for Service or dispatch logs. It is important to note that Calls for Service or dispatch log accuracy varies by jurisdiction. Further, changes to incident management and dispatch systems may also impact accuracy even within the same jurisdiction. When assessing relevant crimes, Calls for Service and dispatch logs should not be used alone. Offense/Incident Reports are necessary to validate the Calls for Service or dispatch logs, specifically the crime type, crime location, and whether a crime actually occurred. Calls for service or dispatch logs alone, in many jurisdictions, are insufficient for these three elements.

2. The IAPSC recognizes that criminology studies and related research have generally found that crime in the area may or may not be relevant to the subject property.

Case ID: 170300712
Control No.: 21060495

2. Site Inspection – Inspect site where the incident occurred and the surrounding area, if relevant. *(Note: Not all cases will require site inspections, nor is it always possible to conduct site views—e.g., if the site has been altered substantially or no longer exists.) Further, the facts of some cases and potential liability issues are not related to the site/property layout, design, or other physical attributes. As such, a site inspection may be unnecessary.*

   a. Determine layout of the premises

   b. Evaluate relevant factors (lighting, lines of sight, places of concealment, remoteness, accessibility, security measures, conditions, etc.)

   c. Review relevant documentation (lease, contract, diagram, map, etc.)

   d. Assess the characteristics of the surrounding area and what impact, if any, those characteristics may have had on the subject property

3. Security Personnel

   a. Review security officer(s) (including off-duty law enforcement officers) actions, staffing levels, post orders, duty hours, equipment provided, tours, evaluations, training, hiring procedures and supervision

   b. Review law enforcement presence and actions (e.g., on-duty, police details, etc.)

   c. Review roles and actions of non-security related persons who may have participated in the security program and/or incident

   d. Assess the qualifications and performance of owner/management personnel overseeing the security program

4. Security Management Program

   a. Review management and security related policies, procedures, and practices

   b. Review any risk assessments performed prior to the date of the incident

   c. Review daily activity reports, job descriptions, incident reports and internal correspondence

   d. Review security services contract

   e. Review training manuals and materials

   f. Review depositions regarding employees' understanding of their duties, and all customs and undocumented practices

   g. Evaluate the qualifications, training, and experience of security management and supervisory personnel

5. Security Equipment

   a. Review building design and site plans

   b. Inspect all security devices related to the incident

   c. Inspect structural security features related to the incident

   d. Determine the position, function and maintenance status of the relevant security equipment and features in place at the time of the incident

   e. Determine levels of illumination, if relevant

Case ID: 170300712
Control No.: 21060495

## ANALYSIS AND OPINIONS

The security expert will determine the level of adequacy of security at the location of the incident on the date and at the time the incident occurred. This will be based on the information obtained in the previous steps, and the application of a qualitative analysis based on the experience, education and training of the expert.

Based upon the analysis, the expert will reach conclusions on the issues of risk analysis, preventability and the adequacy of the security program at the subject property. At this point the expert has formed opinions and is prepared to provide a written report, be deposed and/or testify at trial. Those opinions will state the detailed basis for the findings, including evidence, standards, best practices and guidelines, where applicable.

## BIBLIOGRAPHY/REFERENCES

The process of evaluating the risk of crime at a specific location or geographical area is widely recognized and has been adopted nationwide by private industry, public law enforcement, municipalities, and other governmental agencies. The following published sources reference the process used to perform a crime risk analysis. *This is not all-inclusive, but a representative sampling of available references.*

This bibliography is not to be construed in any way as an endorsement by the International Association of Professional Security Consultants of the publications or the respective authors.

ASIS International (2003). *General Security Risk Assessment Guideline*. Alexandria, VA.

Bates, Norman D. (1997). "Foreseeability of Crime and Adequacy of Security," Accident Prevention Manual for Business & Industry, Security Management, National Safety Council.

Broder, James F. and Tucker, Eugene (2012). Risk Analysis and the Security Survey, 4th Edition. Boston, MA: Butterworth-Heinemann.

Bureau of Justice Statistics http://www.bjs.gov/index.cfm?ty=tp&tid=941

Caplan, Joel M. and Leslie W. Kennedy (2016). Risk Terrain Modeling: Crime Prediction and Risk Reduction. Jackson, TN: University of California Press.

Clarke, R., & Eck, J. (2007). Understanding Risky Facilities. Problem Specific Guide Series. Washington, DC: Office of Community Oriented Policing, U.S. Department of Justice.

Crowe, Timothy D. and Fennelly, Lawrence (2013). Crime Prevention Through Environmental Design, 3rd Edition. National Crime Prevention Institute, Boston, MA: Butterworth-Heinemann.

Department of the Navy, Naval Facilities Engineering Command, (1983). *Physical Security Design Manual 13.1*, Washington, DC: Government Printing Office.

Eck, John E. and Weisburd, David (1995). Crime and Place. Monsey, NY: Criminal Justice Press (Police Executive Research Forum).

Eck, JE, Clarke, RV, and Guerette, RT (2007), "Risky Facilities: Crime Concentration in Homogeneous Sets of Establishments and Facilities" in Graham Farrell, Kate J. Bowers, Shane D. Johnson and Michael Townsley, ed. Imagination for Crime Prevention, Crime

Prevention Studies, Volume 21, Monsey, NY: Criminal Justice Press.

Eck, JE, & Weisburd, D. (Eds.). (1995). Crime and Place. Crime Prevention Studies 4. Monsey, NY: Criminal Justice Press.

Gottlieb, Stephen, Sheldon Arenberg, and Raj Singh (1998). Crime Analysis: From First Report to Final Arrest. Montclair, CA: Alpha Publishing.

International Association of Crime Analysts (2009). Exploring Crime Analysis. 2nd Edition. Overland Park, KS: BookSurge Publishing

Madensen, Tamara D. and John E. Eck (2013). "Crime Places and Place Management" in Cullen, F. T., & Wilcox, P.. The Oxford Handbook Of Criminological Theory. New York, NY: Oxford University Press.

Miethe, Terance D. and Richard McCorkle (2005). Crime Profiles: The Anatomy of Dangerous Persons, Places, and Situations. 3rd Edition. Los Angeles: Oxford University Press

National Crime Prevention Institute (2001). Understanding Crime Prevention, Boston, MA: Butterworth-Heinemann.

"Premises Security Experts and Admissibility Considerations Under Daubert and Kumho: A Revised Standard," Norman D. Bates and Danielle A. Frank, Suffolk Journal of Trial and Appellate Advocacy, June 2010

Sennewald, Charles A. (2015). Effective Security Management. 6th Edition. Woburn: Butterworth-Heinemann.

Sennewald, Charles A. (2012). Security Consulting. 4th Edition. Woburn: Butterworth-Heinemann.

U.S. Army Corps of Engineers (1990). Security Engineering Manual, Missouri River Division/Omaha District.

U.S. Department of Justice, Federal Bureau of Investigation, "UCR: Uniform Crime Reporting Handbook" Revised 2004, U.S. Government Printing Office, Washington, DC.

U.S. Department of Justice (1995). Vulnerability Assessment of Federal Facilities, Washington, DC: Government Printing Office

Vellani, Karim H. (2006). Strategic Security Management: A Risk Assessment Guide for Decision Makers. Woburn: Butterworth-Heinemann.

Weisburd, David, Elizabeth Groff and Sue-Ming Yang. (2012), The Criminology of Place: Street Segments And Our Understanding of the Crime Problem. Oxford: Oxford University Press.

Weisburd, David, et al. (2016), Place Matters: Criminology for the Twenty-First Century. Cambridge: Cambridge University Press.

# FORENSIC SECURITY COMMITTEE MEMBERS

Norman D. Bates, Esq.,
Committee Chairman;
President, Liability Consultants, Inc.

Chad Callaghan, CPP, CSC, CLSD,
Premises Liability Experts, LLC

James H. Clark, CPP,
Managing Partner,
Clark Security Group, LLC

Lance Foster, CPP, CSC
Security Associates, Inc.

Case ID: 170300712
Control No.: 21060495

Karim Vellani, CPP, CSC,
Threat Analysis Group, LLC

Alan W. Zajic, CPP, CSP,
AWZ Consulting

## CASES CITING METHODOLOGY

<u>Childress v Kentucky Oaks Mall</u>, 2007 WL
2772299 (W.D. KY) 2007

<u>Reinaldo Robles Del Valle, et al v Vornado
Realty Trust</u>, 06-1818 US Dist. Crt., Puerto
Rico, 2009

## DOCUMENT REVISION HISTORY

Initial Release: June 2000 approved by the
IAPSC membership in attendance at the
annual meeting.

Revised: May 2, 2005 with approval by the
IAPSC membership in attendance at the
annual meeting.

Revised: November 2008 with approval of
the Board of Directors

Revised: November 2011 by Forensic
Security Committee – minor formatting
changes and addition of "Premises Security
Experts…" article to bibliography.

Revised: April 28, 2014 with approval of
IAPSC Forensic Security Committee – addi-
tion of language to Actual Crime section:
"Relevant crimes in the immediate vicinity
of the facility (three to five years prior to
the date of the incident) *as defined by and
deemed relevant by the security expert.*"

Revised: January 19, 2018 with approval by
the Board of Directors

*Founded in 1984, the International Associ-
ation of Professional Security Consultants
(IAPSC) is a widely recognized and respect-
ed association committed to establishing
and maintaining the highest standards for
security consultants in the industry. IAPSC
members are independent, non-product
affiliated consultants who are required to
meet strict educational, experience, and
practice requirements, ensuring that they
uphold the IAPSC code for professionalism
and ethical conduct. For more information,
to find an IAPSC security consultant, or to
become a member of the association, visit
www.iapsc.org.*

Case ID: 170300712
Control No.: 21060495

# EXHIBIT D

Case ID: 170300712
Control No.: 21060495

**Court of Common Pleas Philadelphia County, Pennsylvania**

**M.B.**

**Plaintiff**

**v.**

**Roosevelt Inn, LLC, et al.**

**Defendant**

**(MARCH TERM, 2017 NO.: 00712)**

**Expert Report of Dr. Kimberly Mehlman-Orozco**
**CEO of Break the Chain, LLC**
**15920 Fairway Drive**
**Dumfries, Virginia 22025**
**(703) 362-9405**

_(signature)_

_____

**SUBMITTED BY DR. KIMBERLY MEHLMAN-OROZCO under penalty of perjury.**
**May 20, 2020.**



Case ID: 170300712
Control No.: 21060495

# Table of Contents

I.      INTRODUCTION ............................................................................................... 5

II.     DEFINITIONS ................................................................................................... 7

III.    SUMMARY OF OPINIONS .............................................................................. 9

IV.     HUMAN TRAFFICKING OVERVIEW ........................................................ 10

V.      LIMITATIONS OF HUMAN TRAFFICKING DATA ................................. 12

    Prevalence ......................................................................................................... 12

    Evidence-Based Interventions ......................................................................... 13

    Sensitivity and Specificity ................................................................................ 14

VI.     MISIDENTIFICATION OF HUMAN TRAFFICKING VICTIMS ............. 15

    Juveniles ............................................................................................................ 16

VII.    SEX TRAFFICKING ...................................................................................... 19

    Sex Trafficker Characteristics ......................................................................... 19

    Human Trafficking Victim Characteristics ..................................................... 20

VIII.   ROOSEVELT INN CASE ............................................................................... 21

IX.     PLAINTIFF'S EXPERT WITNESS REPORTS ........................................... 25

    Overview ............................................................................................................ 25

    Richard G. Hudak ............................................................................................. 25

    Michelle Guelbart ............................................................................................. 50

X.      CONCLUSION ................................................................................................ 60

XI.     APPENDIX A. Curriculum Vitae ................................................................... 62

XII.    APPENDIX B. Materials Reviewed and Considered ...................................... 76

Case ID: 170300712
Control No.: 21060495

## Table of Tables

Table 1. Maryland Scientific Methods Scale (SMS) ........................................................................ 14
Table 2. M.B. Mentions of "trafficking" versus "prostitution" ................................................ 22
Table 3. Hudak Citation of M.B. Deposition ............................................................................... 29
Table 4. Hudak Citation of Patel Deposition ............................................................................... 33
Table 5. Hudak Citation of Rushi Deposition .............................................................................. 35
Table 6. Hudak Citation of Keeler Deposition ............................................................................ 37
Table 7. Hudak Citation of Azeez Deposition ............................................................................. 38
Table 8. Hudak Citation of Hussain Deposition .......................................................................... 39
Table 9. Hudak Citation of Mueller Deposition ......................................................................... 41
Table 10. Hudak Citation of Hanton Deposition ........................................................................ 44
Table 11. Hudak Citation of Lopez Deposition ........................................................................... 46
Table 12. Lack of Evidentiary Basis for Guelbart Opinions ..................................................... 50

Case ID: 170300712
Control No.: 21060495

**Table of Figures**

Figure 1. Example of Human Trafficking Victim Erroneously Criminalized.................................16
Figure 2. Polaris Project Survey: Hotel/Motel Question..................................................................26
Figure 3. Results from Polaris Project Survey ....................................................................................26
Figure 4. Polaris Project Matrix on Human Trafficking Types by Industry................................27

4

Case ID: 170300712
Control No.: 21060495

# I. INTRODUCTION

I, Dr. Kimberly Mehlman-Orozco, am the Chief Executive Officer (CEO) of Break the Chain, LLC. I have been engaged by Roosevelt Inn, LLC, The Roosevelt Motor Inn, Inc. UFVS Management Co., LLC and Yagna Patel in the above-captioned action to provide opinions as applicable. My compensation for this engagement is my hourly rate of $500 for remote consultation and $750 per hour for in-person testimony. My compensation is not contingent upon offering any specific opinions or on the outcome of this matter.

Over the past thirteen years, I have accumulated a variety of work experiences that contribute to my qualifications as an expert on human trafficking (see Appendix A for a copy of my Curriculum Vitae). As the CEO of Break the Chain, LLC and former CEO of Mahn, Mehlman & Associates, LLC, I regularly serve as an expert witness for human trafficking cases.

I am also the author of a book on the different forms of human trafficking, which is used to train law enforcement on recognizing the red flags, entitled *Hidden in Plain Sight: America's Slaves of the New Millennium*. For this book, I performed extensive primary and secondary research, including:

> (1) Conducted a systematic review of approximately 300 human trafficking cases;
> (2) Performed content analyses on nearly 1,000 media reports of human trafficking arrests;
> (3) Conducted approximately 100 interviews of human trafficking victims; and
> (4) Conducted approximately 2,000 interviews with human traffickers.

My book was incorporated into the curriculum used by ERASE Child Trafficking to train law enforcement in the United States on human trafficking identification and investigation. The book also received a variety of advanced praise from experts within the field.

In addition, I formally served as an adjunct human trafficking subject matter expert for RAND Corporation, a nonprofit institution that helps improve policy and decision-making through research and analysis. In that capacity, I worked on three study proposals:

> (1) Research design to evaluate the National Human Trafficking Hotline;
> (2) Development of an evidence based human trafficking risk assessment tool for organizations working with minors; and
> (3) Evaluating the outcomes of housing services for adult and juvenile human trafficking survivors.

In these capacities, I have had the opportunity to train various law enforcement agencies around the country on my human trafficking research for investigations, including Homeland Security Investigations in Buffalo, NY; Montebello Police Department in Montebello, California; the North Carolina State Bureau of Investigation; and the Royal Canadian Mounted Police in Halifax, Nova Scotia. I have also presented my research at various human trafficking summits and conferences and served on the Greater Prince William County Human Trafficking Task Force (GPWCHTTF) as the data collection sub-committee chair, as well as on the Prince

Case ID: 170300712
Control No.: 21060495

George's County Human Trafficking Task Force.

In addition to my work on human trafficking, I have received formal training, as well as quantitative and qualitative research experience, during my graduate coursework at George Mason University. Specifically, I served as a research associate on the Trinidad and Tobago Crime Reduction Project, which involved government-sanctioned surveys of both police officers and members of the community in Trinidad. I also led participant outreach for the Office of Juvenile Justice and Delinquency Prevention (OJJDP) Census of Juveniles on Probation.

In addition to my practical and research experience, I also formally taught about human trafficking as part of my course material at George Mason University and at University of Maryland, College Park, the #1 criminology department in the nation.

I hold a Ph.D. in Criminology, Law and Society from George Mason University, as well as a M.S. in Justice, Law, and Crime Policy and a B.S. cum laude in Administration of Justice.

My research on the efficacy of anti-trafficking interventions has been published in the *Journal of Social Inclusion*, which was guest edited by leading human trafficking expert Siddharth Kara, a Harvard University Lecturer and author of "Sex Trafficking: Inside the Business of Modern Slavery." My qualitative interviews with convicted human traffickers were also published in the journal *Trends and Organized Crime*. My research has also been published through magazines such as the Diplomatic Courier and in media outlets, such as USA Today, Politico, The Houston Chronicle, The Hill, The Washington Post, The Baltimore Sun, The Crime Report, Thomson Reuters, and others.

Additionally, I serve as a peer-reviewer for empirical research articles on human trafficking, for example with the Journal of Human Trafficking and American Journal of Evaluation. I also serve as a peer-reviewer for grant applications for human trafficking research. Most recently, in April 2020, I was invited by the Office of Justice Programs and National Institute of Justice to serve as a peer-reviewer for two grant solicitations: FY 2020 Research on Law Enforcement Responses to Sex Trafficking of Minors and FY 2020 Research on Law Enforcement Responses to Sex Trafficking of Minors.

I may prepare graphic or illustrative exhibits based on the information reviewed and/or my analyses for use at trial. I reserve the right to amend my analysis, opinions, and this report should additional information be made available.

Case ID: 170300712
Control No.: 21060495

## II.   DEFINITIONS

**Human trafficking**: the recruitment, harboring, transportation, provision, or obtaining of a person for labor or services, through the use of force, fraud, or coercion for the purpose of subjection to involuntary servitude, peonage, debt bondage, or slavery.[1]

**Sex Trafficking**: when a commercial sex act is induced by force, fraud, or coercion, or in which the person induced to perform such act has not attained 18 years of age.

**Sex Trafficker:** a person who induces an adult to perform a commercial sex act through the use of force, fraud, coercion, abduction, threat, or deception; or induces anyone who has not attained 18 years of age to perform a commercial sex act.

**Sex Trafficking Victim:** a person who is induced into a commercial sex act through force, fraud, coercion, abduction, threat, or deception; or any person induced into a commercial sex act, who has not attained 18 years of age.

**Consenting Sex Worker:** an adult who chooses to engage in sexual activities in exchange for payment, without being forced, defrauded, coerced, abducted, threatened, or deceived. Also referred to as a prostitute or whore[2].

**Trick:** committing an act of prostitution (verb), or the person buying it (noun)[3]. A victim is said to be "turning a trick" or "with a trick."[4]

**John:** A man who patronizes sex workers. Also referred to as a monger, hobbyist, or trick.[5]

**Bottom:** a female victim of a sex trafficker who has been indoctrinated enough to facilitate the recruitment, control, and exploitation of other sex workers despite being exploited herself.

**Family/Folks**: the term used to describe the other individuals under the control of the same pimp. He plays the role of father (or "Daddy") while the group fulfills the need for a "family."[6]

**The Game/The Life:** the subculture of prostitution, complete with rules, a hierarchy of authority, and language. Referring to the act of pimping as 'the game' gives the illusion that it can be a fun and easy way to make money, when the reality is much harsher. Women and girls will say they've been "in the life" if they've been involved in prostitution for a while.[7]

---

[1] 22 U.S. Code § 7102.Definitions: https://www.law.cornell.edu/uscode/text/22/7102
[2] Gira Grant, Melissa. (2014). Playing the Whore: The Work of Sex Work. Verso.
[3] A "commercial sex consumer" can be referred to as a "John" or a "Trick" by sex traffickers, victims of sex trafficking, or consenting sex workers; however, these men generally refer to themselves as "mongers" or "hobbyists."
[4] Shared Hope International. N.d. Human Trafficking Terms. Retrieved from: https://sharedhope.org/the-problem/trafficking-terms/
[5] Mehlman-Orozco, Kimberly. (2017). Hidden in Plain Sight: America's Slaves of the New Millennium. Praeger.
[6] Ibid.
[7] Ibid.

Case ID: 170300712
Control No.: 21060495

**Two-Call System:** Commercial sex exchange tactic to evade third party detection. The commercial sex consumer will call twice for in- call commercial sex providers: first, to set up an appointment time and obtain general directions to the in-call location, and second, to obtain specific information on which hotel room or apartment the sexual services will be provided.[8]

**In-call:** Any location where the commercial sex consumer travels to the commercial provider for services, such as the sex worker's place of residence or hotel room.

**Outcall:** Any location where the commercial sex worker travels to the consumer for services, such as the hobbyist or monger's place of residence or hotel room. Also known as TOS or take out service.

**Notel:** No tell. Typically used to describe a hotel where commercial sex services can be exchanged in secrecy.

---

[8] Mehlman-Orozco, Kimberly. (2017). <u>Hidden in Plain Sight: America's Slaves of the New Millennium.</u> Praeger.

8

## III.   SUMMARY OF OPINIONS

a.  Sex trafficking is a clandestine crime.

b.  Sex trafficking victims are difficult to identify and are frequently misidentified.

c.  As a consequence of misidentification, sex trafficking victims are often erroneously criminalized by the judicial system.

d.  Indicia of prostitution are often erroneously conflated with indicia sex trafficking.

e.  Indicia of "sex trafficking" have not been evaluated for sensitivity or specificity.

f.  To a reasonable degree of social scientific certainty, the interventions referenced by Plaintiff's purported experts would not have a statistically significant effect on the prevalence of sex trafficking, much less the identification of victims or offenders.

g.  To a reasonable degree of social scientific certainty, the interventions referenced by Plaintiff's purported experts would not have led to M.B.'s identification as a victim.

h.  Many of the opinions levied by Plaintiff's purported experts are based on misinformation, conjecture, or ecological fallacies, and are not supported by state-of-the-science research.

i.  Based on the evidence in this case, M.B.'s sex trafficking victimization was not "open" or "obvious."

j.  Based on the evidence in this case and my expertise on the identification of sex trafficking victims, it is not reasonable for Plaintiff's experts to conclude that the Roosevelt Inn staff knew or should have known that M.B. was a victim of sex trafficking.

Case ID: 170300712
Control No.: 21060495

## IV.  HUMAN TRAFFICKING OVERVIEW

Human trafficking generally refers to the recruitment, transportation, transfer, harboring or receipt of persons, by means of threat, force, coercion, abduction, fraud, or deception, for the purpose of exploitation. Juveniles, unlike adults, cannot consent to exploitation and therefore should be considered victims of trafficking if they were exploited. This definition encompasses two general forms of human trafficking: labor trafficking and sex trafficking.

Labor trafficking is defined as the recruitment, harboring, transportation, provision, or obtaining of a person for labor or services through the use of force, fraud, or coercion for the purpose of subjection to involuntary servitude, peonage, debt bondage, or slavery[9].

Sex trafficking, on the other hand, is defined as when a commercial sex act is induced by force, fraud, or coercion, or in which the person induced to perform such act has not attained 18 years of age[10].

The modern concept of human trafficking did not start becoming internationally popularized until the year 2000.

On October 28, 2000, the U.S. Congress enacted the Trafficking Victims Protection Act (TVPA), which set up formidable actions to combat trafficking in persons. Specifically:

1. Coordinate and monitor anti-trafficking activities through an interagency task force;
2. Prevent human trafficking through vocational training, education, and human trafficking public awareness campaigns;
3. Protect human trafficking survivors by not detaining them in correctional facilities, providing them with medical care and other assistance, and protecting them and their families from revictimization and/or deportation; and
4. Strengthening prosecution and punishment of human traffickers[11].

Less than two months after the TVPA was adopted in the United States, the United Nations met in Palermo, Italy, and adopted the Protocol to Prevent, Suppress and Punish Trafficking in Persons, Especially Women and Children, Supplementing the United Nations Convention Against Transnational Organized Crime—colloquially known as the Palermo Protocol. The purpose of the protocol was threefold:

1. To prevent and combat trafficking in persons, paying particular attention to women and children;
2. To protect and assist the victims of such trafficking, with full respect for their human rights; and

---

[9] Victims of Trafficking and Violence Protection Act of 2000, Pub. L. No. H.R. 3244 (2000). http://www.state.gov/j/tip/laws/61124.htm
[10] Ibid.
[11] Ibid.

Case ID: 170300712
Control No.: 21060495

3. To promote cooperation among states' parties in order to meet those objectives[12].

Since 2000, there has been an increase in public awareness of human trafficking. There are more anti-trafficking task forces, hotlines, and survivor services than ever before. However, there are still critical gaps between the human trafficking narrative, reality, and policy.

Although more people are aware of the human trafficking concept, few understand how this crime manifests in real life, and there is little empirical data to support generalizable information. Typically, victims are coerced, defrauded, and deceived into exploitive situations, where they are manipulated into complacency. Many organizations and anti-trafficking authorities provide information on how to identify the red flags of human trafficking, yet even trained law enforcement and service providers frequently misidentify victims.

---

[12] Protocol to Prevent, Suppress and Punish Trafficking in Persons, Especially Women and Children, Supplementing the United Nations Convention Against Transnational Organized Crime. (2000).

Case ID: 170300712
Control No.: 21060495

# V. LIMITATIONS OF HUMAN TRAFFICKING DATA

*Prevalence*

While social science researchers have begun to use qualitative data to develop themes on the recruitment and control techniques that are utilized by human traffickers, quantitative statistics should be discussed with caution. Although anti-trafficking advocates and the media cite data on the prevalence and characteristics of human trafficking crimes, the current body of research suggests that these statistics are questionable at best, due to a combination of methodological weaknesses and gaps in data, among a number of other discrepancies[13]. Despite increases in anti-trafficking law enforcement and legislative initiatives, social scientists have continued to experience difficulty in empirically evaluating the largely unobserved crime of human trafficking[14]. Organizations influencing anti-trafficking legislation make robust claims on the prevalence of this crime, the efficacy of interventions, and the need for legislative changes; however, researchers caution "inadequate data collection methods might result in descriptions that have little to do with reality[15]."

For example, in 2013 The U.S. Department of State Trafficking in Persons Report suggested that there were as many as 27 million men, women, and children being trafficked at any given time. However, that statistic was later debunked. In response, a State Department official said, "The major problem we have always faced with human trafficking is finding good data. For now, this is still a guesstimate, but the best guesstimate there is[16]." In addition to prevalence estimates, authorities have been caught citing erroneous statistics on the characteristics of victims[17] and the amount of illicit income from human trafficking enterprises[18].

Although there are new efforts to track incidents, arrests, and criminal offenses related to

---

[13] Chuang, Janie A. (2014). Exploitation Creep and the Unmaking of Human Trafficking Law. *The American Journal of International Law*, 108 (4): 609-659
Cwikel, J., & Hoban, E. (2005). Contentious issues in research on trafficked women working in the sex industry: study designs, ethics and methodology. *Journal of Sex Research, 42*(4), 306-316.
Goodey, J. (2008). Human trafficking: sketchy data and policy responses. *Criminology & Criminal Justice, 8*(4), 421-442.
Van der Laan, P. H., Smit, M., Busschers, I., & Aarten, P. (2011). Cross-border Trafficking In Human Beings: Prevention and Intervention Strategies for Reducing Sexual Exploitation. Campbell Systematic Reviews.
Weitzer, R. (2010). The Movement to Criminalize Sex Work in the United States. *Journal of Law and Society. 37* (1): 61-84.
[14] Brunovskis, A., & Tyldum, G. (2005). Describing the Unobserved: Methodological Challenges in Empirical Studies on Human Trafficking. *International Migration. 43* (1-2): 17-34.
[15] *Ibid*, pg. 17.
[16] Kessler, Glenn. April 24, 2015. Why you should be wary of statistics on 'modern slavery' and 'trafficking.' *The Washington Post*.
[17] Kessler, Glenn. June 8, 2016. Indiana AG touts a debunked and rejected 'fact' on sex trafficking. *The Washington Post*.
[18] Kessler, Glenn. June 2, 2015. The false claim that human trafficking is a '$9.5 billion business' in the United States. *The Washington Post*.

Case ID: 170300712
Control No.: 21060495

human trafficking, prevalence estimates are still lacking in the United States. Despite promises to standardize data from law enforcement about human trafficking, reported cases are still remarkably low and there is a large gulf between these data and the prevalence estimates purported by anti-trafficking advocates[19].

### *Evidence-Based Interventions*

In addition to the dearth of research on human trafficking prevalence, evidence-based interventions have yet to be identified.

Within the field of criminology, it is generally accepted that randomized controlled trials (experiments) are considered the gold-standard—the highest quality research—for evaluating the effectiveness of an intervention. In order to promote more evidence-based interventions to effectively combat crime, criminologists have taken a distinct "experimental turn" and the sheer number of quantitative experiments in criminology has increased dramatically in recent decades.[20] Most evidence-based criminological interventions have dozens of experiments supporting their efficacy. For example, Braga, Welsh, and Schnell (2015) conducted a meta-analysis of 30 randomized experimental and quasi-experimental tests of disorder policing.[21]

However, there is remarkably less research evaluating the efficacy of human trafficking interventions.

In a survey of extant research, Van der Laan et. al. (2011) conducted a systematic review of evaluations for interventions aimed to prevent and suppress trafficking in human beings in conjunction with the Campbell Collaboration.[22] The search identified 144 studies, but there was no methodologically rigorous evaluation of interventions aimed to prevent and suppress trafficking in human beings[23]. Therefore, the researchers could not draw any conclusions on actual outcomes or impacts of these interventions[24].

In order to be considered "high quality," a study would at least need to have a level 3 on the Maryland Scientific Methods Scale (SMS) (see Table 1).

---

[19] Farrell, Amy and Reichert, Jessica. (2017). Using U.S. Law-Enforcement Data: Promise and Limits in Measuring Human Trafficking. *Journal of Human Trafficking*, 3 (1) 39-60.

[20] Sampson, R.J. Gold Standard Myths: Observations on the Experimental Turn in Quantitative Criminology. J Quantitative Criminology 26, 489–500 (2010). https://doi.org/10.1007/s10940-010-9117-3

[21] Braga, A. A., Welsh, B. C., & Schnell, C. (2015). Can Policing Disorder Reduce Crime? A Systematic Review and Meta-analysis. Journal of Research in Crime and Delinquency, 52(4), 567–588. https://doi.org/10.1177/0022427815576576

[22] Campbell Collaboration is a social science research network that produces high quality, open access evidence synthesis in the field of criminology.

[23] No study was at least level 3 of the Maryland Scientific Methods Scale (SMS), i.e. a controlled design with both pretest and posttest measures and comparable control conditions.

[24] Van der Laan, P. H., Smit, M., Busschers, I., & Aarten, P. (2011). Cross-border Trafficking In Human Beings: Prevention and Intervention Strategies for Reducing Sexual Exploitation. Campbell Systematic Reviews.

Case ID: 170300712
Control No.: 21060495

**Table 1. Maryland Scientific Methods Scale (SMS)**[25]

| Level | Study Design |
|-------|--------------|
| 1 | Correlation between a prevention program and a measure of crime at one point in time. |
| 2 | Measures of crime before and after the program, with no comparable control condition. |
| 3 | Measures of crime before and after the program in experimental and comparable control conditions. |
| 4 | Measures of crime before and after the program in multiple experimental and control units, controlling for other variables that influence crime. |
| 5 | Random assignment of program and control conditions to units. |

However, at present, I am not aware of even a single Level 1 study evaluating the efficacy of the human trafficking victim identification protocols and/or "red flags" espoused by the plaintiff's experts.

Instead of relying on state of the science research methods, businesses, service providers, and other practitioners are limited to implementing speculative best practices with relatively unknown efficacy.

### *Sensitivity and Specificity*

Although there is relatively unknown efficacy of these interventions for sex trafficking victim identification, to a reasonable degree of social scientific certainty I can hypothesize that they will have low rates of sensitivity and specificity.

Herein, the term sensitivity is defined as the ability of law enforcement, service providers, and other third parties to correctly identify true victims of human trafficking (true positive). The term specificity refers to the ability of law enforcement, service providers, and other third parties to correctly identify persons who are not victims of human trafficking (true negative).

In regard to sex trafficking victim identification, low sensitivity of means that even if these protocols were implemented, victims of human trafficking would continue to be misidentified as non-victims, criminals, or co-conspirators. Low specificity means that even if these protocols were implemented, persons who are not victims of human trafficking would be misidentified as being possible victims.

These hypotheses are informed by my background, training, and expertise on the high rates of misidentification of victims by even trained professionals, including law enforcement.

---

[25] Farrington, D. P., Gottfredson, D. C., Sherman, L. W., & Welsh, B. C. (2003). The Maryland Scientific Methods Scale. In Evidence-based crime prevention (pp. 27-35). Routledge.

Case ID: 170300712
Control No.: 21060495

## VI.  MISIDENTIFICATION OF HUMAN TRAFFICKING VICTIMS

Despite increases in public awareness and new laws to criminalize human trafficking, the likelihood of U.S. officials actually identifying a victim has historically been relatively low. For example, using a nationally representative survey of police organizations, Farrell, McDevitt, & Fahy (2010) found that between 2000-2006 less than 10% of police agencies identified a human trafficking case. Even with increases in awareness and new, more comprehensive legislation at the disposal of law enforcement, few human trafficking cases are ever identified (Farrell, Owens, & McDevitt, 2013).

In evaluating why many law enforcement agencies have identified relatively few cases, Farrell (2013) analyzed data from municipal police agencies in the United States. Her research found that despite changes to legislation, police agencies might still be unprepared to identify and respond to human trafficking locally. In part, the study found that due to theoretical and practical barriers with effectuating organizational change within police agencies, policy developments have not necessarily manifested into effective changes in law enforcement practices.

As of 2014, The Polaris Project reported that only 32 states mandate training of law enforcement on human-trafficking crimes[26]. Even when the police have received basic training about human trafficking, they lack an investigative culture that supports the types of investigations that may be most effective in identifying a broad range of human trafficking.[27] When law-enforcement officials encounter human-trafficking incidents, they struggle to distinguish human-trafficking crimes from other previously existing crimes such as prostitution, commonly misclassifying human-trafficking victims as offenders.[28]

---

[26] Polaris. (2015). 2014 state ratings on human trafficking laws. Retrieved from http://www.polarisproject.org/storage/ 2014SRM_pamphlet_download.pdf
[27] Farrell, A., and R. Pfeffer. (2014). Policing Human Trafficking: Cultural Blinders and Organizational Barriers. The ANNALS of the American Academy of Political and Social Science; A. Gallagher and P. Holmes. (2008). Developing an Effective Criminal Justice Response to Human Trafficking: Lessons from the Front Line. International Criminal Justice Review. http://togetherletsstoptraffick.org/assets/OnlineDocuments/ICJR-GALLAGHER-HOLMES.pdf ; Wilson, J.M. and E. Dalton. (2008). Human Trafficking in the Heartland: Variation in Law Enforcement Awareness and Response. Journal of Contemporary Criminal Justice.
[28] Farrell, A., Owens, C., & McDevitt, J. (2013). New laws but few cases: understanding the challenges to the investigation and prosecution of human trafficking cases. Crime, Law and Social Change and Farrell, A., Pfeffer, R., and K. Bright. (2015). Police perceptions of human trafficking. Journal of Crime and Justice.

Case ID: 170300712
Control No.: 21060495

For example, take the case of Jennifer Lowery-Keith. She had been sex trafficked on and off since she was fourteen years old, first by her mother's drug dealer, whom she thought was her "boyfriend." At one point, one of her sex traffickers shot her at point blank range in her right leg, requiring a vascular transfusion. When Jennifer finally called the police to ask for help, she was arrested, not her sex trafficker (see Figure 1). In 2013, police responded to Jennifer's call for help at a Super 8 Motel in West Haven, Connecticut; yet, the police arrested her, not her trafficker.[29]



Figure 1. Example of Human Trafficking Victim Erroneously Criminalized

Many experts agree that "the anti-trafficking field is a strikingly 'rigor-free zone' when it comes to defining the concept's legal parameters[30]. It is believed that key aspects of the legal definition were intentionally left vague in order to achieve legislative consensus, but this has resulted in the indiscriminate conflation of legal concepts and misidentification of victims[31].

### Juveniles

According to Section 103, 8A of the Trafficking Victims Protection Act (TVPA) of 2000, children do not need to be forced, defrauded, or coerced to be considered victims of sex trafficking. The definition of child sex trafficking implies that juveniles do not have the legal capacity to consent to exploitation and that illicit means are implicit when a juvenile is induced to commit a commercial sex act.

As victims of a severe form of human trafficking, commercial sexually exploited children are afforded numerous protections under Section 107, c1 of the TVPA (2000), namely sex trafficked juveniles shall:

(1)    Not be detained in facilities inappropriate to their status as crime victims;
(2)    Receive necessary medical care and other assistance;
(3)    Be provided protection if a victim's safety is at risk or if there is danger of additional harm by recapture of the victim by a trafficker (p. 1477).

The letter and spirit of these provisions are to generally safeguard juvenile sex trafficking survivors. However, these protective directives can be difficult to effectuate in practice. Given the trauma bond that often accompanies human trafficking victimization, survivors may be

---

[29] The Associated Press. (2013) Connecticut woman charged with prostitution after calling police on pimp. Oregon Live. https://www.oregonlive.com/today/2013/05/connecticut_woman_charged_with.html
[30] Chuang, Janie A. (2014). Exploitation Creep and the Unmaking of Human Trafficking Law. *The American Journal of International Law*. (108) 4: 609-649.
[31] *Ibid*.

Case ID: 170300712
Control No.: 21060495

initially unwilling to cooperate with law enforcement[32]. In response, law enforcement agencies may utilize arrest, detention, and holding as measures to provide protection and coerce treatment for un-cooperating victims[33]. However, this may further exacerbate the already strained relationship between child survivors of sex trafficking and law enforcement; thus, leading to cyclical victim criminalization.

For example, in 2002 convicted human trafficker Carlos Curtis enticed a 12-year-old runaway girl to leave New York City and come with him to Washington D.C., where he took sexually explicit photographs of her, raped her, and forced her to prostitute herself on the streets[34]. Although the victim was eventually identified by law enforcement as a sex trafficking survivor, she was not protected from various forms of criminalization. Since the minor victim (A.P.) did not have any family who could retrieve her from D.C. and there was no social service worker to care for her, she was transferred to Oak Hill, a juvenile detention facility, where two inmates sodomized her with a toothpaste tube[35]. A.P. later returned to living and working on the streets in New York and began prostituting to support herself, where she was arrested and re-incarcerated. Given A.P.'s family situation and trauma, the prosecution justified holding A.P. in a detention facility as a material witness pending the trial of Carlos Curtis. Despite being afforded counseling and therapy, A.P. never availed herself to services and returned to the commercial sex industry post-trial[36].

Unfortunately, despite their victim status, juvenile survivors of sex trafficking continue to be arrested and detained for crimes related to their victimization, namely involvement in the commercial sex industry. The Uniform Crime Report collects data on the total number of persons arrested, cited, or summoned for criminal acts. Demographic data, along with the most serious charge filed, are reported for each arrested person. According to aggregate level UCR data, between 1,000−1,800 juveniles were arrested for prostitution offenses yearly at the time of M.B.'s victimization. Ultimately, a growing body of research identifies a gap between protections afforded to juvenile victims of sex trafficking under the law and their treatment by law enforcement in practice[37].

---

[32] National Center for Missing and Exploited Children (NCMEC). (n.d.). Commercial sexual exploitation of children: A fact sheet. Retrieved from http://www.missingkids.com/en_US/documents/CCSE_Fact_Sheet.pdf
[33] Office of Victims of Crime Training and Technical Assistance Center (OVCTTAC). (n.d.). The arrest, detain, and hold dilemma. Retrieved from
https://www.ovcttac.gov/TaskForceGuide/EGuide/WebHelp/12f_6.6c_The_Arrest_detain_and_hold_dilemma.htm
[34] U.S. v. Curtis (2006). No. 06-3047. Government's Memorandum in Aid of Sentencing.
[35] *Ibid.*
[36] *Ibid.*
[37] Adelson, W. J. (2008). Child prostitute or victim of trafficking. University of St. Thomas Law Journal, 6, 96; Drasin, W. J. (2012). New York's law allowing trafficked persons to bring motions to vacate prostitution convictions: Bridging the gap or just covering it up. Touro Law Review, 28, 489; Green, S. T. (2008). Protection for victims of child sex trafficking in the United States: Forging the gap between U.S. immigration laws and human trafficking laws. UC Davis Journal of Juvenile Law & Policy, 12, 309; Kittling, N. (2006). God bless the child: The United States' response to domestic juvenile prostitution. Nevada Law Journal, 6, 913; Reid, J., & Jones, S. (2011). Exploited vulnerability: Legal and psychological perspectives on child sex trafficking victims. Victims & offenders: An International Journal of Evidence-Based Research, Policy, and Practice, 6(2), 207-231; and Wharton, R. (2010). A new paradigm for human trafficking: Shifting the focus

Case ID: 170300712
Control No.: 21060495

17

It is important for commercial sexually exploited children (CSEC) to be protected from criminalization because these minors often suffer from multiple layers of trauma that are not easily recognizable[38]. The emotional, physical, psychological abuse, and torture CSEC experience often precedes their human trafficking victimization. Before becoming victims of human trafficking, these juveniles are considered high-risk on a number of fronts. For example, these prostituted kids typically grow up in dysfunctional environments, being "in-and-out of various parts of the social services system including private NGOs, foster homes, and runaway shelters"[39](pp. 74-75). Yet, despite having high risks and experiencing multiple forms of traumatic victimization, these juveniles often fail to receive directed services and are typically forced into a "revolving door of exploitation and arrest"[40] (p. 74).

In a movement toward a more victim-centered approach to human trafficking response, anti-trafficking organizations like Polaris Project (2013)[41] began publicly highlighting the gap between federal law and practice, denouncing the criminalization of child sex trafficking survivors. As a result of lobbying efforts, states recently began passing safe harbor laws. Safe harbor laws further clarify the distinction between prostitute and human trafficking victim at the state level. Similar to federal law[42], safe harbor policies generally define prostituted juveniles as severely trafficked persons in need of services[43]. However, it is unclear how these state-level policies manifest in practice and whether they have addressed the federal legal gap.

The spirit of the safe harbor policy can easily lead to the assumption that the number of juveniles arrested for the crime of prostitution would dissipate after the policies are implemented. However, in 2015 I authored the first empirical exploration of the criminalization of commercial sexually exploited children post safe harbor policy implementation using yearly count data on juvenile prostitution arrests aggregated at the state level. Preliminary data from four states suggested that the passage of safe harbor laws may not reduce the number of juveniles arrested for prostitution crimes[44]. Data since then intimates that juveniles continue to be misidentified and erroneously criminalized, despite the provisions in the TVPA and safe harbor statutes.[45]

from prostitution to exploitation in the trafficking victims protection act. William & Mary Journal of Women and the Law, 16(3), 753-780.

[38] Geist, D. (2012). Finding safe harbor: Protection, prosecution, and state strategies to address prostituted minors. Legislation & Policy Brief, 4, p. 67.

[39] Geist, D. (2012). Finding safe harbor: Protection, prosecution, and state strategies to address prostituted minors. Legislation & Policy Brief, 4, p. 67.

[40] *Ibid.*

[41] Polaris Project. (2013). Safe harbor-protecting sexually exploited minors (p. 4). Retrieved from http://www.polarisproject.org/storage/2013-Analysis-Category-6-Safe-Harbor.pdf

[42] Victims of Trafficking and Violence Protection Act of 2000. (2000). United States of America. Public Law 106-386 [H.R. 3244]. 28 October 2000.

[43] Drasin, W. J. (2012). New York's law allowing trafficked persons to bring motions to vacate prostitution convictions: Bridging the gap or just covering it up. Touro Law Review, 28, 489.

[44] Mehlman-Orozco, Kimberly. (2015). Safe Harbor Policies for Juvenile Victims of Sex Trafficking: A Myopic View of Improvements in Practice. *Social Inclusion*, volume 3, issue 1.

[45] According to the Office of Juvenile Justice and Delinquency Prevention, in 2018 there were 260 children under the age of 18 arrested for prostitution and/or commercialized vice, 50 of which were under the age of 15[45].

Case ID: 170300712
Control No.: 21060495

# VII. SEX TRAFFICKING

## *Sex Trafficker Characteristics*

Earlier research on recruitment and control in the commercial sex industry explored tactics used by "pimps" as opposed to "sex traffickers." Pimps recruited women into the commercial sex industry through one or a combination of five techniques: (1) love (romantic relationships), (2) debt (through extravagant introductory gifting), (3) drugs, (4) the "gorilla" technique (brute force), and (5) position of authority (parents or family).[46]

Similarly, sex traffickers in the United States conceal their exploitive intentions through entrapment and enmeshment schemes, portraying themselves as boyfriends/lovers or faux family, as well as using ruses involving debt bondage or coerced co-offending to gain compliance, while diminishing human trafficking victim credibility, likelihood of escape, and cooperation with law enforcement.

In conducting my own interviews with convicted human traffickers, I found that sex traffickers typically projected themselves to be honest heroes and lovers, while concealing their true self-identity as skilled manipulators.[47] Each human trafficker I interviewed claimed to truly love his victims and help improve their lives, despite being convicted for sex trafficking.

For example, according to Carlos Curtis, who is currently serving life in prison for sex trafficking a 12-year-old girl from New York to Washington, D.C.:

> *"Why does a prostitute need a pimp? To guide her, to love her, to protect her. The pimp is her father that she never had. He is that big brother that she misses, or the boyfriend from back in the day. The pimp is that husband that she fantasized about over and over. He is the popular guy in school that never paid her attention in class. To her, he is what Christ is to a Christian . . . The blood that pumps in her heart and keeps her legs moving. Without him, there's no her. You must understand, a ho was put on earth to be pimped by her pimp . . . Not all pimps, players, or macks possess the same characteristics. But, what we all have in common is a unique way of life and love for women and how they are able to use what they have to get them, and us what we need (notice I said NEED); we all need money to survive!"*

In addition, the sex traffickers I interviewed rationalized their crimes through a common understanding of the commercial sex industry counterculture—also known as "The Game" or "The Life"—which was perceived as being misunderstood by mainstream conformists.

---

[46] Mehlman-Orozco, Kimberly B. (2017). "Projected Heroes and Self-Perceived Manipulators: Understanding the Duplicitous Identities of Human Traffickers." *Trends in Organized Crime.*
[47] *Ibid.*

Case ID: 170300712
Control No.: 21060495

### *Human Trafficking Victim Characteristics*

Law enforcement and direct service providers regularly encounter victims of human trafficking who do not view themselves as victims and in many cases decline assistance. Many victims can be led to believe that they are "in love" with their trafficker or were "rescued" by their trafficker and feel compelled to return, even after being liberated by law enforcement. The emotional and social attachment described by victims is explained as "trauma bonding" by experts in the field.

Trauma bonding is generally defined as the complex emotional relationship that often exists between human traffickers and their victims. In order to facilitate a trauma bond with a victim, human traffickers will use a combination of emotional manipulation, feigned affection, physical and emotional abuse, common goals, and other tactics in order to maintain control and obedience for sexual exploitation. Their attachment with the perpetrator of the trauma/trafficker can serve as a coping mechanism for victims, while leading to distrust of law enforcement, family, and others, as well as failure to report victimization or delayed reporting, omissions, errors, and discrepant accounts.

While these counterintuitive reactions are described as byproducts of trauma bonding, they are also partially explained by the restricted life-choices of victims, prior to and following their commercial sexual exploitation. These victims are typically raised in dysfunctional environments, being in-and-out of various parts of the social services system including private NGOs, foster homes, and runaway shelters. Even after they are rescued from the commercial sex industry, there are limited resources to assist victims of human trafficking with housing, vocational placement, or education. Given the limited or non-existent resources for victims, human traffickers often portray themselves as "honest heroes," who rescued America's "disposable people."

The dysfunctional attachment between victims and human traffickers can hinder identification and impede prosecution by reducing the likelihood of cooperation with law enforcement; thus, perpetuating the exploitation. Eventually, victims of sex trafficking can have their agency obscured to such a degree that they can perceive themselves as consenting prostitutes who may facilitate the exploitation of others, despite the fact that they are being exploited.

Case ID: 170300712
Control No.: 21060495

# VIII.  ROOSEVELT INN CASE

Human trafficking is a clandestine crime. Traffickers go to great lengths to conceal their activities from third parties. While the plaintiff's purported "experts" claim that the Roosevelt Inn knew or should have known about M.B.'s commercial sexual exploitation, there is a wealth of countervailing evidence.

In his declaration, Daiquan Davis stated that he rented rooms from the Roosevelt Inn "only on a handful of occasions.[48]" He stated that when he did stay at the Roosevelt Inn, he "kept a low profile" and "made sure that the females that (he) worked with also kept a low profile because the Roosevelt Inn management was strict and patrolled the hotel." Mr. Davis testified that he "kept a low profile at the Roosevelt Inn to prevent hotel employees from knowing that (he) was involved in prostitution." Mr. Davis further stated in his declaration that he did not permit the girls he worked with to allow "Johns" to hang out in the hallways outside rooms he rented because he did not want hotel management or the security guard to know what was going on in the rooms. M.B. testified that this was true, that they engaged in practices to conceal their illicit activities from the hotel staff and security.[49] Last, Mr. Davis testified that M.B. was never sex trafficked at the Roosevelt Inn, only at the house on Comly Street.[50] In part of Lopez's testimony, he corroborated Davis's narrative. Although in one of his signed statements Mr. Lopez admits to advertising M.B. on Backpage and sexually exploiting her for approximately one month at the Roosevelt Inn[51], in his deposition and in a second signed statement he testified that M.B. was only at the Roosevelt Inn for seven days, during which time no person exchanged money for sex with her.[52]

Even if M.B. was sex trafficked at the Roosevelt Inn, staff denied ever knowing of her presence and victimization. From her deposition, M.B.'s contention that Roosevelt Inn knew or should have known rests on her allegation that there were condoms, prepaid cards, and lingerie in the room[53], and that a security guard witnessed her in the hall with only lingerie on one occasion. None of these variables are empirically tested indicia of sex trafficking or illicit activities that would catalyze law enforcement intervention. She was never personally present when any of the "Johns" entered the hotel and did not know if they ever spoke to the front desk staff, and as such she was not sure whether they were aware of the alleged commercial sex acts exchanged in the rooms.[54] M.B. testified that she was physically assaulted by Daiquan Davis on three occasions, but no one observed.[55] M.B. alleges that a man stood outside of her room in the hall only on one occasion.[56]

---

[48] Davis, Daiquan. February 5, 2018. Declaration of Daiquan Davis.
[49] Pg. 242 of M.B.'s deposition.
[50] Davis, Daiquan. February 5, 2018. Declaration of Daiquan Davis.
[51] Abdul Rahim Lopez Statement. 1/14/2019.
[52] Page 46 of Abdul Rahim Lopez Deposition. 2/19/2019.
[53] M.B. claims that it was "obvious" that commercial sex acts were being exchanged because there were "condoms everywhere, prepaid cards everywhere, and lingerie." Page 174.
[54] Page 174 of M.B. Deposition.
[55] Page 185 of M.B. Deposition.
[56] Page 187-188 of M.B. Deposition.

Case ID: 170300712
Control No.: 21060495

Despite being a minor victim of sex trafficking, M.B. was conditioned to perceive herself as a consenting sex worker, which made her victimization difficult to identify. Even during her deposition, M.B. conceptualized herself as a "prostitute" more often than a victim of sex trafficking (see Table 2).

Table 2. M.B. Mentions of "trafficking" versus "prostitution"

| M.B. Mentions of Trafficking, Trafficked, or Trafficker | M.B. Mentions of Prostitute, Prostitutes, or Prostitution |
|---|---|
| "I also did work with him with Rolanda, because that was his girl that he was trafficking also." Pg. 26 | "It was, I believe, when I started prostituting." Pg 43. |
| "Well, being abused, I would like to help out other females that have been in my situation with sex trafficking." Pg. 65 | "I was living there and then I ran away, and then that's when it— the prostitution started." Pg 56. |
| "I stopped trafficking and then I went to the placement." Pg. 253 | "I was involved in prostitution when my dad got out of jail." Pg. 74 |
| | "When I first started prostituting, I believe it was in a hotel room." Pg. 104 |
| | "The money that we made from prostituting, we had to — that was basically the room money." Pg. 177 |
| | "I didn't want her thinking that I was going back to prostitution because that — that wasn't my intention being there." Pg. 190 |
| | "I was prostituting." Pg. 192 |
| | "I know we just ended up prostituting — well, him prostituting me." Pg. 205 |
| | "I was still continuing to prostitute when he got out of jail… I stopped prostituting when I turned myself in." Pg. 232. |

Case ID: 170300712
Control No.: 21060495

This is common among victims of sex trafficking, especially minors. As a result of this manipulation and conditioning, M.B. admitted that she never tried to escape her traffickers[57], never asked for help from hotel staff[58], and did not disclosed her victimization to family[59]. Although M.B.'s traffickers deny that she was trafficked at the Roosevelt Inn, if she were, it is the modus operandi of sex traffickers that they would have gone to great lengths to conceal her presence for third parties on the premises. They would have kept her in the hotel room away from staff, kept her in the car when they rented the room[60], and never left the room with the commercial sex consumers who purchased sex from her[61].

Testimony contradicting the clandestine nature of sex trafficking crimes is of questionable veracity and should be treated accordingly in developing conclusions.[62] The reliability of these statements is further brought into question, when examined in the context of the police reports originating at the Roosevelt Inn. Police reports did not corroborate women brazenly walking the halls "half-naked" and meeting men in front of staff at the entrances. Instead, officers were typically guided to the rooms through a common "two-call system" and would meet the women inside at the door of the room. Insinuation that the Roosevelt Inn did not alert law enforcement to illicit activities is partially contradicted by repeated calls for service.

Moreover, it is important to note that multiple prostitution arrests that occurred at the Roosevelt Inn originated from "anonymous" complaints. On April 24, 2020, I called Lieutenant Gary Ferguson—the supervising officer over the Philadelphia Police Department staff involved in many of the Roosevelt Inn commercial sex arrests—and I asked him who the complainant was in the calls involving the Roosevelt Inn. In response, Lt. Ferguson stated the, "Complainant is the hotel staff. I am 99% sure it is going to be the hotel staff." When I asked why there was no record of the complainant in the police report Lt. Ferguson went on to explain, "We don't keep that stuff. We don't put that in the police report for the safety of the complainant. In court, it will be discoverable cause you can see or figure out who called the police on them. We don't put it in there for their safety." This was a standard practice in policing at the time.

M.B. testified that she returned to the Roosevelt Inn, after she was rescued, around 2016 or 2017. While receiving supervision and services through Judge Dumas' court, M.B. went to a party at the Roosevelt Inn, where she admitted to drinking and smoking, but not engaging in

---

[57] M.B. stated that she did not remember if she ever tried to escape her traffickers. Pg. 126-127.
[58] M.B. testified that she never told anyone at the Roosevelt Inn that she was being sex trafficked. Pg. 258.
M.B. testified that she never told anyone at the Roosevelt Inn that she exchanged sex for money. Pg. 258-259.
M.B. testified that she was not aware of any Roosevelt Inn employee having sex with any of the girls. Pg. 259.
[59] In M.B.'s supplemental answers, she stated that she told her parents and grandparents about being trafficked. Then in her deposition, she retracted that statement in saying, "No. I actually didn't want to tell anybody. I was so embarrassed especially towards my parents and my grandparents. I never told anybody." Pg. 217-218 of M.B.'s Deposition.
[60] M.B. testified that she was not at the front desk when her trafficker's rented rooms and would stay in the car. Page 200 of M.B.'s Deposition.
[61] M.B. testified that she would never leave the room with the older men who came to purchase from her. Page 184-185 of M.B.'s Deposition.
[62] For example, see testimony from Abdul Lopez, Kelvin Hanton, and Keith Fenwick discussing overt signs of commercial sex.

Case ID: 170300712
Control No.: 21060495

commercial sex exchanges. A police officer eventually came and broke up the party. M.B. advised the officer that she was working with the FBI at the time. The officer called the FBI agent, who advised him to take M.B. home—not charging her with any crime[63]. This is important because the one and only time that M.B. entered the Roosevelt Inn without her trafficker and had free movement, police were alerted to her presence at a party, demonstrating the diligence of Roosevelt Inn staff in reporting suspected illicit activity to police and cooperating with law enforcement.

Ultimately, instead of erroneously blaming third party businesses, it is important to look at the systemic failure by persons and systems charged with protecting M.B. and preventing her victimization. While M.B. was unequivocally a victim of sex trafficking, the clandestine nature of her victimization inhibited identification and intervention.

---

[63] Pg. 192 of M.B. Deposition.

Case ID: 170300712
Control No.: 21060495

# IX.   PLAINTIFF'S EXPERT WITNESS REPORTS

*Overview*

- Mr. Hudak and Ms. Guelbart did not cite any research assessing the reliability and/or validity sex trafficking interventions.

- Mr. Hudak and Ms. Guelbart repeatedly ignored the limitations of human trafficking identification, as well as the barriers to rigorous research on the efficacy of intervention.

- Mr. Hudak and Ms. Guelbart either did not mention the sensitivity and specificity challenges with victim identification, or referenced these barriers in a biased manner.

- Mr. Hudak and Ms. Guelbart repeatedly conflated prostitution and drug use indicia with sex trafficking.

- Mr. Hudak reached his conclusions by cherry-picking excerpts from deposition testimony, which was periodically referenced incorrectly or out of context, and either ignored countervailing evidence or rejected it as false or unreliable.

- Mr. Hudak and Ms. Guelbart suggested that Roosevelt Inn should have implemented interventions that were developed years after M.B.'s escape.

*Richard G. Hudak*

In his expert witness report, Mr. Hudak cherry-picked information on human trafficking to support multiple erroneous conclusions, which were not based in evidence. For example, on page three of his report, Mr. Hudak cited The Polaris Project *Hotels and Motels Recommendations*. Mr. Hudak stated "75% of survivors responding to Polaris' survey reported coming into contact with hotels at some point during their exploitation[64]." This "statistic" is taken out of context and includes no evaluation of the methodological rigor of The Polaris Project's survey.

The content of The Polaris Project's *Hotels and Motels Recommendations* was an excerpt from a larger report entitled *On-Ramps, Intersections, and Exit Routes: A Roadmap for Systems and Industries to Prevent and Disrupt Human Trafficking*.[65] The survey included only 127 respondents and did not include any institutional review board (IRB) process, which is standard practice for empirical research. A nationwide sample of 127 is too small to draw any inferences and should not have been cited as "fact" by Mr. Hudak. The survey was completed online and respondents were not asked for any kind of confirmation of victim status. Respondents were not selected randomly and were compensated for their participation.

---

[64] Specifically, Mr. Hudak included this website in his footnote citation: https://polarisproject.org/hotels-motels-recommendations/
[65] https://polarisproject.org/wp-content/uploads/2018/08/A-Roadmap-for-Systems-and-Industries-to-Prevent-and-Disrupt-Human-Trafficking.pdf

Case ID: 170300712
Control No.: 21060495



**Figure 2. Polaris Project Survey: Hotel/Motel Question**

While the report did state that 75% of survivors in the Polaris survey reported coming into contact with hotels at some point during their trafficking situation, the very next line of the report is "This means traffickers in all 50 states are taking advantage of ***unwitting*** hotel franchisees…" Moreover, of the sample 45% sought shelter in hotels or motels during their exits[66] and 18% lived independently at a hotel. Only 4% reported being trafficked by a hotel and 3% reported being trafficked by a hotel subcontractor (see Figure 3), neither of which is alleged to have happened at the Roosevelt Inn.

In addition to hotels/motels, the report identified seven other industries that encounter human trafficking crimes:

1. Financial Services;
2. Housing and Homelessness Systems;
3. Social Media;
4. Temporary Work Visas;
5. Transportation;
6. Business Regulatory Systems; and
7. Healthcare.

Of those different industries, Hotels & Motels encountered the fewest forms of trafficking (see Figure 4) and other industries are alleged to "facilitate" these crimes more. For example, one respondent alleged that "technology is being used to hurt" them; specifically, social media platforms.

On Page 3 of Mr. Hudak's report, he also states that "Any person under the age of 18 in the sex industry is, by definition, a victim of human trafficking." While

**Figure 4.0:**
**Hotel & Motel Involvement During Trafficking**
Polaris Survivor Survey (n=100)

**80%**
Commercial sex occurred at hotel (80)

**69%**
Used during travel (69)

**47%**
Victim sought shelter during exit(s) (47)

**20%**
Trafficker housed victim in hotel (20)

**18%**
Victim lived independently at a hotel (18)

**7%**
Other (7)

**4%**
Trafficked by a hotel (4)

**3%**
Trafficked by a hotel subcontractor (3)

Hotel & Motel

**Figure 3. Results from Polaris Project Survey**

---

[66] When a victim escapes her trafficker and "exits 'The Life,' seeking refuge at hotels.

Case ID: 170300712
Control No.: 21060495

that most certainly should be the case, that is not a "fact" in the operationalization of our criminal justice system. Juvenile victims of sex trafficking are frequently misidentified and erroneously criminalized by law enforcement. For example, take the cases of In re: N.C., In re M.V., In re. M.D., and In re. Aarica S. in the state of California. All four cases involved juveniles criminalized for prostitution. In fact, according to the Office of Juvenile Justice and Delinquency Prevention, in 2018 there were 260 children under the age of 18 arrested for prostitution and/or commercialized vice, 50 of which were under the age of 15[67]. As such, although any person under the age of 18 in the sex industry *should* be treated as a victim of human trafficking, it is important to recognize that children have been misidentified and erroneously criminalized by the criminal justice system.



**Figure 4. Polaris Project Matrix on Human Trafficking Types by Industry**

On page 5 of Mr. Hudak's report he states that "human sex trafficking, abuse of narcotics, and other crimes at the hotel, were open and obvious." This statement is in direct contradiction to the modus operandi of human trafficking crimes in general and the human trafficking crimes that are alleged to have happened in this case. Sex trafficking is a clandestine activity. Sex traffickers go to great lengths to conceal the victimization and to make the victims believe there are consenting participants to their own exploitation.

On pages 6 and 7 Mr. Hudak includes reviews from Trip Advisor, Yelp, and Facebook. These websites are not typically used by researchers or anti-trafficking NGOs to gauge commercial sex activity, much less sex trafficking. However, several researchers and anti-trafficking organizations have relied upon commercial sex review websites such as USASexGuide.nl[68]. There were only a handful of references to the Roosevelt Inn on USASexGuide.nl, and none of the posts implicated the hotel in any way of being complicit. In

---

[67] OJJDP. Estimated number of arrests by offense and age group, 2018.
https://www.ojjdp.gov/ojstatbb/crime/ucr.asp?table_in=1
[68] For example, see: Janson, Lara, et. al. 2013. "Our Great Hobby": An Analysis of Online Networks for Buyers of Sex in Illinois. Chicago Alliance Against Sexual Exploitation.

Case ID: 170300712
Control No.: 21060495

fact, one user explicitly undermined the information contained in Mr. Hudak's report. On May 29, 2009, an anonymous commercial sex consumer who went by the online handle 'JerryGarcia,' posted the following under 'Streetwalker Reports':

> "I was going to date this girl Terry if other options (well- reviewed GFE's closer to home) fell through and at the last minute found a girl on Backpage who was up on Roosevelt Blvd at a motel. I negotiated 1 hour of promised GFE entertainment for $.54— so I passed up the girl who I thought so highly of for an unknown thing. This turned out to be a mistake— I went to the motel and didn't like the scene at all (Roosevelt Inn)— the front desk stopped me from going to the room and asked too many questions. When I finally got to the room, the girl opened the door, and I was very disappointed in her looks— nothing like the ad or description— had missing teeth and didn't look 19 as had been promised—so I went in the room for 10 seconds, and then bolted."

The fact that this alleged commercial sex consumer posted that the hotel staff "stopped" him from "going to the room" and "asked too many questions" suggest that they were going above and beyond standard practices in 2009 in attempt to prevent and deter commercial sex consumerism on their premises.

Mr. Hudak goes on to list a number of "warning signs" that indicate the presence of human trafficking at hotels. This toolkit was not published until several years after M.B.'s escape and is not based in research, much less evaluated for efficacy. The purpose of the DHS Blue Campaign toolkit was to raise general awareness. It was never intended to be a mandated intervention that would effectively reduce the prevalence of sex trafficking or increase the likelihood of identification of victims or offenders[69].

In addition, Mr. Hudak conflates untested "best practice" signs of prostitution with sex trafficking, despite the fact that these illicit activities are not one in the same and the majority of consenting adult sex workers are not victims of sex trafficking. In fact, the International Labor Organization (ILO)[70], Amnesty International[71], and Women's Rights in Development[72] all

---

http://www.icasa.org/docs/misc/caase%20report%20online%20buyers%20of%20sex%20in%20illinois.pdf OR Pilny, Andrew and Jeffrey Proulx. 2017. The Influence of Prototypical Communication in Dark Online Organizations: How to Speak Like a Monger. Journal of Language and Social Psychology. https://www.researchgate.net/profile/Andrew_Pilny/publication/318885232_The_Influence_of_Prototypical_Communication_in_Dark_Online_Organizations_How_to_Speak_Like_a_Monger/links/59a454b50f7e9b4f7df37455/The-Influence-of-Prototypical-Communication-in-Dark-Online-Organizations-How-to-Speak-Like-a-Monger.pdf

[69] Interview with Mick McKeown, former Chairman and Executive Director of the DHS Blue Campaign. January 26, 2020.

[70] https://www.ilo.org/global/publications/ilo-bookstore/order-online/books/WCMS_PUBL_9221095223_EN/lang--en/index.htm

[71] https://www.amnesty.org/en/qa-policy-to-protect-the-human-rights-of-sex-workers/

[72] https://www.awid.org/news-and-analysis/awid-calls-voices-sex-workers-be-heard-european-parliament

Case ID: 170300712
Control No.: 21060495

advocate for the decriminalization and/or legalization of sex work, alongside prominent American politicians and Presidential candidates[73].

*Deposition Analysis*

The overwhelming majority (pages 7 to 19) of Mr. Hudak's report consisted of cherry-picking excerpts from depositions, completely taking deposition statements out of context, or erroneously citing depositions to support his *a priori* erroneous conclusions. The following tables illustrate some of Mr. Hudak's statements in comparison to countervailing and/or additional contextual information in each respective deposition.

**Table 3. Hudak Citation of M.B. Deposition**

| Mr. Hudak's Statements about M.B.'s Deposition | Relevant Excerpts from M.B.'s Deposition |
|---|---|
| "Never possessed or used a false identification." | • M.B. testified that she never possessed or owned a fake ID or used a real ID that belonged to another person[74]; however, she also testified that she never went to the front desk to reserve the room, she would wait in the car.[75]<br><br>• M.B. testified that she went by the fake name "Monroe[76]" and used pseudonyms on social media.[77] |
| "Was never arrested." | • M.B. testified that she has never been arrested and "Don't have no criminal background[78];" however, she also stated that she "had to stop smoking marijuana" because she was in Judge Dumas' court and "she sent" M.B. to a "program for marijuana."[79] She also stated that she went to a party at the Roosevelt Inn after her escape that was broken up by the police and she was not charged, despite the underage drinking and marijuana present, because she was working with the FBI at the time.[80] |

---

[73] For example, see CNN. (2019). Kamala Harris doesn't support criminalizing prostitutes. https://www.cnn.com/videos/politics/2019/04/23/kamala-harris-sex-work-decriminalization-town-hall-vpx.cnn
[74] Pg. 28 M.B. Deposition.
[75] Pg. 200 M.B. Deposition.
[76] Pages 164-165 M.B. Deposition.
[77] Pages 27-28 M.B. Deposition.
[78] Pg. 233 M.B. Deposition.
[79] Page. 75 M.B. Deposition.
[80] Page 190-192 M.B. Deposition.

Case ID: 170300712
Control No.: 21060495

| | |
|---|---|
| | • M.B. testified that she was placed in a juvenile detention center for smoking marijuana on September 16, 2015.[81] |
| "Began smoking marijuana at 12 years of age. Mother was heroin addict." | • M.B. testified that she started smoking marijuana when she was 12,[82] but became addicted around age 14.[83]<br><br>• M.B. testified her mother was using for 20 years and was not able to care or provide for M.B.[84]<br><br>• M.B. testified her father was selling heroin out of the house.[85] |
| "Was placed in Foster care before leaving and was sold for sex at 14 years of age." | • M.B. testified that she was placed in foster care on March 7, 2014 and placed in a group home on June 12, 2014, before being returned to her parents on August 21, 2015.<br><br>• M.B. testified that she believes her sex trafficking started in the summer of 2013 and continued into summer of 2014, ending before she was placed in a group home.[86]<br><br>• M.B. testified that she believes she met Daiquan Davis in 2014.[87]<br><br>• M.B. testified that she was not sure where she first engaged in commercial sex acts: at her mother's residence, the Roosevelt Inn, or Comly Street.[88]<br><br>• M.B. testified that she also engaged in commercial sex acts at Daiquan's mother's house on Parrish Street.[89]<br><br>• M.B. testified that she engaged in commercial sex acts at her mother's residence at 1718 Bridge Street in 2014.[90] |
| "Davis carried a firearm and frequently | • M.B. testified that Davis "punched, slapped to the face, the back, the sides" on three occasions[91]. |

[81] Page 271 M.B. Deposition.
[82] Pg. 72 M.B. Deposition.
[83] Pg. 247 M.B. Deposition.
[84] Pg. 39 M.B. Deposition.
[85] Pg. 318 M.B. Deposition.
[86] Pg. 108-109 M.B. Deposition.
[87] Pg. 130 M.B. Deposition.
[88] Pg. 136 M.B. Deposition.
[89] Pg. 136-137 M.B. Deposition.
[90] Pg. 135 M.B. Deposition.
[91] Pages 122-123 M.B. Deposition.

Case ID: 170300712
Control No.: 21060495

| | |
|---|---|
| threatened her, punched, slapped, and beat her." | |
| "Could only leave the room to let "Johns" in the side or back entrance about 10 times a day, "but half the time they walked in the front door." | • M.B. testified that she "was mainly locked in a room 24/7." The only time she had access to leave out the room was to "go get the johns from the side entrance" about ten times every day.[92]<br><br>• M.B. testified that she would go to the side entrance to get the johns, "but half of the time they walked right in the front door and come straight to the room."[93] However, she later qualified that Johns would go through the main lobby more often that her letting them in the side-door.[94]<br><br>• M.B. testified that Abdul Lopez told her she could not leave the room.[95]<br><br>• M.B. testified that she was only aware of two hotel entrances— "the side door and the main lobby."[96] She testified that she wasn't sure if there was a back entrance.[97] |
| "In response to a question from counsel would housekeepers know rooms were being used for prostitution?, "It was obvious there were condoms everywhere, dirty towels, prepaid cards everywhere, lingerie."" | • M.B.'s statement that "it was obvious because when you walk in the room, there's condoms everywhere, prepaid cards everywhere, lingerie" was NOT in response to a question from counsel on housekeeping. It was in response to a question about whether the front desk clerk at the Roosevelt Inn was aware. Immediately after, M.B. admitted that no front desk clerk ever came back to her room.[98]<br><br>• M.B. also contradictorily testified about how her traffickers would conceal their operations. For example, M.B. first testified that neither Daiquan Davis or Abdul Lopez ever told M.B. not to allow her customers to hang out in the hallways outside the rooms because they did not want hotel management to know what they were doing.[99] But then later, when asked about Daiquan Davis's testimony, where he stated that he did not permit the girls he worked with to allow "Johns" to hang out in the hallways outside rooms he rented because he did not want hotel management or the |

[92] Pg. 101 M.B. Deposition.
[93] Pg. 169 M.B. Deposition.
[94] Pg. 170 M.B. Deposition.
[95] Pg. 157 and Pg. 180 M.B. Deposition.
[96] Pg. 169 M.B. Deposition.
[97] Pg. 173 M.B. Deposition.
[98] Pg. 174 M.B. Deposition.
[99] Pg. 100 M.B. Deposition.

31

| | |
|---|---|
| | security guard to know what was going on in the rooms. M.B. testified that this was true, that they engaged in practices to conceal their illicit activities from the hotel staff and security.[100] |
| "Counsel inquired about interaction with "Abdul" the Manager. She responded, "only when he came and collected the money."" | • On four or five occasions, M.B. testified that she saw Abdul Lopez give a man he called "Abdul" money to stay in the room around checkout time. Abdul Lopez told M.B. that was the hotel manager.[101] |
| "There were about 15 girls working prostitution at the Roosevelt Inn at any given time, often competing with one another for the "Johns" who were at times on the weekends waiting in the hallway." | • When asked about Daiquan Davis's testimony, where he stated that he did not permit the girls he worked with to allow "Johns" to hang out in the hallways outside rooms he rented because he did not want hotel management or the security guard to know what was going on in the rooms. M.B. testified that this was true, that they engaged in practices to conceal their illicit activities from the hotel staff and security.[102] <br><br> • M.B. testified that only on one occasion she had a John waiting to come in the room when she already had someone.[103] |
| "Upon arrival at the Roosevelt Inn, she would stay in the car while Daiquan or Abdul rented the rooms at the Front Desk. They would open the side or back door for her to enter." | • M.B. testified that she was only aware of two hotel entrances—"the side door and the main lobby."[104] She testified that she was not sure if there was a back entrance.[105] |

---

[100] Pg. 242 M.B. Deposition.
[101] Pg. 175-178 M.B. Deposition.
[102] Pg. 242 of M.B. Deposition.
[103] Pg. 187-188 and Pg. 242 of M.B. Deposition.
[104] Pg. 169 of M.B. Deposition.
[105] Pg. 173 of M.B. Deposition.

Case ID: 170300712
Control No.: 21060495

**Table 4. Hudak Citation of Patel Deposition**

| Mr. Hudak's Statements about Yagnakumar Patel's Deposition | Relevant Excerpts from Yagnakumar Patel's Deposition |
|---|---|
| "He never observed anyone committing a crime when looking at the monitors or walking around the property." | • Mr. Patel clearly testified that he never watched a person commit a crime live on camera. However, if anyone complained, he would rewind the tapes and watch them for suspicious activity, sometimes with police.[106] |
| "Never observed any violence in the hallways" | • Mr. Patel testified he never saw any violence in the hallways on camera.[107]<br><br>• Mr. Patel testified he did have video of a shooting at the Roosevelt Inn and provided that video to police[108]. |
| "Does not know why the shootout occurred on March 31, 2014, thinks it could be faked by competition" | • Mr. Patel testified "They wouldn't tell us. Any time police comes for any reason, they just go to the room, they tell us to stay away, you know, because it's a crime scene or any other reason. They don't tell us, unless they want some information."[109]<br><br>• Mr. Patel testified he did not know why these men were shooting at each other, but he stated, "I want to find out, but who will tell me? Nobody will know the real reason. Only the cops know what happened. You know, they never told us."[110]<br><br>• Mr. Patel testified "When the cops come and ask me to run back the camera, then we know. I mean, what -- they will never tell us why, what happened or who was involved in shooting."[111]<br><br>• Mr. Patel testified that after the shooting occurred, security at the hotel was increased.[112] |

---

[106] Pg. 34 of Patel Deposition 7/19/2018
[107] Page 35 of Patel Deposition 7/19/2018.
[108] Page 36-37 of Patel Deposition 7/19/2018.
[109] Page 37 of Patel Deposition 7/19/2018.
[110] Page 38 of Patel Deposition 7/19/2018.
[111] Page 40 of Patel Deposition 7/19/2018.
[112] Page 54 of Patel Deposition 7/19/2018.

Case ID: 170300712
Control No.: 21060495

| | |
|---|---|
| | • The words "fake" or "faked" and "competition" were not mentioned during Mr. Patel's deposition at all, and not discussed in regard to the shootout. |
| "Does not know if a prostitution ring was run out of the hotel." | • Mr. Patel testified that the Roosevelt Inn has a "do not rent list" with undesired guests, which may include sex workers. This list included anyone who walked the halls half dressed, played music too loud or had parties, If they did not listen, they would be banned.[113]<br><br>• Mr. Patel testified that Mr. Azeez told him that he suspected there was prostitution at the Roosevelt Inn, but never observed it.[114]<br><br>• Mr. Patel testified that he had seen arrests at the hotel, which may have been for prostitution, but the police did not confirm the reason, so he could not be sure[115]. |
| "Azeez never told him he observed or suspected prostitution at the Roosevelt Inn." | • Mr. Patel testified that Mr. Azeez told him that he suspected there was prostitution at the Roosevelt Inn, but never observed it.[116] |
| "Is aware of arrests at the hotel for prostitution" | • Mr. Patel testified that he had seen arrests at the hotel, which may have been for prostitution, but the police did not confirm the reason, so he could not be sure[117]. |
| "No training programs have been conducted for human trafficking" | • To date, there is no evidence based-training program for hotels on human trafficking.<br><br>• In 2014, most police officers were not specifically trained on human trafficking, much less private businesses. |

---

[113] Page 346 of Patel Deposition.
[114] Page 85 of Patel Deposition 7/19/2018.
[115] Page 115 of Patel Deposition 7/19/2018.
[116] Page 85 of Patel Deposition 7/19/2018.
[117] Page 115 of Patel Deposition 7/19/2018.

Case ID: 170300712
Control No.: 21060495

**Table 5. Hudak Citation of Rushi Deposition**

| Mr. Hudak's Statements about Sanat Kumar Rushi's Deposition | Relevant Excerpts from Sanat Kumar Rushi's Deposition |
|---|---|
| "Never observed suspicious items in rooms, e.g. condoms, excessive number of dirty towels, lingerie, or other signs of prostitution." | • Mr. Rushi testified that he did not see any used condoms on the floor, but was trained to throw them away if he saw any.[118]<br><br>• The phrase "dirty towel" or "dirty towels" was not mentioned in Mr. Rushi's Deposition. Moreover, it is not an empirically tested "sign of prostitution." If there was any research on this so called "sign of prostitution," the sensitivity and specificity would be incredibly low.<br><br>• Mr. Rushi testified that he did not recall any customers calling and asking him for towels, but if they did, they would need to come to the front desk to retrieve them.[119]<br><br>• Lingerie is not an empirically tested "sign of prostitution." If there was any research on this so called "sign of prostitution," the sensitivity and specificity would be incredibly low.<br><br>• Mr. Rushi testified that if he saw customers breaking the hotel rules, he should call 911.[120] |
| "He never called the police. (Except on March 31, 2014, the night of the shootout, contradicting himself)." | • Mr. Hudak attempts to undermine the credibility of Mr. Rushi by pointing out a contradiction, but fails to do so for Plaintiff witnesses, who also made contradictory statements. This illustrates bias, especially since it is clear Mr. Rushi speaks English as a second language.<br><br>• When asked, "Have you ever had to call the police?" Mr. Rushi answered, "No."[121]<br><br>• In response to the question, "Is that the time when you called the police?" Mr. Rushi answered, "No. I have not |

[118] Page 36 of Rushi Deposition.
[119] Page 41 of Rushi Deposition.
[120] Page 131 of Rushi Deposition.
[121] Page 59 of Rushi Deposition.

Case ID: 170300712
Control No.: 21060495

| | |
|---|---|
| | called police. Other cashiers called the police on weekdays, not happen in my shift, only one time happen. That's all."[122] |
| | • When asked "Have you ever had to call 911?" Mr. Rushi answered "One time…It happened that many customers gathered in the room, and customers not listen to security guard and not leave the room. So I call 911, and police came and they kick out the customers."[123] |
| | • Mr. Rushi testified that within one minute of the shooting, he called 911.[124] |
| "Never spoke to security officers-but did initial the security log every hour to verify officers completed a tour." | • In response to the questions "Have you had any conversations with any security guards at the Roosevelt" and "Did you ever speak to the security guard?" Mr. Rushi testified, "No." However, in his very next answer, he testified that he spoken to security guards about the doors being open.[125] |
| | • Mr. Rushi testified that if a door was opened at the Roosevelt Inn he would "inform the security guard to close the door."[126] |
| | • Mr. Rushi testified that security guards typically worked 5:00pm to 2:00am Sunday to Thursday and 10:00pm to 6:00am Friday and Saturday.[127] Mr. Rushi testified that he worked Thursday night from 11:00pm to 7:00am and Sunday night from 10:00pm to 6:00am or from 7:00pm to 11:00pm. Perhaps Mr. Rushi's interaction with security was limited because his schedule only partially overlapped with theirs and he didn't work on the busiest days, which may have required more security interaction—Friday and Saturday.[128] |

---

[122] Page 62-63 of Rushi Deposition.
[123] Page 53 of Rushi Deposition.
[124] Pages 83, 85, 87, 95, 130 of Rushi Deposition.
[125] Pages 51 and 66 of Rushi Deposition.
[126] Page 48 of Rushi Deposition.
[127] Page 47 of Rushi Deposition. Patrick Panetta, President, Alpha-Century Security, Inc., testified in deposition that the seven-day schedule started in 2017: Monday-Thursday 5:30pm to 2:00am and Friday/Saturday 10:00pm to 6:00am.
[128] Page 110 of Rushi Deposition.

Case ID: 170300712
Control No.: 21060495

**Table 6. Hudak Citation of Keeler Deposition**

| Mr. Hudak's Statements about Fred Keeler's Deposition | Relevant Excerpts from Fred Keeler's Deposition |
|---|---|
| "Called police when fight broke out. Would contact security for unruly persons- by signaling a security officer who often sat in chair outside lounge." | • Mr. Keeler testified that during his employment at the Roosevelt Inn, he recalled calling security on unruly guests on possibly five occasions.[129]<br><br>• Of those five occasions, Mr. Keeler only specifically remembered two: (1) when an "loud" and "obnoxious" woman was bothering other guests and then asked to leave and (2) where there was an actual "fisticuffs," which prompted Mr. Keeler to actually call the police, but by the time the police arrived, the persons had left.<br><br>• In addition to these occasions, Mr. Keeler testified that he saw police at the Roosevelt Inn on perhaps four or five occasions: parked in the parking lot, speaking to someone at the front desk, or walking up and down the hall.[130]<br><br>• Mr. Keeler testified that he was unaware of any criminal activity occurring at the Roosevelt Inn, other than patrons occasionally being loud or fights from "beer muscles."[131]<br><br>• Mr. Keeler testified that he never saw anyone under the influence of drugs at the Roosevelt Inn, but he would refuse to serve individuals (on 10-15 occasions) who looked "spaced out."[132] |
| "Met with FBI about human trafficking, but advised he did not see signs of prostitution." | • Mr. Keeler testified that he never any signs of prostitution or human trafficking[133].<br><br>• Mr. Keeler testified that never saw any undercover police at the bar, but was contacted by an F.B.I Special Agent |

---

[129] Page 21 of Keeler Deposition.
[130] Page 23 of Keeler Deposition.
[131] Page 37 of Keeler Deposition.
[132] Page 38 of Keeler Deposition.
[133] Page 30 of Keeler Deposition.

Case ID: 170300712
Control No.: 21060495

| | sometime later (around 2015), who he did recognize, but was undercover previously.[134] |
| --- | --- |
| | • Mr. Keeler testified that the F.B.I Special Agent stated, "Fred, you looked like you were doing a good job," which he interpreted to mean he was "abiding by the rules" and "carding anybody who appeared underage.[135]" |
| | • Mr. Keeler testified that he only saw women in "skimpy" outfits at the Roosevelt Inn on one occasion, where women were wearing "club wear" for a New Year's Eve party.[136] |

**Table 7. Hudak Citation of Azeez Deposition**

| Mr. Hudak's Statements about Abdul Azeez's Deposition | Relevant Excerpts from Abdul Azeez's Deposition |
| --- | --- |
| "Never received training how to recognize, or what to do, if suspecting criminal activity, including human trafficking, occurs." | • While Mr. Azeez testified that he didn't receive any training on how to recognize criminal activity or what to do if he saw any, when asked if he saw a crime or were told about a crime at the Roosevelt, he stated he would, "Let the security guard know, send him up, let him look into it. If he cannot do anything, then call the police."[137]

• Mr. Azeez testified that if he saw someone in danger, he would call the police right away.[138]

• While Mr. Azeez testified that he didn't receive any training on how to recognize criminal activity or what to do if he saw any, he did testify that he received instructions from Mr. Patel on what to do if the police came to him during his shift. Specifically, he stated, "He said a hundred percent give them what they want. Let them come in the office and check all the computers and the registration cards."[139] |

---

[134] *Ibid.*
[135] Page 31 of Keeler Deposition.
[136] Page 38 of Keeler Deposition.
[137] Page 151 of Azeez Deposition.
[138] Page 152 of Azeez Deposition.
[139] *Ibid.*

Case ID: 170300712
Control No.: 21060495

| | |
|---|---|
| | • Mr. Azeez testified that he never refused a law enforcement officer access to any information maintained by the Roosevelt Inn.[140] |
| "Has never called the Police suspecting criminal behavior occurred." | • Mr. Azeez testified that he called the police on one instance because a gun had been retrieved.[141] <br><br> • Mr. Azeez testified that he called the police on another instance because his car had been vandalized for refusing to rent a room to people without identification.[142] <br><br> • Mr. Azeez testified that he was threatened at a bus stop for refusing to rent rooms to people without identification.[143] |

**Table 8. Hudak Citation of Hussain Deposition**

| Mr. Hudak's Statements about Bibihalimoon Hussain's Deposition | Relevant Excerpts from Bibihalimoon Hussain's Deposition |
|---|---|
| "She was has been (sic) approached by an FBI Agent to get trash from rooms on at least eight occasions." | • Ms. Hussain testified that she never saw prostitution at the Roosevelt Inn.[144] <br><br> • Ms. Hussain testified that she never saw drugs being sold at the Roosevelt Inn.[145] <br><br> • Ms. Hussain testified that the FBI approached Mr. Patel and asked for their assistance in building a case by retrieving trash, to which the staff obliged.[146] <br><br> • Ms. Hussain testified that the FBI Agent, who she referred to as "Jackson" came to the Roosevelt on approximately 15-17 occasions and she spoke with him on each occasion.[147] |

---

[140] *Ibid.*
[141] Page 157 of Azeez Deposition.
[142] *Ibid.*
[143] Page 157 of Azeez Deposition.
[144] Page 33 of Hussain Deposition.
[145] Page 33 of Hussain Deposition.
[146] Page 34 of Hussain Deposition.
[147] Page 34-35 of Hussain Deposition.

Case ID: 170300712
Control No.: 21060495

| | |
|---|---|
| | • Ms. Hussain testified that she kept the trash from a particular room and gave it to the FBI agent on approximately six or seven occasions.[148] |
| | • Ms. Hussain testified although she never called the police personally, the front desk would on occasion, if it appeared a patron had overdosed on drugs.[149] Ms. Hussain testified that she had seen this approximately eight times.[150] |
| | • Ms. Hussain testified that she never saw anyone that she suspected was engaged in prostitution or involved with sex trafficking.[151] |
| | • Ms. Hussain testified that she occasionally smelled marijuana at the Roosevelt Inn and only reported it when it was in a non-smoking room.[152] |
| "She has spoken to a law enforcement officer regarding a man named "dreads" who she has seen at the Roosevelt Inn." | • When asked whether Ms. Hussain had spoken to any other law enforcement besides the FBI Agent "Jackson," she mentioned an officer named "Jenny," who brought her a picture of a man nicknamed "Dreads." "Jenny" asked Ms. Hussain if she had seen "Dreads," which she had in the past, but he wasn't staying at the Roosevelt Inn presently. |
| "She recognized Abdul Lopez as someone who stayed at the Roosevelt Inn." | • When Ms. Hussain was shown a picture of Daiquan Davis, she did not recognize and testified that she had never seen him at the Roosevelt Inn.[153] |
| | • When Ms. Hussain was shown a picture of Abdul Lopez not only did she recognize him, but knew him by name. Ms. Hussain testified that she knew him because she had seen him on two or three occasions and the manager told her "he don't want him in there because he bringing in guests and they party in the room and trash it." Ms. Hussain then testified "So if we see him, we just go and tell the manager well, he is around, and he go and check and tell him that the room is not even in your name. What are you doing in the room, but he never disrespect us. He just leave.[154]" |

---

[148] Page 36 of Hussain Deposition.
[149] Page 24 of Hussain Deposition.
[150] Page 22 of Hussain Deposition.
[151] Page 26-27 of Hussain Deposition.
[152] Page 25 of Hussain Deposition.
[153] Page 45 of Hussain Deposition.
[154] Page 46 of Hussain Deposition.

Case ID: 170300712
Control No.: 21060495

| | • Ms. Hussain did not recognize the plaintiff or other women presented in deposition photographs.[155] |
|---|---|

**Table 9. Hudak Citation of Mueller Deposition**

| Mr. Hudak's Statements about Kimberly Mueller's Deposition | Relevant Excerpts from Kimberly Mueller's Deposition |
|---|---|
| "It was impossible for her to fulfill all of her job responsibilities." | • Ms. Mueller testified that it was "impossible" to do her job responsibilities, which consisted of "five things" at a time.[156]<br><br>• According to Ms. Mueller's testimony, she felt there was "too much technology," which involved: (1) working a console, (2) answering the phone, (3) processing credit cards, (4) answering questions, and (5) watching the cameras. This caused her "sensory overload" and she felt it was beyond her "physical capabilities."[157]<br><br>• When asked about her job responsibilities, Ms. Mueller listed: (1) making a maids list; (2) process deliveries; (3) checked in guests; (3) answered calls; (4) started reports regarding new guests[158] money, and vendors; (5) count safe cash; (6) take new reservations; (7) answer police calls[159]; (8) process checkouts; and (9) address any guest problems. These tasks are what made her feel her job was "impossible." |
| "The maids complained of condoms being everywhere and cleaning up blood." | • Ms. Mueller stated that customers would throw condoms under the bed and they would accumulate.[160] |

---

[155] Pages 46-48 of Hussain Deposition.
[156] Page 17 of Mueller Deposition.
[157] Page 43 of Mueller Deposition.
[158] Page 45 of Mueller Deposition: Guests included AAA, travelers, out-of-state guests, guests for weddings or events, or from out-of-the-country.
[159] Page 46 of Mueller Deposition: Most police calls were on Mondays.
[160] Page 51. of Mueller Deposition.

Case ID: 170300712
Control No.: 21060495

| | |
|---|---|
| | • Ms. Mueller stated that customers who left condoms in the room and were "really dirty" were not allowed back in.[161] |
| | • Ms. Mueller stated that maids would find blood in some rooms, but insinuated the blood was from menstruation[162] or drug use.[163] |
| | • Ms. Mueller stated that most of the rooms did not have blood in them. Blood was only found "occasionally."[164] |
| | • Ms. Mueller stated that rooms with blood, excessive condoms, or drugs were "problem rooms" and those guests were asked to leave.[165] |
| | • Ms. Mueller only personally witnessed one guest with blood on themselves—a male, who was using drugs, and subsequently "kicked out" of the hotel.[166] |
| "Maids would find drug paraphernalia in the rooms." | • Ms. Mueller testified that she would call the police if somebody was "not functioning right" under the influence of drugs.[167] |
| | • Ms. Mueller testified that drug dealers were not allowed in the Roosevelt Inn and they would call the police if anyone looked suspicious.[168] |
| | • Ms. Mueller stated that she had never seen a used needle or a rubber band or rubber tube to tie around a person's arm.[169] |
| | • Ms. Mueller stated that maids sporadically found used needles when cleaning the rooms. Ms. Mueller categorized these guests as the "wrong people" and who |

[161] Page 50-51 of Mueller Deposition.
[162] "Some of them had blood. Some of them had, you know—some of them went to the bathroom all over, you know. So they had to clean up all that stuff. And blood, I don't know where the blood came from." Page 53 of Mueller Deposition.
[163] Ms. Mueller stated she associated blood with drugs. Page 80 of Mueller Deposition.
[164] Page 80-81 of Mueller Deposition.
[165] Page 84. of Mueller Deposition.
[166] Page 76 of Mueller Deposition.
[167] Page 63 of Mueller Deposition.
[168] Page 72-73 of Mueller Deposition.
[169] Page 79-80 of Mueller Deposition.

Case ID: 170300712
Control No.: 21060495

| | |
|---|---|
| | • were asked to leave the Roosevelt Inn and never return.[170] <br><br> • Ms. Mueller categorized rooms with needles as "problem rooms" and those guests would "have to go."[171] <br><br> • Ms. Mueller repeatedly stated that Roosevelt Inn management did not "want drugs in the hotel" and those guests would need to leave or they would call the police.[172] |
| "She would review security camera videos with Mr. Patel and Abdul Azeez and there were times that Mr. Patel kicked the entire floor out of the hotel." | • Ms. Mueller stated that Mr. Patel would call her in to review security camera videos because he would have to make a decision on whether he should kick out the whole floor if he couldn't pinpoint where a problem was coming from.[173] |
| "Recognized Naeem Johnson, Abdul Lopez, Jerel Jackson, and Christopher Powell at the Roosevelt Inn." | • When Ms. Mueller was shown a picture of Naeem Johnson, she confused him with someone named "Cowell."[174] <br><br> • When Ms. Mueller was shown a picture of Abdul Lopez, she did not recognize him and his name didn't sound familiar.[175] She did not recall him staying at the Roosevelt Inn. <br><br> • When Ms. Mueller was shown a picture of Jerel Jackson she did not recognize him and did not recall him staying at the Roosevelt Inn.[176] <br><br> • When Ms. Mueller was shown a picture of Christopher Powell she confused him with someone named "Cowell"—the same man she confused with Naeem Johnson.[177] |

---

[170] Page 81-82 of Mueller Deposition.
[171] Page 84 of Mueller Deposition.
[172] Page 85 of Mueller Deposition.
[173] Page 133-134 of Mueller Deposition.
[174] Page 177-179 of Mueller Deposition.
[175] Page 207 of Mueller Deposition.
[176] Page 210-212 of Mueller Deposition.
[177] Page 219 of Mueller Deposition.

Case ID: 170300712
Control No.: 21060495

| "Was aware of prostitution at the Roosevelt Inn." | • Ms. Mueller testified that prostitution was against the policy at the Roosevelt Inn and sex workers were not permitted to stay there.[178] |
| | • Ms. Mueller testified that she was instructed to refuse to rent rooms to anyone who appeared to possibly be a sex worker.[179] |
| | • Ms. Mueller testified that she never heard there was "a lot of prostitution" going on at the Roosevelt Inn.[180] |

**Table 10. Hudak Citation of Hanton Deposition**

| Mr. Hudak's Statements about Kelvin Hanton's Deposition | Relevant Excerpts from Kelvin Hanton's Deposition |
| --- | --- |
| "Did not pay attention to patrolling the bar because it was off limits." | • When asked if anyone ever told him he wasn't allowed to enter the bar to patrol it, Mr. Hanton answered, "No."[181] |
| | • Mr. Hanton testified that at the bar was closed down and not operational for some time when he worked at the Roosevelt Inn.[182] |
| "People working at the front desk did not want to call or involve the cops." | • When asked if he ever called the police when working at the Roosevelt Inn, Mr. Hanton testified that he "never had to."[183] |
| | • Mr. Hanton testified that the front desk clerk didn't want to call or involve the police and testified that they "never" called the cops.[184] However, this statement is not true, because there are police records of the police being called by Roosevelt Inn staff. |
| "Heard from the front desk workers that the shootout was over drugs, pimps and prostitutes." | • Mr. Hanton testified that he heard from the front desk workers that the shootout was over drugs, pimps, and prostitutes, but when asked "Did anyone at the Roosevelt Inn come and talk to you after the shootout about the |

---

[178] Page 244 of Mueller Deposition.
[179] Page 245 to 246 of Mueller Deposition.
[180] Page 141 of Mueller Deposition.
[181] Page. 136 of Hanton's Deposition.
[182] Page 36 of Hanton's Deposition.
[183] Page 49 of Hanton's Deposition.
[184] Page 51 of Hanton's Deposition.

Case ID: 170300712
Control No.: 21060495

| | |
|---|---|
| | shootout," Mr. Hanton answered "No," contradicting himself.[185] |
| "Observed prostitution on busy nights with women walking around the halls half- naked." | • Mr. Hanton claims he saw "naked women" who he described as "buck naked" walking down the halls at the Roosevelt Inn once or twice.[186]<br><br>• Mr. Hanton claims he saw "half-naked women," which he described as wearing short skirts, "see through" tops, and tight clothing once or twice.[187]<br><br>• Mr. Hanton claims he saw women with no top and bare breasts "lots of times," which he approximated was every weekend.[188]<br><br>• Mr. Hanton claims he saw all of this, but was aware of no police presence on the premises, which directly contradicts police reports.[189] |
| "Pimps and men coming to buy sex were none of his business." | • When asked if Mr. Hanton ever saw pimps at the Roosevelt Inn, he stated he saw men and didn't know any more about these men because it was none of his business.[190] |
| "It didn't take a rocket scientist to figure out the prostitution was going on at the Roosevelt Inn." | • Mr. Hanton stated "it didn't take a rocket scientist to figure out that prostitution was going on in there, that if you see women walking around half naked, you know, you see different men walking in and out of these people's rooms, that's prostitution all day long, you know.[191]<br><br>• When asked if he thought there was a sex trafficking problem at the Roosevelt, Mr. Hanton answered "No[192]."<br><br>• When asked if he was aware of any human trafficking at the Roosevelt, Mr. Hanton answered "No.[193]" |

[185] Page 53-54 of Hanton's Deposition.
[186] Page 110-111 of Hanton's Deposition.
[187] Page 111-112 of Hanton's Deposition.
[188] Page 113 of Hanton's Deposition.
[189] Page 65 of Hanton's Deposition.
[190] Page 57 of Hanton's Deposition.
[191] Page 59 of Hanton's Deposition.
[192] Page 65 of Hanton's Deposition.
[193] Page 143-144 of Hanton's Deposition.

Case ID: 170300712
Control No.: 21060495

| "He wasn't stopping anything, so he was just showing up to get paid." | • Mr. Hanton stated that he would have reported sex trafficking of a minor if he had witnessed it and would have "kicked" the trafficker's "ass" himself, because he doesn't condone that.[194]<br><br>• Mr. Hanton testified that if saw anyone forced to sell themselves for sex he would have reported that activity, but he didn't witness it.[195] |
|---|---|
| "Would not tell the staff if he observed or overheard indications of prostitution because they already knew it was happening at the motel." | • Mr. Hanton also testified that suspected prostitution is "probably why" the Roosevelt Inn hired the security company to be a deterrent.[196]<br><br>• Mr. Hanton stated that he would have reported sex trafficking of a minor if he had witnessed it and would have "kicked" the trafficker's "ass" himself, because he doesn't condone that.[197]<br><br>• Mr. Hanton testified that if saw anyone forced to sell themselves for sex he would have reported that activity, but he didn't witness it.[198] |
| "Stopped working at the Roosevelt Inn because he was accused of selling a room key." | • This should bring into question the veracity of Mr. Hanton's testimony. |

**Table 11. Hudak Citation of Lopez Deposition**

| Mr. Hudak's Statements about Abdul Lopez's Deposition | Relevant Excerpts from Abdul Lopez's Deposition |
|---|---|
| "He was on a Do Not Rent list because of parties he used to throw and prostitution but continued to use the Roosevelt Inn | • Mr. Lopez testified that Mr. Patel was "shutting things down" because he "wanted to stop the traffic of the hotel. He wanted to have regular customers, he didn't want to |

---

[194] Page 144 of Hanton's Deposition.
[195] Page 150 of Hanton's Deposition.
[196] Page 63 of Hanton's Deposition.
[197] Page 144 of Hanton's Deposition.
[198] Page 150 of Hanton's Deposition.

Case ID: 170300712
Control No.: 21060495

| | |
|---|---|
| for parties and prostitution." | have the usual suspects"…He told kicked Mr. Lopez out and told him "don't come back."[199]

- Mr. Lopez testified that if Mr. Patel heard music blasting from a room he would knock on the door and tell the occupant to "turn it down or leave." He went on to state that Mr. Patel would "kick your ass out" for having the music too loud.[200]

- When asked whether Mr. Patel was more strict than other hoteliers Mr. Lopez stated, "Yeah, he didn't play. He didn't play, I ain't going to lie. And when he kicked me out for good, he couldn't come back at all." Before Mr. Lopez was incarcerated, he attempted to re-enter the Roosevelt Inn and was told "You got to go, you can't come. Bye. Leave." He stated that he couldn't step foot on the premises at all once he got banned.[201]

- On one occasion when Mr. Lopez was being kicked out of the Roosevelt Inn, he testified that Mr. Patel showed him videotape from the hallways, that catalyzed Mr. Patel's decision to ask Mr. Lopez to leave.[202]

- Mr. Lopez testified that after he got kicked out of the Roosevelt Inn, he couldn't come through the front door. He believed if he came through the front door, Mr. Patel would be there and prevent him from entering the premises. In order to evade detection, Mr. Lopez would enter the property through the side door and conceal his identity through disguises, such as wearing a hat or hoodie. He described it a "slide" or "sneak" in to the property.[203] |
| "Abdul Lopez described the Roosevelt Inn as a gentlemen's club or strip club with girls everywhere wearing lingerie, towels and little clothing." | - Mr. Lopez testified that there were regular families who stayed at the Roosevelt Inn all the time.[204]

- Mr. Lopez testified that if Mr. Patel heard music blasting from a room he would knock on the door and tell the occupant to "turn it down or leave." He went on to state |

---

[199] Page 42 of Lopez Deposition.
[200] Pag 65 and 66 of Lopez Deposition.
[201] Page 91-92 of Lopez Deposition.
[202] Page 127-128 of Lopez Deposition.
[203] Page 135-136 of Lopez Deposition.
[204] Page 43 of Lopez Deposition.

Case ID: 170300712
Control No.: 21060495

| | |
|---|---|
| | that Mr. Patel would "kick your ass out" for having the music too loud.[205] |
| | • When asked whether Mr. Patel was more strict than other hoteliers Mr. Lopez stated, "Yeah, he didn't play. He didn't play, I ain't going to lie. And when he kicked me out for good, he couldn't come back at all." Before Mr. Lopez was incarcerated, he attempted to re-enter the Roosevelt Inn and was told "You got to go, you can't come. Bye. Leave." He stated that he couldn't step foot on the premises at all once he got banned.[206] |
| | • Mr. Lopez testified that he wasn't friends with any employee of the Roosevelt Inn, didn't tell anyone at the Roosevelt Inn that he was engaged in prostitution, never bribed or offered any money to any employee at the Roosevelt Inn, and the employees at the Roosevelt Inn did not in any way may his sex trafficking easier. Mr. Lopez stated he could have done what he did at "any hotel."[207] |
| "There were a lot of pimps working at the Roosevelt Inn." | • Mr. Lopez testified that he knew other pimps that he alleges operated out of the Roosevelt, but didn't quantify as "a lot."[208] |
| | • Mr. Lopez testified there were more girls that didn't have pimps than girls that had pimps and girls that had guys with them at the Roosevelt.[209] |
| "Prostitution and girls standing in doorways was open and obvious beginning in the middle and end of 2012." | • When asked if any prostitution went on in front of the security guards, Mr. Lopez testified "Not necessarily." He explained that girls would walk the hallways, but not being too disrespectful. |
| | • When asked to describe what M.B. was wearing when she encountered security one time during the week he claims she stayed at the Roosevelt Inn, Mr. Lopez described a long white dress that went down to her |

---

[205] Pag 65 and 66 of Lopez Deposition.
[206] Page 91-92 of Lopez Deposition.
[207] Page 147-148 of Lopez Deposition.
[208] Page 52-53 of Lopez Deposition.
[209] Page 122 of Lopez Deposition.

Case ID: 170300712
Control No.: 21060495

| | |
|---|---|
| | ankles, which she purchased at Rainbow. He stated M.B. was not walking around half naked, period.[210] |
| "There were drug dealers at the Roosevelt Inn and you could get whatever drugs you wanted, marijuana, pills, crack cocaine, powder." | • Although Mr. Lopez does claim he could purchase Marijuana, pills, crack cocaine, powder, etc. while staying at the Roosevelt Inn[211], he repeatedly admits that Mr. Patel was shutting things down and addressing the issue (see rows above).<br><br>• Mr. Lopez described an instance when Mr. Patel kicked the whole second floor out of the hotel.[212] |
| "He stayed at the Roosevelt Inn for months at a time." | • Mr. Lopez also testified that he would use different people to rent the rooms three times per week because he was on the "banned list.[213]" |
| "He had much love for Yagna Patel and Frida." | • While Mr. Lopez did say that he has much love for Patel and Frieda,[214] human traffickers often claim to "love" the people they exploit.[215]<br><br>• Mr. Lopez also discussed Mr. Patel being more strict than other hoteliers and being banned (see above). |

Using this information, Mr. Hudak erroneously concludes that the defendants "knew or should have known" human trafficking, prostitution, drug abuse and transactions, and other criminal activities were occurring at the hotel. Mr. Hudak claims that the defendants failed to take steps to deter or prevent criminal activity, including sex trafficking, and instead, "permitted illegal criminal acts to occur." Mr. Hudak goes on to allege that the defendants were "willfully blind" to sex trafficking and failed to report it to the police. In support of his allegation, Mr. Hudak cites the U.S. Department of Homeland Security publication on *Human Trafficking and the Hospitality Industry* — a document that was not made available to the industry until 2017. Mr. Hudak audaciously states that the human trafficking at the Roosevelt Inn was "open and obvious," which is the antithesis of the human trafficker's modus operandi.

Human trafficking is a clandestine crime. Traffickers go to great lengths to not only conceal their illicit activities from third parties, but to also veil the exploitation from their victims and their social network. M.B. was manipulated into believing she was a consenting participant

---

[210] Page 199-200 of Lopez Deposition.
[211] Page 43 of Lopez Deposition.
[212] Page 202 of Lopez Deposition.
[213] Page 19-20 of Lopez Deposition.
[214] Page 92 of Lopez Deposition.
[215] Mehlman-Orozco, Kimberly B. (2017). "Projected Heroes and Self-Perceived Manipulators: Understanding the Duplicitous Identities of Human Traffickers." Trends in Organized Crime.

Case ID: 170300712
Control No.: 21060495

to her own exploitation, which is why she initially did not self-identify as a victim or ask for help, much less disclose her victimization to her family or friends.

Given the clandestine nature of M.B.'s victimization, it is not reasonable to conclude that the Roosevelt Inn "knew or should have known," especially when trained law enforcement were misidentifying and erroneously arresting juvenile victims of sex trafficking at that time and there were no evidence-based indicia of sex trafficking that could have led to M.B.'s identification as a victim of sex trafficking by hotel staff.

### *Michelle Guelbart*

Astonishingly, Ms. Guelbart does not provide a single citation in her expert witness report. As such, it is unclear what empirical research, if any, she relied upon to support her opinions. Many of Ms. Guelbart's opinions appear to be based on platitudes and conjecture as opposed to state-of-the-science empirical research.

Statements made by Ms. Guelbart that are in need of citation, include, but are not limited to, the following:

**Table 12. Lack of Evidentiary Basis for Guelbart Opinions**

| Page # | Guelbart Statement | Lack of Evidentiary Basis |
|--------|--------------------|---------------------------|
| 4 | "Due to the anonymous, risk-free nature of the hospitality industry, children are often exploited in hotels—ranging from budget properties to luxury resorts." | I am not aware of any rigorous empirical evidence to suggest that sex traffickers view the hospitality industry as "risk free" or empirically quantify the percent of children who are exploited in hotels as opposed to private residences or other venues.<br><br>Hotels are not anonymous, considering they require identification for check-in, and are not risk-free as hotel employees have been known to report illicit activity to law enforcement. |
| 4 | "The location (hotels) feels safer than going to any one person's home." | I am not aware of any rigorous empirical evidence to support this statement. |
| 4 | "Hotel employees are uniquely situated to identify and report suspicious activity, if they are appropriately prepared, empowered, and trained." | I am not aware of any rigorous empirical evidence to support the efficacy of any training in preparing, empowering, or training hotel staff, especially not at the time of M.B.'s victimization. Moreover, according to anti-trafficking NGOs, hotels are not uniquely situated to identify suspicious activity any more |

Case ID: 170300712
Control No.: 21060495

| | | than law enforcement, healthcare providers, the beauty industry, the foster care system, the school system, the financial industry, the transportation industry, etc.[216] |
|---|---|---|
| 4 | "From check-in (or drop off) to check-out (or pick up) there are a number of indicators victims, buyers, and traffickers exhibit during the time they are on a hotel property." | I am not aware of any rigorous empirical evidence that tests the sensitivity or specificity of any "indicators" or "red-flags" in the identification of victims, buyers, or traffickers. Most of the extant "indicators" or "red-flags" were developed and disseminated after M.B.'s victimization and are currently criticized for lack of sensitivity/specificity.[217] |
| 4 | "Companies that adopt policies and procedures to combat human trafficking and child exploitation, mitigate the risk of exploitation occurring on their properties." | I am not aware of any rigorous empirical evidence that correlates the adoption of policies and procedures to combat human trafficking child exploitation to a reduction in the risk of exploitation occurring on a property. Anecdotally, hotels that have implemented the policies and procedures to combat human trafficking and child exploitation recommended by Ms. Guelbart's NGO ECPAT continue to be implicated by commercial sex consumers on review websites such as USASexGuide.nl and are actively being sued by victims in civil court. |
| 4 | "When buyers are in travel settings (even hotels in their own community) feelings of anonymity can embolden them to act in ways they would not act if they felt they were being watching (sic)." | I am not aware of any rigorous empirical evidence to suggest that commercial sex consumers feel emboldened in hotels. In fact, commercial sex consumers often go to great lengths to avoid the front desk and other staff because they are fearful of security. |
| 4 | "Travel industry associates are more likely to witness human trafficking occurring in plain sight than the average person." | I am not aware of any rigorous empirical evidence that evaluates the odds of a travel industry associate witnessing human trafficking occurring in plain sight compared to other industries or the average person. |

[216] https://polarisproject.org/wp-content/uploads/2018/08/A-Roadmap-for-Systems-and-Industries-to-Prevent-and-Disrupt-Human-Trafficking.pdf
[217] For example, see: Song, Sandra. (2019). When Anti-Sex Trafficking Policies Like the Marriott's Do More Harm Than Good. https://www.papermag.com/marriott-hotels-sex-trafficking-training-2627520121.html?rebelltitem=1#rebelltitem1

Case ID: 170300712
Control No.: 21060495

| 4 | "When properly trained, they can and do report suspected incidents to the appropriate authorities." | It is unclear what Ms. Guelbart believes is "proper" training. I am not aware of any rigorous empirical evidence that suggests any extant training results in a statistically significant increase in the reporting of suspected trafficking incidents. Based on my knowledge and experience, hotel staff have reported suspected incidents to the appropriate authorities, even without training. |
|---|---|---|
| 5 | "General managers often reach out to law enforcement who are trained on the issue so they have a go-to response for the hotel property." | Ms. Guelbart completely ignores the fact that even law enforcement who are "trained on the issue" have difficulty in identifying victims of sex trafficking, which often results in failed service provision and erroneous criminalization. |
| 5 | "In 2010 Congressman Christopher Smith, R, NJ stressed the role travel and tourism companies have in addressing human trafficking stating, "[t]he airline and hotel industries should be on the front lines of the fight." | Ms. Guelbart fails to acknowledge the multiple lawsuits that resulted from poorly conceived anti-trafficking trainings and that are alleged to violate basic civil liberties. For example, from the aviation industry:<br><br>• In 2014, a whole plane was detained while police questioned an Asian woman and a Puerto Rican man who were traveling together. They were boyfriend and girlfriend, but police had decided the woman was likely being sex trafficked.<br><br>• In 2017, Brian Smith, from Arizona, was travelling back from a trip to Florida with his wife Renee and their three children, including Georgianna, 16, who the couple adopted from China, when a Southwest Airlines staff member accused Smith of trafficking his adopted daughter.<br><br>• In 2019, 55-year-old Peter DelVecchia, a white man, was traveling with his adopted 12-year-old son, who is black. According to a lawsuit DelVecchia filed in federal court, Frontier Airlines staff accused him of sex trafficking his son |

Case ID: 170300712
Control No.: 21060495

| | | and detained the boy in the back of the plane.[218] |
|---|---|---|
| 5 | "Pressure from the government increased in 2012, when President Obama's administration launched increased efforts to "combat human trafficking at home and abroad. The President administered an Executive Order to strengthen protections against trafficking in federal contracts." | Ms. Guelbart failed to recognize that although President Obama issued Executive Order 13627 in September 2012, the anti-trafficking provisions didn't take effect until March 2, 2015. The "Strengthening Protections against Trafficking in Persons in Federal Contracts" order required the FAR Council to amend the FAR to provide the government with additional tools to implement and enforce anti-trafficking policies and to provide contractors with "additional clarity" on policy compliance. In 2015, the FAR Council finalized those amendments.[219] |
| 5-7 | ECPAT-USA advocated for companies to implement comprehensive policies and training by joining The Code. | Ms. Guelbart appears to be using her expert witness report to tout her organization's training without providing any evidence of its efficacy and without acknowledging the conflict of interest she has in opining that signing up to partner with ECPAT-USA and implement The Code is how a hotel should "combat trafficking." Moreover, she fails to acknowledge that at many of the hotels that have joined as members of "The Code" are currently being sued for allegations of trafficking on premises, despite the implementation. |
| 7 | "In order to address the issue, the Blue Campaign developed a toolkit for the hospitality industry, which offers tips and resources that can help the hospitality industry inform and educate employees about human trafficking" | Ms. Guelbart fails to acknowledge the publication year of The Blue Campaign's toolkit for the hospitality industry, which was well after M.B.'s victimization. Ms. Guelbart fails to acknowledge that, like ECPAT's recommendations, The Blue Campaign's toolkit for the hospitality industry was not based in |

[218] Nolan Brown, Elizabeth. (2019). Another Multiracial Family Falsely Accused of Sex Trafficking While Flying. Reason. https://reason.com/2019/09/10/another-multiracial-family-falsely-accused-of-sex-trafficking-while-flying/

[219] Rust, Jayna Marie. 2016. Government contractors must address domestic trafficking. https://www.thompsoncoburn.com/insights/publications/item/2016-02-03/government-contractors-must-address-domestic-trafficking

Case ID: 170300712
Control No.: 21060495

| | | state-of-the-science research and has not had its efficacy empirically evaluated.[220] |
|---|---|---|
| 7-8 | "In January 2014, he American hotel and Lodging Association (AHLA) partnered with ECPAT-USA to develop "The Role of Hospitality in Preventing and Reacting to Child Trafficking" which is the first e-learning module to combat child sexual exploitation in the travel industry." | Ms. Guelbart fails to provide any evidence to suggest this e-learning module actually decreases the prevalence of child sexual exploitation in the travel industry, much less lead to any statistically significant increase in intervention, or victim or offender identification. Moreover, Ms. Guelbart fails to provide any evidence on the sensitivity and specificity of the indicia included in the training. Given my research and experience, a 30-minute e-learning module is unlikely to have any statistically significant effect on the likelihood of intervention, or victim or offender identification. |
| 9 | Ms. Guelbart opines that The Roosevelt Inn failed to take steps to prevent the commercial sexual exploitation of children because in 2014 the hotel did not adopt a company-wide anti-trafficking policy. | Ms. Guelbart failed to provide any evidence to suggest that such company-wide anti-trafficking policies were standard business practices in 2014, much less any evidence to suggest that a company-wide anti-trafficking policy would have prevented M.B.'s victimization or increased the likelihood of identification or intervention. Ms. Guelbart provides no evidence why a specific policy needs to be implemented in writing or why a general instruction to notify management of illicit activity is not sufficient. |
| 9-10 | "Hotels must provide their employees with a protocol (procedure) for responding to any suspicions or indicators of sex trafficking." | At present, there are no empirically tested and validated indicators of sex trafficking and these most certainly did not exist in 2014. The procedures and protocols mentioned by Ms. Guelbart in her report have not been empirically validated for efficacy and most certainly do not have measure of sensitivity and specificity. Ms. Guelbart has a clear conflict of interest in peddling her own organization's training as a necessity to prevent the commercial sexual exploitation of children. |
| 10 | Ms. Guelbart opines that in order to prevent the commercial sexual exploitation of children, hoteliers | Ms. Guelbart provides no evidence that alerting a specific person when reporting suspected |

[220] Interview with Mick McKeown, former Chairman and Executive Director of the DHS Blue Campaign. January 26, 2020.

Case ID: 170300712
Control No.: 21060495

| | | | |
|---|---|---|---|
| | | must have an established relationship with trained law enforcement. | human trafficking activity is more effective than simply reporting said activity to 911.

Evidence from this case demonstrates that The Roosevelt Inn staff did alert law enforcement to suspected criminal activity. |
| 10-11 | Training should be administered "annually and prior to major conventions or sporting events in the area." | Ms. Guelbart appears to base this statement off of the long-debunked myth that human trafficking increases around sporting events, such as Super Bowl.[221] |
| 11 | "Training objectives include defining human trafficking and commercial sexual exploitation of children; identify individuals who are most at risk for human trafficking; understand the difference between labor and sex trafficking specific to the hotel sector; explain the role of the hospitality employees in responding to this issue." | Ms. Guelbart provides no evidence evaluating the content of these training objectives, much less when (or if) these objectives have become standard practice within the hotel industry. Ms. Guelbart goes on to mention the resources available through the Department of Homeland Security's Blue Campaign, which did not become available for the hospitality industry until several years after M.B.'s victimization and have not been evaluated for efficacy.[222] |
| 11 | "Child victims of trafficking often go under the radar because most people do not know that by US law any child sold in the commercial sex trade is by law a victim of sex trafficking." | This statement is key in demonstrating Ms. Guelbart's unsophisticated understanding of the human trafficking issue. While according to US law, any child sold in the commercial sex trade should be treated as a victim of sex trafficking, the reality is they often are not. As previously mentioned, juvenile victims of sex trafficking are often erroneously criminalized by law enforcement. According to OJJDP, in 2014, the same year as M.B.'s victimization, there were 740 juveniles under the age of 18 arrested for prostitution or commercialized vice, of which 90 were under the age of 15.

More importantly, Philadelphia Police arrested juveniles for prostitution routinely at the time of |

[221] For example, see: Martin, Lauren and Annie Hill. 2019. Debunking the Myth of 'Super Bowl Sex Trafficking': Media hype or evidenced-based coverage. Anti-Trafficking Review and Polaris Project. 2019. Worried about Human Trafficking and the Super Bowl? Consider your Nachos. https://polarisproject.org/blog/2019/01/worried-about-human-trafficking-and-the-super-bowl-consider-your-nachos/
[222] Interview with Mick McKeown, former Chairman and Executive Director of the DHS Blue Campaign. January 26, 2020.

Case ID: 170300712
Control No.: 21060495

| | | M.B.'s victimization, even at the Roosevelt Inn. For example, DC#13-02-016805 and DC#13-02-080752. |
| --- | --- | --- |
| | | It is inappropriate for Ms. Guelbart to expect a private business proprietor and their staff to do more than trained law enforcement and the criminal justice system. |
| 11 | "One would wonder how an employee of the Roosevelt Inn would know how to report suspicious activity when it was related to human trafficking and/or prostitution when few could even define either word." | Many human-trafficking victims are unfamiliar with the term "human trafficking" and do not self-identify as victims.[223] Law enforcement generally lacks training and awareness about the crime of human trafficking and its elements.[224]<br><br>It is unclear why Ms. Guelbart feels that she should hold private businesses to a higher standard than law enforcement.<br><br>Moreover, Roosevelt Inn employees were able to provide definitions to human trafficking and prostitution:<br><br>• When asked, "What is human trafficking?" Yagnakumar Patel stated "It's abuse of woman or prostitution. Or guy, like, meeting of the woman, that's abusing, too.[225]"<br><br>• When asked, "What's your understanding of human trafficking?" Kimberly Mueller answered "Being forced into something that you really object to being forced into. You don't want to be part of a crime.[226]" When |

---

Irazola, S., Williamson, E., Chen, C., Garrett, A., & Clawson, H. (2008). Trafficking of U.S. citizens and legal permanent residents: The forgotten victims and survivors. Fairfax, VA: ICF international. Retrieved from http://thehill.com/ sites/default/files/ICFI_TraffickingofUSCitizens_0.pdf

[224] Farrell, A. (2014). Environmental and institutional influences on police agency responses to human trafficking. Police Quarterly, 17, 3–29. doi:10.1177/1098611113495050; Farrell, A., McDevitt, J., & Fahy, S. (2010). Where are all the victims? Understanding the determinants of official identification of human trafficking incidents. Criminology & Public Policy, 9, 201–233. doi:10.1111/j.1745- 9133.2010.00621.x; Newton, P., Mulcahy, T., & Martin, S. (2008). Finding victims of human trafficking. Bethesda, MD: National Opinion Research Center; and Wilson, D., Walsh, W., & Kleuber, S. (2006). Trafficking in human beings: Training and services among U.S. law enforcement agencies. Police Practice and Research, 7, 149–160. doi:10.1080/15614260600676833

[225] Patel Deposition Page 114.

[226] Mueller Deposition page 243.

Case ID: 170300712
Control No.: 21060495

| | | | asked about prostitution, Ms. Mueller stated "there's a consent to the prostitution among people. It wasn't part of a victimized person."[227] |
| --- | --- | --- | --- |
| | | | • When asked, "Do you know what sex trafficking is?" Fred Keeler answered, "That's for — when a person, an individual is being a prostitute against their will."[228] When asked, "Do you know what prostitution is? Mr. Keeler answered, "Yes…That would be the exchange of sexual acts between two individuals for money."[229] |
| | | | • When asked, "Do you know what prostitution is?" Bibihalimoon Hussain stated, "Prostitution, yeah. It's, like, people selling their body for money." When asked, "Do you know what sex trafficking is? Ms. Hussain testified, "It's, like, someone holding and condemning someone selling them to do this dirty jobs, like, prostituting them for money."[230] |
| | | | • When asked what sex trafficking is, Sanat Rushi did not know. When asked what is prostitution, Mr. Rushi answered "I know. Prostitution, women are selling drugs — women are selling sex.[231]" |
| | | | • Abdul Azeez initially testified that he wasn't familiar with the definition of neither prostitution or human trafficking.[232] However, later in his deposition, he corrected that he does know the definition of prostitution, but was just confused by the question.[233] |

[227] Mueller Deposition page 244.
[228] Keeler Deposition page 41.
[229] Keeler Deposition page 29.
[230] Hussain Deposition page 26.
[231] Rushi Deposition page 59.
[232] Azeez Deposition page 111.
[233] Azeez Deposition page 159.

Case ID: 170300712
Control No.: 21060495

| 12 | "Police reports reference young women and girls sharing rooms with excess condoms and lubricant and multiple room keys all of which can be indications of sex trafficking. If staff had known these indicators through training, they could have responded appropriately. Instead this pervasive illicit activity was tolerated at the Roosevelt Inn." | The presence of condoms, lubricant, and multiple room keys has not been evaluated for sensitivity and specificity in identifying sex trafficking. The presence of these items are legal. If Ms. Guelbart is opining that hotel staff should call the police any time condoms, lubricant, and multiple room keys are present, I do not think that would be an effective intervention, based on my research and experience.<br><br>Moreover, Ms. Guelbart fails to recognize that the police erroneously arrested these young girls and charged them with prostitution. |
|----|----|----|
| 12 | "The hotel should ensure employees have easy access to resources that complement the training. For example, they can put up posters in employee break rooms and hand out indicator cards." | The efficacy public awareness campaigns are not supported by rigorous research and extant research suggests they have no impact on the prevalence of sex trafficking.[234] |
| 12-13 | Hotels should include a clause in contracts with suppliers against human trafficking. | Ms. Guelbart fails to recognize that this wasn't even a requirement for federal contractors until 2015, the year following M.B.'s victimization. It is unclear why Ms. Guelbart is holding a private business to a higher standard than the federal government. |
| 13 | "Not checking identification allows trafficking and buyers of sex to remain anonymous." | Not only do most hotels not check the identification of every person entering the premises, but this is not practical and typically not possible, and Roosevelt Inn did check identification of everyone renting rooms from the hotel.[235] |
| 14 | "Monitor online sex ads such as Craigslist and Backpage for your hotel [or cross streets] and | This statement again illustrates a sophomoric understanding of the human trafficking issue. Backpage and Craigslist are not "online sex ads" or online sex ad websites. Both are classified advertisement websites. Moreover, Craigslist has |

---

[234] For example, see: Van der Laan, P. H., Smit, M., Busschers, I., & Aarten, P. (2011). Cross-border Trafficking in Human Beings: Prevention and Intervention Strategies for Reducing Sexual Exploitation. Campbell Systematic Reviews.

[235] For example, see page 157 of Azeez deposition, "I wouldn't rent rooms out to people who doesn't have an ID and all these things."

Case ID: 170300712
Control No.: 21060495

| | pictures of your rooms and guests. | not allowed any adult advertisements since 2010. Commercial sex advertisements rarely, if ever, mention specific location, since they are actively monitored by law enforcement.<br><br>Ms. Guelbart's recommendations are unlikely to have any statistically significant effect on the prevalence of sex trafficking, much less the identification of victims or offenders. |
|---|---|---|
| 14 | "If online classified websites such as Backpage.com were blocked, traffickers at the Roosevelt Inn would have been deterred from using the hotel property as a venue for exploitation." | There is absolutely no research to support this and it is concerning why Ms. Guelbart so cavalierly states it as if it were fact in order to erroneously blame The Roosevelt Inn.<br><br>If online classified websites were blocked, traffickers are unlikely to be deterred and would instead simply rely upon their cellular hotspot and/or post the advertisements off premises. |
| 14 | "The Roosevelt Inn did not have any postings for guests or employees on how to recognize and report commercial sex activity." | There is no evidence to suggest these postings have any effect on the prevalence of sex trafficking or ability of employees to identify victims or offenders[236]. Ms. Guelbart appears to have a clear conflict of interest considering that she overtly peddles her organizations materials and training throughout her report without providing any evidence on the efficacy or research basis for the development. |

It is Ms. Guelbart's opinion that Roosevelt Inn through their management and employees, failed to meet the standard of care with regard to recognizing and acting upon indications of sex trafficking and criminal activity that occurred at Roosevelt Inn. As such, sex trafficking and commercial sex activity was tolerated and accepted by the Roosevelt Inn Defendants." Ms. Guelbart states that her opinions are "within a reasonable degree of professional certainty in the fields of the hospitality industry, child exploitation and human trafficking." She concludes that the Roosevelt Inn "ignored the open and obvious indications of sex trafficking that enabled M.B.'s traffickers to use the Roosevelt Inn to traffic M.B. and other victims without repercussion." It is unclear what Ms. Guelbart asserts is an "open and obvious" indication of sex trafficking, considering none of the "indicia" mentioned in her report have been adequately tested for sensitivity or specificity, much less efficacy in preventing sex trafficking. Moreover,

---

[236] For example, see: Van der Laan, P. H., Smit, M., Busschers, I., & Aarten, P. (2011). Cross-border Trafficking In Human Beings: Prevention and Intervention Strategies for Reducing Sexual Exploitation. Campbell Systematic Reviews.

Case ID: 170300712
Control No.: 21060495

many of the "indicia" mentioned are activities that would not have warranted law enforcement intervention, especially not in 2014, and are conflated with prostitution.

In conclusion, Ms. Guelbart's opinions are not based in state-of-the-science research and her conclusions are erroneous. Of concern, for example:

1. Ms. Guelbart ignores the difficulty in identifying victims of sex trafficking and high rate of misidentification and erroneous criminalization by law enforcement, even of juvenile victims of sex trafficking.

2. Ms. Guelbart conflates "best practice" indicia of prostitution with sex trafficking.

3. Ms. Guelbart attempts to hold the Roosevelt Inn to a higher standard than law enforcement and the federal government and law enforcement.

4. Ms. Guelbart's recommendations are based on current knowledge, which still have not been evaluated for efficacy, sensitivity, and specificity.

5. Ms. Guelbart's opinions appear to be biased by her conflict of interest in peddling her organization's anti-trafficking training for hotels, which has not been adequately evaluated.

6. Ms. Guelbart does not cite any state-of-the-science research to support her conclusions.


# X.   CONCLUSION

Due to the clandestine nature of the crime, sex trafficking victims are frequently misidentified. As a consequence of misidentification, sex trafficking victims are typically denied services and erroneously criminalized, while facing multiple missed opportunities for intervention and rescue by law enforcement.

To retroactively correct the erroneous criminalization faced by human trafficking victims in the criminal justice system, an increasing number of states have passed vacatur statues.[237] These laws provide post-conviction relief for survivors of human trafficking by completely erasing criminal convictions related to their victimization. By one recent count, 18 states had passed vacatur statutes and another 10 states had enacted partial vacatur laws by 2017.[238]

Despite raising awareness and law enforcement adjustments, victims of sex trafficking continue to be misidentified and erroneously criminalized. It is extremely difficult to identify a victim of sex trafficking without in-depth information. Although M.B.

---

[237] Mehlman-Orozco, Kimberly B. and Simon Hedlin. (2017). "Mehlman-Orozco, Hedlin: Stop criminalizing victims of sex trafficking." The Houston Chronicle.
[238] https://www.ncjw.org/wp-content/uploads/2017/07/Fact-Sheet_Vacatur-Laws_Updated-2016.pdf

Case ID: 170300712
Control No.: 21060495

was a victim of sex trafficking, her sex traffickers went to great lengths to conceal her exploitation from third parties.

It is important to understand that indicia of prostitution are often erroneously conflated with indicia sex trafficking. Extant indicia of sex trafficking have not been evaluated for sensitivity or specificity, which is hypothesized to be low.

There is no evidence to suggest that the interventions referenced by Plaintiff's purported experts would have a statistically significant effect on the prevalence of sex trafficking, much less the identification of victims or offenders. There is no evidence to suggest that the interventions referenced by Plaintiff's purported experts would have led to M.B.'s identification as a victim.

Many of the opinions levied by Plaintiff's experts are based on misinformation, conjecture, or ecological fallacies, and are not supported by state-of-the-science research. The evidence in this case demonstrates that M.B.'s victimization was not "open" or "obvious." Based on the evidence in this case and my expertise on the identification of sex trafficking victims, it is not reasonable for Plaintiff's experts to conclude that the Roosevelt Inn staff knew or should have known that M.B. was a victim of sex trafficking.
.

Case ID: 170300712
Control No.: 21060495

# XI. APPENDIX A. Curriculum Vitae

## DR. KIMBERLY B. MEHLMAN-OROZCO

(703) 362-9405 • kim@mehlmanorozco.com • www.mehlmanorozco.com

<u>EDUCATION</u>

**Doctor of Philosophy**                          Criminology, Law and Society
                                                 George Mason University
*Dissertation:* The "Crimmigration" Affect: An Analysis of 287(g) and Latino/a Representation in the U.S. Juvenile Justice System
*Expertise:* Human Trafficking, Human Smuggling, Immigration, Survey Methods and Systematic Review

**Master of Arts**                               Justice, Law, and Crime Policy
                                                 George Mason University
*Thesis:* Foreign Nationals and Crime: An Exploratory Analysis of Undocumented Migrants in Northern Virginia

**Bachelor of Science**                          Administration of Justice
                                                 George Mason University
*Cum Laude*

<u>TEACHING EXPERIENCE</u>

**Surviving and Thriving Beyond Sex Trafficking**  SP18
                                                 Ph.D. Research Course
                                                 Sustainability Education
                                                 Prescott College

**CRIM307 Social Inequality, Crime, and Justice**  FA17
                                                 Criminology, Law and Society
                                                 George Mason University

**CRIM405 Law and Justice Around the World**      SP17, SP18
                                                 Criminology, Law and Society
                                                 George Mason University

**CRIM308 Human Rights and Justice**              FA16
                                                 Criminology, Law and Society
                                                 George Mason University

**CCJS100 Intro to Criminal Justice**             FA12-SP14
                                                 Department of Criminology & Criminal Justice
                                                 University of Maryland College Park

**CCJS370 Race and Crime**                        FA12-SP14
                                                 Department of Criminology & Criminal Justice
                                                 University of Maryland College Park

**CCJS432 Law of Corrections**                    FA12
                                                 Department of Criminology & Criminal Justice
                                                 University of Maryland College Park

Case ID: 170300712
Control No.: 21060495

| | |
|---|---|
| **CCJS418J Foreign Nationals and Crime** | FA12-SP13<br>Department of Criminology & Criminal Justice<br>University of Maryland College Park |
| **CRIM490 Foreign Nationals and Crime** | SU09, SU10, SU11, SU12<br>Criminology, Law and Society<br>George Mason University |
| **GED, Work Place Essential Skills,<br>and Adult Basic Education** | SU05-SU06<br>Adult Detention Center<br>Prince William County |

RESEARCH EXPERIENCE

| | |
|---|---|
| **Executive Director** | WI18– Present<br>Freedom Light |
| **Partner/Human Trafficking Expert Witness** | FA16– WI18<br>Mahn, Mehlman & Associates |
| **Human Trafficking Subject Matter Expert** | SU16-FA17<br>RAND Corporation |
| **Executive Director/Human Trafficking Consultant** | WI12– FA16<br>The Justitia Institute |
| **Director** | FA10 – WI12<br>Latino Policy Institute<br>Roger Williams University |
| **Research Associate** | SU11 – WI12<br>Cochrane Collaboration College for Policy<br>George Mason University |
| **Lead Clinical Trials Search Coordinator** | SU10 – WI12<br>Justice Health Field<br>The Cochrane Collaboration |
| **Senior Research Associate** | SU08 – SU11<br>OJJDP Census of Juveniles on Probation<br>George Mason University |
| **Graduate Research Assistant** | SU10 – FA10<br>Violence and Victimization Research Division<br>National Institute of Justice (On Contract)<br>Office of Justice Programs |
| **Senior Fellow** | SU08 – FA10<br>The Lloyd Society |

Case ID: 170300712<br>Control No.: 21060495

| **Graduate Research Assistant** | SU06 – SU08 |
| | Trinidad & Tobago Crime Reduction Project |
| | George Mason University |
| **Graduate Research Assistant** | WI07-SP07, SP08 |
| | OJJDP Vaccines for Children Project |
| | George Mason University |

<u>PUBLICATIONS</u>

**Mehlman-Orozco, Kimberly B**. (2019). "Jeffrey Epstein's deal with Alexander Acosta wasn't out of line with what I have seen." USA Today.

**Mehlman-Orozco, Kimberly B**. and Sheriff William D. Snyder. (2019). "Robert Kraft spa scandal: Sex trafficking is hard to prove, that doesn't mean it's a lie." USA Today.

**Mehlman-Orozco, Kimberly B**. and William D. Snyder. (2019). "Legalizing prostitution could end sex-trafficking investigations." The Hill.

**Mehlman-Orozco, Kimberly B**. (2019). "How to Fight Sex Trafficking." Politico.

**Mehlman-Orozco, Kimberly B**. (2019). <u>The Jihadi Next Door: How ISIS is Forcing, Defrauding, and Coercing Your Neighbor into Terrorism</u>. SkyHorse.

**Mehlman-Orozco, Kimberly B.** (2018). "Sex trafficking bill likely to do more harm than good." The Baltimore Sun.

**Mehlman-Orozco, Kimberly B.** (2018). "Why cracking down on websites won't stop online sex trafficking." *Thomson Reuters Foundation*.

**Mehlman-Orozco, Kimberly B.** (2018). "Legislation Aiming to Stop Sex Trafficking Would Hurt Investigations." *Homeland Security Today*.

**Mehlman-Orozco, Kimberly B.** (2017). "Trafficking victims get lost under unjust criminal convictions." *The Hill*.

**Mehlman-Orozco, Kimberly B.** (2017). "Projected Heroes and Self-Perceived Manipulators: Understanding the Duplicitous Identities of Human Traffickers." *Trends in Organized Crime*.

**Mehlman-Orozco, Kimberly B.** (2017). <u>Hidden in Plain Sight: America's Slaves of the New Millennium</u>. ABC-CLIO/Praeger.

**Mehlman-Orozco, Kimberly**. (2017). "Why we should question the FBI's recent human trafficking sting." *Thomson Reuters*.

**Mehlman-Orozco, Kimberly**. (2017). "Decriminalize sex work to bring trafficking victims out of the shadows." *The Hill*.

**Mehlman-Orozco, Kimberly**. (2017). "Decriminalizing sex work would help bring victims out of the shadows." *The Washington Post*.

Case ID: 170300712
Control No.: 21060495

**Mehlman-Orozco, Kimberly B.** (2017). "Why the Stop Enabling Sex Traffickers Act is the Wrong Solution." *The Crime Report.*

**Mehlman-Orozco, Kimberly B.** (2017). "Identifying Victims of Human Trafficking." *Dimensions of Dental Hygiene.*

Syme, Sheryl, Camardese, Susan, and **Kimberly Mehlman-Orozco.** (2017). "Human Trafficking: Red Flags for Dental Professionals." *Decisions in Dentistry.*

**Mehlman-Orozco, Kimberly B.** (2017). "Vilifying Backpage.com won't help fight sex trafficking" *The Washington Post.*

**Mehlman-Orozco, Kimberly B.** (2017). "Child Trafficking: The Tragedy of 'Princess'" *The Crime Report.*

**Mehlman-Orozco, Kimberly B.** (2017). "To sue or not to sue third-party businesses for sex trafficking?" *Thomson Reuters Foundation.*

**Mehlman-Orozco, Kimberly B.** (2017). "Hunting the Internet's Sex Predators." *The Crime Report.*

**Mehlman-Orozco, Kimberly B.** (2017). "Will shutting down Backpage.com end the scourge of child sex trafficking in America?" *Thomson Reuters Foundation.*

**Mehlman-Orozco, Kimberly B.** (2017). "Sex Trafficking: A Surprising Rescue Story." *The Crime Report.*

**Mehlman-Orozco, Kimberly B.** (2017). "What every parent should know about sex trafficking." *Baltimore Sun.*

**Mehlman-Orozco, Kimberly B.** and Simon Hedlin. (2017). "Mehlman-Orozco, Hedlin: Stop criminalizing victims of sex trafficking." *The Houston Chronicle.*

**Mehlman-Orozco, Kimberly B.** (2017). "Why Do We Criminalize Young Victims of Sex Trafficking?" *The Crime Report.*

**Mehlman-Orozco, Kimberly B.** (2016). "The Plight of Sex-Trafficking Survivors." *The Gay and Lesbian Review Worldwide.*

**Mehlman-Orozco, Kimberly B.** (2016). "Sex Trafficking is often hidden in plain sight." *The Hill.*

**Mehlman-Orozco, Kimberly B.** (2016). "Will Legalized Prostitution End the Sex Trafficking Scourge?" *The Huffington Post.*

**Mehlman-Orozco, Kimberly B.** (2016). "What happens after a human trafficking victim is rescued?" *The Hill.*

**Mehlman-Orozco, Kimberly B.** (2016). "The Reality of Sex Trafficking in Washington's Red Light District." *Baltimore Sun.*

**Mehlman-Orozco, Kimberly B.** (2016). "America's Symbolic, Not Effective, Anti-Trafficking Policy. *Diplomatic Courier.*

Case ID: 170300712
Control No.: 21060495

**Mehlman-Orozco, Kimberly B.** (2016). America's Anti-Trafficking Efforts: Hollow victories for public accolade. *Connection Newspapers*: Chantilly, Centerville, Great Falls, Herndon, McLean, & Vienna.

**Mehlman-Orozco, Kimberly B.** (2016). "Sex Slaves or Prostitutes?: How Human Trafficking is Hidden in Plain Sight in America's Capital." *Diplomatic Courier*.

**Mehlman-Orozco, Kimberly B.** (2015). "Safe Harbor Legislation for Juvenile Victims of Sex Trafficking: A Myopic View of Improvements in Practice. *Social Inclusion*.

**Mehlman-Orozco, Kimberly B.** (2015). "Tor and the Bitcoin: An Exploration into Law Enforcement Surveillance Capability Online". *Diplomatic Courier*.

**Mehlman-Orozco, Kimberly B.** (2014). "Human Trafficking in the Philippines: A Blemish on Economic Growth". *Diplomatic Courier, Recovery in the Philippines*.

**Mehlman-Orozco, Kimberly B.** (2014). "Devoid of Research: An Evaluation of Human Trafficking Interventions". *Diplomatic Courier, Special Issue: Breaking the Cycle of Human Trafficking*.

Martinez, Ramiro, and **Mehlman-Orozco, Kimberly B.** (2014). "Hispanic Immigration and Crime". Oxford Handbook of Ethnicity, Crime, and Immigration. Eds. Michael Tonry and Sandra Bucerius. Oxford University Press.

**Mehlman-Orozco, Kimberly B.** (Contributing Author) (2010) "Breaking It Down: Justice, Law & Society Abstracts for Policymakers and Practitioners". *Center for Justice Law and Society*.

<u>REPORTS</u>

**Mehlman-Orozco, Kimberly B.** (May, 2017). Expert Witness Report. *State of Ohio v. Michael Moore*. CR 16-3191.

**Mehlman-Orozco, Kimberly B.** (2011). The Effects of In-State Tuition for Non-Citizens: A Systematic Review of the Evidence. *Latino Policy Institute at Roger Williams University*. http://www.rwu.edu/depository/lpi/lpi-report.pdf

**Mehlman-Orozco, Kimberly B.** (2008). Race and Reporting Burglary, Robbery, and Assault in Trinidad and Tobago. (Completed under a grant from the Trinidad and Tobago Government*)*.

<u>SCHOLARLY PRESENTATIONS</u>

**Mehlman-Orozco, Kimberly B.** (2019). Keynote Speaker: National Capital Region Threat Intelligence Consortium  (NTIC) Human Trafficking Seminar.

**Mehlman-Orozco, Kimberly B.** (2019). Law Enforcement's Role in Combating Human Trafficking and Assisting Victims. Police Executive Research Forum (PERF).

**Mehlman-Orozco, Kimberly B.** and Marisa Trasatti (2019). Human Trafficking: The Silent Risk. The RIMS (Risk Management Society) Conference.

**Mehlman-Orozco, Kimberly B.** (2019). Social Policy and Justice Panelist. Harvard College Project of Asian and International Relations. Harvard University.

**Mehlman-Orozco, Kimberly B.** (2018). Women in Homeland Security Human Trafficking Symposium

Case ID: 170300712
Control No.: 21060495

Panelist. Marymount University.

**Mehlman-Orozco, Kimberly B.** (2017). Human Trafficking Symposium Panelist. Liberty University School of Law.

Martin, Favian, **Mehlman-Orozco, Kimberly**, and Wooditch, Alese. (2014). Mexican Migration to the United States: An Exploratory Study into Illegal Border Crossings. Academy of Criminal Justice Sciences. Philadelphia, PA

**Mehlman-Orozco, Kimberly B.** (2010). "Justice Health Systematic Review Methods," Presented at the annual colloquium of the Cochrane and Campbell Collaborations: Keystone, CO.

**Mehlman-Orozco, Kimberly B.** (2010). "Open Access Systematic Reviews for Juvenile Probation Information," Presented at the first annual OJJDP Probation Summit: Washington, D.C.

**Mehlman-Orozco, Kimberly B.,** Chirieleison, J., Sebold, C. M., Douds, A., Gallagher, A.M., and Gallagher, C.A. (2010). "Characteristics of Juveniles on Probation: Collecting Data from Atlantic to Pacific". Presented at the 2010 American Probation and Parole Association Conference: Washington, D.C.

**Mehlman-Orozco, Kimberly B.** (2010). "Justice Health Search Methods: PubMed and More," Presented at the International Network for Justice Health Meeting: Scottsdale, AZ.

Gallagher, C.A., Douds, A.S., **Mehlman-Orozco, Kimberly B.,** Chirieleison, J., and Olaghere, A. (2010). "Justice Health Bibliographic Data Mapping," Presented at the International Network for Justice Health Meeting: Scottsdale, AZ.

**Mehlman-Orozco, Kimberly B.** (2010). "Smuggling and the Likelihood of Detention among Undocumented Migrants," Law and Society Association Conference: Chicago, IL.

Douds, A.S. and **Mehlman-Orozco, Kimberly B.** (2010). "FASD in Justice Facilities: What does the research tell us?", Meeting of the Interagency Coordinating Committee on Fetal Alcohol Spectrum Disorders: Rockville, MD.

Gallagher, Catherine, Taxman, Faye, Kinner, Stuart, Doyle, Jodie, Pardo-Rengifo, Monica, **Mehlman-Orozco, Kimberly B.,** Olaghere, Ajima, Royle, Nick, Gabriel Cuervo, Luis. (2009). "Knowledge mapping for research prioritization: examples from the Network for Justice Health". 17th Cochrane Colloquium, Singapore.

**Mehlman-Orozco, Kimberly B.** (2009). "Justice Health Systematic Review Methods," Presented at the International Network for Justice Health Meeting: Orlando, FL.

**Mehlman-Orozco, Kimberly B.** (2008). "Foreign Nationals and Crime: An Exploratory Analysis of Undocumented Migrants in Northern Virginia," American Society of Criminology Conference: St. Louis, MO.

OTHER PRESENTATIONS

**Mehlman-Orozco, Kimberly B.** (2018). Invited Trainer on Human Trafficking Provided to the Advancing the Business of Healthcare Medical Coding Chapter in Woodbridge, Virginia (2 CEUs).

**Mehlman-Orozco, Kimberly B.** (2018). Invited Trainer on Human Trafficking for the Canadian Police

Case ID: 170300712
Control No.: 21060495

College Human Trafficking Investigator's Course, Royal Canadian Mounted Police and Halifax Regional Police, Canada.

**Mehlman-Orozco, Kimberly B.** (2018). Invited Annual Speaker for the College of Humanities and Social Sciences Degree Celebration, George Mason University.

**Mehlman-Orozco, Kimberly B.** (2018). Invited Presenter for the Well Library Honors Event, George Mason University.

**Mehlman-Orozco, Kimberly B.** (2017). Invited Training Presentation on Human Trafficking Red Flags for Prevent Abuse and Neglect through Dental Awareness (P.A.N.D.A).

**Mehlman-Orozco, Kimberly B.** (2017). Invited Guest Speaker for Human Trafficking Awareness Event with Kappa Delta Phi International Sorority, George Mason University.

**Mehlman-Orozco, Kimberly B.** (2017). Invited Guest Speaker at the Mother's Union International Conference Human Trafficking Forum.

**Mehlman-Orozco, Kimberly B.** (2017). Invited Guest Speaker at the Keeping Our Youth Safe Conference. Bernadette's House.

**Mehlman-Orozco, Kimberly B.** (2016). Invited Guest Speaker for Girls at High-Risk of Sex Trafficking. Manassas City Police Department.

**Mehlman-Orozco, Kimberly B.** (2016). Invited Guest Speaker on Human Trafficking. Woodbridge Woman's Club.

**Mehlman-Orozco, Kimberly B.** (2016). Invited Guest Speaker for TEAM Summer Quest: High-Risk Youth Diversion Program. Manassas City Police Department.

**Mehlman-Orozco, Kimberly B.** (2016). Invited Guest Speaker on Human Trafficking. Soroptimist International, Alexandria Chapter.

**Mehlman-Orozco, Kimberly B.** (2016). Invited Guest Speaker on Human Trafficking. Republican Women of Clifton.

**Mehlman-Orozco, Kimberly B.** (2016). Invited Guest Speaker on Human Trafficking in Northern Virginia. Westminster at Lake Ridge.

**Mehlman-Orozco, Kimberly B.** (2016). Keynote Speaker. Soroptimist Human Trafficking Awareness Event.

**Mehlman-Orozco, Kimberly B.** (2015). Invited Guest Speaker on Human Trafficking. Trinity Episcopal Church.

**Mehlman-Orozco, Kimberly B.** (2015). Invited Guest Speaker for TEAM Summer Quest: High-Risk Youth Diversion Program. Manassas City Police Department.

**Mehlman-Orozco, Kimberly B.** (2014). Invited Guest Speaker for TEAM Summer Quest: High-Risk Youth Diversion Program. Manassas City Police Department.

**Mehlman-Orozco, Kimberly B.** (2014). Invited Guest Speaker on Mapping Suspected Human

Case ID: 170300712
Control No.: 21060495

Trafficking Networks through Advertisements. Homeland Security Investigations, DHS, Buffalo, NY.

**Mehlman-Orozco, Kimberly B.** (2013). Exhibitor. Governor's Summit on Human Trafficking. Richmond, VA.

**Mehlman-Orozco, Kimberly B.** (2013). Invited Guest Speaker on Labor Trafficking. St. Francis of Assisi Catholic Church.

**Mehlman-Orozco, Kimberly B.** (2011). Keynote Speaker. First Annual Quetzal Award Gala. Guatemalan Center of New England.

### EXPERT WITNESS CASES—CONSULTATION AND/OR TESTIMONY

| | |
|---|---|
| Forthcoming | Woodhull Freedom Foundation et al. v. United States. |
| Forthcoming | United States v. Cornelius Galloway, United States District of New Mexico |
| 2018 | RCMP Federal Serious and Organized Crime R vs. Downey & Beals C/O Human Trafficking 2016-465660, Halifax, Canada |
| 2018 | United States of America vs. Savanah April Via, U.S. District Court for the District of Arizona |
| 2018 | Commonwealth of Virginia v. Corey Cardoza, Henrico County |
| 2018 | People v. Kareem Abdur-Razzaaq, Ind. No. 3154/2013, and People v. Lemuel Skipper, Ind. No. 2409/2015, Bronx County |
| 2017-2018 | United States of America v. Miguel Scott Arnold, Terrence Hawkins, Tevin Bynoe, Emonie Murphy, and Joshua Guity-Nunez, United States District Court for the Middle District of Pennsylvania. |
| 2017- 2018 | Doe v. Subh Properties, et al., Civil Litigation, State of Maryland |
| 2017-2018 | State of Ohio v. Michael Moore, Lucas County Court |
| 2017-2018 | People of the State of California Plaintiff v. Tracy Sims Superior Court of California, County of Los Angeles |
| 2017 | Keo Ratha; Sem Kosal; Sophea Bun; Yem Ban; Nakry Phan; and Sok Sang v. Phatthana Seafood Co., Ltd; S.S. Frozen Food Co., Ltd.; Doe Corporations 1-5; Rubicon Resources, LLC; and Wales & Co. Universe, Ltd. United States District Court for the Central District of California |
| 2017 | In re: REFLEX MEDIA, INC., a Nevada corporation, Claimant, vs. VIBE MEDIA, INC. d/b/a CityVibe.com, a California corporation; SOPHIA THOMPSON, an individual; PEAKRIDGE d/b/a SugarModels.com, an Anguilla company; DANIEL ROMAN a/k/a Daniel Romanesse, an individual; ALI |

Case ID: 170300712
Control No.: 21060495

ASKARI, an individual; and DOES 1 through 10, inclusive

| | |
|---|---|
| 2016-2017 | J.S., S.L., and L.C. v. Village Voice Media Holdings LLC, Supreme Court of the State of Washington |
| 2016-2017 | People of the State of California Plaintiff v. Joseph, et. al. Contra Costa County Court |
| 2016 | People of the State of California Plaintiff v. Young Kyung Cho Superior Court of California, County of Los Angeles |
| 2016 | People of the State of California Plaintiff v. Mixon-Givens Santa Clara County Court |

SELECTION OF MEDIA

| | |
|---|---|
| August 9, 2019 | ABC. This Week with George Stephanopoulos. Panel discussion on Jeffrey Epstein. |
| July 9, 2019 | CBS News. Sex trafficking expert discusses Jeffrey Epstein case and sexual abuse. |
| May 10, 2019 | Hollywood Reporter. Sex Trafficking mars the Mystique of Cannes Film Festival. |
| April 12, 2019 | The Hill. Expert says it's 'very unlikely' Robert Kraft prostitution case would yield human trafficking convictions. |
| January 11, 2019 | The Seattle Times. Documentary puts new attention on R. Kelly sex allegations. |
| August 22, 2018 | The Crime Report. Backpage Founders: We're Victims of Attack on Free Speech. |
| May 5, 2018 | Delaware Online. Human Trafficking Court shut down, to be merged with other treatment courts in Delaware. |
| May 1, 2018 | Delaware Online. Despite good intentions, Delaware slow to address human trafficking. |
| April 24, 2018 | ABC. Will new law protect women from sex trafficking? |
| April 23, 2018 | The Ringer. How Sex Ads Became a Battleground for the Future of the Internet. |
| April 22, 2018 | Miami Herald. He pimped a minor at Santa's Enchanted Forest. He got slapped with federal prison. |
| April 13, 2018 | Yahoo Lifestyle. Women's March lambasted for criticizing shutdown of Backpage.com. |
| April 10, 2018 | Miami Herald. Florida's sex industry 'in a panic' after feds shut |

Case ID: 170300712
Control No.: 21060495

down notorious Backpage website.

| | |
|---|---|
| April 9, 2018 | The Crime Report. With Backpage Closed, Where Will The Sex Slave Trade Go? |
| March 22, 2018 | Washington Post. Bill enabling prosecutors, victims to pursue websites that host sex traffickers heads to White House. |
| March 2, 2018 | Governing. 3 Cities Lead Fight Against Human Trafficking. |
| February 1, 2018 | Vanity Fair. The Republican Party is Having Another Todd Akin Fiasco. |
| February 1, 2018 | New York Magazine. Missouri GOP Senate Hopeful Goes Off the Deep End on the Sexual Revolution and Human Trafficking. |
| January 31, 2018 | Kansas City Star. Josh Hawley blames sex trafficking on 'sexual revolution' of 1960s in leaked audio. |
| January 25, 2018 | Homeland Security Today. Expert Delves Into Real Face of Human Trafficking: Victims and Perpetrators. |
| January 23, 2018 | Huffington Post. Study Finds More Than 9,000 Brothels Masquerading As Legit Businesses. |
| January 11, 2018 | International Business Times. Human trafficking: Why we are all guilty of supporting the modern slave trade. |
| January 8, 2018 | Majority Report Radio. America's Slaves of the New Millennium with Dr. Kimberly Mehlman-Orozco. |
| December 21, 2017 | Fast Company. Hotels Are Key In The Fight To End Human Trafficking. |
| December 12, 2017 | WNPR. The Colin McEnroe Show. Child Labor In America And Abroad. |
| November 4, 2017 | C-SPAN. Hidden in Plain Sight Book Talk. |
| September 22, 2017 | Gray Media. Interview by Kyle Midura. Sex Trafficking Internet Crackdown Proposal. |
| August 8, 2017 | i24 news. Interview for Stateside with David Shuster. Model allegedly kidnapped for dark web auction. |
| August 2, 2017 | Newsy. Interview for "The Why" on human trafficking on the Internet. |
| July 30, 2017 | Al Jazeera. Segment Produced by Ruairi Casey. World Day Against Human Trafficking. |
| July 25, 2017 | Fox News Radio. Interviewed by Eben Brown. "Security |

Case ID: 170300712
Control No.: 21060495

America" segment on human smuggling deaths in San Antonio.

| | |
|---|---|
| July 25, 2017 | Dallas News. Interviewed by Sarah Mervosh. New trick of the sex trade: Pimps can use retail gift cards to buy Backpage.com ads. |
| July 24, 2017 | WJLA. Interviewed by Stephen Loiaconi. Human smuggling deaths underscore need for immigration reform, experts say. |
| July 18, 2017 | The Washington Post. Interviewed by Tom Jackman. Under attack, Backpage.com has its supporters as anti-trafficking tool. But many differ. |
| June 11, 2017 | PJ Media. Interviewed by Karl Herchenroeder. Expert Notes Gap in Human-Trafficking Laws as Senators Press for Fund Renewal. |
| April 19, 2017 | WYPR. Interviewed by Tom Hall. Misinformation Sparked #DCMissingGirls Outrage, But It Highlights Real And Overlooked Issues. |
| March 30, 2017 | CBS. Interviewed by Jennifer Earl. Mom's warning about "human trafficking" at IKEA goes viral; what you need to know. |
| March 29, 2017 | Women's Health. Interviewed by Korin Miller. This Mom Claims She Encountered Human Traffickers At IKEA And People Are Freaking Out. |
| February 10, 2017 | Miami Herald. Interviewed by David Ovalle. Florida lawsuit targets website decried as hub for human trafficking. |
| February 3, 2017 | Miami Herald. Interviewed by David Ovalle. The 'adult' section might be closed but Miami sex workers still on the job. |
| January 1, 2017 | OutSmart Magazine. Interviewed by Dr. Laura McGuire on Human Trafficking. Hidden in Plain Sight: Researcher Dr. Mehlman-Orozco Discusses the Realities of Human Trafficking. |
| February 3, 2015 | NBC. Interviewed by Tracy Connor. Shoe Bomber has 'Tactical Regrets' Over Failed American Airlines Plot. |
| January 19, 2015 | CNN. Interviewed by Pam Brown. 'Jihad Jane' moved by 'love' and feminine 'pride.' |
| August 15, 2013 | USA Today, Interviewed by Yamiche Alcindor. Dozens of States Pass Laws to Fight Human Trafficking. |
| June 6, 2013 | USA Today. Interviewed by Yamiche Alcindor. Blue Campaign by DHS aims to combat human trafficking. |
| August 12, 2012 | Fox 5 News (DC/MD/VA). Television interview on in-state tuition report on Maryland. Interview by reporter Shawn Yancy. |
| May 18, 2011 | Chronicle of Higher Education. Interviewed for an in-state tuition |

Case ID: 170300712
Control No.: 21060495

story by Katherine Mangan, "In-State Tuition for Illegal Immigrants Can Be a Plus for Both States and Students."

March 24, 2011    NBC 10 (RI). Television interview on Latino population growth, "Digging Deeper: Hispanics on the Rise."

February 18, 2011    The Yale Herald. Interviewed for a story on racial profiling against immigrants by police. Story by Lucas Iberico-Lozada, "East Haven Police Accused of Brutality, Racism."

June 2, 2010    Style Weekly. Interviewed for a human trafficking story by Peter Galuszka, "The New Slavery: Virginia becomes haven for human trafficking."

## OTHER PROFESSIONAL TRAINING

**"Freedom Together" D.C., M.D., and V.A. Regional Anti Human Trafficking Task Force Conference**    D.C., M.D., and V.A. Task Forces
Spring 2018                Conference

**Virginia Forum on Human Trafficking**    Dept. of Criminal Justice Services
Fall 2015                Conference

**Regional Conference of Human Trafficking Task Forces**    DMV Anti-Trafficking Working
Fall 2015                Conference    Group

**Maryland Freedom Conference**    Towson University
Winter 2015                Conference

**Sharing Lessons, Sharing Responsibility: Combating Human Trafficking**    Migration Policy Institute
Spring 2013                Conference

**Freedom Network Annual Conference**    Freedom Network
Spring 2013                Conference

**Human Trafficking Panel Discussion**    George Washington Law
Spring 2013                Working Group

**Analytic Statistics and Meta Analysis**    Stata
Spring 2011                Paid Training

**Systematic Review and Meta Analysis**    GMU
Spring 2009, Fall 2010        Independent Graduate Study

**PubMed, NLMGateway, ToxNet and ClinicalTrials.gov**    National Library of Medicine
Summer 2009                Search Certifications

**Ovid, ProQuest, and Web searches**    AHRQ
Summer 2009                Search Certifications

**Introduction to ArcGIS Workshops**    George Mason University
Fall 2009-Summer 2010

Case ID: 170300712
Control No.: 21060495

<u>AWARDS</u>

| | |
|---|---|
| *Independent Publisher Award, 2019* | Silver Medal for Current Events (<u>Jihadi Next Door</u>). |
| *Independent Publisher Award, 2018* | Bronze Medal for Social Issues/Humanitarian (<u>Hidden in Plain Sight: America's Slaves of the New Millennium</u>). |
| *Dissertation Completion Award,* 2012 | George Mason University, College of Humanities and Social Sciences. |
| *Deans Challenge,* 2009 | George Mason University, College of Humanities and Social Sciences. |

<u>SERVICE</u>

| | |
|---|---|
| Reviewer | Justice Quarterly, WI18-Present |
| Advisory Board Member | Empower Her Network, FA17-Present |
| Survey Methodologist Advisor | United Against Slavery, FA17-Present |
| Advisory Board Member | Dressember (Anti-trafficking foundation), SP17-Present |
| Panel of Expert Witnesses | Los Angeles Superior Court, WI17-Present |
| Member | Prince William County Human Trafficking Task Force, SU13-Present |
| Member | Prince George's County Human Trafficking Task Force, SU12-Present |
| Reviewer | Journal of Human Trafficking, FA2014-Present |
| Member and Former President | Soroptimist International of Woodbridge, FA15-SP18 |
| Reviewer | American Journal of Evaluation, FA2014-FA2015 |
| Member | Prince George's County Human Trafficking Task Force, SU13-2015 |
| Reviewer | Columbia University Press, FA2013 |
| President and Founding Officer | Student Center for Immigration Research, George Mason University, FA08 – FA10 |
| Member | Criminology, Law & Society Student Association, George Mason University, FA09 – WI12 |

Case ID: 170300712
Control No.: 21060495

| | |
|---|---|
| Volunteer | Prince William County Jail, Classification Department, 500 hours, SP 2005 |

<u>PROFESSIONAL MEMBERSHIP</u>

National Society for Collegiate Scholars
Phi-Alpha Delta Pre-Law Fraternity
Alpha Chi Honors Fraternity
American Society of Criminology
National Criminal Justice Honors Fraternity
Alpha Phi Sigma Honors Society

Case ID: 170300712
Control No.: 21060495

# XII. APPENDIX B. Materials Reviewed and Considered

1. Roosevelt Inn's Objections and Responses to M.B.'s Interrogatories (Set II).PDF
2. Yagna Patel's Objections and Responses to M.B.'s Interrogatories (Set II).PDF
3. Roosevelt Inn's Objections and Responses to M.B.'s Interrogatories (Set II).PDF
4. Docs Prod. by Plaintiff- Witness Statements.PDF
5. Roosevelt Motor Inn's Objections and Responses to Minor-Plaintiff M.B.'s Interrogatories (Set 1).PDF
6. Deft Roosevelt Motor Inn's Objections and Responses to Minor-Plaintiff M.B.'s RPD (Set 1).PDF
7. Glen Mills School Records re Daiquan Davis.PDF
8. Bensalem Township Police Department Records re Paul Branham a.k.a Paul Johnson.PDF
9. Pennsylvania Hospital Hall Mercer Community Medical Records.PDF
10. YHEP Records of MB.PDF
11. Aria Health Frankford Docs Produced by Alpha Centurion.PDF
12. Bridge Therapeutic Center Docs Produced by Alpha Centurion.PDF
13. Hall Mercer Comm Ctr Docs Produced by Alpha Centurion.PDF
14. JJ Peters Institute Docs Produced by Alpha Centurion (JJP 001 - 062).PDF
15. Patricia Morgan, CRNP Docs Produced by Alpha Centurion.PDF
16. Second Chance Docs Produced by Alpha Centurion.PDF
17. Temple Ready Care Docs Produced by Alpha Centurion.PDF
18. Temple Urgent Care Docs Produced by Alpha Centurion.PDF
19. The Villa Docs Produced by Alpha Centurion.PDF
20. Visiting Nurse Assoc Community Services Docs Produced by Alpha Centurion.PDF
21. WG Harding Middle School Docs Produced by Alpha Centurion.PDF
22. Wordsworth Academy Docs Produced by Alpha Centurion.PDF
23. Hazelton Elem-Middle School Produced Docs by Alpha Centurion.PDF
24. The Bridge Therapeutic Center at Fox Chase Medical Records.PDF
25. Wordsworth Academy Additional Full Set of Records.PDF
26. Wordsworth Academy Records.PDF
27. Warren G Harding Middle School Records.PDF
28. Abdul Lopez Statement - A.L. USP 000001-000006.PDF
29. Amanda Green Statement - A.G. 000001-000003.PDF
30. DAIQUAN_DAVIS_Comprehensive_Report_-_2017-09-22.PDF
31. DAIQUAN_DAVIS_Unified_Criminals_-_(1).PDF
32. DAIQUAN_DAVIS_Unified_Criminals_-_(2).PDF
33. Declaration of Daiquan Davis.PDF
34. Deposition Transcript of M.B. - Exhibits - 7-10-18.PDF
35. Deposition Transcript of M.B. (Mini) - 7-10-18.PDF
36. Docket - Daiquan Davis.PDF
37. ECF 114  Government's sentencing memorandum.PDF
38. ECF 83  Daiquan Davis's response in opposition to the government's motion in limine to admit defendant's prior conviction.PDF
39. Indictment - Daiquan Davis.PDF

Case ID: 170300712
Control No.: 21060495

40. JJ FDC 000001-000009.PDF
41. Statement - K.S. 000001.PDF
42. Letter from N. Bezar to Counsel enclosed DHS records (DHS000076-000876).PDF
43. M.B. - Alpha-Centurion's Objections to Plaintiff's Interrogatories and Requests for Production of Documents (117138864_1).PDF
44. M.B. - CT_ P_A and Defendant, Alpha-Centurion Security, Inc. responses to Plaintiff's Interrogatories and RPDs Set II  (Discovery Packet 11.1.18) (119265247_1).PDF
45. MB - [SERVED - 11-1-18] - Answers of Alpha to M.B.'s Interrogatories and RPDs (Set II).PDF
46. MB - 1.3.19 Plaintiff's Sec Supp Answers to Set I Interrogatories, No. 14.PDF
47. MB - Bates Nos.-Roosevelt 000576-000651.PDF
48. MB – Defendant's Supp. Response to Plaintiff's RPD No. 14  (First Set).PDF
49. MB – Defendant's Supplemental Responses to Plaintiff's Interrogatories 25-30 Set I.PDF
50. MB - Deposition Transcript of Anthony Uzzo (mini) - 8-16-18.PDF
51. MB - Deposition Transcript of Guillermo Salas (Mini) - 10_03_19.PDF
52. MB - Deposition Transcript of Jessica Salas (Mini) - 10_03_19.PDF
53. MB - Deposition Transcript of Yagnakumar Patel (Mini)- 7_19_18.PDF
54. MB - Exhibit 1 to Deposition Transcript of Guillermo Salas.PDF
55. MB - Investigation - MB Facebook Postings 2013-2014.PDF
56. MB - Kimberly Mueller Video Deposition Transcript dated 9-19-19 (minuscript).PDF
57. MB - M.B. Alpha Discovery Responses (117779583_1).PDF
58. MB – Plaintiff's Answers to RI Interrogatories Set III (01_09_19).PDF
59. MB – Plaintiff's Response to RI RFPD Set V & Docs Produced (RSPSETV 1-29) (01_09_19).PDF
60. MB – Plaintiff's 2nd Supp Answers to Set I Interrogatories No. 14  (w_ BH Statement B.H. 000001).PDF
61. MB – Plaintiff's Documents Produced Pursuant to Subpoena (served 06.19.18).PDF
62. MB – Plaintiff's Documents Produced (JJ FDC 000001-000009) (12_11_18).PDF
63. MB – Plaintiff's Photo Produced (Photo 000001) (12_11_18).PDF
64. MB – Plaintiff's Supp Answers to Def Roosevelt's Interrogatories Set I No. 14 (12_11_18).PDF
65. MB – Plaintiff's Supp Answers to Def Roosevelt's Interrogatories Set I, No. 14 (2).PDF
66. MB – Plaintiff's Supp Answers to Def Roosevelt's Interrogatories Set I, No. 14.PDF
67. MB – Plaintiff's Third Supp Ans to Defendant's Interrogatories Set I, No. 14.PDF
68. MB - RI Defendants Supplemental Answers to Discovery Requests Set I (04_01_19) (Roosevelt4293-5359).PDF
69. MB - Roosevelt Bates-stamped documents_ Roosevelt 3838 - 4139.PDF
70. MB - Roosevelt Bates-stamped documents_ Roosevelt 4140 - 4292.PDF
71. MB - Roosevelt Bates-stamped documents_ Roosevelt 4293 - 5359.PDF
72. MB - Roosevelt Bates-stamped documents_ Roosevelt 5360-5909.PDF
73. MB - Roosevelt Bates-stamped documents_ Roosevelt 705 - 710.PDF
74. MB - Roosevelt Bates-stamped documents_ Roosevelt 712 - 3837.PDF

Case ID: 170300712
Control No.: 21060495

75. MB - Roosevelt Defendants Docs Produced received by JJPI (RSIB 835 - 894) (7_618).PDF
76. MB – Roosevelt MB [712]-Yagna Patel depo transcript with Exhibits dated 8.8.19.PDF
77. MB - Roosevelt-Brian Bowens transcript-06.25.19 (Condensed version).PDF
78. MB - Statement - R.M. 000001-000003.PDF
79. MB - Video Deposition of Yagna Patel dated 9.5.19.PDF
80. MB-pleadings discovery and investigative materials
81. MB-pleadings discovery and investigative materials 2
82. MB-pleadings discovery and investigative materials.zip
83. PDF Bensalem Township Police Department Records (11_14_18).PDF
84. PHOTO 1.PDF
85. Photographs of M.B..PDF
86. Plaintiff's Docs Produce Re Cimbak O.D. (06_26_17) (CIMBAK 000027-000036).PDF
87. Plaintiff's Documents Produced Bates COP0001-1552 (Philadelphia Police Incident Reports Case Folders).PDF
88. Plaintiff's Documents Produced Re JJPI (JJPI000001-000091) (8_9_18).PDF
89. Plaintiff's Documents Produced Re Chestnut Hill Women_s Health Assocs (CHESHILL 000001-000026).PDF
90. Plaintiff's Documents Produced Re Prime Time Dental (PRIMETIME 000037-000041).PDF
91. Plaintiff's Documents Produced Re School District of Philadelphia (SDOP000042-000093).PDF
92. Plaintiff's Documents Produced Re School District of Upper Dublin (SDUD 000094-000246).PDF
93. Plaintiff's Documents Produced - Aria Frankford (AF000001-000086).PDF
94. Plaintiff's Resp to Def RFA (Set III) and RFP (Set IV).PDF
95. Plaintiff's Resp to Roosevelt's RFA (Set II) and RFP (Set III).PDF
96. PPD Incident Reports (COP000001-001552).PDF
97. Roosevelt - Lopez Govt Pretrial Detention Motion.PDF
98. Roosevelt Inn – Plaintiff's Response to Defendant's Amended 1st Set of Request for Admissions.PDF
99. Davis GJ Exhibits 1, 3, 6, 7.
100. Complaint and Amended Complaints
101. Deposition transcript of Fred Keeler
102. Deposition transcript of Bibihalimoon Hussain
103. Deposition transcript of Abdul Lopez
104. Deposition transcript of Sanat Rushi
105. Commonwealth of PA vs. Daiquan Davis Preliminary Hearing Transcript
106. Opening of Investigation Agent Report (FBI) Daiquan Davis
107. Deposition transcript of Keith Fenwick
108. Deposition transcript of Abdul Azeez
109. Deposition transcript of Kelvin Hanton
110. Deposition transcript of Patrick Panetta
111. Mentions of "Roosevelt Inn" on USASexGuide.nl

Case ID: 170300712
Control No.: 21060495

112. Expert witness report by Richard G. Hudak
113. Expert witness report by Michelle Guelbart
114. Expert witness report by Mollie Gordon

79

| M.B | : | PHILADELPHIA COUNTY |
|---|---|---|
| | : | COURT OF COMMON PLEAS |
| v. | : | |
| | : | CIVIL TRIAL DIVISION |
| ROOSEVELT INN LLC | : | MARCH TERM, 2017 |
| d/b/a ROOSEVELT INN and | : | NO.: 00712 |
| ROOSEVELT INN CAFÉ, et al. | : | |
| | : | JURY TRIAL DEMANDED |
| | : | |

## <u>ORDER</u>

**AND NOW**, this _____ day of June, 2021, upon consideration of the Motion in Limine to Preclude and Exclude Hearsay Summary of Interview of Keith Fenwick filed by Defendants Roosevelt Inn LLC, Roosevelt Motor Inn, Inc., UFVS Management Company, LLC, and Yagna Patel (collectively "Roosevelt Defendants"), Plaintiff's Response in Opposition, and any response thereto, it is hereby:

**ORDERED** and **DECREED** that the Roosevelt Defendants' Motion in Limine is **DENIED.**

BY THE COURT:

_____

J.

**KLINE & SPECTER, P.C.**                     Attorneys for Plaintiff M.B.
BY:     THOMAS R. KLINE, ESQUIRE/28895
        NADEEM A. BEZAR, ESQUIRE/63577
        EMILY B. MARKS, ESQUIRE/204405
        KYLE B. NOCHO, ESQUIRE/319270
1525 Locust Street
Philadelphia, Pennsylvania 19102
(215) 772-1000

| | | |
|---|---|---|
| M.B | : | PHILADELPHIA COUNTY |
| | : | COURT OF COMMON PLEAS |
| v. | : | |
| | : | CIVIL TRIAL DIVISION |
| ROOSEVELT INN LLC | : | MARCH TERM, 2017 |
| d/b/a ROOSEVELT INN and | : | NO.: 00712 |
| ROOSEVELT INN CAFÉ, et al. | : | |
| | : | JURY TRIAL DEMANDED |
| | : | |

### PLAINTIFF'S RESPONSE IN OPPOSITION TO THE MOTION IN LIMINE TO PRECLUDE AND EXCLUDE HEARSAY SUMMARY OF INTERVIEW OF KEITH FENWICK FILED BY DEFENDANTS ROOSEVELT INN LLC, ROOSEVELT MOTOR INN, INC., UFVS MANAGEMENT COMPANY, LLC, AND YAGNA PATEL

Plaintiff by and through her attorneys, Kline & Specter, hereby responds in opposition to the Motion in Limine to Preclude and Exclude Hearsay Summary of Interview of Keith Fenwick filed by Defendants Roosevelt Inn LLC, Roosevelt Motor Inn, Inc., UFVS Management Company, LLC, and Yagna Patel (collectively "Roosevelt Defendants"), as follows:

1. Denied as stated. This paragraph refers to Plaintiff's Complaint and Plaintiff's Amended Complaints. These are written documents that speak for themselves. Any characterizations of them are denied.

2. It is admitted only that Defendant Alpha-Centurion Security, Inc. ("Alpha") had a contract to provide security at the Roosevelt Inn for two or three nights per week since 2007. Alpha initially provided a security guard on Friday and Saturday nights. After a shootout at the motel in March 2014, a Sunday shift was added.

Case ID: 170300712
Control No.: 21060533

3. It is admitted only that Keith Fenwick's deposition occurred on September 26, 2019. This paragraph refers to the deposition transcript of Keith Fenwick, which is a written document that speaks for itself. Any characterizations of the transcript are denied.

4. It is admitted only that an investigator retained by Plaintiff's counsel interviewed Keith Fenwick and took his statement. All other averments in this paragraph are specifically denied.

5. Denied as stated. This paragraph refers to the statement of Keith Fenwick. It is a written document that speaks for itself. Any characterizations of the document are denied. <u>See</u> Statement of Keith Fenwick, attached as Exhibit "E".

6. Denied. This paragraph is a legal conclusion to which no response is required.

7. It is admitted only that Keith Fenwick's deposition occurred on September 26, 2019. All other averments in this paragraph are specifically denied.

8. Denied. This paragraph is a legal conclusion to which no response is required.

9. – 12. Denied. This paragraph is a legal conclusion to which no response is required. The Roosevelt Defendants have filed this Motion in Limine attempting to exclude a statement from the witness Keith Fenwick. Mr. Fenwick previously worked for Defendant Alpha-Centurion Security, Inc. as a security guard in 2013 and 2014. Mr. Fenwick testified at his deposition that he recognized Plaintiff M.B. from the Roosevelt Inn and he described how the hotel had an open and obvious presence of criminal activity, including drug activity and also pimps physically assaulting young girls. His testimony is relevant to show the Roosevelt Defendants knew or should have known about the dangers posed by criminal activity to the safety of those at the motel like M.B. Evidence that is relevant and admissible cannot be

Case ID: 170300712
Control No.: 21060533

precluded merely because it is unfavorable to Defendants' position.  See Commonwealth v. Dillon, 925 A.2d 131 (Pa. 2007).

Under Pennsylvania law, a plaintiff can establish liability of a business like the Roosevelt Inn for negligence in preventing the criminal acts of third parties under Section 344 of the Restatement (Second) of Torts, if the plaintiff shows the business failed to take reasonable precautions to protect the plaintiff against "harmful third party conduct that might be reasonably anticipated."  Rabutino v. Freedom State Realty Co., Inc., 932 A.2d 933, 939 (Pa. Super. 2002).

As operators of a motel, the Roosevelt Defendants owed M.B. a duty to take reasonable precautions against potential criminal acts of third parties, where through prior experience the motel could anticipate such conduct.  Evidence of criminal activity witnessed at the Roosevelt Inn goes to the heart of the issue of notice and the motel's need to take reasonable precautions against the foreseeable harm suffered by Plaintiff M.B.  See, e.g., Paliometros v. Loyola, 932 A.2d 128, 135 – 37 (Pa. Super. 2007) (reasoning that a plaintiff who was sexually assaulted at a motel could show the harm that she faced was reasonably foreseeable by introducing evidence of rampant underage drinking at the motel); Rabutino, 809 A.2d at 941 n.6 (reasoning that the harm experienced by a shooting victim at a motel was reasonably foreseeable based on the "alleged laissez faire reputation" of the motel "coupled with an extensive record of reported crimes in the locale during the previous twelve months—170 total calls including 43 disorderly crowds and fighting, twenty three burglaries, five robberies (including one strong arm), 11 vandalisms, and 2 false imprisonments…"); Young v. Prizm Asset Mgmt. Co., 2014 PA Super 195, 100 A.3d 594, 600–02 (2014) (reasoning that plaintiff met notice requirement in case involving assault where plaintiff introduced evidence of police calls made regarding fights, disorderly conduct, trespassing, drug activity, and shoplifting, along with a prior assault in the area); Bonilla v.

Case ID: 170300712
Control No.: 21060533

<u>Motel 6 Operating L.P.</u>, No. 2:09CV712, 2011 WL 4345786, at *5-*8 (W.D. Pa. Sept. 15, 2011) (reasoning that the frequency of calls to the police for crimes generally could be a factor considered by the jury whether the motel had constructive notice of the foreseeable harm experienced by a plaintiff stabbed at a motel).

Mr. Fenwick's testimony also rebuts the Roosevelt Defendants' denial of knowledge of crimes occurring at the motel. During their depositions, the motel's manager Yagna Patel and the employees of the motel denied any knowledge about criminal activities going on at the Roosevelt Inn.

It is premature to categorically exclude Mr. Fenwick's statement when it can be admissible in a number of different ways. Plaintiff's counsel is well-aware of the Pennsylvania Rules of Evidence and the specific rules pertaining to hearsay evidence. It is premature to categorically exclude this evidence when it can be admissible in a number of different ways, including through expert testimony, refreshing a witness' recollection, impeaching a witness or if reviewed and relied upon by an expert. <u>See</u> Pa. R.E. 703 ("If experts in the particular field would reasonably rely on those kinds of facts or data in forming an opinion on the subject, they need not be admissible for the opinion to be admitted."). The Roosevelt Defendants' own liability experts rely on witness statements in their expert reports. This evidence's high probative value outweighs its prejudicial effect. The Court should thus deny the Roosevelt Defendants' Motion in Limine.

4

Case ID: 170300712
Control No.: 21060533

WHEREFORE, Plaintiff respectfully request this Honorable Court deny the Roosevelt

Defendants' Motion *in Limine*.  An appropriate form of Order is attached.

Respectfully submitted,

**KLINE & SPECTER, P.C.**

BY: */s/Emily B. Marks*

THOMAS R. KLINE, ESQUIRE
NADEEM A. BEZAR, ESQUIRE
EMILY B. MARKS, ESQUIRE
KYLE B. NOCHO, ESQUIRE
*Attorneys for Plaintiff*

Case ID: 170300712
Control No.: 21060533

**KLINE & SPECTER, P.C.**                    Attorneys for Plaintiff M.B.
BY:    THOMAS R. KLINE, ESQUIRE/28895
          NADEEM A. BEZAR, ESQUIRE/63577
          EMILY B. MARKS, ESQUIRE/204405
          KYLE B. NOCHO, ESQUIRE/319270
1525 Locust Street
Philadelphia, Pennsylvania 19102
(215) 772-1000

| | | |
|---|---|---|
| M.B | : | PHILADELPHIA COUNTY |
| | : | COURT OF COMMON PLEAS |
|    v. | : | |
| | : | CIVIL TRIAL DIVISION |
| ROOSEVELT INN LLC | : | MARCH TERM, 2017 |
| d/b/a ROOSEVELT INN and | : | NO.: 00712 |
| ROOSEVELT INN CAFÉ, et al. | : | |
| | : | JURY TRIAL DEMANDED |
| | : | |

## <u>PLAINTIFF'S MEMORANDUM OF LAW IN OPPOSITION TO THE MOTION IN LIMINE TO PRECLUDE AND EXCLUDE HEARSAY SUMMARY OF INTERVIEW OF KEITH FENWICK FILED BY DEFENDANTS ROOSEVELT INN LLC, ROOSEVELT MOTOR INN, INC., UFVS MANAGEMENT COMPANY, LLC, AND YAGNA PATEL</u>

### I.    PRELIMINARY STATEMENT

The Roosevelt Defendants have filed this Motion in Limine attempting to exclude a statement from the witness Keith Fenwick. Mr. Fenwick previously worked for Defendant Alpha-Centurion Security, Inc. as a security guard in 2013 and 2014. Mr. Fenwick testified at his deposition that he recognized M.B. at the Roosevelt Inn and how the motel had an open and obvious presence of criminal activity, including drug activity and also pimps physically assaulting young girls. This evidence is relevant in showing that the Roosevelt Defendants knew or should have known about the dangers posed by criminal activity to the safety of those at the motel like M.B. and contradicts the Roosevelt Defendants' position that they were unaware of any criminal activity.

As operators of a motel, the Roosevelt Defendants owed M.B. a duty to take reasonable precautions against potential criminal acts of third parties, where through prior experience the

Case ID: 170300712
Control No.: 21060533

motel could anticipate such conduct. Mr. Fenwick's observations of open and obvious criminal activity at the motel goes to the heart of the issue of notice and the motel's need to take reasonable precautions against the foreseeable harm suffered by Plaintiff M.B. This evidence also rebuts the Roosevelt Defendants' denial of knowledge of crimes occurring at the motel.

Plaintiff's counsel is well-aware of the Pennsylvania Rules of Evidence and the specific rules pertaining to hearsay evidence. It is premature to categorically exclude Mr. Fenwick's statement when it can be admissible in a number of different ways, including through refreshing a witness' recollection, impeaching a witness or expert testimony if reviewed and relied upon by an expert. The Roosevelt Defendants' own liability experts rely on witness statements in their expert reports. The Court should thus deny the Roosevelt Defendants' Motion in Limine.

## II.  QUESTION PRESENTED

A.      Should the Court deny the Roosevelt Defendants' Motion to preclude the witness statement provided by Keith Fenwick who formerly worked as a security guard at the Roosevelt Inn?

*Suggested Answer*: Yes. Evidence of Mr. Fenwick's observations about open criminal activity at the motel, including commercial sex activity, is highly relevant in showing that Defendants knew or should have known about the dangers posed to the safety of those at the motel like M.B. As operators of a motel, Defendants owed M.B. a duty to take reasonable precautions against potential criminal acts of third parties, where through prior experience the motel could anticipate such conduct. Testimony regarding other criminal activity, especially commercial sex activity, at the motel can be used to prove that the Roosevelt Inn was put on notice that it needed to take reasonable precautions to prevent the foreseeable harm suffered by Plaintiff. Mr. Fenwick's statement can also be admissible in a number of different ways, including through expert testimony, refreshing a witness' recollection, or impeachment. It would be premature to categorically exclude this evidence.

## III.  BRIEF FACTUAL AND PROCEDURAL BACKGROUND

Plaintiff M.B. was the victim of sex trafficking that occurred at the Roosevelt Inn Motel when she was just 14 years-old from approximately January 2014 through June 6, 2014. Plaintiff filed a Complaint on March 10, 2017 against Defendants Roosevelt Inn LLC and

2

Case ID: 170300712
Control No.: 21060533

Roosevelt Motor Inn, Inc., as owners of the motel; the motel's management company, UFVS Management Company, LLC; and the motel's manager, Yagna Patel (hereinafter collectively, "Roosevelt Defendants"). On September 5, 2017, Plaintiff filed an Amended Complaint adding the security company, Alpha-Centurion Security, Inc., as an additional defendant. In this action, Plaintiff has asserted claims under theories of common law Negligence (Counts - I, II) and Negligent Infliction of Emotional Distress (Counts III, IV). See Plaintiff's 4th Amended Complaint attached as Exhibit "A".

Through the instant Motion, the Roosevelt Defendants seek to preclude the introduction of the statement of Keith Fenwick who previously worked as a security guard at the Roosevelt Inn in 2013 and 2014. It is premature to categorically exclude Mr. Fenwick's statement when it can be admissible in a number of different ways, including through refreshing a witness' recollection, impeaching a witness or expert testimony if reviewed and relied upon by an expert. The Roosevelt Defendants' own liability experts rely on witness statements in their expert reports. The Court should thus deny the Roosevelt Defendants' Motion in Limine.

**IV.   LEGAL ARGUMENT**

    **A. Keith Fenwick testified that he observed open and obvious criminal activity at the Roosevelt Inn, including commercial sex activity**

Under Pennsylvania law, to plead a claim for negligence, a plaintiff must show: (1) the existence of a duty or obligation recognized by law; (2) a failure on the part of the Defendant to conform to that duty, or breach thereof; (3) a causal connection between the Defendant's breach and the resulting injury; and (4) actual loss or damage suffered by the complainant." Paliometros v. Loyola, 932 A.2d 128, 134 (Pa. Super. 2007) (citation and internal quotations omitted).

Plaintiff's claims center on Defendants' negligence in failing to take appropriate steps to ensure the safety and protection of people at the Roosevelt Inn including M.B. from reasonably

Case ID: 170300712
Control No.: 21060533

anticipated criminal conduct by third parties.  See Ex. A at ¶¶ 68 – 87.  Pennsylvania has adopted

§ 344 of the Restatement (Second) of Torts, which lays out the standard for businesses' liability

for third party criminal acts committed against an invitee on the business premises.  See Moran

v. Valley Forge Drive–In Theater, Inc., 431 Pa. 432, 246 A.2d 875, 878 (Pa.1968) (reasoning

that § 344 applied when deciding whether a busines was liable for the tortious or negligent acts

by third parties).

> The Restatement (Second) of Torts § 344 states:

>> A possessor of land who holds it open to the public for entry for
>> his business purposes is subject to liability to members of the
>> public while they are upon the land for such a purpose, for physical
>> harm caused by the accidental, negligent, or intentionally harmful
>> acts of third persons or animals, and by the failure of the possessor
>> to exercise reasonable care to
>> - (a) discover that such acts are being done or are likely to be
>>   done, or
>> - (b) give a warning adequate to enable the visitors to avoid
>>   the harm, or otherwise to protect them against it.

Restatement (Second) of Torts § 344 (1965).

Comment f. to Section 344 provides that businesses may have a duty to police the

premises adequately, if the businesses "know or have reason to know, from past experience that

there is a likelihood of conduct on the part of the third person in general which is likely to

endanger the safety of the visitor, even though he had no reason to expect it on the part of the

particular individual."  Id.  The Comment further states: "If the place or character of his business,

or his past experience is such that he should reasonably anticipate a careless or criminal conduct

on the part of a third person, either generally or at some particular time, he may be under a duty

to take precautions against it, and to provide a reasonably sufficient number of servants to afford

a reasonable protection."  Id.

4

Case ID: 170300712
Control No.: 21060533

In other words, a plaintiff can establish liability of a business like the Roosevelt Inn for the criminal acts of third parties under Section 344 of the Restatement (Second) of Torts, if the plaintiff shows the business failed to take reasonable precautions to protect the plaintiff against "harmful third party conduct that might be reasonably anticipated." Rabutino v. Freedom State Realty Co., Inc., 932 A.2d 933, 939 (Pa. Super. 2002).

Various Pennsylvania state court decisions have found that a plaintiff can show that a business was on notice of the need to take reasonable precautions against the foreseeable potential harm suffered by the plaintiff when the plaintiff introduced evidence of crimes previously committed in the area. For instance, the Superior Court has reasoned that a plaintiff who was sexually assaulted at a motel could show the harm that she faced was reasonably foreseeable by introducing evidence of rampant underage drinking at the motel. See Paliometros, 932 A.2d at 135-37. In another case, the Superior Court reasoned that the harm experienced by a shooting victim at a motel was reasonably foreseeable based on the "alleged laissez faire reputation" of the motel "coupled with an extensive record of reported crimes in the locale during the previous twelve months—170 total calls including 43 disorderly crowds and fighting, twenty three burglaries, five robberies (including one strong arm), 11 vandalisms, and 2 false imprisonments…". Rabutino, 809 A.2d at 941 n.6. The Superior Court in Rabutino reasoned that the extensive crimes "bore on the foreseeability that the illicit environment permitted at the [motel] would foster careless, reckless, and/or deliberate conduct causing harm to those present." Id.; see also Murphy v. Penn Fruit Co., 274 Pa. Super. 427, 432–33, 418 A.2d 480, 483 (1980) (reasoning that in case involving plaintiff who was assaulted, the plaintiff demonstrated the business' notice of her potential harm through evidence of "instances of disturbances, car thefts, muggings, purse snatches, drug use" occurring in the area); Young v.

Case ID: 170300712
Control No.: 21060533

Prizm Asset Mgmt. Co., 2014 PA Super 195, 100 A.3d 594, 600–02 (2014) (reasoning that plaintiff met notice requirement in case involving assault where plaintiff introduced evidence of police calls made regarding fights, disorderly conduct, trespassing, drug activity, and shoplifting, along with a prior assault in the area).

Federal courts interpreting Pennsylvania law have also reasoned that plaintiffs can meet the notice requirement by showing evidence of past criminal activity in the area. In a case involving a stabbing victim at a motel, the court reasoned that the frequency of calls to the police for crimes generally could be a factor considered by the jury whether the motel had constructive notice of the foreseeable harm experienced by the plaintiff. See Bonilla v. Motel 6 Operating L.P., No. 2:09CV712, 2011 WL 4345786, at *5-*8 (W.D. Pa. Sept. 15, 2011). These courts have reasoned that past criminal activity near a business can be used to show that the crime suffered by the plaintiff was reasonably foreseeable. See Morgan v. Bucks Assocs., 428 F. Supp. 546, 550–51 (E.D. Pa.1977) (reasoning that non-violent car thefts occurring on premises put the defendant on constructive notice that violent criminal conduct on the part of third persons, such as the assault of the plaintiff, might occur on the premises); Baker v. Solo Nightclub, LLC, No. CIV.A. 11-2380, 2013 WL 1927052, at *8 (E.D. Pa. May 9, 2013) (reasoning that Defendants were on notice of potential danger to plaintiff in case involving plaintiff who was a shooting victim, where the plaintiff showed past incidents of disorderly conduct and fights occurring in the area, along with a Commonwealth action to enjoin the business's liquor license and previous gun incidents).

Contrary to the Roosevelt Defendants' argument, the testimony of former Alpha security guard Keith Fenwick is relevant to the issue of notice and contradicts the position taken by the Roosevelt Defendants that they were unaware of any criminal activity at the motel. This

6

Case ID: 170300712
Control No.: 21060533

evidence would show that around the time that Plaintiff M.B. was sex trafficked at the Roosevelt Inn, staff at the hotel were on notice of open commercial sex activity occurring at the motel. The criminal activity described in Mr. Fenwick's shows the motel was on notice of the need to take reasonable precautions against the foreseeable harm experienced by M.B. while at the motel. See Murphy, 418 A.2d at 483–84 ("[A]n examination of past criminal acts in the immediate vicinity of [the defendant's business] leads us to conclude the jury could infer that the occurrence of the instant crime was reasonably foreseeable."); Young, 100 A.3d at 601–02 ("… section 344 does not require for the establishment of liability that closely similar incidents of criminality have occurred at or very near the location at which the later crime occurred."); Rabutino, 809 A.2d at 942 (reasoning that the plaintiff shot at motel could prove notice requirement by showing that defendant motel "perpetuated an atmosphere where it was foreseeable that a harmful confrontation involving one or more of the unruly groups in the crowded hallways could have arisen.").

     Witness statements and interviews can reasonably be relied upon by experts in the field of security. See Pa. R.E. 703 ("If experts in the particular field would reasonably rely on those kinds of facts or data in forming an opinion on the subject, they need not be admissible for the opinion to be admitted.") Along with his expert report, the Roosevelt Defendants' security expert Norman Bates provided a copy of his forensic methodology relied upon when issuing his opinions. See Norman Bates' Methodology, attached as Exhibit "B". This methodology was issued as "Best Practices" by the International Association of Professional Security Consultants. The methodology cites witness statements and interviews as evidence typically reviewed by security expert witnesses. See Ex. B. The Roosevelt Defendants' experts Norman Bates and Kimberly Mehlman-Orozco also base part of their opinions on a review of witness statements.

Case ID: 170300712
Control No.: 21060533

<u>See</u> Expert Report of Norman Bates at pages 56 – 58, 65, and 67, attached as Exhibit "C" and Expert Report of Kimberly Mehlman-Orozco at page 21, attached as Exhibit "D".

Although witness statements may not be able to be read to the jury on their own, they can be admissible under various circumstances. The statements can be used by the witness who signed the statement to refresh their recollection. <u>See</u> Pa. R.E. 612 ("(a) Right to Refresh Memory. A witness may use a writing or other item to refresh memory for the purpose of testifying while testifying, or before testifying."). The statements can also be used to impeach the person who made the statement in that person's testimony. Pa. R.E. 613 ("(a) Witness's Prior Inconsistent Statement to Impeach**.** A witness may be examined concerning a prior inconsistent statement made by the witness to impeach the witness's credibility."). It is premature to categorically exclude any Keith Fenwick's statement when there are multiple ways that it can be admissible.

Mr. Fenwick's testimony is relevant to proving Plaintiff's claims against the Roosevelt Defendants and Defendant Alpha. Therefore, it is premature to preclude Mr. Fenwick's statement.

Case ID: 170300712
Control No.: 21060533

## V.  CONCLUSION

The Court should deny the Roosevelt Defendants' Motion.  An appropriate form of order

is respectfully attached hereto for the Court's consideration.


Respectfully submitted,

**KLINE & SPECTER, P.C.**

*/s/Emily B. Marks*

BY: _____

THOMAS R. KLINE, ESQUIRE
NADEEM A. BEZAR, ESQUIRE
EMILY B. MARKS, ESQUIRE
KYLE B. NOCHO, ESQUIRE
*Attorneys for Plaintiff*

9

Case ID: 170300712
Control No.: 21060533

## <u>VERIFICATION</u>

I, EMILY B. MARKS, ESQUIRE, hereby state that I am the attorney for Plaintiff M.B. in this matter and hereby verify that the statements made in the foregoing motion are true and correct to the best of my knowledge, information and belief.

The undersigned understands that the statements contained therein are made subject to the penalties of 18 Pa. C.S. § 4904 relating to unsworn falsification to authorities.

**KLINE & SPECTER, P.C.**

*/s/Emily B. Marks*

**BY:** _____
THOMAS R. KLINE, ESQUIRE
NADEEM A. BEZAR, ESQUIRE
EMILY B. MARKS, ESQUIRE
KYLE B. NOCHO, ESQUIRE
*Attorneys for Plaintiff*

## CERTIFICATE OF SERVICE

I, Emily B. Marks, Esquire attorney for Plaintiff, do hereby certify that service of a true and correct copy of the above *Plaintiff's Response in Opposition to the Motion in Limine to Preclude and Exclude Hearsay Summary of Interview of Keith Fenwick filed by Defendants Roosevelt Inn LLC, Roosevelt Motor Inn, Inc., UFVS Management Company, LLC, and Yagna Patel*, was filed with the Court on June 11, 2021 and served by electronic filing upon counsel of record:

Charles S. Marion, Esquire
Kevin M. Eddy, Esquire
Justina L. Byers, Esquire
Blank Rome LLP
One Logan Square, 130 North 18th Street
Philadelphia, PA 19103
*Counsel for Defendants Roosevelt Inn LLC, Roosevelt Motor Inn, Inc.,*
*UFVS Management Company, LLC and Yagna Patel*

Thomas P. Wagner, Esq.
Robert W. Stanko, Esq.
Melanie J. Foreman, Esq.
Marshall Dennehey Warner Coleman & Goggin
2000 Market Street, Suite 2300
Philadelphia, PA 19103
*President of Defendant Alpha-Centurion Security, Inc.*

By first-class mail upon the following parties:

Daiquan Davis, Register No. 72304-066
USP Terre Haute
U.S. Penitentiary
P.O. Box 33
Terre Haute, IN 47808
*Pro Se Defendant*

Abdul Lopez, Register No. 69643-066
USP Tucson
U.S. Penitentiary
P.O. Box 24550
Tucson, AZ 85734
*Pro Se Defendant*

**KLINE & SPECTER, P.C.**

*/s/Emily B. Marks*

BY: _____

EMILY B. MARKS, ESQUIRE
*Attorney for Plaintiff*

Case ID: 170300712
Control No.: 21060533

| | | |
|---|---|---|
| M.B. | : | PHILADELPHIA COUNTY |
| | : | COURT OF COMMON PLEAS |
| v. | : | |
| | : | CIVIL TRIAL DIVISION |
| ROOSEVELT INN LLC | : | MARCH TERM, 2017 |
| d/b/a ROOSEVELT INN and | : | NO.: 00712 |
| ROOSEVELT INN CAFÉ, et al. | : | |
| | : | |

## ORDER

**AND NOW**, this _____ day of June, 2021, upon consideration of Motion in Limine of Defendant Alpha-Centurion Security, Inc. to Preclude Reference to the Word "Rape" at Trial, and any response in opposition thereto, it is hereby:

**ORDERED** and **DECREED** that Defendant Alpha-Centurion Security, Inc.'s Motion is **DENIED**.

**BY THE COURT**

_____
                                                          J.

**KLINE & SPECTER, P.C.**                Attorneys for Plaintiff
BY:    THOMAS R. KLINE, ESQUIRE/28895
        NADEEM A. BEZAR, ESQUIRE/63577
        EMILY B. MARKS, ESQUIRE/204405
        KYLE B. NOCHO, ESQUIRE/319270
1525 Locust Street
Philadelphia, Pennsylvania 19102
(215) 772-1000

| | | |
|---|---|---|
| M.B. | : | PHILADELPHIA COUNTY |
| | : | COURT OF COMMON PLEAS |
| v. | : | |
| | : | CIVIL TRIAL DIVISION |
| ROOSEVELT INN LLC | : | MARCH TERM, 2017 |
| d/b/a ROOSEVELT INN and | : | NO.: 00712 |
| ROOSEVELT INN CAFÉ, et al. | : | |
| | : | |

### PLAINTIFF'S RESPONSE TO MOTION IN LIMINE OF DEFENDANT ALPHA-CENTURION SECURITY, INC. TO PRECLUDE REFERENCE TO THE WORD "RAPE" AT TRIAL

Plaintiff M.B. ("Plaintiff"), by her counsel, Kline & Specter, P.C, responds in opposition to the Motion in Limine of Defendant Alpha-Centurion Security, Inc. to Preclude Reference to the Word "Rape" at Trial as follows:

1.      Denied as stated. By way of further explanation, Plaintiff's Complaint is a document that speaks for itself, and thus, any characterizations of Plaintiff's factual or legal claims are specifically denied. See generally Pl. Fourth Amended Complaint attached as "Exhibit A."

2.      Denied as stated. Abdul Lopez and Daiquan Davis sex trafficked Plaintiff at the Roosevelt Inn when she was a minor. Both of these sex traffickers were convicted of the crime sex trafficking of a minor under 18 U.S.C. §§ 1591 and 1594(a).

3.      Denied as stated. See response to Paragraph 1.

4.      Denied as stated. See response to Paragraph 1.

Case ID: 170300712
Control No.: 21060403

5. Denied. By way of further explanation, this paragraph consists of legal argument and purported conclusions of law to which no response is required, and thus, all allegations are denied.

6. Denied as stated. See response to Paragraph 1.

7. Denied as stated. See response to Paragraph 1.

8. Denied as stated. By way of further explanation, this paragraph consists of legal argument and purported conclusions of law to which no response is required, and thus, all allegations are denied. Plaintiff's testimony speaks for itself and any characterizations thereof are also denied.

9. Denied as stated. Plaintiff's testimony speaks for itself and any characterizations thereof are also denied.

10. Denied as stated. See response to Paragraph 9.

11. Denied. By way of further explanation, this paragraph consists of legal argument and purported conclusions of law to which no response is required, and thus, all allegations are denied.

12. Denied as stated. By way of further explanation, this paragraph consists of legal argument and purported conclusions of law to which no response is required, and thus, all allegations are denied. Abdul Lopez and Daiquan Davis sex trafficked Plaintiff at the Roosevelt Inn when she was a minor. Both of these sex traffickers were convicted of the crime sex trafficking of a minor under 18 U.S.C. §§ 1591 and 1594(a).

13. Denied as stated. Abdul Lopez and Daiquan Davis sex trafficked Plaintiff at the Roosevelt Inn when she was a minor. Both of these sex traffickers were convicted of the crime sex trafficking of a minor under 18 U.S.C. §§ 1591 and 1594(a).

14. Denied as stated. See response to Paragraph 1.

Case ID: 170300712
Control No.: 21060403

15.-20.         Denied. By way of further explanation, this paragraph consists of legal argument and purported conclusions of law to which no response is required, and thus, all allegations are denied. Plaintiff was raped when Daiquan Davis, Abdul Lopez, and other men who paid to have sex with her engaged in sexual intercourse with her despite Plaintiff only being fourteen years old. Alpha contends that referring to such sexual intercourse as "rape" is "irrelevant" and "would serve no purpose other than to incite a jury and prejudice [Alpha]." See Alpha Motion at 2.  The Court should reject Alpha's contention because Plaintiff is not required to "sanitize the trial to eliminate all unpleasant facts from the jury's consideration where those facts are relevant to the issues at hand and form part of the history and natural development of the events." See Com. v. Hairston, 84 A.3d 657, 666 (Pa. 2014).

As M.B. was just 14 years old, she could not consent to being sold for sex or having sex with adults.   The term rape accurately describes the harm M.B. suffered as a result of the Defendants' conduct. There is nothing inflammatory about using the word rape to describe what happened to M.B. when it is based in fact and law. "[T]he availability of alternate testimonial evidence does not preclude the admission of allegedly inflammatory evidence." Com. v. Sanchez, 36 A.3d 24, 42-43 (Pa. 2011), cert. denied, 133 S. Ct. 122 (2012).

**WHEREFORE**, Plaintiff requests that this Honorable Court enter an Order denying Motion in Limine of Defendant Alpha-Centurion Security, Inc. to Preclude Reference to the Word "Rape" at Trial.

<div align="right">

**KLINE & SPECTER, P.C.**

*/s/Emily B. Marks*

BY: _____
THOMAS R. KLINE, ESQUIRE
NADEEM A. BEZAR, ESQUIRE
EMILY B. MARKS, ESQUIRE
KYLE B. NOCHO, ESQUIRE
*Attorneys for Plaintiff*

</div>

Case ID: 170300712
Control No.: 21060403

**KLINE & SPECTER, P.C.**         Attorneys for Plaintiff
BY:    THOMAS R. KLINE, ESQUIRE/28895
        NADEEM A. BEZAR, ESQUIRE/63577
        EMILY B. MARKS, ESQUIRE/204405
        KYLE B. NOCHO, ESQUIRE/319270
1525 Locust Street
Philadelphia, Pennsylvania 19102
(215) 772-1000

| | | |
|---|---|---|
| M.B. | : | PHILADELPHIA COUNTY |
| | : | COURT OF COMMON PLEAS |
| v. | : | |
| | : | CIVIL TRIAL DIVISION |
| ROOSEVELT INN LLC | : | MARCH TERM, 2017 |
| d/b/a ROOSEVELT INN and | : | NO.: 00712 |
| ROOSEVELT INN CAFÉ, et al. | : | |
| | : | |

## PLAINTIFF'S MEMORANDUM OF LAW IN SUPPORT OF HER RESPONSE TO MOTION IN LIMINE OF DEFENDANT ALPHA-CENTURION SECURITY, INC. TO PRECLUDE REFERENCE TO THE WORD "RAPE" AT TRIAL

Plaintiff M.B. ("Plaintiff"), by her counsel, Kline & Specter, P.C., respectfully submits

this Memorandum of Law in Support of her Response to the Motion in Limine of Defendant

Alpha-Centurion Security, Inc. to Preclude Reference to the Word "Rape" at Trial.

## I.    PRELIMINARY STATEMENT

Plaintiff was raped when Defendant Daiquan Davis ("Davis"), Defendant Abdul Lopez

("Lopez"), and other men who paid to have sex with her engaged in sexual intercourse with her

despite Plaintiff only being fourteen years old. Defendant Alpha-Centurion Security, Inc.

("Alpha") contends that referring to such sexual intercourse as "rape" is "irrelevant" and "would

serve no purpose other than to incite a jury and prejudice [Alpha]." See Alpha Motion at 2.  The

Court should reject Alpha's contention because Plaintiff is not required to "sanitize the trial to

eliminate all unpleasant facts from the jury's consideration where those facts are relevant to the

issues at hand and form part of the history and natural development of the events." See Com. v.

Hairston, 84 A.3d 657, 666 (Pa. 2014).

Case ID: 170300712
Control No.: 21060403

## II.    QUESTION PRESENTED

1. Should this Honorable Court permit Plaintiff to use the word "rape" at trial?

    **SUGGESTED ANSWER:**    *Yes. Evidence is not unfairly prejudicial merely because it is harmful to a defendant.*

## III.    BRIEF FACTUAL AND PROCEDURAL HISTORY

Plaintiff was the victim of sex trafficking that occurred at the Roosevelt Inn when she was just fourteen years old from about January 2014 through June 6, 2014.  Plaintiff filed a Complaint on March 10, 2017 against Defendants Roosevelt Inn LLC and Roosevelt Motor Inn, Inc., as owners of the motel; the motel's management company, UFVS Management Company, LLC; and the motel's manager, Yagna Patel (hereinafter collectively, "Roosevelt Defendants"). On September 5, 2017, Plaintiff filed an Amended Complaint adding the security company, Alpha, as an additional defendant.

Plaintiff asserts that Davis and Lopez, who were both adults had sex with her and sold her to other adult men who paid to have sex with her. As M.B. was just 14 years old, she could not consent to being sold for sex or having sex with adults.   The term rape accurately describes the harm M.B. suffered as a result of the Defendants' conduct. There is nothing inflammatory about using the word rape to describe what happened to M.B. when it is based in fact and law.

## IV.    THE COURT SHOULD NOT PRECLUDE PLAINTIFF FROM USING THE WORD "RAPE" AT TRIAL

The conduct of Davis, Lopez, and the adult men who paid to have sex with Plaintiff falls within the well-understood generic legal and layperson's definition of "statutory rape." The use of the word "rape" by Plaintiff at trial is relevant and will serve to assist the jury in understanding the material facts of the case—specifically, the harm M.B. suffered as a result of the Defendants' conduct. The Court should not preclude the word "rape" merely because Alpha

Case ID: 170300712
Control No.: 21060403

claims the term is inflammatory. This case involves sensitive issues and strong words will be used at trial. However, this is a fact of the case, and is not a basis to preclude relevant evidence.

Evidence is relevant if: "(a) it has any tendency to make a fact more or less probable than it would be without the evidence; and (b) the fact is of consequence in determining the action." Pa.R.E. 401. "All relevant evidence is admissible, except as otherwise provided by law." Pa.R.E. 402. A court may exclude relevant evidence if its probative value is outweighed by a danger of one or more of the following: "unfair prejudice, confusing the issues, misleading the jury, undue delay, wasting time, or needlessly presenting cumulative evidence." Pa.R.E. 403. Evidence will not be excluded simply because it is harmful to the defendant. Com. v. Antidormi, 84 A.3d 736, 750 (Pa. Super. Ct. 2014). There is no mandate that the trial court "sanitize[s] the trial to eliminate all unpleasant facts from the jury's consideration where those facts are relevant to the issues at hand and form part of the history and natural development of the events." See Hairston, 84 A.3d at 666. Finally, "the availability of alternate testimonial evidence does not preclude the admission of allegedly inflammatory evidence." Com. v. Sanchez, 36 A.3d 24, 42-43 (Pa. 2011), cert. denied, 133 S. Ct. 122 (2012).

Both dictionaries and Pennsylvania courts prescribe similar definitions of rape. Black's Law Dictionary defines "statutory rape" as "[u]nlawful sexual intercourse with a person under the age of consent (as defined by statute), regardless of whether it is against that person's will." BLACK'S LAW DICTIONARY 1374 (9th ed. 2009). Similarly, Merriam-Webster's Dictionary defines "statutory rape" as "sexual intercourse with a person who is below the statutory age of consent." MERRIAM-WEBSTER'S COLLEGIATE DICTIONARY 1146 (10th ed. 2001). The Superior Court of Pennsylvania has stated that "[i]t is axiomatic that [individuals] *under the age of 16* may not legally assent to sexual acts of . . . any kind." Com. v. Hughlett, 378 A.2d 326, 329 (Pa. Super. Ct. 1977) (emphasis added).

3

Case ID: 170300712
Control No.: 21060403

Pennsylvania does not currently have an offense titled "statutory rape," however, Pennsylvania courts have used the term "statutory rape" to refer to "statutory sexual assault." See, e.g., Com. v. Ludwig, No. 1075-MDA-2016, 2017 WL 129121, at *4 (Pa. Super. Ct. Jan. 13, 2017). In Ludwig, the then-18-1/2-year-old defendant engaged in sexual relations with a 14-year-old girl. Id. His conduct constituted a violation of § 3122.1. Id. at 1 n.1. The Superior Court of Pennsylvania, though noting the caption of the offense as "statutory sexual assault," explained that such sexual relations, as the defendant admitted to, represent "statutory rape." Id. at 4 ("The two men also discussed [the defendant]'s sexual relationship with [the minor]. The men were aware that the relations would constitute statutory rape.").

Here, the Court should not preclude Plaintiff from using the word "rape" at trial. Plaintiff has asserted claims for negligence (Count II) and negligent infliction of emotional (Count IV) against Alpha for, *inter alia*, failing to "take precautions against reasonably anticipated criminal conduct by third parties so as not to endanger the welfare and well-being of Plaintiff[, and failing] to take reasonable steps to protect foreseeable victims [from] the dangers created by their acts and omissions, including the danger of human trafficking and *sexual exploitation on the premises of the Roosevelt Inn*." See, e.g., Pl. Fourth Amended Complaint. Alpha's contention that using the word "rape" would mean granting Plaintiff "the license to unreasonably expand the issues using inherently inflammatory language" is without merit. Instead, Plaintiff should be permitted to use the word "rape" because it is by definition what happened to M.B. and is relevant to showing the sexually exploitative and criminal conduct that occurred on the Roosevelt Inn's premises that Alpha failed to take precautions against. Moreover, it would aid the jury's understanding of the sexual relations that Plaintiff was subject to at the Roosevelt Inn.

Further, precluding use of the word "rape" would amount to sanitizing an unpleasant fact from the jury's consideration. Not only did Davis and Lopez sell Plaintiff to other adult males for

4

Case ID: 170300712
Control No.: 21060403

sex, but they had illegal sexual contact with M.B. as well. Under Black's Law Dictionary, Merriam-Webster's Dictionary, and Pennsylvania law, what happened to M.B. at the Roosevelt Inn is by definition rape. The Roosevelt Defendants cite these very statutes in a negligence per se count in the Joinder Complaint joining Daiquan Davis and Abdul Lopez as additional defendants.

Plaintiff was fourteen years old when she was sold for sex and adult men had sexual contact with her. A fourteen-year-old girl, like Plaintiff, could not have provided legally valid consent to have sex with anyone. Like in Ludwig, the adult men here had sex with a fourteen-year-old girl. Whether such sex is "statutory sexual assault," as provided in the caption of the offense, or "statutory rape," as described in the Superior Court's opinion, is a distinction without a difference. In that statutory context, "sexual assault" includes "rape." The Court should not permit Alpha to alter the facts of the case.

For the foregoing reasons, Plaintiff respectfully requests that this Honorable Court enter the proposed Order denying Alpha's Motion in Limine to Preclude Reference to the Word "Rape" at Trial.

<div align="center"></div>

Respectfully submitted,

**KLINE & SPECTER, P.C.**

*/s/Emily B. Marks*

BY: _____
THOMAS R. KLINE, ESQUIRE
NADEEM A. BEZAR, ESQUIRE
EMILY B. MARKS, ESQUIRE
KYLE B. NOCHO, ESQUIRE
*Attorneys for Plaintiff*

<div align="center">5</div>

Case ID: 170300712
Control No.: 21060403

## VERIFICATION

I, EMILY B. MARKS, ESQUIRE, hereby state that I am the attorney for Plaintiff M.B. in this matter and hereby verify that the statements made in the foregoing motion are true and correct to the best of my knowledge, information and belief.

The undersigned understands that the statements contained therein are made subject to the penalties of 18 Pa. C.S. § 4904 relating to unsworn falsification to authorities.

**KLINE & SPECTER, P.C.**

**BY:** */s/Emily B. Marks*
_____
THOMAS R. KLINE, ESQUIRE
NADEEM A. BEZAR, ESQUIRE
EMILY B. MARKS, ESQUIRE
KYLE B. NOCHO, ESQUIRE
*Attorneys for Plaintiff*

Case ID: 170300712
Control No.: 21060403

<u>**CERTIFICATE OF SERVICE**</u>

I, Emily B. Marks, Esquire attorney for Plaintiff, do hereby certify that service of a true and correct copy of the above ***Motion in Limine of Defendant Alpha-Centurion Security, Inc. to Preclude Reference to the Word "Rape" at Trial*** was filed with the Court on June 11, 2021 and served by electronic filing upon counsel of record:

Justina L. Byers, Esquire
Charles S. Marion, Esquire
Kevin M. Eddy, Esquire
Blank Rome LLP
One Logan Square, 130 North 18th Street
Philadelphia, PA 19103
*Counsel for Defendants Roosevelt Inn LLC, Roosevelt Motor Inn, Inc.,*
*UFVS Management Company, LLC and Yagna Patel*

Thomas P. Wagner, Esq.
Robert W. Stanko, Esq.
Melanie J. Foreman, Esq.
Marshall Dennehey Warner Coleman & Goggin
2000 Market Street, Suite 2300
Philadelphia, PA 19103
*President of Defendant Alpha-Centurion Security, Inc.*

By first-class mail upon the following parties:

Daiquan Davis, Register No. 72304-066
USP Terre Haute
U.S. Penitentiary
P.O. Box 33
Terre Haute, IN 47808
*Pro Se Defendant*

Abdul Lopez, Register No. 69643-066
USP Tucson
U.S. Penitentiary
P.O. Box 24550
Tucson, AZ 85734
*Pro Se Defendant*

**KLINE & SPECTER, P.C.**

BY: */s/Emily B. Marks*
_____
EMILY B. MARKS, ESQUIRE
*Attorney for Plaintiff*

Case ID: 170300712
Control No.: 21060403

# <u>EXHIBIT A</u>

Case ID: 170300712
Control No.: 21060403

**KLINE & SPECTER, P.C.**
BY:     THOMAS R. KLINE, ESQUIRE/28895
        NADEEM A. BEZAR, ESQUIRE/63577
        EMILY B. MARKS, ESQUIRE/204405
1525 Locust Street
Philadelphia, Pennsylvania 19102
(215) 772-1000

Attorneys for Plaintiff


*Filed and Attested by the Office of Judicial Records 08 NOV 2019 10:20 am S. RICE*

| | |
|---|---|
| M.B. | PHILADELPHIA COUNTY |
| c/o Kline & Specter, P.C. | COURT OF COMMON PLEAS |
| 1525 Locust Street | |
| Philadelphia, PA 19102 | CIVIL TRIAL DIVISION |
| Plaintiff, | MARCH TERM, 2017 |
| | NO.: 00712 |
| V. | |
| | |
| ROOSEVELT INN LLC | JURY TRIAL DEMANDED |
| *d/b/a ROOSEVELT INN and* | |
| *ROOSEVELT INN CAFE* | |
| 7630 Roosevelt Boulevard | |
| Philadelphia, PA 19152 | |
| | |
| and | |
| | |
| ROOSEVELT MOTOR INN, INC. | |
| *d/b/a ROOSEVELT MOTOR INN* | |
| 7630 Roosevelt Boulevard | |
| Philadelphia, PA 19152 | |
| | |
| and | |
| | |
| UFVS MANAGEMENT COMPANY, LLC | |
| 287 Bowman Avenue | |
| Purchase, NY 10577 | |
| | |
| and | |
| | |
| YAGNA PATEL | |
| 7630 Roosevelt Boulevard | |
| Philadelphia, PA 19152 | |
| | |
| and | |
| | |
| ALPHA-CENTURION SECURITY, INC. | |
| 3720 West Chester Pike | |
| Newtown Square, PA 19073 | |

Defendants                    :

_____

## **NOTICE TO DEFEND**

<table>
<tr>
<td align="center"><b>NOTICE</b></td>
<td align="center"><b>AVISO</b></td>
</tr>
<tr>
<td valign="top">

You have been sued in court.  If you wish to defend against the claims set forth in the following pages, you must take action within twenty (20) days after this complaint and notice are served, by entering a written appearance personally or by attorney and filing in writing with the court your defenses or objections to the claims set forth against you.  You are warned that if you fail to do so the case may proceed without you and a judgment may be entered against you by the court without further notice for any money claimed in the complaint or for any other claim or relief requested by the plaintiff.  You may lose money or property or other rights important to you.

YOU SHOULD TAKE THIS PAPER TO YOUR LAWYER AT ONCE.  IF YOU DO NOT HAVE A LAWYER (OR CANNOT AFFORD ONE), GO TO OR TELEPHONE THE OFFICE SET FORTH BELOW TO FIND OUT WHERE YOU CAN GET LEGAL HELP.

<u>THIS OFFICE CAN PROVIDE YOU WITH INFORMATION ABOUT HIRING A LAWYER.</u>

<u>IF YOU CANNOT AFFORD TO HIRE A LAWYER, THIS OFFICE MAY BE ABLE TO PROVIDE YOU WITH INFORMATION ABOUT AGENCIES THAT MAY OFFER LEGAL SERVICES TO ELIGIBLE PERSONS AT A REDUCED FEE OR NO FEE.</u>

</td>
<td valign="top">

Le han demandado en corte.  Si usted quiere defenderse contra las demandas nombradas en las paginas siguientes, tiene viente (20) dias a partir de recibir esta demanda y notificacion para entablar personalmente o por un abogado una comparecencia escrita y tambien para entablar con la corte en forma escrita sus defensas y objeciones a las demandas contra usted.  Sea advisado que si usted no se defiende, el caso puede continuar sin usted y la corte puede incorporar un juicio contra usted sin previo aviso para conseguir el dinero demandado en el pleito o para conseguir cualquier otra demanda o alivio solicitados por el demandante.  Usted puede perder dinero o propiedad u otros derechos importantes para usted.

USTED DEBE LLEVAR ESTE DOCUMENTO A SU ABOGADO INMEDIATAMENTE. SI USTED NO TIENE ABOGADO (O NO TIENE DINERO SUFICIENTE PARA PAGAR A UN ABOGADO), VAYA EN PERSONA O LLAME POR TELEFONO LA OFICINA NOMBRADA ABAJO PARA AVERIGUAR DONDE SE PUEDE CONSEGUIR ASSISTENCIA LEGAL. <u>ESTA OFICINA PUEDE PROPORCIONARLE LA INFORMACION SOBRE CONTRATAR A UN ABOGADO.</u>

<u>SI USTED NO TIENE DINERO SUFICIENTE PARA PAGAR A UN ABOGADO, ESTA OFICINA PUEDE PROPORCIONARLE INFORMACION SOBRE AGENCIAS QUE OFRECEN SERVICIOS LEGALES A PERSONAS QUE CUMPLEN LOS REQUISITOS PARA UN HONORARIO REDUCIDO O NINGUN HONORARIO.</u>

</td>
</tr>
<tr>
<td align="center">

**LAWYERS REFERENCE SERVICE**
**One Reading Center**
**Philadelphia, PA  19107**
**(215) 238-6333**
**TTY(215) 451-6197**

</td>
<td align="center">

**SERVICIO de REFERENCIA LEGAL**
**Uno Reading Centro**
**Filadelfia, PA  19107**
**Telefono:  (215) 238-6333**
**TTY(215) 451-6197**

</td>
</tr>
</table>

Case ID: 170300712
Control No.: 21060403

**KLINE & SPECTER, P.C.**                          Attorneys for Plaintiff
BY:   THOMAS R. KLINE, ESQUIRE/28895
       NADEEM A. BEZAR, ESQUIRE/63577
       EMILY B. MARKS, ESQUIRE/204405
1525 Locust Street
Philadelphia, Pennsylvania 19102
(215) 772-1000

| | | |
|---|---|---|
| M.B. | : | PHILADELPHIA COUNTY |
| c/o Kline & Specter, P.C. | : | COURT OF COMMON PLEAS |
| 1525 Locust Street | : | |
| Philadelphia, PA 19102 | : | CIVIL TRIAL DIVISION |
| | : | MARCH TERM, 2017 |
| Plaintiff, | : | NO.:00712 |
| v. | : | |
| | : | |
| ROOSEVELT INN LLC | : | JURY TRIAL DEMANDED |
| *d/b/a ROOSEVELT INN and* | : | |
| *ROOSEVELT INN CAFE* | : | |
| 7630 Roosevelt Boulevard | : | |
| Philadelphia, PA 19152 | : | |
| | : | |
| and | : | |
| | : | |
| ROOSEVELT MOTOR INN, INC. | : | |
| *d/b/a ROOSEVELT MOTOR INN* | : | |
| 7630 Roosevelt Boulevard | : | |
| Philadelphia, PA 19152 | : | |
| | : | |
| and | : | |
| | : | |
| UFVS MANAGEMENT COMPANY, LLC | : | |
| 287 Bowman Avenue | : | |
| Purchase, NY 10577 | : | |
| | : | |
| and | : | |
| | : | |
| YAGNA PATEL | : | |
| 7630 Roosevelt Boulevard | : | |
| Philadelphia, PA 19152 | : | |
| | : | |
| and | : | |
| | : | |
| ALPHA-CENTURION SECURITY, INC. | : | |
| 3720 West Chester Pike | : | |
| Newtown Square, PA 19073 | : | |

Case ID: 170300712
Control No.: 21060403

## PLAINTIFF'S FOURTH AMENDED COMPLAINT

### PRELIMINARY STATEMENT

1.      Human sex trafficking is a form of modern day slavery that exists throughout the United States and globally.  It is a form of evil in the abuse and exploitation of the most innocent and vulnerable.

2.      Since 2007 over 17,000 incidents of sex trafficking in the United States have been reported to the National Human Trafficking Resources Center.  Over 1,200 cases of sex trafficking has been reported in the first six months of 2016, with the vast majority of victims being women and a disproportionate number being minors.

3.      In 2014, the Commonwealth of Pennsylvania extensively revised its human trafficking law to compensate the victims and ensure that anyone or any entity that knowingly markets or provides its goods or services to sex traffickers is civilly liable.

### THE PARTIES

4.      Plaintiff, M.B., was born on September 3, 1999 and is one of the thousands of victims of human trafficking in the United States.  In 2014, Plaintiff was exploited as a minor by commercial sex traffickers who financially benefitted from her exploitation.  Plaintiff resides in Philadelphia County, Pennsylvania.  Plaintiff can be contacted through her counsel, Thomas R. Kline, Esquire, Nadeem A. Bezar, Esquire, and Emily B. Marks, Esquire of Kline & Specter, P.C., 1525 Locust Street, Philadelphia, Pennsylvania 19102.

5.      Plaintiff's name and address are not contained in this Complaint so as to protect the privacy and identity of Plaintiff M.B. who incurred injuries and damages starting when she was fourteen (14) years old. See also Public Access Policy of the Unified Judicial System of

Pennsylvania: Case Records of the Appellate and Trial Courts § 7.0.

6.      Defendant Roosevelt Inn LLC d/b/a Roosevelt Inn and Roosevelt Inn Cafe [hereinafter referred to as "Roosevelt Inn LLC"] is a limited liability company organized and existing under the laws of Delaware.  At all material times hereto, Defendant Roosevelt Inn LLC owned, operated or managed a motel located at 7630 Roosevelt Boulevard, Philadelphia, PA 19152 [hereinafter referred to as the "Roosevelt Inn"].

7.      Defendant Roosevelt Motor Inn, Inc. d/b/a Roosevelt Motor Inn [hereinafter referred to as "Roosevelt Motor Inn, Inc."] is a corporation duly organized and existing under the laws of the Commonwealth of Pennsylvania.  At all material times hereto, Defendant Roosevelt Motor Inn, Inc. owned, operated or managed the Roosevelt Inn.

8.      Defendant UFVS Management Company, LLC, is a limited liability company duly organized and existing under the laws of the State of New York.  At all material times hereto, Defendant UFVS Management Company LLC owned, operated and/or managed the Roosevelt Inn.

9.      Defendant Yagna Patel is an adult person and resident of Pennsylvania who resides at 7630 Roosevelt Boulevard, Philadelphia, Pennsylvania, PA 19152.  Based on information and belief, Mr. Patel owned, operated and/or managed the Roosevelt Inn.

10.      Defendant Alpha-Centurion Security, Inc. is a corporation duly organized and existing under the laws of the Commonwealth of Pennsylvania. At all material times hereto, Defendant Alpha-Centurion Security, Inc. provided security services at the Roosevelt Inn.

11.      Upon information and belief, at all times relevant hereto, Defendant Alpha-Centurion Security, Inc. provided paid for security and related services at the Roosevelt Inn located at 7630 Roosevelt Boulevard, Philadelphia, Pennsylvania 19152, incidental to a

Case ID: 170300712
Control No.: 21060403

contractual arrangement as between itself and the owners and operators of the premises: Defendants Roosevelt Inn LLC, Roosevelt Motor Inn, Inc., UFVS Management Company, LLC, and Yagna Patel.

13. Defendant Alpha-Centurion Security, Inc. occupied, controlled, patrolled, monitored and assumed responsibility for security of the premises located at the Roosevelt Inn, 7630 Roosevelt Boulevard, Philadelphia, PA 19152.

13. Venue is appropriate in this case because Defendant Yagna Patel resides in Philadelphia County and Defendants Roosevelt Inn LLC, Roosevelt Motor Inn, Inc. UFVS Management Company, LLC, and Alpha-Centurion Security, Inc. regularly conduct business in Philadelphia County. Venue is also proper in this case because Pennsylvania's human trafficking law, 18 Pa. C.S.A. § 3051, permits victims of human trafficking and the sex trade to bring suit in the county in which the victim resides. Plaintiff M.B. resides in Philadelphia County. Therefore, venue is proper in the Philadelphia County Court of Common Pleas.

14. At all times material hereto, Defendants Roosevelt Inn LLC, Roosevelt Motor Inn, Inc., UFVS Management Company, LLC and Yagna Patel acted individually and/or by and through their actual or apparent agents, servants and employees, including but not limited to front desk staff, back room staff, housekeepers, custodians, maintenance workers, food preparation workers, doorman, concierges and security guards and are therefore liable for the acts and/or omissions of their agents, servants and/or employees under theories of agency, master-servant, respondent superior and/or right of control.

15. At all times material hereto, Alpha-Centurion Security, Inc. acted individually and/or by and through its actual or apparent agents, servants and employees, including but not limited to security guards and is therefore liable for the acts and/or omissions of their agents,

Case ID: 170300712
Control No.: 21060403

servants and/or employees under theories of agency, master-servant, respondent superior and/or right of control.

16. At all material times hereto, Defendants Roosevelt Inn LLC, Roosevelt Motor Inn, Inc., UFVS Management Company, LLC and Yagna Patel individually and/or by their actual or apparent agents, servants and employees were uniquely positioned to observe the manifestations, indications and evincement of human sex trafficking within the Roosevelt Inn where they worked.

17. At all material times hereto, Alpha-Centurion Security, Inc., individually and/or by its actual or apparent agents, servants and employees, was uniquely positioned to observe the manifestations, indications and evincement of human sex trafficking within the Roosevelt Inn.

18. At all material times hereto, Defendants Roosevelt Inn LLC, Roosevelt Motor Inn, Inc., UFVS Management Company, LLC and Yagna Patel individually and/or by their actual or apparent agents, servants and employees, failed to take any steps to prevent criminal activity, including sex trafficking, at the Roosevelt Inn and instead permitted heinous and unspeakable acts to occur.

19. At all material times hereto, Defendant Alpha-Centurion Security, Inc., individually and/or by its actual or apparent agents, servants and employees, failed to take any steps to prevent criminal activity, including sex trafficking, at the Roosevelt Inn and instead permitted heinous and unspeakable acts to occur.

**OPERATIVE FACTS**

20. Hotels and motels are common venues for sex trafficking, due to ease of access for buyers and traffickers, ability to pay in cash and maintain financial anonymity, and the avoidance of building and maintenance fees. Hotels and motels are a convenient place for

Case ID: 170300712
Control No.: 21060403

customers to purchase sex to avoid detection. Indeed, since 2007, 1,434 cases of human trafficking in hotels and motels have been reported to the National Human Trafficking Resource Center (NHTRC).

21.     Defendants Roosevelt Inn LLC, Roosevelt Motor Inn, Inc., UFVS Management Company, LLC and Yagna Patel, individually and/or by and through their actual or apparent agents, servants and employees knew or should have known that sex crimes were occurring at the Roosevelt Inn. From January 2012 through December 2017, the Philadelphia Police Department documented more than one thousand incidents of criminal activity at and/or near the Roosevelt Inn including aggravated assault, domestic abuse, theft, weapon violations, rape, prostitution, drug offenses, disorderly conduct and a video recorded shooting.

22.     While investigating and making arrests of perpetrators of prostitution at the Roosevelt Inn, the Philadelphia Police Department would regularly collect up to eight key cards from a single guest involved in prostitution.

23.     Philadelphia Police Department records note, on at least one occasion, that a female guest told a police officer that she would receive texts from a security guard at the Roosevelt Inn, warning of any police activity that would expose her to potential arrest.

24.     Commencing in 2014, Plaintiff was recruited, enticed, solicited, harbored and/or transported to engage in commercial sex acts by sex traffickers to engage in commercial sex acts at the Roosevelt Inn on a regular, consistent and/or repeated basis.

25.     Defendants Roosevelt Inn LLC, Roosevelt Motor Inn, Inc., UFVS Management Company, LLC and Yagna Patel, individually and/or by and through their actual or apparent agents, servants and employees, regularly rented or otherwise provided rooms and services at the Roosevelt Inn to traffickers engaged in commercial sex acts with Plaintiff when she was a minor.

Case ID: 170300712
Control No.: 21060403

26.     Defendants Roosevelt Inn LLC, Roosevelt Motor Inn, Inc., UFVS Management Company, LLC and Yagna Patel, individually and/or by and through their actual or apparent agents, servants and employees had a duty to ensure the safety and well-being of individuals lawfully on the motel's premises, the motel's guests, the motel's employees, and the motel's property.

27.     Defendants Roosevelt Inn LLC, Roosevelt Motor Inn, Inc., UFVS Management Company, LLC and Yagna Patel, individually and/or by and through their actual or apparent agents, servants and employees had a duty to ensure the safety and well-being of Plaintiff while she was at the Roosevelt Inn and protect her from criminal conduct.

28.     Upon information and belief, Defendant Alpha-Centurion Security, Inc. contracted with the Roosevelt Inn beginning in approximately March 2007 to provide security services.

29.     Defendant Alpha-Centurion Security, Inc., individually and/or by and through its actual or apparent agents, servants and employees, had a duty ensure the safety and well-being of individuals lawfully on the motel's premises, the motel's guests, the motel's employees, and the motel's property.

30.     Defendant Alpha-Centurion Security, Inc., had a duty to ensure the safety and well-being of Plaintiff while she was at the Roosevelt Inn and protect her from criminal conduct.

31.     Defendants Roosevelt Inn LLC, Roosevelt Motor Inn, Inc., UFVS Management Company, LLC and Yagna Patel, individually and/or by and through their actual or apparent agents, servants and employees assumed responsibility for protecting individuals lawfully present at the Roosevelt Inn, including Plaintiff from foreseeable harm, including commercial sex exploitation and human sex trafficking.

Case ID: 170300712
Control No.: 21060403

32.     Defendant Alpha-Centurion Security, Inc., assumed responsibility for protecting individuals lawfully present at the Roosevelt Inn, including Plaintiff from foreseeable harm, including commercial sex exploitation and human sex trafficking.

33.     Defendants Roosevelt Inn LLC, Roosevelt Motor Inn, Inc., UFVS Management Company, LLC and Yagna Patel, individually and/or by and through their actual or apparent agents, servants and employees had a duty to Plaintiff to provide a reasonably safe environment at the Roosevelt Inn and protect Plaintiff from dangerous people and conditions on the premises.

34.     Defendant Alpha-Centurion Security, Inc., had a duty to Plaintiff to provide a reasonably safe environment at the Roosevelt Inn and protect Plaintiff from dangerous people and conditions on the premises.

35.     Defendants Roosevelt Inn LLC, Roosevelt Motor Inn, Inc., UFVS Management Company, LLC and Yagna Patel, individually and/or by and through their actual or apparent agents, servants, and employees, failed to take any steps to protect Plaintiff from criminal acts including sex trafficking.

36.     Defendant Alpha-Centurion Security, Inc., individually and/or by and through its actual or apparent agents, servants and employees, failed to take any steps to protect Plaintiff from criminal acts including sex trafficking.

37.     Defendants Roosevelt Inn LLC, Roosevelt Motor Inn, Inc., UFVS Management Company, LLC, and Yagna Patel, individually and/or by and through their actual or apparent agents, servants and employees, knew or should have known that criminal activity and sex trafficking that occurred at the Roosevelt Inn put plaintiff at risk of being harmed.

38.     Defendant Alpha-Centurion Security, Inc., individually and/or by and through its actual or apparent agents, servants and employees, knew or should have known that criminal

activity and sex trafficking that occurred at the Roosevelt Inn put plaintiff at risk of being harmed.

39.     Plaintiff's traffickers put up internet advertisements for the purpose of sex trafficking Plaintiff as a minor.

40.     The advertisements included a fake name for Plaintiff and a phone number to call.

41.     During the phone call, sex for cash was negotiated and the caller "John" would be informed that Plaintiff was at the Roosevelt Inn.

42.     Plaintiff's traffickers would linger in the halls and on the premises of the Roosevelt Inn.

43.     The motel room where Plaintiff engaged in commercial sex acts contained used condoms and condom wrappers and the room frequently smelled of marijuana.

44.     Plaintiff engaged in numerous commercial sex acts and/or "dates" per day.

45.     Plaintiff was accompanied by older men while on the premises of the Roosevelt Inn.

46.     Plaintiff was visibly treated in an aggressive manner by traffickers engaged in commercial sex acts with Plaintiff while in public areas of the Roosevelt Inn.

47.     Plaintiff exhibited fear and anxiety while on the premises and in public areas of the Roosevelt Inn.

48.     Plaintiff's traffickers paid cash for the motel rooms where Plaintiff engaged in commercial sex acts.

49.     Plaintiff's traffickers consistently displayed "Do Not Disturb" signs on the door to the motel where Plaintiff engaged in commercial sex acts and consistently refused housekeeping services.

50. Men and other minors frequently entered and left the rooms where Plaintiff engaged in commercial sex acts.

51. Men stood in the hallways outside of rooms where Plaintiff was engaged in commercial sex acts.

52. Plaintiff had extended stays at the Roosevelt Inn with few or no personal possessions and was left in the room for long periods of time.

53. Plaintiff dressed in a sexually explicit manner and would walk the hallways of the Roosevelt Inn.

54. Security guards and/or employees of Defendant Alpha-Centurion Security, Inc. observed Plaintiff who was a minor at the time at the Roosevelt Inn in sexually explicit clothing.

55. Plaintiff was paid cash for the commercial sex acts she engaged in while at the Roosevelt Inn.

56. Plaintiff distributed the cash she received for the commercial sex acts to her traffickers who used the cash to pay for the motel rooms rented at the Roosevelt Inn.

57. Despite the open and obvious signs of criminal activity and human trafficking, Defendants Roosevelt Inn LLC, Roosevelt Motor Inn, Inc., UFVS Management Company, LLC, and Yagna Patel, individually and/or by and through their actual or apparent agents, servants and employees, failed to take reasonable steps to prevent the sex trafficking of the Plaintiff and failed to ensure her safety and well-being.

58. Defendants Roosevelt Inn, LLC, Roosevelt Motor Inn, Inc. UFVS Management Company, LLC and Yagna Patel, individually and/or by and through their actual or apparent agents, servants and negligently failed to prevent Plaintiff from being sexually exploited.

59. Despite the open and obvious signs of human trafficking, Defendants Roosevelt

Case ID: 170300712
Control No.: 21060403

Inn, LLC., Roosevelt Motor Inn, Inc., UFVS Management Company, LLC, and Yagna Patel, individually and/or by and through their actual or apparent agents, servants and employees failed to protect Plaintiff from criminal conduct.

60.  Despite the open and obvious signs of human trafficking, Defendant Alpha-Centurion Security, Inc failed to take reasonable steps to prevent the sex trafficking of the Plaintiff and failed to ensure her safety and well-being.

61.  Defendant Alpha-Centurion Security, Inc. negligently failed to prevent Plaintiff from being sexually exploited.

62.  Despite the open and obvious signs of human trafficking, Defendant Alpha-Centurion Security, Inc. failed to protect Plaintiff from criminal conduct.

63.  The negligence of Defendants Roosevelt Inn LLC, Roosevelt Motor Inn, Inc., UFVS Management Company, LLC and Yagna Patel, individually and/or by and through their actual or apparent agents, servants and employees caused Plaintiff to suffer physical harm, a sexually transmitted disease, mental anguish, humiliation, exploitation, degradation, mental distress, loss of the enjoyments of life, and loss of life's pleasures both in the past and in the future.

64.  By renting rooms to individuals sex trafficking Plaintiff, Defendants Roosevelt Inn LLC, Roosevelt Motor Inn, Inc., UFVS Management Company, LLC and Yagna Patel, individually and/or by and through their actual or apparent agents, servants and employees caused Plaintiff to suffer physical harm, a sexually transmitted disease, mental anguish, humiliation, exploitation, degradation, mental distress, loss of the enjoyments of life, and loss of life's pleasures both in the past and in the future.

65. The negligence of Defendant Alpha-Centurion Security, Inc., individually and/or by and through its actual or apparent agents, servants and employees, caused Plaintiff to suffer physical harm, a sexually transmitted disease, mental anguish, humiliation, exploitation, degradation, mental distress, loss of the enjoyments of life, and loss of life's pleasures both in the past and in the future.

66. Defendants Roosevelt Inn LLC, Roosevelt Motor Inn, Inc., UFVS Management Company, LLC and Yagna Patel, individually and/or by and through their actual or apparent agents, servants and employees acted outrageously and in reckless disregard for the health and welfare of the Plaintiff warranting the imposition of punitive damages.

67. Defendant Alpha-Centurion Security, Inc., individually and/or by and through its actual or apparent agents, servants and employees, acted outrageously and in reckless disregard for the health and welfare of the Plaintiff warranting the imposition of punitive damages.

## COUNT I - NEGLIGENCE

### M.B. v. ROOSEVELT INN LLC, ROOSEVELT MOTOR INN, INC., UFVS MANAGEMENT COMPANY, LLC, YAGNA PATEL

68. The averments of Paragraphs 1 through 67 are incorporated herein by reference.

69. Defendants Roosevelt Inn LLC, Roosevelt Motor Inn, Inc., UFVS Management Company, LLC and Yagna Patel, individually and/or by and through their actual or apparent agents, servants and employees, were under a duty to provide reasonable, adequate, and sufficient security personnel and/or to otherwise take appropriate steps to ensure the safety and protection of persons, including Plaintiff, on the premises of the Roosevelt Inn.

70. Defendants Roosevelt Inn LLC, Roosevelt Motor Inn, Inc., UFVS Management Company, LLC and Yagna Patel, individually and/or by and through their actual or apparent agents, servants and employees should have reasonably anticipated criminal conduct by third

parties, including other guests, invitees or persons on the premises of the Roosevelt Inn.

71. Defendants Roosevelt Inn LCC, Roosevelt Motor Inn, Inc. UFVS Management Company, LLC and Yagna Patel, individually and/or by and through their actual or apparent agents, servants and employees, had a duty to take precautions against reasonably anticipated criminal conduct by third parties and to operate the Roosevelt Inn in a manner that did not endanger children or other persons, including Plaintiff. Moreover, the Defendants had a duty of care to take reasonable steps to protect foreseeable victims of the dangers created by their acts and omissions, including the danger of human trafficking and sexual exploitation on the premises of the Roosevelt Inn.

72. Defendants Roosevelt Inn LLC, Roosevelt Motor Inn, Inc., UFVS Management Company, LLC and Yagna Patel, individually and/or by and through their actual or apparent agents, servants and employees, breached the foregoing duties because they knew or should have known that persons on the premises of the Roosevelt Inn, including Plaintiff, could be victimized by, or subjected to, criminal activities on the premises that would likely endanger their health, safety, and/or well-being.

73. Defendants Roosevelt Inn LLC, Roosevelt Motor Inn, Inc., UFVS Management Company, LLC and Yagna Patel, individually and/or by and through their actual or apparent agents, servants and employees, should have reasonably anticipated that it was reasonably foreseeable from their knowledge and/or past experiences that persons on the premises of the Roosevelt Inn, including Plaintiff, would suffer serious bodily harm as a result of being victimized by violent crimes perpetrated by third parties on the premises of the Roosevelt Inn.

74. Defendants Roosevelt Inn LLC, Roosevelt Motor Inn, Inc., UFVS Management Company, LLC and Yagna Patel, individually and/or by and through their actual or apparent

agents, servants and employees, failed or refused to take adequate precautions to protect persons on the premises of the Roosevelt Inn, including Plaintiff, from criminal and violent activities of others, despite a reasonable likelihood that person on the premises of the Roosevelt Inn, including Plaintiff, would be victimized by, or subjected to, such criminal and/or violent acts, which could cause such persons serious bodily injury. The negligence of Defendants Roosevelt Inn LLC, Roosevelt Motor Inn, Inc., UFVS Management Company, LLC and Yagna Patel, individually and/or by and through their actual or apparent agents, servants and employees consisted of the following:

a. Failing to execute and/or implement the established security plan and/or execute and/or implement any established security plan;

b. Failure to publish and/or post orders at the security posts providing protocols for employees to follow in circumstances involving commercial sexual activity and/or human sex trafficking;

c. Failing to adopt, establish, implement, and/or enforce required policies, procedures, rules, regulations and/or guidelines concerning protection of individuals lawfully on the premises;

d. Failing to adopt, establish, implement, and/or enforce required policies, procedures, rules, regulations and/or guidelines concerning removal from the premises of individuals posing security threats;

e. Failing to adequately control access to the premises;

f. Failing to prevent entry of unauthorized individuals onto the premises;

g. Failing to properly and adequately hire, train and provide ongoing training to employees including but not limited to ongoing training involving recognizing, preventing and responding to criminal activity, prostitution and sex trafficking;

h. Failing to select and/or retain only personnel competent to provide proper and adequate professional services;

i. Failing to assign experienced security personnel to provide competent guard services at the Roosevelt Inn;

j. Failing to adopt, establish, implement, execute and/or enforce required policies,

Case ID: 170300712
Control No.: 21060403

procedures, rules, regulations and/or guidelines concerning protection of business invitees on the premises of the Roosevelt Inn;

k.  Failing to adopt, establish, implement, execute and/or enforce required policies, procedures, rules, regulations, and/or guidelines concerning proper security measures in a motel setting;

l.  Failing to adopt, establish, implement, execute and/or enforce required policies, procedures, rules, regulations, and/or guidelines concerning proper monitoring, surveillance, and patrolling of the premises;

m.  Failing to adopt, establish, implement, execute and/or enforce required policies, procedures, rules, regulations, and/or guidelines concerning prevention of violent and/or criminal acts on the premises;

n.  Failing to detect and respond to commercial sex activity and human sex trafficking at the Roosevelt Inn;

o.  Failing to conduct adequate surveillance of the premises of the Roosevelt Inn;

p.  Failing to utilize surveillance equipment to monitor suspicious activity and promptly react thereto for the safety of Plaintiff;

q.  Failing to respond and react to suspicious activity;
r.  Failing to maintain surveillance equipment in proper working order;

s.  Failing to test or properly test surveillance equipment to ensure it was in working order;

t.  Failing to utilize appropriate and/or required surveillance equipment;

u.  Failing to adequately monitor activity on video surveillance and promptly react thereto for the safety of Plaintiff;

v.  Allowing individuals to come on to the premises for the express purpose of trafficking Plaintiff;

w.  Failing to prevent Plaintiff from being trafficked on the premises;

x.  Breaching its duties under the Restatement of the Law of Torts (Second), including but not limited to §§ 302, 318, 321, 323, 324A, and 344; and

y.  Failing to exercise care, caution and diligence required under the circumstances.

75.  As a result of Defendants Roosevelt Inn LLC, Roosevelt Motor Inn, Inc., UFVS

Management Company, LLC and Yagna Patel's negligence, Plaintiff was caused to suffer

physical harm, a sexually transmitted disease, mental anguish, humiliation, exploitation, degradation, mental distress, loss of the enjoyments of life and loss of life's pleasures both in the past and in the future.

76.     As a result of Defendants Roosevelt Inn LLC, Roosevelt Motor Inn, Inc., UFVS Management Company, LLC, and Yagna Patel's negligence, Defendants breached its duty to Plaintiff to ensure her safety and well-being and protect her from criminal acts.

77.     Defendants Roosevelt Inn LLC, Roosevelt Motor Inn, Inc., UFVS Management Company, LLC and Yagna Patel acted outrageously and in reckless disregard for the health and welfare of the Plaintiff warranting the imposition of punitive damages.

**WHEREFORE,** Plaintiff M.B. demands judgment in her favor and against Defendants Roosevelt Inn LLC, Roosevelt Motor Inn, Inc., UFVS Management Company, LLC and Yagna Patel and demands compensatory and punitive damages in excess of Fifty Thousand ($50,000.00) Dollars exclusive of prejudgment interest, costs and damages for pre-judgment delay.

## COUNT II – NEGLIGENCE

## M.B. v. ALPHA-CENTURION SECURITY, INC.

78.     The averments of paragraphs 1 through 77 are incorporated herein by reference.

79.     Defendant Alpha-Centurion Security, Inc. had a duty to provide reasonable, adequate, and sufficient security personnel and/or to otherwise take appropriate steps to ensure the safety and protection of persons, including Plaintiff, on the premises of the Roosevelt Inn.

80.     Defendant Alpha-Centurion Security, Inc should have reasonably anticipated criminal conduct by third parties, including other guests, invitees or persons on the premises of the Roosevelt Inn.

81.     Defendant Alpha-Centurion Security, Inc. had a duty to take precautions against reasonably anticipated criminal conduct by third parties so as not to endanger the welfare and well-being of Plaintiff. Moreover, the Defendant Alpha-Centurion Security, Inc a duty of care to take reasonable steps to protect foreseeable victims of the dangers created by their acts and omissions, including the danger of human trafficking and sexual exploitation on the premises of the Roosevelt Inn.

82.     Defendant Alpha-Centurion Security, Inc. breached the foregoing duties because they knew or should have known that persons on the premises of the Roosevelt Inn, including Plaintiff, could be victimized by, or subjected to, criminal activities on the premises that would likely endanger their health, safety, and/or well-being.

83.     Defendant Alpha-Centurion Security, Inc. should have reasonably anticipated that it was reasonably foreseeable from their knowledge and/or past experiences that persons on the premises of the Roosevelt Inn, including Plaintiff, would suffer serious bodily harm as a result of being victimized by violent crimes perpetrated by third parties on the premises of the Roosevelt Inn.

84.     Defendant Alpha-Centurion Security, Inc. failed or refused to take adequate precautions to protect persons on the premises of the Roosevelt Inn, including Plaintiff, from criminal and violent activities of others, despite a reasonable likelihood that person on the premises of the Roosevelt Inn, including Plaintiff, would be victimized by, or subjected to, such criminal and/or violent acts, which could cause such persons serious bodily injury. The negligence Alpha-Centurion Security, Inc. consisted of the following:

a.  Failing to execute and/or implement the established security plan and/or execute and/or implement any established security plan;

b. Failure to publish and/or post orders at the security posts providing protocols for security personnel to follow in circumstances involving criminal activity, commercial sexual activity and/or human sex trafficking;

c. Failing to adopt, establish, implement, and/or enforce required policies, procedures, rules, regulations and/or guidelines concerning protection of individuals lawfully on the premises;

d. Failing to adopt, establish, implement, and/or enforce required policies, procedures, rules, regulations and/or guidelines concerning removal from the premises of individuals posing security threats;

e. Failing to adequately control access to the premises;

f. Failing to prevent entry of unauthorized individuals onto the premises;

g. Failing to properly and adequately train and provide ongoing training to its security personnel including but not limited to ongoing training involving preventing and responding to commercial sexual activity and human sex trafficking;

h. Failing to select and/or retain only personnel competent to provide proper and adequate security services;

i. Failing to assign experienced security personnel to provide competent guard services at the Roosevelt Inn;

j. Failing to adopt, establish, implement, execute and/or enforce required policies, procedures, rules, regulations and/or guidelines concerning protection of business invitees on the premises of the Roosevelt Inn;

k. Failing to adopt, establish, implement, execute and/or enforce required policies, procedures, rules, regulations, and/or guidelines concerning proper security measures in a hotel setting;

l. Failing to adopt, establish, implement, execute and/or enforce required policies, procedures, rules, regulations, and/or guidelines concerning proper monitoring, surveillance, and patrolling of the premises;

m. Failing to adopt, establish, implement, execute and/or enforce required policies, procedures, rules, regulations, and/or guidelines concerning prevention of violent and/or criminal acts on the premises;

n. Failing to detect and respond to commercial sex activity and human sex trafficking at the Roosevelt Inn;

Case ID: 170300712
Control No.: 21060403

o. Failing to conduct adequate surveillance of the premises of the Roosevelt Inn;

p. Failing to utilize surveillance equipment to monitor suspicious activity and promptly react thereto for the safety of Plaintiff;

q. Failing to respond and react to suspicious activity detected on video surveillance;

r. Failing to maintain surveillance equipment in proper working order;

s. Failing to test or properly test surveillance equipment to ensure it was in working order;

t. Failing to utilize appropriate and/or required surveillance equipment;

u. Failing to adequately monitor activity on video surveillance and promptly react thereto for the safety of Plaintiff;

v. Allowing individuals to come on to the premises for the express purpose of conducting commercial sex acts with Plaintiff;

w. Failing to prevent Plaintiff from being trafficked on the premises; and

x. Breaching its duties under the Restatement of the Law of Torts (Second), including but not limited to §§ 302, 318, 321, 323, 324A, and 344.

85.     As a result of Defendant Alpha-Centurion Security, Inc.'s negligence, Plaintiff was caused to suffer physical harm, a sexually transmitted disease, mental anguish, humiliation, exploitation, degradations, mental distress, loss of enjoyment of life and loss of life's pleasures both in the past and in the future.

86.     As a result of Defendant Alpha-Centurion Security, Inc.'s negligence, Defendant Alpha-Centurion Security, Inc. breached its duty to ensure Plaintiff's safety and well-being and protect her from criminal acts..

87.     Defendant Alpha-Centurion Security, Inc. acted outrageously and in reckless disregard for the health and welfare of the Plaintiff warranting the imposition of punitive damages.

**WHEREFORE**, Plaintiff M.B. demands judgment in her favor and against Defendant Alpha-Centurion Security, Inc. and demands compensatory and punitive damages in excess of Fifty Thousand ($50,000.00) Dollars exclusive of prejudgment interest, costs and damages for pre-judgment delay.

### COUNT III – NEGLIGENT INFLICTION OF EMOTIONAL DISTRESS

### M.B. v. ROOSEVELT INN LLC, ROOSEVELT MOTOR INN, INC., UFVS MANAGEMENT COMPANY, LLC, YAGNA PATEL

88.     The averments of paragraphs 1 through 87 are incorporated herein by reference.

89.     Defendants Roosevelt Inn LLC, Roosevelt Motor Inn, Inc., UFVS Management Company, LLC and Yagna Patel, individually and/or by and through their actual or apparent agents, servants and employees, negligently committed the acts averred in this Complaint against the Plaintiff and thereby caused Plaintiff to suffer fear, depression, humiliation, mental anguish and severe physical and emotional distress, directly and proximately causing harm and damages to the Plaintiff.

90.     Defendants acted outrageously and in reckless disregard for the health and welfare of the Plaintiff warranting the imposition of punitive damages.

**WHEREFORE,** Plaintiff M.B. demands judgment in her favor and against Defendants Roosevelt Inn LLC, Roosevelt Motor Inn, Inc., UFVS Management Company, LLC and Yagna Patel and demands compensatory and punitive damages in excess of Fifty Thousand ($50,000.00) Dollars exclusive of prejudgment interest, costs and damages for pre-judgment delay.

## COUNT IV– NEGLIGENT INFLICTION OF EMOTIONAL DISTRESS

## M.B. v. ALPHA-CENTURION SECURITY, INC.

91.     The averments of paragraphs 1 through 90 are incorporated herein by reference.

92.     Defendant Alpha-Centurion Security, Inc., individually and/or by and through its actual or apparent agents, servants and employees, negligently committed the acts averred in this Complaint against the Plaintiff and thereby caused Plaintiff to suffer fear, depression, humiliation, mental anguish and severe physical and emotional distress, directly and proximately causing harm and damages to the Plaintiff.

93.     Defendant Alpha-Centurion Security, Inc. acted outrageously and in reckless disregard for the health and welfare of the Plaintiff warranting the imposition of punitive damages.

**WHEREFORE**, Plaintiff M.B. demands judgment in her favor and against Defendant Alpha-Centurion Security, Inc. and demands compensatory and punitive damages in excess of Fifty Thousand ($50,000.00) Dollars exclusive of prejudgment interest, costs and damages for pre-judgment delay.

**KLINE & SPECTER, P.C.**

BY: _____
THOMAS R. KLINE, ESQUIRE
NADEEM A. BEZAR, ESQUIRE
EMILY B. MARKS, ESQUIRE

Dated:_____

Case ID: 170300712
Control No.: 21060403

**CERTIFICATE OF SERVICE**

I do hereby certify that service of a true and correct copy of the ***Plaintiff's Fourth Amended Complaint*** was filed with the Court on _____ and served by electronic filing upon the following counsel of record:

Grant S. Palmer, Esq.
James J. Quinlan, Esq.
Daniel E. Oberdick, Esq.
Blank Rome LLP
One Logan Square, 130 North 18th Street
Philadelphia, PA 19103
*Counsel for Roosevelt Inn LLC, Roosevelt Motor Inn, Inc.,*
*UFVS Management Company, LLC and Yagna Patel*

Thomas P. Wagner, Esq.
Robert W. Stanko, Esq.
Melanie J. Foreman, Esq.
Marshall Dennehey Warner Coleman & Goggin
2000 Market Street, Suite 2300
Philadelphia, PA 19103
*Counsel for Alpha-Centurion Security, Inc.*

Via Certified and Regular Mail to:

Daiquan Davis, Register No. 72304-066
USP Terre Haute
U.S. Penitentiary
P.O. Box 33
Terre Haute, IN 47808
*Pro Se Defendant*

Abdul Lopez, Register No. 69643-066
USP Tucson
U.S. Penitentiary
P.O. Box 24550
Tucson, AZ 85734
*Pro Se Defendant*

KLINE & SPECTER, P.C.

Dated: _____  By: _____
NADEEM A. BEZAR, ESQUIRE
Attorney for Plaintiff

## <u>VERIFICATION</u>

I, M.B., hereby state that I am the Plaintiff in the within matter, and as such verify that the statements made in the foregoing Fourth Amended Complaint are true and correct to the best of my knowledge, information and belief.

The undersigned understands that the statements herein are made subject to the penalties of 18 Pa. C.S. 4904 relating to unsworn falsification to authorities.

_____
M.B.

| M.B. | : | PHILADELPHIA COUNTY |
| | : | COURT OF COMMON PLEAS |
| v. | : | |
| | : | CIVIL TRIAL DIVISION |
| ROOSEVELT INN LLC | : | MARCH TERM, 2017 |
| d/b/a ROOSEVELT INN and | : | NO.: 00712 |
| ROOSEVELT INN CAFÉ, et al. | : | |
| | : | |

## ORDER

    **AND NOW**, this _____ day of June, 2021, upon consideration of Defendants Roosevelt Inn LLC d/b/a Roosevelt Inn, Roosevelt Inn Café, Roosevelt Motor Inn, Inc. d/b/a Roosevelt Motor Inn, UFVS Management Company, LLC and Yagna Patel's Motion for Change of Venue or in the Alternative, Change of Venire, and any response in opposition thereto, it is hereby:

    **ORDERED** and **DECREED** that Defendants Roosevelt Inn LLC d/b/a Roosevelt Inn, Roosevelt Inn Café, Roosevelt Motor Inn, Inc. d/b/a Roosevelt Motor Inn, UFVS Management Company, LLC and Yagna Patel's Motion is **DENIED**.

                             **BY THE COURT**

                                  _____

                                          J.

Case ID: 170300712
Control No.: 21060632

**KLINE & SPECTER, P.C.**                     Attorneys for Plaintiff
BY:    THOMAS R. KLINE, ESQUIRE/28895
       NADEEM A. BEZAR, ESQUIRE/63577
       EMILY B. MARKS, ESQUIRE/204405
       KYLE B. NOCHO, ESQUIRE/319270
1525 Locust Street
Philadelphia, Pennsylvania 19102
(215) 772-1000

| | | |
|---|---|---|
| M.B. | : | PHILADELPHIA COUNTY |
| | : | COURT OF COMMON PLEAS |
| v. | : | |
| | : | CIVIL TRIAL DIVISION |
| ROOSEVELT INN LLC | : | MARCH TERM, 2017 |
| d/b/a ROOSEVELT INN and | : | NO.: 00712 |
| ROOSEVELT INN CAFÉ, et al. | : | |
| | : | |

### PLAINTIFF'S RESPONSE TO DEFENDANTS ROOSEVELT INN LLC D/B/A ROOSEVELT INN, ROOSEVELT INN CAFÉ, ROOSEVELT MOTOR INN, INC. D/B/A ROOSEVELT MOTOR INN, UFVS MANAGEMENT COMPANY, LLC AND YAGNA PATEL'S MOTION FOR CHANGE OF VENUE OR IN THE ALTERNATIVE, CHANGE OF VENIRE

Plaintiff M.B. ("Plaintiff"), by and through her undersigned counsel, Kline & Specter,

P.C., responds in opposition to the Defendants Roosevelt Inn LLC d/b/a Roosevelt Inn,

Roosevelt Inn Café, Roosevelt Motor Inn, Inc. d/b/a Roosevelt Motor Inn, UFVS Management

Company, LLC and Yagna Patel's Motion for Change of Venue or in the Alternative, Change of

Venire as follows:

1.      Denied as stated. By way of further explanation, Plaintiff's Complaint is a

document that speaks for itself, and thus, any characterizations of the factual or legal claims

therein are denied. See Pl. Fourth Amended Complaint attached as Exhibit A.

2.      Denied as stated. See response to Paragraph 1.

3.      Denied as stated. See response to Paragraph 1. Additionally, the cited articles,

news reports, and other sources are digital or print documents that speak for themselves, and

thus, any characterizations thereof are specifically denied.

Case ID: 170300712
Control No.: 21060632

4.    Denied as stated. See response to Paragraph 1. Additionally, the cited articles, news reports, and other sources are digital or print documents that speak for themselves, and thus, any characterizations thereof are specifically denied.

5.    Denied as stated. See response to Paragraph 3. Additionally, this paragraph consists of legal arguments and conclusions of law for which no response is required.

6.    Denied as stated. See response to Paragraph 5.

7.    Denied as stated. See response to Paragraph 5.

8.    Denied as stated. See response to Paragraph 1. Additionally, the cited articles, news reports, and other sources are digital or print documents that speak for themselves, and thus, any characterizations thereof are specifically denied.

9.    Denied as stated. See response to Paragraph 1. Additionally, the cited articles, news reports, and other sources are digital or print documents that speak for themselves, and thus, any characterizations thereof are specifically denied.

10.    Denied as stated. See response to Paragraph 5.

11.    Denied as stated. See response to Paragraph 3. Additionally, any subsequent legal actions filed by Plaintiff's counsel are documents that speak for themselves, and thus, any characterizations of the factual or legal claims therein are specifically denied.

12.    Denied as stated. See response to Paragraph 11.

13.    Denied as stated. By way of further explanation, the cited articles, news reports, and other sources are digital or print documents that speak for themselves, and thus, any characterizations thereof are specifically denied.

14.    Denied as stated. See response to Paragraph 3. Additionally, this paragraph consists of legal arguments and conclusions of law for which no response is required.

Case ID: 170300712
Control No.: 21060632

15.     Denied as stated. See response to Paragraph 3. Additionally, this paragraph consists of legal arguments and conclusions of law for which no response is required.

16.-.35.     Denied. These paragraphs consist of legal arguments and conclusions of law for which no response is required, and any factual allegations contained therein are also denied. On the eve of trial—exactly two weeks before jury selection is scheduled to begin—Defendants have tried to create a smokescreen by speculating that they would be deprived of a fair and impartial jury based on pre-trial publications from about sixteen months ago.  Such a decision to change this trial's venue or venire falls within the trial court's discretion. See Winpenny v. Winpenny, 442 A.2d 778, 780 (Pa. Super. Ct. 1982). But that decision is not granted lightly or without real necessity, and the applicant bears the burden of proving that the change is necessary. See Pa. Power & Light Co. v. Gulf Oil Corp., 411 A.2d 1203, 1211-12 (Pa. Super. Ct. 1979) (a change of venue will not be granted based on mere speculation of prejudice).

At the time of Defendants' motion, any prejudice resulting from publications about this case has sufficiently dissipated. Indeed, the most recent publication occurred in February 2020—almost sixteen months ago and had nothing to do with this case and was printed in an obscure publication. See Com. v. Pursell, 495 A.2d 183, 188 (Pa. 1985) (three-day period of saturation followed by six-month period with no publicity sufficient to dispel saturation); Com. v. Galloway, 434 A.2d 1220, 1221 (Pa. 1981) (five and one-half months sufficient); Com. v. Atkinson, 528 A.2d 210, 216 (Pa. Super. Ct. 1987) (five-month period sufficient). When as little as five months was sufficient to dispel any saturation, several years (or at a minimum 16 months) from when any article about this case was published is more than adequate to do the same.

All told, Defendant's assertions that the "salacious" details in various print and digital articles have prejudiced the prospective jurors can be effectively vetted in voir dire. Even if prospective jurors indicate, like in Smith, that they are familiar with the media reports, their

3

Case ID: 170300712
Control No.: 21060632

contentions that they can act fairly and impartially are sufficient to supersede Defendants'
concerns. Disregarding the prospective jurors' responses would be "a most unusual case." See
Com. v. Chambers, 685 A.2d 96, 104 (Pa. 1996), cert. denied, 522 U.S. 827 (1997). See attached
Memorandum of Law as if set forth fully herein.

      **WHEREFORE,** Plaintiff respectfully requests that this Honorable Court denies
Defendants Roosevelt Inn LLC d/b/a Roosevelt Inn, Roosevelt Inn Café, Roosevelt Motor Inn,
Inc. d/b/a Roosevelt Motor Inn, UFVS Management Company, LLC and Yagna Patel's Motion
for Change of Venue or in the Alternative, Change of Venire.


                       **KLINE & SPECTER, P.C.**

                       */s/Emily B. Marks*

**BY:** _____
                       THOMAS R. KLINE, ESQUIRE
                       NADEEM A. BEZAR, ESQUIRE
                       EMILY B. MARKS, ESQUIRE
                       KYLE B. NOCHO, ESQUIRE
                       *Attorneys for Plaintiff*

Case ID: 170300712
Control No.: 21060632

**KLINE & SPECTER, P.C.**                    Attorneys for Plaintiff
BY:    THOMAS R. KLINE, ESQUIRE/28895
          NADEEM A. BEZAR, ESQUIRE/63577
          EMILY B. MARKS, ESQUIRE/204405
          KYLE B. NOCHO, ESQUIRE/319270
1525 Locust Street
Philadelphia, Pennsylvania 19102
(215) 772-1000

| | | |
|---|---|---|
| M.B. | : | PHILADELPHIA COUNTY |
| | : | COURT OF COMMON PLEAS |
| v. | : | |
| | : | CIVIL TRIAL DIVISION |
| ROOSEVELT INN LLC | : | MARCH TERM, 2017 |
| d/b/a ROOSEVELT INN and | : | NO.: 00712 |
| ROOSEVELT INN CAFÉ, et al. | : | |
| | : | |

### PLAINTIFF'S MEMORANDUM OF LAW IN OPPOSITION TO DEFENDANTS ROOSEVELT INN LLC D/B/A ROOSEVELT INN, ROOSEVELT INN CAFÉ, ROOSEVELT MOTOR INN, INC. D/B/A ROOSEVELT MOTOR INN, UFVS MANAGEMENT COMPANY, LLC AND YAGNA PATEL'S MOTION FOR CHANGE OF VENUE OR IN THE ALTERNATIVE, CHANGE OF VENIRE

Plaintiff M.B. ("Plaintiff"), by her counsel, Kline & Specter, P.C., respectfully submits this Memorandum of Law in Support of her Response to Defendants Roosevelt Inn LLC d/b/a Roosevelt Inn, Roosevelt Inn Café, Roosevelt Motor Inn, Inc. d/b/a Roosevelt Motor Inn, UFVS Management Company, LLC and Yagna Patel's ("Roosevelt Defendants") Motion for Change of Venue or in the Alternative, Change of Venire.

## I.    PRELIMINARY STATEMENT

The timing of the Roosevelt Defendants' Motion for Change of Venue is curious as Defendants have filed their Motion to change venue just days before trial is to commence.  This case has been in suit of over four (4) years and was previously listed for trial to commence on September 8, 2020. Now, just days before trial is to start, the Roosevelt Defendants are seeking to transfer venue without any legal or factual basis to make such a request.

Case ID: 170300712
Control No.: 21060632

When a fourteen-year-old girl is raped and sold for sex out of Philadelphia hotel, there will be media coverage. And when she seeks a civil remedy against that hotel, its management, and its security company for its repeated and widespread failure to protect her from rape and sex trafficking, there will be media coverage. The Roosevelt Defendants' argument, on the eve of trial, that they cannot get a fair and impartial jury in Philadelphia, when the media reports cited to by the Roosevelt Defendants are several years old and the Roosevelt Defendant have presented no evidence of actual prejudice, is disingenuous. The Roosevelt Defendants have no basis in law or fact to move to change venue or veniere and thus, the Court should deny Defendants' motion.

## II.    QUESTION PRESENTED

1.   Should this Honorable Court transfer venue or venire?

**SUGGESTED ANSWER:**   *No. The prejudice that Defendants claim to have suffered is not based in law or fact and is speculative at best.*

## III.    BRIEF FACTUAL AND PROCEDURAL HISTORY

Plaintiff was the victim of sex trafficking that occurred at the Roosevelt Inn when she was just fourteen years old from about January 2014 through June 6, 2014. Plaintiff filed a Complaint on March 10, 2017 against Defendants Roosevelt Inn LLC and Roosevelt Motor Inn, Inc., as owners of the motel; the motel's management company, UFVS Management Company, LLC; and the motel's manager, Yagna Patel. On September 5, 2017, Plaintiff filed an Amended Complaint adding the security company, Alpha, as an additional defendant.

When Plaintiff filed this her initial Complaint in 2017, various news outlets. The news outlets mentioned some of circumstance that led to the filing of the lawsuit and at times, quoted or paraphrased Plaintiff's counsel. In March 2019 and November 2019, Plaintiff's counsel filed two additional lawsuits against the Roosevelt Defendants on behalf of two other plaintiffs.

Case ID: 170300712
Control No.: 21060632

Likewise, some news coverage followed. The last news publication cited to by the Roosevelt

Defendants is from February 29, 2020, where billypenn.com, a fairly unknown media outlet, ran

an article about an unrelated incident involving a man, staying at the Roosevelt Inn, who stole an

ambulance. The article briefly added that [t]he motel at 7600 Roosevelt Blvd. has been linked to

sex trafficking on more than one occasion."  The article does not reference the M.B. case or any

civil lawsuits.  The news publications primarily cited to by Defendants occurred at or around the

time M.B. filed her lawsuit which was in March 2017, over four (4) years ago. Defendants have

not cited any recent publications describing this case or the Roosevelt Inn.

The Roosevelt Defendants do not have a valid basis to request a change of venue and

have not shown any actual prejudice that would preclude from a fair and impartial trial.

## IV. NEITHER A CHANGE OF VENUE NOR A CHANGE OF VENIRE IS NECESSARY TO ENSURE THAT DEFENDANTS RECEIVE A FAIR AND IMPARTIAL TRIAL

On the eve of trial—exactly two weeks before jury selection is scheduled to begin—

Defendants have tried to create a smokescreen by speculating that they would be deprived of a

fair and impartial jury based on pre-trial publications from about sixteen months ago.  Such a

decision to change this trial's venue or venire falls within the trial court's discretion. See

Winpenny v. Winpenny, 442 A.2d 778, 780 (Pa. Super. Ct. 1982). But that decision is not

granted lightly or without real necessity, and the applicant bears the burden of proving that the

change is necessary. See Pa. Power & Light Co. v. Gulf Oil Corp., 411 A.2d 1203, 1211-12 (Pa.

Super. Ct. 1979) (a change of venue will not be granted based on mere speculation of prejudice).

Even if Rule 1006(d) imposes no time limit, see Vogel v. National Railroad Passenger Corp.,

536 A.2d 422, 425 (Pa. Super. Ct. 1988), "a transfer petition should not be a tool by which a

defendant may forestall litigation in the underlying case by generating litigation concerning the

transfer petition." Cheeseman v. Lethal Exterminator, Inc., 701 A.2d 156, 162 n.8 (Pa. 1997).

3

If the court is satisfied that an objective, open-minded jury can be selected from the members of the community exposed to the publicity it need not grant a change of venue. <u>Com. v. Powell</u>, 328 A.2d 507, 510 (Pa. 1974). The Supreme Court of the United States noted:

> It is not required . . . that the jurors be totally ignorant of the facts and issues involved. In these days of swift, widespread and diverse methods of communication, an important case can be expected to arouse the interest of the public in the vicinity, and scarcely any of those best qualified to serve as jurors will not have formed some impression or opinion as to the merits of the case.

<u>See</u> <u>Irvin v. Dowd</u>, 366 U.S. 717, 722 (1961). Similarly, the Pennsylvania Supreme Court has held that, "The right to a trial by an impartial jury does not preclude from jury service persons who admit to having formed an opinion of a defendant's guilt or innocence but attest to being able to set it aside." <u>See</u> <u>Com. v. Martinolich</u>, 318 A.2d 680, 687 (Pa. 1974). Therefore, actual prejudice can be determined at *voir dire.* Accordingly, the Court should deny Defendants' motion to change this trial's venue or venire as the Roosevelt Defendants have not shown any actual prejudice but merely speculate without any basis that they will be unable to get a fair trial in Philadelphia County.

## A. ANY PREJUDICE RESULTING FROM PRE-TRIAL PUBLICITY IS SPECULATIVE

As a general rule, a defendant is not entitled to a change of venue or venire unless he can show that the pre-trial publicity resulted in "actual prejudice that prevented the impaneling of an impartial jury." <u>Com. v. Karenbauer</u>, 715 A.2d 1086, 1092 (Pa. 1998). Yet the mere existence of pre-trial publicity "*does not* warrant a presumption of prejudice." <u>Id.</u> (emphasis added). There is an exception to actual prejudice, but whether a defendant has met this exception is a two-step analysis. <u>See</u> <u>id.</u> First, the defendant must prove one of three factors: (1) that the publicity was sensational, inflammatory, and slanted toward conviction, rather than factual or objective; (2) that such publicity revealed the defendant's prior criminal record, if any, or referred to

Case ID: 170300712
Control No.: 21060632

confessions, admissions, or reenactments of the crime by the defendant; or (3) that it was derived from official police and prosecutorial reports. Id. Second, after proving one of the three factors, a change of venue or venire is not required unless the requesting party also shows that the pre-trial publicity was "so extensive, sustained, and pervasive that the community must be deemed to have been saturated with it, and that there was insufficient time between the publicity and the trial for any prejudice to have dissipated." Id. In essence, Pennsylvania courts recognize that a "cooling off" period can negate any unfair prejudice to a defendant. See id.

First, Pennsylvania courts have denied requests to change venue when a party's assertion of prejudice is based on mere speculation. Pa. Power & Light Co. v. Gulf Oil Corp, 411 A.2d at 1215. In Pa. Power & Light, the defendant Gulf Oil asserted that the 98.5% of the venue's inhabitants were customers of PP&L, and thus, that the inhabitants had an interest adverse to Gulf Oil. Id. Assuming without concluding that 98.5% of the venue's inhabitants were in fact customers of PP&L, the Superior Court determined that this position was deficient in several ways. Id. at 1214. First, the notion of interest as argued by Gulf Oil that PP&L would pass any recovery from the lawsuit back through to its customers either by reimbursement or reduced electric rates was not a present benefit but only the possibility of a future benefit. Id. Second, Gulf Oil did not establish that a venireman will immediately get a sum certain but only that a venireman who remains a PP&L customer may over a period of years receive some benefits in the form of reduced electric rates. Id. Third, that the county veniremen believed, or, when the jury would be selected, would have believed, that they would benefit from a recovery of damages by PP&L was unsupported by any evidence that recovery by PP&L would benefit the county's customers. Id. at 1215. In sum, Gulf Oil's "tenuous" adverse-interest argument was "speculative" and "its immediate impact may be insignificant" to warrant a change of venue. Id.

5

Case ID: 170300712
Control No.: 21060632

Here, adopting the Superior Court's reasoning from PP&L, this Court should deny Defendants' motion. Assuming *arguendo* that 98.5% of the veniremen in this case are not Defendants' customers, a "tenuous" connection, but merely heard of this case is even more "tenuous." Initially, there is no contention that any specific percentage of veniremen have an interest adverse to Defendants or prejudged Defendants. Equally absent from Defendants' motion is any contention that a finding for Plaintiff would cause pecuniary harm to the prospective jurors either now or in the future. Last, Defendants have not advanced any evidence that the county's veniremen have any pre-conceived notions about the effects, if any, of a finding for Plaintiff. Thus, the Court should deny Defendants' motion given the speculative nature of their position.

Next, Defendants' reliance on Commonwealth v. Cohen, 413 A.2d 1066 (Pa. 1980), is misplaced. In Cohen, a city's two newspapers and two of its radio stations "extensively covered every aspect" of a murder case. Id. at 1073. Id. Moreover, two pre-trial public opinion polls and *voir dire* revealed that over half of the polled individuals were not only aware of the case but had prejudged the defendant as guilty. Id. at 1073, 1076. In short, the Supreme Court concluded that the prejudicial material was so widespread at the time of trial that that the trial court abused its discretion in refusing to grant a change of venue. Id. at 1077.

Unlike the defendant in Cohen, Defendants suggest without proof that they have been prejudiced by any pre-trial publicity. In Cohen, the defendant undertook two public opinion polls, surveying over 1,000 people in total. Cohen, 413 A.2d at 1073, 1076. Defendants have not presented evidence of any public opinion polls that show actual prejudice. Moreover, the most recent news article, the billypenn.com article (an unknown media outlet) from February 2020, does not mention this case at all but involved a domestic dispute at the Roosevelt Inn that resulted in someone stealing an ambulance. Such a vague reference that the Roosevelt Inn has

6

Case ID: 170300712
Control No.: 21060632

been "linked" to sex trafficking does not create prejudice like media coverage that followed "every aspect" of a specific case in <u>Cohen.</u> Without polling or other proof, Defendants' position rests on self-serving speculation, which as noted in <u>PP&L</u>, is insufficient to warrant a change of venue.

The remaining civil cases cited in Defendants' memorandum of law in support of their motion do not in fact support their request for a change of venue. <u>Bruckshaw v. Frankford Hospital of Philadelphia</u>, 58 A.3d 102 (Pa. 2014); <u>Salameh v. Spossey</u>, 731 A.2d 649 (Pa. Commw. Ct. 1999) ("the fact that six out of forty-four potential jurors were aware of the plaintiff's prior convictions does not rise to the level of where the publicity was so pervasive that the community must have been deemed to have been saturated with it); and <u>Dranzo v. Winterhalter</u>, 577 A.2d 1349 (Pa. Super. Ct. 1990) (upheld the trial court's decision to deny a transfer of venue where the plaintiff was employed by the Court of Common Pleas in which venue was proper).

Thus, Defendants have failed to cite any authority that would allow this last-minute venue transfer based on speculative prejudice, which Plaintiff contends is merely an attempt to forestall trial.

**B.  ANY PUBLICITY FOLLOWING THE FILING OF PLAINTIFF'S LAWSUIT HAS HAS SUFFICIENTLY "COOLED OFF" OVER SEVERAL YEARS**

Next, Defendants' reliance on <u>Commonwealth v. Brado</u>, 368 A.2d 643 (Pa. 1977), neglects the notion that prejudice resulting from pre-trial publicity dissipates during a "cooling off" period.  In <u>Brado</u>, a local newspaper's two-column editorial column published *on the day of jury selection* ridiculed a recent Pennsylvania Supreme Court decision permitting intoxication as a defense to criminal conduct—the very defense relied upon by the defendant—and said in part that as a result of that ruling ". . . by claiming drunkenness one may now be able to escape

7

Case ID: 170300712
Control No.: 21060632

punishment for premeditated murder, robbery, burglary and rape." 368 A.2d at 644. An accompanying cartoon, entitled "This Way Out," depicted a judge in his robes on the bench excusing a criminal defendant, who was holding an indictment for murder, robbery, burglary and rape in one hand and drinking from a bottle labeled "Booze Defense" in the other hand. Id. Ultimately, the Pennsylvania Supreme Court concluded that the trial court should have continued the trial because the probability that the publication would affect and anger the jurors against the defendant, who presented the criticized defense the day the articles were published, was so high that the article must be deemed inherently prejudicial to the defendant. Id. at 645.

At the time of Defendants' motion, any prejudice resulting from publications about this case has sufficiently dissipated. Indeed, the most recent publication occurred in February 2020—almost sixteen months ago—and had nothing to do with this case and was printed in an obscure publication. See Com. v. Pursell, 495 A.2d 183, 188 (Pa. 1985) (three-day period of saturation followed by six-month period with no publicity sufficient to dispel saturation); Com. v. Galloway, 434 A.2d 1220, 1221 (Pa. 1981) (five and one-half months sufficient); Com. v. Atkinson, 528 A.2d 210, 216 (Pa. Super. Ct. 1987) (five-month period sufficient). When as little as five months was sufficient to dispel any saturation, several years (or at a minimum 16 months) from when any article about this case was published is more than adequate to do the same.

## C.  *VOIR DIRE* CAN EFFECTIVELY DETERMINE WHETHER JURORS CAN BE OPEN-MINDED IN THIS CASE

Last, a change of venue or venire based on prejudicial pre-trial publicity is not warranted when the publicity inaccurately describes the conduct for which a defendant might be liable if *voir dire* reveals that the prospective jurors did not prejudge that defendant. Com. v. Smith, 433 A.2d 489, 493 (Pa. Super. Ct. 1981). In Smith, newspaper reports, news casts, and local gossip erroneously reported that the defendant was charged with conspiracy to commit murder instead

8

Case ID: 170300712
Control No.: 21060632

of theft, robbery, and conspiracy to commit arson. Id. Many prospective jurors indicated that they were familiar with these events, but added that they could act fairly and impartially in determining the defendant's guilt or innocence. Id. Accepting this, the Superior Court held that there was no abuse of discretion for denying the defendant's motion for a change of venue. Id.

All told, Defendant's assertions that the "salacious" details in various print and digital articles have prejudiced the prospective jurors can be effectively vetted in *voir dire*. Even if prospective jurors indicate, like in Smith, that they are familiar with the media reports, their contentions that they can act fairly and impartially are sufficient to supersede Defendants' concerns. Disregarding the prospective jurors' responses would be "a most unusual case." See Com. v. Chambers, 685 A.2d 96, 104 (Pa. 1996), cert. denied, 522 U.S. 827 (1997). In the end, jurors are not expected to arrive at Philadelphia City Hall without prejudices, biases, or opinions, but instead they are expected to check those prejudices, biases, and opinions when they enter the jury box.

## V. CONCLUSION

For the foregoing reasons, Plaintiff respectfully requests that this Honorable Court enter the proposed Order denying Roosevelt's Motion for Change of Venue or in the Alternative, Change of Venire.

Respectfully submitted,

**KLINE & SPECTER, P.C.**

*/s/Emily B. Marks*

BY: _____

THOMAS R. KLINE, ESQUIRE
NADEEM A. BEZAR, ESQUIRE
EMILY B. MARKS, ESQUIRE
KYLE B. NOCHO, ESQUIRE
*Attorneys for Plaintiff*

9

Case ID: 170300712
Control No.: 21060632

## <u>VERIFICATION</u>

I, EMILY B. MARKS, ESQUIRE, hereby state that I am the attorney for Plaintiff M.B. in this matter and hereby verify that the statements made in the foregoing motion are true and correct to the best of my knowledge, information and belief.

The undersigned understands that the statements contained therein are made subject to the penalties of 18 Pa. C.S. § 4904 relating to unsworn falsification to authorities.

**KLINE & SPECTER, P.C.**

*/s/Emily B. Marks*

**BY:** _____

THOMAS R. KLINE, ESQUIRE
NADEEM A. BEZAR, ESQUIRE
EMILY B. MARKS, ESQUIRE
KYLE B. NOCHO, ESQUIRE
*Attorneys for Plaintiff*

Case ID: 170300712
Control No.: 21060632

## CERTIFICATE OF SERVICE

I, Emily B. Marks, Esquire attorney for Plaintiff, do hereby certify that service of a true and correct copy of the above ***Response to Motion for Change of Venue or in the Alternative, Change of Venire***, was filed with the Court on June 11, 2021 and served by electronic filing upon counsel of record:

Justina L. Byers, Esquire
Charles S. Marion, Esquire
Kevin M. Eddy, Esquire
Blank Rome LLP
One Logan Square, 130 North 18th Street
Philadelphia, PA 19103
*Counsel for Defendants Roosevelt Inn LLC, Roosevelt Motor Inn, Inc.,*
*UFVS Management Company, LLC and Yagna Patel*

Thomas P. Wagner, Esq.
Robert W. Stanko, Esq.
Melanie J. Foreman, Esq.
Marshall Dennehey Warner Coleman & Goggin
2000 Market Street, Suite 2300
Philadelphia, PA 19103
*President of Defendant Alpha-Centurion Security, Inc.*

By first-class mail upon the following parties:

Daiquan Davis, Register No. 72304-066
USP Terre Haute
U.S. Penitentiary
P.O. Box 33
Terre Haute, IN 47808
*Pro Se Defendant*

Abdul Lopez, Register No. 69643-066
USP Tucson
U.S. Penitentiary
P.O. Box 24550
Tucson, AZ 85734
*Pro Se Defendant*

**KLINE & SPECTER, P.C.**

***/s/Emily B. Marks***

BY: _____
EMILY B. MARKS, ESQUIRE
*Attorney for Plaintiff*

# <u>EXHIBIT A</u>

Case ID: 170300712
Control No.: 21060632

**KLINE & SPECTER, P.C.**
BY:  THOMAS R. KLINE, ESQUIRE/28895
        NADEEM A. BEZAR, ESQUIRE/63577
        EMILY B. MARKS, ESQUIRE/204405
1525 Locust Street
Philadelphia, Pennsylvania 19102
(215) 772-1000

Attorneys for Plaintiff

*Filed and Attested by the
Office of Judicial Records
08 NOV 2019 10:20 am
S. RICE*

| | |
|---|---|
| M.B. | PHILADELPHIA COUNTY |
| c/o Kline & Specter, P.C. | COURT OF COMMON PLEAS |
| 1525 Locust Street | |
| Philadelphia, PA 19102 | CIVIL TRIAL DIVISION |
| Plaintiff, | MARCH TERM, 2017 |
| | NO.: 00712 |
| V. | |
| | |
| ROOSEVELT INN LLC | JURY TRIAL DEMANDED |
| *d/b/a ROOSEVELT INN and* | |
| *ROOSEVELT INN CAFE* | |
| 7630 Roosevelt Boulevard | |
| Philadelphia, PA 19152 | |
| | |
| and | |
| | |
| ROOSEVELT MOTOR INN, INC. | |
| *d/b/a ROOSEVELT MOTOR INN* | |
| 7630 Roosevelt Boulevard | |
| Philadelphia, PA 19152 | |
| | |
| and | |
| | |
| UFVS MANAGEMENT COMPANY, LLC | |
| 287 Bowman Avenue | |
| Purchase, NY 10577 | |
| | |
| and | |
| | |
| YAGNA PATEL | |
| 7630 Roosevelt Boulevard | |
| Philadelphia, PA 19152 | |
| | |
| and | |
| | |
| ALPHA-CENTURION SECURITY, INC. | |
| 3720 West Chester Pike | |
| Newtown Square, PA 19073 | |

Case ID: 170300712
Control No.: 21060632

Defendants        :

---

## **NOTICE TO DEFEND**

| **NOTICE** | **AVISO** |
|---|---|

You have been sued in court. If you wish to defend against the claims set forth in the following pages, you must take action within twenty (20) days after this complaint and notice are served, by entering a written appearance personally or by attorney and filing in writing with the court your defenses or objections to the claims set forth against you. You are warned that if you fail to do so the case may proceed without you and a judgment may be entered against you by the court without further notice for any money claimed in the complaint or for any other claim or relief requested by the plaintiff. You may lose money or property or other rights important to you.

YOU SHOULD TAKE THIS PAPER TO YOUR LAWYER AT ONCE. IF YOU DO NOT HAVE A LAWYER (OR CANNOT AFFORD ONE), GO TO OR TELEPHONE THE OFFICE SET FORTH BELOW TO FIND OUT WHERE YOU CAN GET LEGAL HELP.

THIS OFFICE CAN PROVIDE YOU WITH INFORMATION ABOUT HIRING A LAWYER.

IF YOU CANNOT AFFORD TO HIRE A LAWYER, THIS OFFICE MAY BE ABLE TO PROVIDE YOU WITH INFORMATION ABOUT AGENCIES THAT MAY OFFER LEGAL SERVICES TO ELIGIBLE PERSONS AT A REDUCED FEE OR NO FEE.

**LAWYERS REFERENCE SERVICE**
**One Reading Center**
**Philadelphia, PA 19107**
**(215) 238-6333**
**TTY(215) 451-6197**

Le han demandado en corte. Si usted quiere defenderse contra las demandas nombradas en las paginas siguientes, tiene viente (20) dias a partir de recibir esta demanda y notificacion para entablar personalmente o por un abogado una comparecencia escrita y tambien para entablar con la corte en forma escrita sus defensas y objeciones a las demandas contra usted. Sea advisado que si usted no se defiende, el caso puede continuar sin usted y la corte puede incorporar un juicio contra usted sin previo aviso para conseguir el dinero demandado en el pleito o para conseguir cualquier otra demanda o alivio solicitados por el demandante. Usted puede perder dinero o propiedad u otros derechos importantes para usted.

USTED DEBE LLEVAR ESTE DOCUMENTO A SU ABOGADO INMEDIATAMENTE. SI USTED NO TIENE ABOGADO (O NO TIENE DINERO SUFICIENTE PARA PAGAR A UN ABOGADO), VAYA EN PERSONA O LLAME POR TELEFONO LA OFICINA NOMBRADA ABAJO PARA AVERIGUAR DONDE SE PUEDE CONSEGUIR ASSISTENCIA LEGAL. ESTA OFICINA PUEDE PROPORCIONARLE LA INFORMACION SOBRE CONTRATAR A UN ABOGADO.

SI USTED NO TIENE DINERO SUFICIENTE PARA PAGAR A UN ABOGADO, ESTA OFICINA PUEDE PROPORCIONARLE INFORMACION SOBRE AGENCIAS QUE OFRECEN SERVICIOS LEGALES A PERSONAS QUE CUMPLEN LOS REQUISITOS PARA UN HONORARIO REDUCIDO O NINGUN HONORARIO.

**SERVICIO de REFERENCIA LEGAL**
**Uno Reading Centro**
**Filadelfia, PA 19107**
**Telefono: (215) 238-6333**
**TTY(215) 451-6197**

Case ID: 170300712
Control No.: 21060632

**KLINE & SPECTER, P.C.**                          Attorneys for Plaintiff
BY:    THOMAS R. KLINE, ESQUIRE/28895
       NADEEM A. BEZAR, ESQUIRE/63577
       EMILY B. MARKS, ESQUIRE/204405
1525 Locust Street
Philadelphia, Pennsylvania 19102
(215) 772-1000

| | | |
|---|---|---|
| M.B. | : | PHILADELPHIA COUNTY |
| c/o Kline & Specter, P.C. | : | COURT OF COMMON PLEAS |
| 1525 Locust Street | : | |
| Philadelphia, PA 19102 | : | CIVIL TRIAL DIVISION |
| | : | MARCH TERM, 2017 |
| Plaintiff, | : | NO.:00712 |
| v. | : | |
| | : | |
| ROOSEVELT INN LLC | : | JURY TRIAL DEMANDED |
| *d/b/a ROOSEVELT INN and* | : | |
| *ROOSEVELT INN CAFE* | : | |
| 7630 Roosevelt Boulevard | : | |
| Philadelphia, PA 19152 | : | |
| | : | |
| and | : | |
| | : | |
| ROOSEVELT MOTOR INN, INC. | : | |
| *d/b/a ROOSEVELT MOTOR INN* | : | |
| 7630 Roosevelt Boulevard | : | |
| Philadelphia, PA 19152 | : | |
| | : | |
| and | : | |
| | : | |
| UFVS MANAGEMENT COMPANY, LLC | : | |
| 287 Bowman Avenue | : | |
| Purchase, NY 10577 | : | |
| | : | |
| and | : | |
| | : | |
| YAGNA PATEL | : | |
| 7630 Roosevelt Boulevard | : | |
| Philadelphia, PA 19152 | : | |
| | : | |
| and | : | |
| | : | |
| ALPHA-CENTURION SECURITY, INC. | : | |
| 3720 West Chester Pike | : | |
| Newtown Square, PA 19073 | : | |

Case ID: 170300712
Control No.: 21060632

## PLAINTIFF'S FOURTH AMENDED COMPLAINT

### PRELIMINARY STATEMENT

1.　　Human sex trafficking is a form of modern day slavery that exists throughout the United States and globally.  It is a form of evil in the abuse and exploitation of the most innocent and vulnerable.

2.　　Since 2007 over 17,000 incidents of sex trafficking in the United States have been reported to the National Human Trafficking Resources Center.  Over 1,200 cases of sex trafficking has been reported in the first six months of 2016, with the vast majority of victims being women and a disproportionate number being minors.

3.　　In 2014, the Commonwealth of Pennsylvania extensively revised its human trafficking law to compensate the victims and ensure that anyone or any entity that knowingly markets or provides its goods or services to sex traffickers is civilly liable.

### THE PARTIES

4.　　Plaintiff, M.B., was born on September 3, 1999 and is one of the thousands of victims of human trafficking in the United States.  In 2014, Plaintiff was exploited as a minor by commercial sex traffickers who financially benefitted from her exploitation.  Plaintiff resides in Philadelphia County, Pennsylvania.  Plaintiff can be contacted through her counsel, Thomas R. Kline, Esquire, Nadeem A. Bezar, Esquire, and Emily B. Marks, Esquire of Kline & Specter, P.C., 1525 Locust Street, Philadelphia, Pennsylvania 19102.

5.　　Plaintiff's name and address are not contained in this Complaint so as to protect the privacy and identity of Plaintiff M.B. who incurred injuries and damages starting when she was fourteen (14) years old. See also Public Access Policy of the Unified Judicial System of

Pennsylvania: Case Records of the Appellate and Trial Courts § 7.0.

6.      Defendant Roosevelt Inn LLC d/b/a Roosevelt Inn and Roosevelt Inn Cafe [hereinafter referred to as "Roosevelt Inn LLC"] is a limited liability company organized and existing under the laws of Delaware. At all material times hereto, Defendant Roosevelt Inn LLC owned, operated or managed a motel located at 7630 Roosevelt Boulevard, Philadelphia, PA 19152 [hereinafter referred to as the "Roosevelt Inn"].

7.      Defendant Roosevelt Motor Inn, Inc. d/b/a Roosevelt Motor Inn [hereinafter referred to as "Roosevelt Motor Inn, Inc."] is a corporation duly organized and existing under the laws of the Commonwealth of Pennsylvania. At all material times hereto, Defendant Roosevelt Motor Inn, Inc. owned, operated or managed the Roosevelt Inn.

8.      Defendant UFVS Management Company, LLC, is a limited liability company duly organized and existing under the laws of the State of New York. At all material times hereto, Defendant UFVS Management Company LLC owned, operated and/or managed the Roosevelt Inn.

9.      Defendant Yagna Patel is an adult person and resident of Pennsylvania who resides at 7630 Roosevelt Boulevard, Philadelphia, Pennsylvania, PA 19152. Based on information and belief, Mr. Patel owned, operated and/or managed the Roosevelt Inn.

10.     Defendant Alpha-Centurion Security, Inc. is a corporation duly organized and existing under the laws of the Commonwealth of Pennsylvania. At all material times hereto, Defendant Alpha-Centurion Security, Inc. provided security services at the Roosevelt Inn.

11.     Upon information and belief, at all times relevant hereto, Defendant Alpha-Centurion Security, Inc. provided paid for security and related services at the Roosevelt Inn located at 7630 Roosevelt Boulevard, Philadelphia, Pennsylvania 19152, incidental to a

Case ID: 170300712
Control No.: 21060632

contractual arrangement as between itself and the owners and operators of the premises: Defendants Roosevelt Inn LLC, Roosevelt Motor Inn, Inc., UFVS Management Company, LLC, and Yagna Patel.

13. Defendant Alpha-Centurion Security, Inc. occupied, controlled, patrolled, monitored and assumed responsibility for security of the premises located at the Roosevelt Inn, 7630 Roosevelt Boulevard, Philadelphia, PA 19152.

13. Venue is appropriate in this case because Defendant Yagna Patel resides in Philadelphia County and Defendants Roosevelt Inn LLC, Roosevelt Motor Inn, Inc. UFVS Management Company, LLC, and Alpha-Centurion Security, Inc. regularly conduct business in Philadelphia County. Venue is also proper in this case because Pennsylvania's human trafficking law, 18 Pa. C.S.A. § 3051, permits victims of human trafficking and the sex trade to bring suit in the county in which the victim resides. Plaintiff M.B. resides in Philadelphia County. Therefore, venue is proper in the Philadelphia County Court of Common Pleas.

14. At all times material hereto, Defendants Roosevelt Inn LLC, Roosevelt Motor Inn, Inc., UFVS Management Company, LLC and Yagna Patel acted individually and/or by and through their actual or apparent agents, servants and employees, including but not limited to front desk staff, back room staff, housekeepers, custodians, maintenance workers, food preparation workers, doorman, concierges and security guards and are therefore liable for the acts and/or omissions of their agents, servants and/or employees under theories of agency, master-servant, respondent superior and/or right of control.

15. At all times material hereto, Alpha-Centurion Security, Inc. acted individually and/or by and through its actual or apparent agents, servants and employees, including but not limited to security guards and is therefore liable for the acts and/or omissions of their agents,

Case ID: 170300712
Control No.: 21060632

servants and/or employees under theories of agency, master-servant, respondent superior and/or right of control.

16. At all material times hereto, Defendants Roosevelt Inn LLC, Roosevelt Motor Inn, Inc., UFVS Management Company, LLC and Yagna Patel individually and/or by their actual or apparent agents, servants and employees were uniquely positioned to observe the manifestations, indications and evincement of human sex trafficking within the Roosevelt Inn where they worked.

17. At all material times hereto, Alpha-Centurion Security, Inc., individually and/or by its actual or apparent agents, servants and employees, was uniquely positioned to observe the manifestations, indications and evincement of human sex trafficking within the Roosevelt Inn.

18. At all material times hereto, Defendants Roosevelt Inn LLC, Roosevelt Motor Inn, Inc., UFVS Management Company, LLC and Yagna Patel individually and/or by their actual or apparent agents, servants and employees, failed to take any steps to prevent criminal activity, including sex trafficking, at the Roosevelt Inn and instead permitted heinous and unspeakable acts to occur.

19. At all material times hereto, Defendant Alpha-Centurion Security, Inc., individually and/or by its actual or apparent agents, servants and employees, failed to take any steps to prevent criminal activity, including sex trafficking, at the Roosevelt Inn and instead permitted heinous and unspeakable acts to occur.

**OPERATIVE FACTS**

20. Hotels and motels are common venues for sex trafficking, due to ease of access for buyers and traffickers, ability to pay in cash and maintain financial anonymity, and the avoidance of building and maintenance fees. Hotels and motels are a convenient place for

Case ID: 170300712
Control No.: 21060632

customers to purchase sex to avoid detection. Indeed, since 2007, 1,434 cases of human trafficking in hotels and motels have been reported to the National Human Trafficking Resource Center (NHTRC).

21.     Defendants Roosevelt Inn LLC, Roosevelt Motor Inn, Inc., UFVS Management Company, LLC and Yagna Patel, individually and/or by and through their actual or apparent agents, servants and employees knew or should have known that sex crimes were occurring at the Roosevelt Inn. From January 2012 through December 2017, the Philadelphia Police Department documented more than one thousand incidents of criminal activity at and/or near the Roosevelt Inn including aggravated assault, domestic abuse, theft, weapon violations, rape, prostitution, drug offenses, disorderly conduct and a video recorded shooting.

22.     While investigating and making arrests of perpetrators of prostitution at the Roosevelt Inn, the Philadelphia Police Department would regularly collect up to eight key cards from a single guest involved in prostitution.

23.     Philadelphia Police Department records note, on at least one occasion, that a female guest told a police officer that she would receive texts from a security guard at the Roosevelt Inn, warning of any police activity that would expose her to potential arrest.

24.     Commencing in 2014, Plaintiff was recruited, enticed, solicited, harbored and/or transported to engage in commercial sex acts by sex traffickers to engage in commercial sex acts at the Roosevelt Inn on a regular, consistent and/or repeated basis.

25.     Defendants Roosevelt Inn LLC, Roosevelt Motor Inn, Inc., UFVS Management Company, LLC and Yagna Patel, individually and/or by and through their actual or apparent agents, servants and employees, regularly rented or otherwise provided rooms and services at the Roosevelt Inn to traffickers engaged in commercial sex acts with Plaintiff when she was a minor.

Case ID: 170300712
Control No.: 21060632

26. Defendants Roosevelt Inn LLC, Roosevelt Motor Inn, Inc., UFVS Management Company, LLC and Yagna Patel, individually and/or by and through their actual or apparent agents, servants and employees had a duty to ensure the safety and well-being of individuals lawfully on the motel's premises, the motel's guests, the motel's employees, and the motel's property.

27. Defendants Roosevelt Inn LLC, Roosevelt Motor Inn, Inc., UFVS Management Company, LLC and Yagna Patel, individually and/or by and through their actual or apparent agents, servants and employees had a duty to ensure the safety and well-being of Plaintiff while she was at the Roosevelt Inn and protect her from criminal conduct.

28. Upon information and belief, Defendant Alpha-Centurion Security, Inc. contracted with the Roosevelt Inn beginning in approximately March 2007 to provide security services.

29. Defendant Alpha-Centurion Security, Inc., individually and/or by and through its actual or apparent agents, servants and employees, had a duty ensure the safety and well-being of individuals lawfully on the motel's premises, the motel's guests, the motel's employees, and the motel's property.

30. Defendant Alpha-Centurion Security, Inc., had a duty to ensure the safety and well-being of Plaintiff while she was at the Roosevelt Inn and protect her from criminal conduct.

31. Defendants Roosevelt Inn LLC, Roosevelt Motor Inn, Inc., UFVS Management Company, LLC and Yagna Patel, individually and/or by and through their actual or apparent agents, servants and employees assumed responsibility for protecting individuals lawfully present at the Roosevelt Inn, including Plaintiff from foreseeable harm, including commercial sex exploitation and human sex trafficking.

32. Defendant Alpha-Centurion Security, Inc., assumed responsibility for protecting individuals lawfully present at the Roosevelt Inn, including Plaintiff from foreseeable harm, including commercial sex exploitation and human sex trafficking.

33. Defendants Roosevelt Inn LLC, Roosevelt Motor Inn, Inc., UFVS Management Company, LLC and Yagna Patel, individually and/or by and through their actual or apparent agents, servants and employees had a duty to Plaintiff to provide a reasonably safe environment at the Roosevelt Inn and protect Plaintiff from dangerous people and conditions on the premises.

34. Defendant Alpha-Centurion Security, Inc., had a duty to Plaintiff to provide a reasonably safe environment at the Roosevelt Inn and protect Plaintiff from dangerous people and conditions on the premises.

35. Defendants Roosevelt Inn LLC, Roosevelt Motor Inn, Inc., UFVS Management Company, LLC and Yagna Patel, individually and/or by and through their actual or apparent agents, servants, and employees, failed to take any steps to protect Plaintiff from criminal acts including sex trafficking.

36. Defendant Alpha-Centurion Security, Inc., individually and/or by and through its actual or apparent agents, servants and employees, failed to take any steps to protect Plaintiff from criminal acts including sex trafficking.

37. Defendants Roosevelt Inn LLC, Roosevelt Motor Inn, Inc., UFVS Management Company, LLC, and Yagna Patel, individually and/or by and through their actual or apparent agents, servants and employees, knew or should have known that criminal activity and sex trafficking that occurred at the Roosevelt Inn put plaintiff at risk of being harmed.

38. Defendant Alpha-Centurion Security, Inc., individually and/or by and through its actual or apparent agents, servants and employees, knew or should have known that criminal

activity and sex trafficking that occurred at the Roosevelt Inn put plaintiff at risk of being harmed.

39.     Plaintiff's traffickers put up internet advertisements for the purpose of sex trafficking Plaintiff as a minor.

40.     The advertisements included a fake name for Plaintiff and a phone number to call.

41.     During the phone call, sex for cash was negotiated and the caller "John" would be informed that Plaintiff was at the Roosevelt Inn.

42.     Plaintiff's traffickers would linger in the halls and on the premises of the Roosevelt Inn.

43.     The motel room where Plaintiff engaged in commercial sex acts contained used condoms and condom wrappers and the room frequently smelled of marijuana.

44.     Plaintiff engaged in numerous commercial sex acts and/or "dates" per day.

45.     Plaintiff was accompanied by older men while on the premises of the Roosevelt Inn.

46.     Plaintiff was visibly treated in an aggressive manner by traffickers engaged in commercial sex acts with Plaintiff while in public areas of the Roosevelt Inn.

47.     Plaintiff exhibited fear and anxiety while on the premises and in public areas of the Roosevelt Inn.

48.     Plaintiff's traffickers paid cash for the motel rooms where Plaintiff engaged in commercial sex acts.

49.     Plaintiff's traffickers consistently displayed "Do Not Disturb" signs on the door to the motel where Plaintiff engaged in commercial sex acts and consistently refused housekeeping services.

50. Men and other minors frequently entered and left the rooms where Plaintiff engaged in commercial sex acts.

51. Men stood in the hallways outside of rooms where Plaintiff was engaged in commercial sex acts.

52. Plaintiff had extended stays at the Roosevelt Inn with few or no personal possessions and was left in the room for long periods of time.

53. Plaintiff dressed in a sexually explicit manner and would walk the hallways of the Roosevelt Inn.

54. Security guards and/or employees of Defendant Alpha-Centurion Security, Inc. observed Plaintiff who was a minor at the time at the Roosevelt Inn in sexually explicit clothing.

55. Plaintiff was paid cash for the commercial sex acts she engaged in while at the Roosevelt Inn.

56. Plaintiff distributed the cash she received for the commercial sex acts to her traffickers who used the cash to pay for the motel rooms rented at the Roosevelt Inn.

57. Despite the open and obvious signs of criminal activity and human trafficking, Defendants Roosevelt Inn LLC, Roosevelt Motor Inn, Inc., UFVS Management Company, LLC, and Yagna Patel, individually and/or by and through their actual or apparent agents, servants and employees, failed to take reasonable steps to prevent the sex trafficking of the Plaintiff and failed to ensure her safety and well-being.

58. Defendants Roosevelt Inn, LLC, Roosevelt Motor Inn, Inc. UFVS Management Company, LLC and Yagna Patel, individually and/or by and through their actual or apparent agents, servants and negligently failed to prevent Plaintiff from being sexually exploited.

59. Despite the open and obvious signs of human trafficking, Defendants Roosevelt

Inn, LLC., Roosevelt Motor Inn, Inc., UFVS Management Company, LLC, and Yagna Patel, individually and/or by and through their actual or apparent agents, servants and employees failed to protect Plaintiff from criminal conduct.

60. Despite the open and obvious signs of human trafficking, Defendant Alpha-Centurion Security, Inc failed to take reasonable steps to prevent the sex trafficking of the Plaintiff and failed to ensure her safety and well-being.

61. Defendant Alpha-Centurion Security, Inc. negligently failed to prevent Plaintiff from being sexually exploited.

62. Despite the open and obvious signs of human trafficking, Defendant Alpha-Centurion Security, Inc. failed to protect Plaintiff from criminal conduct.

63. The negligence of Defendants Roosevelt Inn LLC, Roosevelt Motor Inn, Inc., UFVS Management Company, LLC and Yagna Patel, individually and/or by and through their actual or apparent agents, servants and employees caused Plaintiff to suffer physical harm, a sexually transmitted disease, mental anguish, humiliation, exploitation, degradation, mental distress, loss of the enjoyments of life, and loss of life's pleasures both in the past and in the future.

64. By renting rooms to individuals sex trafficking Plaintiff, Defendants Roosevelt Inn LLC, Roosevelt Motor Inn, Inc., UFVS Management Company, LLC and Yagna Patel, individually and/or by and through their actual or apparent agents, servants and employees caused Plaintiff to suffer physical harm, a sexually transmitted disease, mental anguish, humiliation, exploitation, degradation, mental distress, loss of the enjoyments of life, and loss of life's pleasures both in the past and in the future.

65.     The negligence of Defendant Alpha-Centurion Security, Inc., individually and/or by and through its actual or apparent agents, servants and employees, caused Plaintiff to suffer physical harm, a sexually transmitted disease, mental anguish, humiliation, exploitation, degradation, mental distress, loss of the enjoyments of life, and loss of life's pleasures both in the past and in the future.

66.     Defendants Roosevelt Inn LLC, Roosevelt Motor Inn, Inc., UFVS Management Company, LLC and Yagna Patel, individually and/or by and through their actual or apparent agents, servants and employees acted outrageously and in reckless disregard for the health and welfare of the Plaintiff warranting the imposition of punitive damages.

67.     Defendant Alpha-Centurion Security, Inc., individually and/or by and through its actual or apparent agents, servants and employees, acted outrageously and in reckless disregard for the health and welfare of the Plaintiff warranting the imposition of punitive damages.

## COUNT I - NEGLIGENCE

### M.B. v. ROOSEVELT INN LLC, ROOSEVELT MOTOR INN, INC., UFVS MANAGEMENT COMPANY, LLC, YAGNA PATEL

68.     The averments of Paragraphs 1 through 67 are incorporated herein by reference.

69.     Defendants Roosevelt Inn LLC, Roosevelt Motor Inn, Inc., UFVS Management Company, LLC and Yagna Patel, individually and/or by and through their actual or apparent agents, servants and employees, were under a duty to provide reasonable, adequate, and sufficient security personnel and/or to otherwise take appropriate steps to ensure the safety and protection of persons, including Plaintiff, on the premises of the Roosevelt Inn.

70.     Defendants Roosevelt Inn LLC, Roosevelt Motor Inn, Inc., UFVS Management Company, LLC and Yagna Patel, individually and/or by and through their actual or apparent agents, servants and employees should have reasonably anticipated criminal conduct by third

Case ID: 170300712
Control No.: 21060632

parties, including other guests, invitees or persons on the premises of the Roosevelt Inn.

71.     Defendants Roosevelt Inn LCC, Roosevelt Motor Inn, Inc. UFVS Management Company, LLC and Yagna Patel, individually and/or by and through their actual or apparent agents, servants and employees, had a duty to take precautions against reasonably anticipated criminal conduct by third parties and to operate the Roosevelt Inn in a manner that did not endanger children or other persons, including Plaintiff.  Moreover, the Defendants had a duty of care to take reasonable steps to protect foreseeable victims of the dangers created by their acts and omissions, including the danger of human trafficking and sexual exploitation on the premises of the Roosevelt Inn.

72.     Defendants Roosevelt Inn LLC, Roosevelt Motor Inn, Inc., UFVS Management Company, LLC and Yagna Patel, individually and/or by and through their actual or apparent agents, servants and employees, breached the foregoing duties because they knew or should have known that persons on the premises of the Roosevelt Inn, including Plaintiff, could be victimized by, or subjected to, criminal activities on the premises that would likely endanger their health, safety, and/or well-being.

73.     Defendants Roosevelt Inn LLC, Roosevelt Motor Inn, Inc., UFVS Management Company, LLC and Yagna Patel, individually and/or by and through their actual or apparent agents, servants and employees, should have reasonably anticipated that it was reasonably foreseeable from their knowledge and/or past experiences that persons on the premises of the Roosevelt Inn, including Plaintiff, would suffer serious bodily harm as a result of being victimized by violent crimes perpetrated by third parties on the premises of the Roosevelt Inn.

74.     Defendants Roosevelt Inn LLC, Roosevelt Motor Inn, Inc., UFVS Management Company, LLC and Yagna Patel, individually and/or by and through their actual or apparent

agents, servants and employees, failed or refused to take adequate precautions to protect persons on the premises of the Roosevelt Inn, including Plaintiff, from criminal and violent activities of others, despite a reasonable likelihood that person on the premises of the Roosevelt Inn, including Plaintiff, would be victimized by, or subjected to, such criminal and/or violent acts, which could cause such persons serious bodily injury. The negligence of Defendants Roosevelt Inn LLC, Roosevelt Motor Inn, Inc., UFVS Management Company, LLC and Yagna Patel, individually and/or by and through their actual or apparent agents, servants and employees consisted of the following:

a. Failing to execute and/or implement the established security plan and/or execute and/or implement any established security plan;

b. Failure to publish and/or post orders at the security posts providing protocols for employees to follow in circumstances involving commercial sexual activity and/or human sex trafficking;

c. Failing to adopt, establish, implement, and/or enforce required policies, procedures, rules, regulations and/or guidelines concerning protection of individuals lawfully on the premises;

d. Failing to adopt, establish, implement, and/or enforce required policies, procedures, rules, regulations and/or guidelines concerning removal from the premises of individuals posing security threats;

e. Failing to adequately control access to the premises;

f. Failing to prevent entry of unauthorized individuals onto the premises;

g. Failing to properly and adequately hire, train and provide ongoing training to employees including but not limited to ongoing training involving recognizing, preventing and responding to criminal activity, prostitution and sex trafficking;

h. Failing to select and/or retain only personnel competent to provide proper and adequate professional services;

i. Failing to assign experienced security personnel to provide competent guard services at the Roosevelt Inn;

j. Failing to adopt, establish, implement, execute and/or enforce required policies,

Case ID: 170300712
Control No.: 21060632

procedures, rules, regulations and/or guidelines concerning protection of business invitees on the premises of the Roosevelt Inn;

k. Failing to adopt, establish, implement, execute and/or enforce required policies, procedures, rules, regulations, and/or guidelines concerning proper security measures in a motel setting;

l. Failing to adopt, establish, implement, execute and/or enforce required policies, procedures, rules, regulations, and/or guidelines concerning proper monitoring, surveillance, and patrolling of the premises;

m. Failing to adopt, establish, implement, execute and/or enforce required policies, procedures, rules, regulations, and/or guidelines concerning prevention of violent and/or criminal acts on the premises;

n. Failing to detect and respond to commercial sex activity and human sex trafficking at the Roosevelt Inn;

o. Failing to conduct adequate surveillance of the premises of the Roosevelt Inn;

p. Failing to utilize surveillance equipment to monitor suspicious activity and promptly react thereto for the safety of Plaintiff;

q. Failing to respond and react to suspicious activity;

r. Failing to maintain surveillance equipment in proper working order;

s. Failing to test or properly test surveillance equipment to ensure it was in working order;

t. Failing to utilize appropriate and/or required surveillance equipment;

u. Failing to adequately monitor activity on video surveillance and promptly react thereto for the safety of Plaintiff;

v. Allowing individuals to come on to the premises for the express purpose of trafficking Plaintiff;

w. Failing to prevent Plaintiff from being trafficked on the premises;

x. Breaching its duties under the Restatement of the Law of Torts (Second), including but not limited to §§ 302, 318, 321, 323, 324A, and 344; and

y. Failing to exercise care, caution and diligence required under the circumstances.

75.   As a result of Defendants Roosevelt Inn LLC, Roosevelt Motor Inn, Inc., UFVS

Management Company, LLC and Yagna Patel's negligence, Plaintiff was caused to suffer

physical harm, a sexually transmitted disease, mental anguish, humiliation, exploitation, degradation, mental distress, loss of the enjoyments of life and loss of life's pleasures both in the past and in the future.

76.     As a result of Defendants Roosevelt Inn LLC, Roosevelt Motor Inn, Inc., UFVS Management Company, LLC, and Yagna Patel's negligence, Defendants breached its duty to Plaintiff to ensure her safety and well-being and protect her from criminal acts.

77.     Defendants Roosevelt Inn LLC, Roosevelt Motor Inn, Inc., UFVS Management Company, LLC and Yagna Patel acted outrageously and in reckless disregard for the health and welfare of the Plaintiff warranting the imposition of punitive damages.

**WHEREFORE,** Plaintiff M.B. demands judgment in her favor and against Defendants Roosevelt Inn LLC, Roosevelt Motor Inn, Inc., UFVS Management Company, LLC and Yagna Patel and demands compensatory and punitive damages in excess of Fifty Thousand ($50,000.00) Dollars exclusive of prejudgment interest, costs and damages for pre-judgment delay.

## COUNT II – NEGLIGENCE

## M.B. v. ALPHA-CENTURION SECURITY, INC.

78.     The averments of paragraphs 1 through 77 are incorporated herein by reference.

79.     Defendant Alpha-Centurion Security, Inc. had a duty to provide reasonable, adequate, and sufficient security personnel and/or to otherwise take appropriate steps to ensure the safety and protection of persons, including Plaintiff, on the premises of the Roosevelt Inn.

80.     Defendant Alpha-Centurion Security, Inc should have reasonably anticipated criminal conduct by third parties, including other guests, invitees or persons on the premises of the Roosevelt Inn.

81.     Defendant Alpha-Centurion Security, Inc. had a duty to take precautions against reasonably anticipated criminal conduct by third parties so as not to endanger the welfare and well-being of Plaintiff. Moreover, the Defendant Alpha-Centurion Security, Inc a duty of care to take reasonable steps to protect foreseeable victims of the dangers created by their acts and omissions, including the danger of human trafficking and sexual exploitation on the premises of the Roosevelt Inn.

82.     Defendant Alpha-Centurion Security, Inc. breached the foregoing duties because they knew or should have known that persons on the premises of the Roosevelt Inn, including Plaintiff, could be victimized by, or subjected to, criminal activities on the premises that would likely endanger their health, safety, and/or well-being.

83.     Defendant Alpha-Centurion Security, Inc. should have reasonably anticipated that it was reasonably foreseeable from their knowledge and/or past experiences that persons on the premises of the Roosevelt Inn, including Plaintiff, would suffer serious bodily harm as a result of being victimized by violent crimes perpetrated by third parties on the premises of the Roosevelt Inn.

84.     Defendant Alpha-Centurion Security, Inc. failed or refused to take adequate precautions to protect persons on the premises of the Roosevelt Inn, including Plaintiff, from criminal and violent activities of others, despite a reasonable likelihood that person on the premises of the Roosevelt Inn, including Plaintiff, would be victimized by, or subjected to, such criminal and/or violent acts, which could cause such persons serious bodily injury. The negligence Alpha-Centurion Security, Inc. consisted of the following:

   a.  Failing to execute and/or implement the established security plan and/or execute and/or implement any established security plan;

b. Failure to publish and/or post orders at the security posts providing protocols for security personnel to follow in circumstances involving criminal activity, commercial sexual activity and/or human sex trafficking;

c. Failing to adopt, establish, implement, and/or enforce required policies, procedures, rules, regulations and/or guidelines concerning protection of individuals lawfully on the premises;

d. Failing to adopt, establish, implement, and/or enforce required policies, procedures, rules, regulations and/or guidelines concerning removal from the premises of individuals posing security threats;

e. Failing to adequately control access to the premises;

f. Failing to prevent entry of unauthorized individuals onto the premises;

g. Failing to properly and adequately train and provide ongoing training to its security personnel including but not limited to ongoing training involving preventing and responding to commercial sexual activity and human sex trafficking;

h. Failing to select and/or retain only personnel competent to provide proper and adequate security services;

i. Failing to assign experienced security personnel to provide competent guard services at the Roosevelt Inn;

j. Failing to adopt, establish, implement, execute and/or enforce required policies, procedures, rules, regulations and/or guidelines concerning protection of business invitees on the premises of the Roosevelt Inn;

k. Failing to adopt, establish, implement, execute and/or enforce required policies, procedures, rules, regulations, and/or guidelines concerning proper security measures in a hotel setting;

l. Failing to adopt, establish, implement, execute and/or enforce required policies, procedures, rules, regulations, and/or guidelines concerning proper monitoring, surveillance, and patrolling of the premises;

m. Failing to adopt, establish, implement, execute and/or enforce required policies, procedures, rules, regulations, and/or guidelines concerning prevention of violent and/or criminal acts on the premises;

n. Failing to detect and respond to commercial sex activity and human sex trafficking at the Roosevelt Inn;

Case ID: 170300712
Control No.: 21060632

o. Failing to conduct adequate surveillance of the premises of the Roosevelt Inn;

p. Failing to utilize surveillance equipment to monitor suspicious activity and promptly react thereto for the safety of Plaintiff;

q. Failing to respond and react to suspicious activity detected on video surveillance;

r. Failing to maintain surveillance equipment in proper working order;

s. Failing to test or properly test surveillance equipment to ensure it was in working order;

t. Failing to utilize appropriate and/or required surveillance equipment;

u. Failing to adequately monitor activity on video surveillance and promptly react thereto for the safety of Plaintiff;

v. Allowing individuals to come on to the premises for the express purpose of conducting commercial sex acts with Plaintiff;

w. Failing to prevent Plaintiff from being trafficked on the premises; and

x. Breaching its duties under the Restatement of the Law of Torts (Second), including but not limited to §§ 302, 318, 321, 323, 324A, and 344.

85.     As a result of Defendant Alpha-Centurion Security, Inc.'s negligence, Plaintiff was caused to suffer physical harm, a sexually transmitted disease, mental anguish, humiliation, exploitation, degradations, mental distress, loss of enjoyment of life and loss of life's pleasures both in the past and in the future.

86.     As a result of Defendant Alpha-Centurion Security, Inc.'s negligence, Defendant Alpha-Centurion Security, Inc. breached its duty to ensure Plaintiff's safety and well-being and protect her from criminal acts..

87.     Defendant Alpha-Centurion Security, Inc. acted outrageously and in reckless disregard for the health and welfare of the Plaintiff warranting the imposition of punitive damages.

**WHEREFORE**, Plaintiff M.B. demands judgment in her favor and against Defendant Alpha-Centurion Security, Inc. and demands compensatory and punitive damages in excess of Fifty Thousand ($50,000.00) Dollars exclusive of prejudgment interest, costs and damages for pre-judgment delay.

### COUNT III – NEGLIGENT INFLICTION OF EMOTIONAL DISTRESS

### M.B. v. ROOSEVELT INN LLC, ROOSEVELT MOTOR INN, INC., UFVS MANAGEMENT COMPANY, LLC, YAGNA PATEL

88. The averments of paragraphs 1 through 87 are incorporated herein by reference.

89. Defendants Roosevelt Inn LLC, Roosevelt Motor Inn, Inc., UFVS Management Company, LLC and Yagna Patel, individually and/or by and through their actual or apparent agents, servants and employees, negligently committed the acts averred in this Complaint against the Plaintiff and thereby caused Plaintiff to suffer fear, depression, humiliation, mental anguish and severe physical and emotional distress, directly and proximately causing harm and damages to the Plaintiff.

90. Defendants acted outrageously and in reckless disregard for the health and welfare of the Plaintiff warranting the imposition of punitive damages.

**WHEREFORE,** Plaintiff M.B. demands judgment in her favor and against Defendants Roosevelt Inn LLC, Roosevelt Motor Inn, Inc., UFVS Management Company, LLC and Yagna Patel and demands compensatory and punitive damages in excess of Fifty Thousand ($50,000.00) Dollars exclusive of prejudgment interest, costs and damages for pre-judgment delay.

## COUNT IV– NEGLIGENT INFLICTION OF EMOTIONAL DISTRESS

## M.B. v. ALPHA-CENTURION SECURITY, INC.

91.    The averments of paragraphs 1 through 90 are incorporated herein by reference.

92.    Defendant Alpha-Centurion Security, Inc., individually and/or by and through its actual or apparent agents, servants and employees, negligently committed the acts averred in this Complaint against the Plaintiff and thereby caused Plaintiff to suffer fear, depression, humiliation, mental anguish and severe physical and emotional distress, directly and proximately causing harm and damages to the Plaintiff.

93.    Defendant Alpha-Centurion Security, Inc. acted outrageously and in reckless disregard for the health and welfare of the Plaintiff warranting the imposition of punitive damages.

**WHEREFORE**, Plaintiff M.B. demands judgment in her favor and against Defendant Alpha-Centurion Security, Inc. and demands compensatory and punitive damages in excess of Fifty Thousand ($50,000.00) Dollars exclusive of prejudgment interest, costs and damages for pre-judgment delay.

**KLINE & SPECTER, P.C.**

BY: _____
THOMAS R. KLINE, ESQUIRE
NADEEM A. BEZAR, ESQUIRE
EMILY B. MARKS, ESQUIRE

Dated:_____

Case ID: 170300712
Control No.: 21060632

## CERTIFICATE OF SERVICE

I do hereby certify that service of a true and correct copy of the ***Plaintiff's Fourth Amended Complaint*** was filed with the Court on _____ and served by electronic filing upon the following counsel of record:

Grant S. Palmer, Esq.
James J. Quinlan, Esq.
Daniel E. Oberdick, Esq.
Blank Rome LLP
One Logan Square, 130 North 18th Street
Philadelphia, PA 19103
*Counsel for Roosevelt Inn LLC, Roosevelt Motor Inn, Inc.,*
*UFVS Management Company, LLC and Yagna Patel*

Thomas P. Wagner, Esq.
Robert W. Stanko, Esq.
Melanie J. Foreman, Esq.
Marshall Dennehey Warner Coleman & Goggin
2000 Market Street, Suite 2300
Philadelphia, PA 19103
*Counsel for Alpha-Centurion Security, Inc.*

Via Certified and Regular Mail to:

Daiquan Davis, Register No. 72304-066
USP Terre Haute
U.S. Penitentiary
P.O. Box 33
Terre Haute, IN 47808
*Pro Se Defendant*

Abdul Lopez, Register No. 69643-066
USP Tucson
U.S. Penitentiary
P.O. Box 24550
Tucson, AZ 85734
*Pro Se Defendant*

KLINE & SPECTER, P.C.

Dated: _____            By: _____
NADEEM A. BEZAR, ESQUIRE
Attorney for Plaintiff

Case ID: 170300712
Control No.: 21060632

## **VERIFICATION**

I, M.B., hereby state that I am the Plaintiff in the within matter, and as such verify that the statements made in the foregoing Fourth Amended Complaint are true and correct to the best of my knowledge, information and belief.

The undersigned understands that the statements herein are made subject to the penalties of 18 Pa. C.S. 4904 relating to unsworn falsification to authorities.

_____
M.B.

M.B., minor by her Guardian,
William A. Calandra, Esquire,

               Plaintiff,

      v.

ROOSEVELT INN LLC d/b/a ROOSEVELT
INN and ROOSEVELT INN CAFÉ,
ROOSEVELT MOTOR INN, INC. d/b/a
ROOSEVELT MOTOR INN, UFVS
MANAGEMENT COMPANY, LLC,
YAGNA PATEL and ALPHA-CENTURION
SECURITY, INC. d/b/a ALPHA CENTURION
SECURITY INC.

               Defendants,

      v.

DAIQUAN DAVIS and ABDUL LOPEZ

              Additional Defendants.

IN THE COURT OF COMMON PLEAS
PHILADELPHIA COUNTY

MARCH TERM, 2017

Civil Action No.: 00712

## <u>ORDER</u>

**AND NOW**, this \_\_\_\_\_ day of _____, 2021, upon consideration of Defendant

Alpha-Centurion Security, Inc.'s Motion in Limine regarding Kelvin Hanton's Criminal Record,

and responses thereto, it is hereby **ORDERED** and **DECREED** that said Motion is **DENIED**

and the parties shall **NOT BE PRECLUDED** from introducing evidence, testimony and/or

argument regarding Kelvin Hanton's Criminal Record at the trial in this matter.

BY THE COURT:

_____
                                   J.

Case ID: 170300712
Control No.: 21060284

**BLANK ROME LLP**
Charles S. Marion, PA I.D. No. 56509
Kevin M. Eddy, PA I.D. No. 92904
Justina L. Byers, PA ID No. 76773
One Logan Square
130 North 18th Street
Philadelphia, PA 19103-6998
Tel.: (215) 569-5500
Fax: (215) 569-5555
Email: cmarion@blankrome.com
        keddy@blankrome.com
        byers@blankrome.com

*Attorneys for Defendants,*
*Roosevelt Inn LLC d/b/a Roosevelt Inn and*
*Roosevelt Inn Café, Roosevelt Motor Inn, Inc.*
*d/b/a Roosevelt Motor Inn,*
*UFVS Management Company, LLC and*
*Yagna Patel*

| | |
|---|---|
| M.B., minor by her Guardian,<br>William A. Calandra, Esquire,<br><br>Plaintiff,<br><br>v.<br><br>ROOSEVELT INN LLC d/b/a ROOSEVELT<br>INN and ROOSEVELT INN CAFÉ, et al.,<br>ROOSEVELT MOTOR INN, INC. d/b/a<br>ROOSEVELT MOTOR INN, UFVS<br>MANAGEMENT COMPANY, LLC,<br>YAGNA PATEL and ALPHA-CENTURION<br>SECURITY, INC. d/b/a ALPHA CENTURION<br>SECURITY INC.<br><br>Defendants,<br><br>v.<br><br>DAIQUAN DAVIS and ABDUL LOPEZ<br><br>Additional Defendants. | COURT OF COMMON PLEAS<br>PHILADELPHIA COUNTY<br>CIVIL TRIAL DIVISION<br><br>MARCH TERM, 2017<br>NO.: 00712<br><br>JURY TRIAL DEMANDED |

**DEFENDANTS ROOSEVELT INN, LLC, ROOSEVELT MOTOR INN, INC.,
UFVS MANAGEMENT COMPANY AND YAGNA PATEL'S
RESPONSE IN OPPOSITION TO ALPHA-CENTURION SECURITY, INC.'S MOTION
IN LIMINE AS TO KELVIN HANTON'S CRIMINAL RECORD**

Case ID: 170300712
Control No.: 21060284

Defendants Roosevelt Inn, LLC d/b/a Roosevelt Inn and Roosevelt Inn Café, Roosevelt Motor Inn, Inc. d/b/a Roosevelt Motor Inn, UFVS Management Company and Yagna Patel (collectively, the "Roosevelt Defendants"), by and through their attorneys, Blank Rome LLP, hereby submit the following Response in Opposition to Alpha-Centurion Security, Inc.'s Motion in Limine as to Kelvin Hanton's Criminal Record, filed on June 2, 2021 at Control no. 21060284 and in support thereof, avers as follows:

1.      Admitted.

2.      Denied in part and admitted in part. The Roosevelt Defendants deny knowledge as to what evidence Plaintiff intends to seek to introduce at trial. By way of further response, Hanton's criminal record is highly probative of and relevant to the Roosevelt Defendants' crossclaims against Alpha-Centurion Security, Inc. ("Alpha"). Alpha was named as a defendant in this action because it was contractually obligated to provide security services at the Roosevelt Inn. The contract between Alpha and Roosevelt Inn LLC required Alpha to "assist in the safeguard" of the hotel and persons located in the hotel ("Security Contract"). *See* Exhibit A, Security Contract, at ¶ 1. The Security Contract also requires Alpha to indemnify the Roosevelt Defendants for "any loss, theft, or damage to property or injury to persons caused solely or in part as a result of intentional or deliberate acts, conduct, omissions and or criminal activities of [Alpha-Centurion Security] Service's security officers when committed in the performance of their duties." *Id*. at ¶ 8.

Alpha employee Kevin Hanton ("Hanton") was assigned by Alpha to provide security at the Roosevelt Inn during a majority of the weekends in 2014, which overlaps the relevant time period of Plaintiff's identifies in her Fourth Amended Complaint. Hanton testified at his deposition that he that he has worked for Alpha full-time since 1996 and estimated his tenure

2

Case ID: 170300712
Control No.: 21060284

with Alpha as 18 - 20 years. *See* Exhibit B, Hanton deposition transcript, at 14, line 19 - 15, line 12. Hanton's employment application to Alpha, dated July 15, 2010, required applicant Hanton to indicate if he had "ever been convicted of a crime," if he had "even been incarcerated in a prison," if he was "presently on probation or parole," and if at the time of the application, he had "any civil/criminal cases pending in court." *See* Exhibit C:



As depicted, Hanton failed to answer the first and third questions, but responded that he had been incarcerated and had a case currently pending in court. *Id.* Criminal docket searches for Kelvin Hanton reveal that at the time of his application, he had multiple prior convictions—he was

3

Case ID: 170300712
Control No.: 21060284

convicted in Delaware County in 1999 for charges filed in 1995 for retail theft and receiving stolen property and was sentenced to a year of probation; he was convicted of endangering the welfare of children in Philadelphia County in 2005 and was sentenced to one year of probation; and he was convicted in 2008 in Philadelphia County for carrying firearms without a license, a felony, and carrying firearms in public in Philadelphia. *See* Exhibits D, E, F. In relation to Hanton's 2008 convictions, he was sentenced to 1-2 years of confinement (starting October 14, 2008) and 3 years of probation. *See* Exhibit F. At the time of his July 2010 application to work at Alpha, he was likely on probation or parole and quite possibly was still in prison. Also, as depicted in the application, Hanton indicated that he had been an employee of Alpha-Centurion in the past. *See* Exhibit C.

Hanton's period of incarceration, which began in October 2008, fell in the middle of his professed 18 - 20 year tenure with Alpha, which likely explains why he completed an application in 2010, *i.e.,* Alpha likely required that Hanton reapply for a position following his release from incarceration. In fact, Hanton may have actually applied to be rehired in 2009 from prison. As indicated in a document Alpha produced entitled "New Hired," which was purportedly faxed on July 10, 2009, Hanton's contact information lists his address as 8101 State Road, Philadelphia, PA 19136, which is the address for the Philadelphia Alternative and Special Detention Center. *See* https://prisonpath.com/county/pennsylvania/philadelphia-alternative-and-special-detention-center/.

.

150213.00601/126113664v.1

Case ID: 170300712
Control No.: 21060284



## NEW HIRED

Faxed 7/10/09

FULL NAME (include mid.initial): *Kalvin Hanton PP 671694*
ADDRESS: *8101 State Road*
*Phila PA. 19136*
SS# ▓▓▓▓▓▓▓▓
START DATE: *7/11/09*
RATE: ▓▓▓▓▓▓▓
D.O.B. ▓▓▓▓▓▓▓
MARITAL STATUS & CLAIMS: ▓▓▓▓▓▓▓▓▓▓▓▓▓▓
HOURS WORKED ON HIS FIRST PAY PERIOD: _____
DEDUCTIONS:
    UNIFORM: $_____    PAY ADVANCE: $_____
    OTHER: $_____

Exhibit G.

    Alpha's director of operations Panetta testified that during its years in business, Alpha performed in-house criminal background checks on applicants and screened for prior convictions. *See* Exhibit H, Panetta deposition at 71, line 9-24; 72, line 16-73, line 21; 74, line 3-21. Panetta maintained that if a background check revealed any conviction or guilty plea, Alpha would reject the applicant, "If anybody has pending cases, they're on probation, I don't hire them. If they did one year in jail, I don't hire them . . . Anything convicted we can't hire

5

Case ID: 170300712
Control No.: 21060284

them." *Id.* at 73, line 18-22; 74, line 20-21. Despite Panetta's testimony, in the case of Kelvin Hanton, Alpha disregarded its hiring policy and violated the law.

In Pennsylvania, the Private Detective Act of 1953, 22 P.S.A. 22, §§ 11-49 (the "Act"), regulates security guard companies as well as private detective agencies. Pa. Stat. Ann. tit. 22, § 12(a)(11); *Mahan v. Am-Gard, Inc.*, 841 A.2d 1052, 1057 n.11 (Pa. Super. 2003). The Act requires licensed security guard licensees to obtain statements from employees stating they have not been "convicted of a felony, or of any offense involving moral turpitude, or of any of the misdemeanors or offenses described in subsection (a) of this section" of the Act. *See* 22 P.S. § 23. The disqualifying crimes referenced in the Act crimes are:

> (1) illegally using, carrying or possessing a pistol or other dangerous weapon; (2) making or possessing burglar's instruments; (3) buying or receiving stolen property; (4) unlawful entry of a building; (5) aiding escape from prison (6) unlawfully possessing or distributing habit forming narcotic drugs; (7) picking pockets or attempting to do so; (8) soliciting any person to commit sodomy or other lewdness; (9) any person whose private detective or investigator's license was revoked or application for such license was denied by the court of common pleas or by the authorities of any other state or territory because of conviction of any of the crimes or offenses specified in this section; (10) recklessly endangering another person; (11) terroristic threats; or (12) committing simple assault.

*Id.*

Hanton was convicted of three of the listed crimes— illegally using, carrying or possessing a pistol or other dangerous weapon; endangering another person; and buying or receiving stolen property. *See* Exhibits D, E, F. Pursuant to the Act, Alpha was required to verify the information provided by Hanton in his application, and perform a criminal background check. *See* 22 P.S.A. § 23(c)-(f). Alpha was on notice of Hanton's criminal background since he admitted, albeit only partially, that he had been incarcerated and that proceedings were still

6

Case ID: 170300712
Control No.: 21060284

pending. *See* Exhibit C. Not only did Alpha fail to obtain complete information about Hanton's past, as required by the Act, Alpha knowingly hired Hanton notwithstanding his record of convictions, his admission that he had a criminal case pending against him and that he apparently applied for a security guard officer position from state prison while finishing a sentence for a preclusive felony conviction. Alpha's violations of the Act constitute negligence *per se*.

3.     Admitted. Moreover, according to Hanton's testimony as to his 1996 start date, his three separate convictions occurred during the time he was working for Alpha. *See* Exhibits D, E, F. If Hanton applied for the job initially in 1996 as he testified, he did so with charges pending for criminal conspiracy, retail theft and receiving stolen property. *See* Exhibit D. Those pending charges should have disqualified Hanton from being hired in 1996. The three separate convictions that followed should have precluded his rehiring in 2010.

4.     Admitted. Hanton was convicted of three of the enumerated offenses that by law, disqualify him from working as a security guard-- illegally using, carrying or possessing a pistol or other dangerous weapon; endangering another person; and buying or receiving stolen property. 22 P.S.A.§ § 23(a). It is irrelevant that he committed those crimes more than 10 years ago. The timing that is relevant is Alpha's hiring of Hanton in 1996, when Hanton had charges of dishonesty pending against him, and Alpha's rehiring of Hanton in 2010, upon his release from prison for his third disqualifying conviction.

5.     Denied. Hanton's criminal history demonstrates Alpha's utter disregard for not only its professed hiring policies but also Pennsylvania law. Hanton, a three time convicted felon, was on duty at the Roosevelt Inn during the relevant time period, and unbeknownst to the Roosevelt Inn and its manager, Mr. Patel, Alpha, through its agent Hanton, breached the Security Contract on an ongoing basis through the intentional acts, omissions and misconduct of Hanton

7

Case ID: 170300712
Control No.: 21060284

and another former Alpha employee, Keith Fenwick. Hanton testified that although he was supposed to report any and all an unusual activity or incidents, he consistently and purposefully failed to do so, despite observing what he believed to be prostitution occurring at the Roosevelt Inn. Instead of notifying the Roosevelt Inn staff, Alpha supervisors and/or the police of criminal activity at the Roosevelt Inn, Hanton did nothing. *See* Exhibit B, Hanton deposition, at 57:7-10, 64:11-18; 108:13-15; 109: line 18-110, line 12; 115, line 24-116, line 8. Hanton blatantly ignored the unusual activity he observed: "So basically, I was there to get paid. I was there to receive a check from Alpha . . . I was just showing up to work every day." *Id*. at 64:11-18. When he allegedly encountered a naked woman in the hallway at Roosevelt, who refused his instruction to get into a room, he "did nothing." *Id*. at 108:3-8. Hanton claimed he told his Alpha shift supervisor about this encounter but the Alpha shift supervisor, though he knew Hanton was not kidding, "laughed it off" and also did nothing. *Id*. at 109:18-110:12. Hanton admitted that even if a woman had directly told him she was engaging in illegal prostitution at the Roosevelt Inn, he would not have called police or told the Roosevelt staff. *Id*. at 117:20-23. Hanton testified he would not have reported to anyone if he thought human sex trafficking was occurring at Roosevelt Inn. *Id*. at 144:1-6. In the time Hanton was assigned to Roosevelt Inn, he did not fill out a single incident report, despite a post order requiring him to document unusual activity in an incident report. *Id*. at 48:15-18. Hanton testified he never saw the post orders - described by Alpha as containing the specific obligations of the guard on duty -- and while he was familiar with the first several rules in the post orders, he was not familiar with others and did not follow them. *See* Exhibit B, Hanton deposition, at 79:23-80:12; 120:24-121:17.

150213.00601/126113664v.1

Case ID: 170300712
Control No.: 21060284

6.      Denied.  Plaintiff testified that she had a brief encounter with a man in a security guard uniform.  *See* Alpha's Motion in Limine, at ¶ 10.  The guard whom Plaintiff alleges to have encountered could have been Hanton.

7.      Denied.  Hanton identified a photograph of one of Plaintiff's traffickers in his deposition as someone he had seen at the Roosevelt Inn.

8.      Denied.  Plaintiff testified that she had a brief encounter with a man in a security guard uniform.  *See* Alpha's Motion in Limine, at ¶ 10.  The guard whom Plaintiff alleges to have encountered could have been Hanton.

9.      Admitted.

10.      Admitted as to what Plaintiff testified to in her deposition.

11.      Admitted as to what Plaintiff testified to in her deposition.

12.      Admitted as to what Plaintiff testified to in her deposition.

13.      Admitted as to what Plaintiff testified to in her deposition.

14.      Admitted as to what Plaintiff testified to in her deposition.

15.      Denied.  Plaintiff testified that she encountered a security guard.  *See* Alpha's Motion in Limine, at ¶ 10.

16.      Denied.  The guard whom Plaintiff alleges to have encountered could have been Hanton.

17.      Denied.  Hanton's criminal record is directly relevant and highly probative evidence of Alpha's breach of contract, the intentional conduct of its employees, negligent hiring and negligence *per se*.

9

Case ID: 170300712
Control No.: 21060284

18.     Denied.  Hanton's criminal record is directly relevant and highly probative evidence of Alpha's breach of contract, the intentional conduct of its employees, negligent hiring and negligence *per se*.

19.     Denied.  This paragraph is a conclusion of law to which no response is required.

20.     Denied.  This paragraph is a conclusion of law to which no response is required.

21.     Denied.  This paragraph is a conclusion of law to which no response is required.

22.     Denied.  This paragraph is a conclusion of law to which no response is required. By way of further response, the Roosevelt Defendants deny that Hanton's criminal background is not relevant.

23.     Denied.  This paragraph is a conclusion of law to which no response is required. By way of further response, to the contrary, Hanton's criminal background is directly relevant and highly probative evidence of  Alpha's breach of contract, the intentional conduct of its employees, negligent hiring and negligence *per se*.  Employers in Pennsylvania have a duty to "exercise reasonable care in selecting supervising and controlling employees."  *See R.A. ex rel. N.A. v. First Church of Christ*, 748 A.2d 692, 697 (Pa. Super. 2000).  Alpha's utter disregard for the law in hiring and rehiring Kelvin Hanton despite his pending criminal cases and felony convictions establishes its *per se* negligence as its conduct clearly violates requirements of the Private Detective Act; *see also Mahan v. Am-Gard, Inc.*, 841 A.2d 1052, 1057 n.11 (Pa. Super. 2003).

24.     Denied.  This paragraph is a conclusion of law to which no response is required. By way of further response, to the contrary, Hanton's criminal background is directly relevant and highly probative evidence of  Alpha's breach of contract, the intentional conduct of its employees, negligent hiring and negligence *per se*.  Unbeknownst to the Roosevelt Defendants,

10

Case ID: 170300712
Control No.: 21060284

Hanton, whom Alpha should never have hired as a security officer, blatantly ignored suspicious activity at the Roosevelt Inn.  See, *supra*, at ¶¶ 5-6.

25.      Denied.  This paragraph is a conclusion of law to which no response is required. By way of further response, to the contrary, Hanton's criminal background is directly relevant and highly probative evidence of Alpha's breach of contract, the intentional conduct of its employees, negligent hiring and negligence *per se*.  Unbeknownst to the Roosevelt Defendants, Hanton, whom Alpha should never have hired as a security officer, blatantly ignored suspicious activity at the Roosevelt Inn.  *See, supra*, at ¶¶ 5-6.

26.      Denied.  This paragraph is a conclusion of law to which no response is required. By way of further response, to the contrary, Hanton's criminal background is directly relevant and highly probative evidence of  Alpha's breach of contract, the intentional conduct of its employees, negligent hiring and negligence *per se*.  Unbeknownst to the Roosevelt Defendants, Hanton, whom Alpha should never have hired as a security officer, blatantly ignored suspicious activity at the Roosevelt Inn.  *See, supra*, at ¶¶ 5-6.

27.      Denied.  This paragraph is a conclusion of law to which no response is required. By way of further response, to the contrary, Hanton's criminal background is directly relevant and highly probative evidence of  Alpha's breach of contract, the intentional conduct of its employees, negligent hiring and negligence *per se*.  Unbeknownst to the Roosevelt Defendants, Hanton, whom Alpha should never have hired as a security officer, blatantly ignored suspicious activity at the Roosevelt Inn.  *See, supra*, at ¶¶ 5-6.

28.      Denied.  The Roosevelt Defendants intend to introduce Hanton's criminal history as probative evidence of Alpha's breach of contract, the intentional conduct of its employees, negligent hiring and negligence *per se*.

150213.00601/126113664v.1

Case ID: 170300712
Control No.: 21060284

29.     Denied.  As detailed above, Hanton's criminal background is directly relevant to the Roosevelt Defendants' crossclaims.

30.     Denied.  This paragraph is a conclusion of law to which no response is required. By way of further response, to the contrary, Hanton's criminal background is directly relevant and highly probative evidence of Alpha's breach of contract, the intentional conduct of its employees, negligent hiring and negligence *per se*.

31.     Denied.  This paragraph is a conclusion of law to which no response is required. By way of further response, to the contrary, Hanton's criminal background is directly relevant and highly probative evidence of Alpha's breach of contract, the intentional conduct of its employees, negligent hiring and negligence *per se*.

32.     Denied.  This paragraph is a conclusion of law to which no response is required. By way of further response, to the contrary, Hanton's criminal background is directly relevant and highly probative evidence of Alpha's breach of contract, the intentional conduct of its employees, negligent hiring and negligence *per se*.  There is no unfair prejudice in introducing Hanton's criminal record to demonstrate Alpha's breach of contract, intentional conduct, negligent hiring and negligence *per se*.

33.     Denied.  This paragraph is a conclusion of law to which no response is required. By way of further response, to the contrary, Hanton's criminal background is directly relevant and highly probative evidence of Alpha's breach of contract, the intentional conduct of its employees, negligent hiring and negligence *per se*.  Hanton's felony records are not inconsequential to the Roosevelt Defendants' claims against Alpha.

34.     Denied.  This paragraph is a conclusion of law to which no response is required. By way of further response, to the contrary, Hanton's criminal background is directly relevant

150213.00601/126113664v.1

Case ID: 170300712
Control No.: 21060284

and highly probative evidence of Alpha's breach of contract, the intentional conduct of its employees, negligent hiring and negligence *per se.*

35.     Denied. This paragraph is a conclusion of law to which no response is required. By way of further response, to the contrary, Hanton's criminal background is directly relevant and highly probative evidence of Alpha's breach of contract, the intentional conduct of its employees, negligent hiring and negligence *per se.* Hanton's criminal history, and its significance to the Roosevelt Defendants' claims against Alpha, are not collateral issues and are not confusing. To the contrary, the relevance of Hanton's criminal history is a straightforward analysis.

36.     Denied. This paragraph is a conclusion of law to which no response is required. By way of further response, to the contrary, Hanton's criminal background is directly relevant and highly probative evidence of Alpha's breach of contract, the intentional conduct of its employees, negligent hiring and negligence *per se.*

37.     Denied. This paragraph is a conclusion of law to which no response is required. By way of further response, to the contrary, Hanton's criminal background, while prejudicial, is directly relevant and highly probative evidence of Alpha's breach of contract, the intentional conduct of its employees, negligent hiring and negligence *per se.*

38.     Denied. Hanton's criminal background is directly relevant and highly probative evidence of Alpha's breach of its contract with the Roosevelt Inn, LLC, the intentional conduct of its employees, negligent hiring and negligence *per se.*

39.     Denied. This paragraph is a conclusion of law to which no response is required. By way of further response, to the contrary, Hanton's criminal background, while prejudicial, is

150213.00601/126113664v.1

Case ID: 170300712
Control No.: 21060284

directly relevant and highly probative evidence of Alpha's breach of contract, the intentional conduct of its employees, negligent hiring and negligence *per se.*

40.     Denied. This paragraph is a conclusion of law to which no response is required. By way of further response, there is no improper basis in introducing Hanton's criminal background. Hanton's criminal background, while prejudicial, is directly relevant and highly probative evidence of Alpha's breach of contract, the intentional conduct of its employees, negligent hiring and negligence *per se.*

41.     Denied. This paragraph is a conclusion of law to which no response is required. By way of further response, to the contrary, Hanton's criminal background, while prejudicial, is directly relevant and highly probative evidence of Alpha's breach of contract, the intentional conduct of its employees, negligent hiring and negligence *per se.*

42.     Denied. This paragraph is a conclusion of law to which no response is required. By way of further response, to the contrary, Hanton's criminal background, while prejudicial, is directly relevant and highly probative evidence of Alpha's breach of contract, the intentional conduct of its employees, negligent hiring and negligence *per se.*

43.     Denied. This paragraph is a conclusion of law to which no response is required. By way of further response, to the contrary, Hanton's criminal background, while prejudicial, is directly relevant and highly probative evidence of Alpha's breach of contract, the intentional conduct of its employees, negligent hiring and negligence *per se.* Moreover, Hanton's criminal record is evidence will be introduced as evidence related to Alpha's undeniable conduct, which is at issue in this litigation.

44.     Denied. This paragraph is a conclusion of law to which no response is required. By way of further response, to the contrary, Hanton's criminal background, while prejudicial, is

14

Case ID: 170300712
Control No.: 21060284

directly relevant and highly probative evidence of Alpha's breach of contract, the intentional conduct of its employees, negligent hiring and negligence *per se*. Moreover, Hanton's criminal record is evidence will be introduced as evidence related to Alpha's undeniable conduct, which is at issue in this litigation.

45. Denied. The Roosevelt Defendants have no knowledge as to Plaintiff's intentions with regard to evidence. By way of further response, Hanton's criminal history is directly relevant and highly probative evidence of Alpha's breach of contract, the intentional conduct of its employees, negligent hiring and negligence *per se*.

46. Denied. Hanton's criminal history is proper, directly relevant and highly probative evidence of Alpha's breach of contract, the intentional conduct of its employees, negligent hiring and negligence *per se*.

47. Denied. Hanton's criminal history is proper, directly relevant and highly probative evidence of Alpha's breach of contract, the intentional conduct of its employees, negligent hiring and negligence *per se*.

48. Denied. Hanton's criminal history is proper, directly relevant and highly probative evidence of Alpha's breach of contract, the intentional conduct of its employees, negligent hiring and negligence *per se*.

49. Denied. The Roosevelt Defendants have no knowledge as to the truth of the averment in this paragraph.

50. Denied. Hanton's criminal history is directly relevant and highly probative evidence of Alpha's breach of contract, the intentional conduct of its employees, negligent hiring and negligence *per se*. It is proper and admissible evidence.

150213.00601/126113664v.1

Case ID: 170300712
Control No.: 21060284

51.     Denied.  This paragraph is a conclusion of law to which no response is required.
By way of further response, Hanton's criminal history is not merely probative for impeachment
purposes.  His criminal background is directly relevant and highly probative evidence of Alpha's
breach of contract, the intentional conduct of its employees, negligent hiring and negligence *per
se*.  Moreover, the Roosevelt Defendants deny that the evidence is inadmissible for
impeachment purposes.

52.     Denied.  This paragraph is a conclusion of law to which no response is required.
By way of further response, Hanton's criminal history is not merely probative for impeachment
purposes.  His criminal background is directly relevant and highly probative evidence of Alpha's
breach of contract, the intentional conduct of its employees, negligent hiring and negligence *per
se*.

53.     Denied.  This paragraph is a conclusion of law to which no response is required.
By way of further response, Hanton's criminal history is not merely probative for impeachment
purposes.  His criminal background is directly relevant and highly probative evidence of Alpha's
breach of contract, the intentional conduct of its employees, negligent hiring and negligence *per
se*.

54.     Denied.  This paragraph is a conclusion of law to which no response is required.
By way of further response, Hanton's criminal history is not merely probative for impeachment
purposes.  His criminal background is directly relevant and highly probative evidence of Alpha's
breach of contract, the intentional conduct of its employees, negligent hiring and negligence *per
se*.

55.     Denied.  This paragraph is a conclusion of law to which no response is required.
By way of further response, Hanton's criminal history is not merely probative for impeachment

150213.00601/126113664v.1

Case ID: 170300712
Control No.: 21060284

purposes. His criminal background is directly relevant and highly probative evidence of Alpha's breach of contract, the intentional conduct of its employees, negligent hiring and negligence *per se*.

56.     Denied. This paragraph is a conclusion of law to which no response is required. By way of further response, Hanton's criminal history is not merely probative for impeachment purposes. His criminal background is directly relevant and highly probative evidence of Alpha's breach of contract, the intentional conduct of its employees, negligent hiring and negligence *per se*. Not only did Alpha fail to obtain complete information about Hanton's past, as required by the Act, Alpha knowingly hired Hanton notwithstanding his record of convictions, his admission that he had a criminal case pending against him and that he apparently applied for a security guard officer position from state prison while finishing a sentence for a preclusive felony conviction.

57.     Denied. This paragraph is a conclusion of law to which no response is required. By way of further response, Hanton's criminal history is not merely probative for impeachment purposes. His criminal background is directly relevant and highly probative evidence of Alpha's breach of contract, the intentional conduct of its employees, negligent hiring and negligence *per se*.

**WHEREFORE,** Defendants Roosevelt Inn, LLC d/b/a Roosevelt Inn and Roosevelt Inn Café, Roosevelt Motor Inn, Inc. d/b/a Roosevelt Motor Inn, UFVS Management Company and Yagna Patel oppose Defendant Alpha-Centurion Security, Inc.'s Motion in Limine as to

150213.00601/126113664v.1

Case ID: 170300712
Control No.: 21060284

Hanton's Criminal History and respectfully request that this Honorable Court enter an Order in the form attached hereto.

<div style="margin-left:40%">

Respectfully submitted,

**BLANK ROME LLP**

</div>

Dated: June 11, 2021

<div style="margin-left:40%">

*/s/ Charles S. Marion*
Charles S. Marion (PA ID# 56509)
Kevin M. Eddy, PA I.D. No. 92904
Justina L. Byers (PA ID# 76773)
One Logan Square
130 N. 18th Street
Philadelphia, PA 19103
Tel.: (215) 569-5500
Fax: (215) 569-5555
Email: cmarion@blankrome.com
        keddy@blankrome.com
        byers@blankrome.com

*Attorneys for Defendants,*
*Roosevelt Inn LLC d/b/a Roosevelt Inn and*
*Roosevelt Inn Café, Roosevelt Motor Inn, Inc.*
*d/b/a Roosevelt Motor Inn,*
*UFVS Management Company, LLC and*
*Yagna Patel*

</div>

18

Case ID: 170300712
Control No.: 21060284

**BLANK ROME LLP**
Charles S. Marion, PA I.D. No. 56509
Kevin M. Eddy, PA I.D. No. 92904
Justina L. Byers, PA ID No. 76773
One Logan Square
130 North 18th Street
Philadelphia, PA 19103-6998
Tel.: (215) 569-5500
Fax: (215) 569-5555
Email: cmarion@blankrome.com
  keddy@blankrome.com
  byers@blankrome.com

*Attorneys for Defendants,*
*Roosevelt Inn LLC d/b/a Roosevelt Inn and*
*Roosevelt Inn Café, Roosevelt Motor Inn, Inc.*
*d/b/a Roosevelt Motor Inn,*
*UFVS Management Company, LLC and*
*Yagna Patel*

| | | |
|---|---|---|
| M.B., minor by her Guardian, William A. Calandra, Esquire, | : : : | COURT OF COMMON PLEAS PHILADELPHIA COUNTY CIVIL TRIAL DIVISION |
| Plaintiff, | : : | MARCH TERM, 2017 NO.: 00712 |
| v. | : : | |
| ROOSEVELT INN LLC d/b/a ROOSEVELT INN and ROOSEVELT INN CAFÉ, et al., ROOSEVELT MOTOR INN, INC. d/b/a ROOSEVELT MOTOR INN, UFVS MANAGEMENT COMPANY, LLC, YAGNA PATEL and ALPHA-CENTURION SECURITY, INC. d/b/a ALPHA CENTURION SECURITY INC. | : : : : : : : : : | JURY TRIAL DEMANDED |
| Defendants, | : : | |
| v. | : : | |
| DAIQUAN DAVIS and ABDUL LOPEZ | : : | |
| Additional Defendants. | : | |

**MEMORANDUM OF LAW IN SUPPORT OF DEFENDANTS
ROOSEVELT INN, LLC, ROOSEVELT MOTOR INN, INC.,
UFVS MANAGEMENT COMPANY AND YAGNA PATEL'S RESPONSE IN
OPPOSITION TO ALPHA-CENTURION SECURITY, INC.'S MOTION IN
LIMINE AS TO KELVIN HANTON'S CRIMINAL RECORD**

Case ID: 170300712
Control No.: 21060284

## I.     MATTER BEFORE THE COURT

Defendants Roosevelt Inn, LLC d/b/a Roosevelt Inn and Roosevelt Inn Café, Roosevelt Motor Inn, Inc. d/b/a Roosevelt Motor Inn, UFVS Management Company and Yagna Patel (collectively, the "Roosevelt Defendants"), by and through their attorneys, Blank Rome LLP, hereby submit the following Memorandum of Law in Support of their Response in Opposition to Alpha-Centurion Security, Inc.'s Motion in Limine as to Kelvin Hanton's Criminal Record, filed on June 2, 2021 at Control no. 21060284.

## II.     QUESTION PRESENTED

Whether the criminal history of Alpha-Centurion Security, Inc. ("Alpha") employee Kelvin Hanton is properly admitted evidence of Alpha's breach of contract, intentional conduct, negligent hiring and negligence per se.

Suggested Answer:  Yes

Alpha, as an organization providing security guard services, is subject to the requirements of the Private Investigator Act of 1953 ("the Act"), which, among other provisions, prohibits a security guard firm from hiring or employing a person who has been convicted of a felony for certain enumerated crimes.  Alpha produced evidence that establishes Alpha's violation of the Act, and thereby, its *per se* negligence, in the hiring of Kelvin Hanton, who had been convicted of three of the enumerated disqualifying crimes.  Alpha's failure to adequately investigate Hanton's background, and its hiring of Hanton despite his disclosure of a criminal past, among other evidence, also demonstrates Alpha's negligence in the hiring of Hanton.  Previously adduced deposition testimony of Alpha's guards assigned to the Roosevelt Inn and their superior add to the evidence of Alpha's negligence in training and supervising its security guards.

150213.00601/126113664v.1

Case ID: 170300712
Control No.: 21060284

## III.     FACTUAL BACKGROUND

Plaintiff commenced this civil action on March 10, 2017, alleging that she was the victim of human trafficking and asserting negligence claims against defendants. Plaintiff filed four subsequent Amended Complaints, the last as recently as November 2019. Alpha, a company that provided security services, was hired by defendant Roosevelt Inn LLC to provide security services at the Roosevelt Inn. The Roosevelt Inn and Alpha entered into a contract that required Alpha to "assist in the safeguard" of the hotel and persons located in the hotel. Exhibit A, Security Contract, at ¶ 1. The Security Contract also requires Alpha to indemnify the Roosevelt Defendants for "any loss, theft, or damage to property or injury to persons caused solely or in part as a result of intentional or deliberate acts, conduct, omissions and or criminal activities of [Alpha-Centurion Security] Service's security officers when committed in the performance of their duties." *Id*. at ¶ 8.

Based on the Security Contract and common law, the Roosevelt Defendants filed crossclaims against Alpha in their December 13, 2019 Answer with New Matter to Plaintiff's Fourth Amended Complaint.

Alpha produced the employment application competed by Alpha security officer Kelvin Hanton, dated July 15, 2010, in a separate litigation. Exhibit C. Documents produced by the Roosevelt Defendants indicate that Hanton, who was deposed in the instant case, was assigned by Alpha to provide security at the Roosevelt Inn during the first half of 2014, which overlaps the relevant time period of Plaintiff's claims in her Fourth Amended Complaint. Alpha did not produce Hanton's July 15, 2010 application in this case.

Hanton's application was completed on a form that required the applicant to reveal if he had "ever been convicted of a crime," if he had "even been incarcerated in a prison," if he was

150213.00601/126113664v.1

Case ID: 170300712
Control No.: 21060284

"presently on probation or parole," and if at the time of the application, he had "any civil/criminal cases pending in court."  *See* Exhibit C:



Hanton disclosed that he had been incarcerated and that he had a civil or criminal case pending at the time of the application.  Hanton also indicated on the application that he had been

150213.00601/126113664v.1

Case ID: 170300712
Control No.: 21060284

previously employed by Alpha. Additionally, Hanton apparently applied to be rehired by Alpha in 2009 from prison. As indicated in a document Alpha produced entitled "New Hired," which was purportedly faxed on July 10, 2009, Hanton's contact information lists his address as 8101 State Road, Philadelphia PA, 19136:



Exhibit G. The address Hanton listed on his application is that of the Philadelphia Alternative and Special Detention Center. See https://prisonpath.com/county/pennsylvania/philadelphia-alternative-and-special-detention-center/.

Alpha's director of operations during 2010, Patrick Panetta, testified that all applicants for security officer positions were screened through a criminal background search that Alpha conducted electronically inhouse. *See* Exhibit H, Panetta deposition at 71:9-24; 72:6-73:21. Panetta maintained that Alpha would not hire an applicant who a conviction in the prior ten years, had been incarcerated or was on probation. *Id.* at 74:3-21. Panetta testified, "if anybody has pending cases, they're on probation, I don't hire them. If they did one year in jail, I don't

5

Case ID: 170300712
Control No.: 21060284

hire them . . . Anything convicted we can't hire them." *Id.* at 73, line 18-22; 74, line 20-21. Alpha's policies were clearly ignored in the case of Kelvin Hanton, who disclosed on his application having been incarcerated and a pending case. Alpha either failed to perform a background check on Hanton or it performed a search and ignored the results – three convictions, incarceration and ongoing probation.

## IV.    ARGUMENT

In either scenario described above -- Alpha either failed to perform a background check on Hanton or it performed a search and ignored the results -- Alpha violated Act, which regulates security guard companies as well as private detective agencies. *See* 22 P.S. § 12(a)(11); *Mahan v. Am-Gard, Inc.*, 841 A.2d 1052, 1057 n.11 (Pa. Super. 2003). Pursuant to the Act, security guard companies are required first to obtain statements from employees stating they have not been "convicted of a felony, or of any offense involving moral turpitude, or of any of the misdemeanors or offenses described in subsection (a) of this section" of the Act. *See* 22 P.S. § 23. The disqualifying crimes referenced in described in subsection (a) are:

-illegally using, carrying or possessing a pistol or other dangerous weapon;
-making or possessing burglar's instruments;
-buying or receiving stolen property;
-unlawful entry of a building;
-aiding escape from prison
-unlawfully possessing or distributing habit forming narcotic drugs;
-picking pockets or attempting to do so;
-soliciting any person to commit sodomy or other lewdness;
-any person whose private detective or investigator's license was revoked or application for such license was denied by the court of common pleas or by the authorities of any other state or territory because of conviction of any of the crimes or offenses specified in this section;
-recklessly endangering another person;
-terroristic threats; or
-committing simple assault.

6

Case ID: 170300712
Control No.: 21060284

*See* 22 P.S.A. § § 23(a). Hanton was convicted of three of the listed crimes— illegally using, carrying or possessing a pistol or other dangerous weapon; endangering another person; and buying or receiving stolen property. Exhibits D, E, F. Pursuant to the Act, and Alpha's policies as per Panetta, Alpha was required to verify the information provided by Hanton in his application, and perform a criminal background check. *See* 22 P.S.A. § 23(c)-(f).

When Hanton provided the application indicating he had been incarcerated and had a pending case, *listing a prison as his home address*, Alpha was on notice of Hanton's criminal background. Exhibits C, G. Not only did Alpha fail to obtain complete information about Hanton's past, Alpha hired Hanton notwithstanding his record of convictions, his admission that he had a criminal case pending against him and the fact that he applied for the security guard position while still in prison. Alpha's conduct clearly violates the Act and is, thereby, *per se* negligence.

Hanton's application and his testimony also reveal that he was an Alpha employee before his 2008 incarceration. Hanton testified he started with Alpha in 1996 and had been employed full time for 18-20 years. His incarceration starting in October 2008 would fall in the middle of his 20-year tenure if his 1996 start date is accurate. Moreover, his three separate convictions in 1999 (relating to two separate 1995 arrests), 2005 and 2008 occurred during the time he was working for Alpha. Exhibits D, E, F. At a minimum, the three convictions should have precluded his rehiring in 2010. Rather than rejecting Hanton as a convicted felon, Alpha has instead promoted him through the ranks at Alpha, from corporal, sergeant, lieutenant, captain to deputy inspector, his current rank; Hanton now holds a supervisory position. Exhibit B, Hanton deposition, at 8:14-18; 9:1-12.

150213.00601/126113664v.1

Case ID: 170300712
Control No.: 21060284

Alpha violated the Act several ways—in failing to obtain full information from Hanton, in failing to investigate his criminal background and in hiring (and perhaps rehiring) him despite his convictions for disqualifying crimes. Alpha's violations of the Act constitute its *per se* negligence, "conduct, whether of action or omission, which may be declared and treated as negligence without any argument or proof as to the particular surrounding circumstances." *Wagner v. Anzon, Inc.*, 684 A.2d 570, 574 (Pa. Super. 1996). Pennsylvania recognizes that a violation of a statute or ordinance may serve as the basis for negligence *per se*. *Id.*

Hanton's criminal history also evidences the Roosevelt Defendants' claim for negligent hiring, training and supervision. The testimony of Alpha guards Hanton and Keith Fenwick illustrate their absolute dereliction of duty and complete lack of supervision from superiors at Alpha. Hanton testified that although he was supposed to report any and all an unusual activity or incidents, he consistently and deliberately failed to do so despite observing conduct that he believed to be prostitution occurring at the Roosevelt Inn. Instead of notifying the Roosevelt Inn staff, Alpha supervisors and/or the police of what he believed to be criminal activity, Hanton admitted he did nothing. Exhibit B, Hanton deposition, at 64:11-18; 57:7-10; 108:13-15; 109:18-110:12; 115:24-116:8. Hanton acknowledged that he disregarded his duties and blatantly ignored the unusual activity he observed: "So basically, I was there to get paid. I was there to receive a check from Alpha . . . I was just showing up to work every day." *Id.* at 64:11-18. In his deposition, Hanton relayed repeated incidents in which he encountered naked women in the hallways at Roosevelt, who refused his instruction to get into a room, yet he admittedly "did nothing." *Id.* at 108:3-8. Hanton claimed he told his shift supervisor about such an encounter but the Alpha shift supervisor "laughed it off" and also did nothing. *Id.* at 109:18-110:12. Hanton went so far as to admit that even if a woman at the hotel had directly told him she was

150213.00601/126113664v.1

Case ID: 170300712
Control No.: 21060284

engaging in illegal prostitution, he would not have called police or told the Roosevelt staff. *Id.* at 117:20-23. Disturbingly, Hanton testified he would not have reported to anyone if he thought human sex trafficking was occurring at Roosevelt Inn. *Id.* at 144:1-6.

Hanton testified that he did not complete or turn in a single incident report during the period he was assigned to the Roosevelt Inn, notwithstanding a post order, a set of instructions specific to the location, to do so. Exhibit B, Hanton deposition transcript, at 48:15-21; Exhibit H, Panetta deposition transcript, at 109:15-22.

The evidence described above, along with Hanton's criminal history, is directly relevant to the Roosevelt Defendants' claims against Alpha. Pennsylvania Rule of Evidence sets forth the standard for relevant evidence: "relevant evidence means evidence having any tendency to make the existence of any fact that is of consequence to the determination of the action more probable or less probable than it would be without the evidence." *See* Pa. R. E. 401. The evidence is probative of the Roosevelt Defendants' crossclaims against Alpha in this matter. In deciding an evidentiary issue, courts balance the probative value of the evidence with the prejudicial impact the evidence could have on the party against whom it is offered. *See* Pa. R. E. 403.

Kelvin Hanton should never have been hired by Alpha. Hanton's criminal history is direct evidence of Alpha's misdeeds. It is relevant, probative, not unfairly prejudicial and properly admissible.

150213.00601/126113664v.1

Case ID: 170300712
Control No.: 21060284

## V. CONCLUSION

For all the foregoing reasons, Alpha-Centurion Security, Inc.'s Motion in Limine seeking to preclude the criminal record of Kelvin Hanton should be denied.

Respectfully submitted,

**BLANK ROME LLP**

Dated: June 11, 2021

*/s/ Charles S. Marion*
Charles S. Marion (PA ID# 56509)
Kevin M. Eddy, PA I.D. No. 92904
Justina L. Byers (PA ID# 76773)
One Logan Square
130 N. 18th Street
Philadelphia, PA 19103
Tel.: (215) 569-5500
Fax: (215) 569-5555
Email: cmarion@blankrome.com
         keddy@blankrome.com
         byers@blankrome.com

*Attorneys for Defendants,*
*Roosevelt Inn LLC d/b/a Roosevelt Inn and*
*Roosevelt Inn Café, Roosevelt Motor Inn, Inc.*
*d/b/a Roosevelt Motor Inn,*
*UFVS Management Company, LLC and*
*Yagna Patel*

150213.00601/126113664v.1

Case ID: 170300712
Control No.: 21060284

# CERTIFICATE OF SERVICE

I, Justina L. Byers, Esquire, hereby state that on this 11th day of June 2021, true and correct copies of the foregoing Roosevelt Defendants' Joinder and Response in Support of Alpha-Centurion Security, Inc.'s Motion in Limine to Preclude Records Produced by the FBI and Testimony Regarding Their Contents at Trial were served via email and U.S. mail, postage pre-paid, upon the following:

Thomas R. Kline, Esquire
Nadeem A. Bezar, Esquire
Emily B. Marks, Esquire
Kyle Nocho, Esquire
Kline & Specter, P.C.
1525 Locust Street
Philadelphia, PA 19102

*Attorneys for Plaintiff,*
*M.B., minor by her Guardian, William A. Calandra, Esquire*

Thomas P. Wagner, Esquire
Robert W. Stanko, Esquire
Melanie J. Foreman, Esquire
Marshall Dennehey Warner
Coleman & Goggin
2000 Market Street, Suite 2300
Philadelphia, PA 19103
*Attorneys for Defendant,*
*Alpha-Centurion Security, Inc.*

Daiquan Davis
Register Number 72304-066
USP Terre Haute
U.S. Penitentiary
P.O. Box 33
Terre Haute, IN 47808

*Additional Defendant*

Case ID: 170300712
Control No.: 21060284

Abdul Lopez
Register Number 69643-066
FCI Tucson
Federal Correctional Institution
P.O. Box 24550
Tucson, AZ 85734

*Additional Defendant*

/s/ Justina L. Byers
JUSTINA L. BYERS

150213.00601/126113664v.1

Case ID: 170300712
Control No.: 21060284